EXHIBIT C

Page 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION


DARUS HUNTER, et al.   : NO. 17-0889
                       :
        Plaintiffs,    :
                       :
    - vs -             :
                       :
CITY OF PHILADELPHIA,  :
et al.,                :
                       :
        Defendants.    :
- - - - - - - - - - -

                - - -

        Friday, September 14, 2018

                - - -


        TRANSCRIPT OF DEPOSITION OF DARUS
HUNTER, taken by and before ALEXANDRA ALVARADO,
Professional Reporter and Notary Public, at CITY OF
PHILADELPHIA LAW DEPARTMENT, 1515 Arch Street, 14th
Floor, Philadelphia, Pennsylvania, commencing
at 12:47 p.m.


        STREHLOW & ASSOCIATES, INC.
    FULL SERVICE COURT REPORTING AGENCY
        54 FRIENDS LANE, SUITE 116
        NEWTOWN, PENNSYLVANIA 18940
            (215) 504-4622
        SERVING NJ, PA, NY & DE

Darus Hunter
September 14, 2018

---

Page 2

APPEARANCES:

MORGAN LEWIS
BY:  ALEXANDRA M. LASTOWSKI, ESQUIRE
     MICHAELA DRAGALIN YOUNG, ESQUIRE
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-5608
Alexandra.lastowski@morganlewis.com
Counsel for Plaintiffs

DECHERT, LLP
BY:  JOHN P. MCCLAM, ESQUIRE
2929 Arch Street
14th Floor
Philadelphia, Pennsylvania 19104
(215) 994-2046
Counsel for Kenya Shujaa

CITY OF PHILADELPHIA LAW DEPARTMENT
BY:  TARA FUNG, ESQUIRE
1515 Arch Street
14th Floor
Philadelphia, Pennsylvania 19102
(215) 683-5389
Counsel for Defendants

---

Page 3

I N D E X
- - -
WITNESS
DARUS HUNTER
EXAMINATION                        PAGE

By:  Ms. Fung                    4, 112
By:  Ms. Young                   105
By:  Mr. McClam                  112

E X H I B I T S
PAGE

NUMBER      DESCRIPTION            MARKED
Hunter-1    Drawing               54

---

Page 4

- - -
(TRANSCRIPT MARKED CONFIDENTIAL)
- - -
      (By agreement of counsel, the
reading, signing, sealing, filing, and
certification of the transcript have been
waived; and all objections, except as
to the form of the question, have been
reserved until the time of trial.)

        DARUS HUNTER, after having
been duly sworn, was examined and testified
as follows:
                - - -
        DIRECT EXAMINATION
                - - -
BY MS. FUNG:
Q.    Good afternoon, Mr. Hunter.
A.    My name is Darius Leon Hunter.  I'm sorry.
You said good afternoon.  I thought you said could
you have your name.
        Good afternoon.  How are you doing?
Q.    I'm doing well.  How are you?
A.    Fine.

---

Page 5

Q.    Can you please state your full name for the
record?
A.    Yes.  It's Darus Leon Hunter.
Q.    Is that your birth name?
A.    Yes.
Q.    And is that the name on your state issued
ID?
A.    Yes, it is.
Q.    Do you have your state issued ID on you
today?
A.    Yes.
Q.    Can I take a look at it, please?
A.    (Witness complies.)
Q.    Thank you.  Do you have aliases or go by
any other names or nicknames?
A.    No.
Q.    What about Darrell Huntly?
A.    No, I don't go by Darrell Huntly or any
other aliases.
Q.    What about Raheem Jackson?
A.    No, I don't go by Raheem Jackson or any
other aliases.
Q.    So, Mr. Hunter, do you remember meeting
with your attorneys and responding to

---

2 (Pages 2 to 5)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 6

```
 1   Interrogatories?
 2   A.    Yes.
 3   Q.    And one of the questions that I submitted
 4   to your attorneys was what your aliases were or any
 5   names you've gone by?
 6            MS. LASTOWSKI:  What's the
 7        question?
 8            MS. FUNG:  I'm saying correct.
 9   BY MS. FUNG:
10   Q.    That was one of my questions, correct?
11   A.    I believe it was.
12   Q.    And did you respond that you've been known
13   as Darrell Huntly or Raheem Jackson?
14   A.    I think that I did respond, yes.
15   Q.    Okay.  And where did those names come from?
16   A.    I believe that in a prior criminal record
17   those were aliases that were utilized at one time.
18   Q.    Okay.  And can you explain to me when they
19   were used, why they were used?
20   A.    The name Darrell Huntly was used as an
21   effort to evade prosecution as Darus Hunter in --
22   sometime in 1992.  And that was based on my being
23   arrested by someone who knew me and my attempting to
24   obscure my identity.
```

Page 7

```
 1   Q.    Okay.  So that was just a name that you
 2   made up?
 3   A.    Yes.
 4   Q.    Okay.  And that what about Raheem Jackson?
 5   A.    Raheem Jackson was made up by a police
 6   officer who arrested me.
 7   Q.    When was this?
 8   A.    And I believe this was -- I don't know.  It
 9   was sometime following the initial arrest.
10   Q.    Okay.  And when you said the effort to
11   evade prosecution for the name Darrell Huntly, when
12   was that?
13   A.    That was sometime in 1992.
14   Q.    And, Mr. Hunter, you understand that you're
15   under oath today; is that correct?
16   A.    Yes.
17   Q.    And the court reporter to your right is
18   transcribing everything that you're saying and
19   everything that I'm saying.  So for that reason, I
20   would ask that if I'm asking you a question, please
21   wait before answering it.  And while you're
22   answering questions, I will wait to ask you another.
23   Okay?
24   A.    Okay.
```

Page 8

```
 1   Q.    And so for that reason there are no head
 2   nods and no huh-huhs.  You have to verbalize each
 3   response.  Do you understand?
 4   A.    Yes.
 5   Q.    Is there anything preventing you from
 6   testifying truthfully today?
 7   A.    No.
 8   Q.    Before coming in today, what documents did
 9   you review?
10   A.    None.
11   Q.    Did you meet with your attorney?
12   A.    Yes, I spoke briefly with --
13            MS. LASTOWSKI:  Objection.  I'm
14        just going to caution you not to disclose
15        any communications between you and your
16        attorneys.  You can share who, what, when,
17        you know, where type of information.  But
18        you can't share -- I'm instructing you not
19        to disclose the substance of our
20        communications.
21   BY MS. FUNG:
22   Q.    Do you have an answer?
23   A.    Yes.  I met with my attorney here at the --
24   at your office.
```

Page 9

```
 1   Q.    And this is the first time you met with
 2   your attorney?
 3   A.    When?  When do you mean?
 4   Q.    Today is the first time you met with your
 5   attorney?
 6   A.    Yes, that was the first time I met with my
 7   attorney, Alexandra Lastowski.  I met with my other
 8   attorney prior to that here at this office in front
 9   of the building.
10   Q.    Who is --
11            MS. LASTOWSKI:  I think maybe if
12        you clarify the question about when you
13        mean -- what you mean by when you met.
14   BY MS. FUNG:
15   Q.    So, Mr. Hunter, I apologize if I was being
16   confusing.  Have you met with your attorneys to
17   prepare for today's deposition?
18   A.    I did not with my attorneys today to
19   prepare for --
20   Q.    Well, not today specifically, but have you
21   met with your attorneys at any point regarding
22   preparation for your deposition?
23   A.    Yes.
24   Q.    Okay.  And when did you meet with your
```

3 (Pages 6 to 9)

Darus Hunter
September 14, 2018

Page 10

1    attorneys?
2    A.      Yesterday.
3    Q.      And that was the first time that you met
4    with your attorneys and only time regarding the
5    deposition?
6    A.      I believe it was specifically regarding the
7    deposition.
8    Q.      And, Mr. Hunter, you were also sitting
9    through the depositions of Officer Navedo and
10   Sergeant Melvin?
11   A.      Yes.
12   Q.      Okay.  And at no point you met with your
13   attorneys to discuss anything regarding the
14   depositions?
15   A.      No.
16   Q.      Have you spoken to anyone else outside of
17   counsel regarding this case or deposition?
18   A.      No.
19   Q.      Have you ever had your deposition taken
20   before?
21   A.      Yes.
22   Q.      When?
23   A.      Previously in 2012.  Previously in 2015.
24   Q.      So just to stop you, in 2012, what was the

Page 11

1    deposition for?  Were you a plaintiff or a
2    defendant?
3    A.      I was a plaintiff.
4    Q.      Okay.  And what was that matter?
5    A.      That was a civil matter.  And I don't
6    recall the details of the matter.
7    Q.      Okay.  But you were suing someone?
8    A.      Yes.
9    Q.      You don't remember who you were suing?
10   A.      No.
11   Q.      And you said the second time was when?
12   A.      In 2015.  I was a plaintiff.
13   Q.      And who were you suing in that matter?
14   A.      I was suing Jireh Jehovah Baptist Church.
15   Q.      What was the outcome of that case?
16   A.      I settled the case.
17   Q.      And what about the case in 2012, what was
18   the -- was that case settled?  What was the
19   disposition?
20   A.      I also settled that case with one of the
21   suitor.  The other was found to be not liable.
22   Q.      So now do you remember who the party was on
23   the other side?
24   A.      Yes.  The parties were SEPTA, South Eastern

Page 12

1    Pennsylvania Transportation Authority and State Farm
2    Insurance Company.
3    Q.      And any other times that you had your
4    deposition taken?
5    A.      I was -- I was deposed I believe sometime
6    in 2001.
7    Q.      And what was that matter?
8    A.      And that was a matter of myself versus Home
9    Depot.  I was the plaintiff.
10   Q.      What was the disposition of that case?
11   A.      Home Depot was found to be not liable.
12   Q.      Any other times you were deposed?
13   A.      Not that I recall.
14   Q.      Okay.  Any other instances where you've
15   been a plaintiff in a matter?
16   A.      Not that I recall.
17   Q.      Any that you've been a defendant?
18   A.      No, not that I recall.
19   Q.      Have you ever been arrested?
20   A.      Yes.
21   Q.      When were you -- when were the times that
22   you were arrested -- time or times?
23   A.      I was arrested December 1st of 1991.  I was
24   arrested in February of 1992.  I was arrested in May

Page 13

1    of 1992.  I was arrested in June of 1992 and in
2    September of 1992.  I was then arrested in 2001 --
3    in November of 2001.  And I was arrested 2015.  I
4    believe it was February 2015.
5    Q.      And, Mr. Hunter, I think it would make more
6    sense for me to go through your criminal offenses
7    and you can tell which ones you served time for.
8    A.      Okay.
9            MS. FUNG:  And, Counsel, do you
10   mind me reading off the Interrogatory
11   responses you have regarding --
12           MS. LASTOWSKI:  No, just I think
13   so long as it's clear on the record which
14   response -- which Interrogatory you're
15   reading.
16   BY MS. FUNG:
17   Q.      So, Mr. Hunter, is it correct that in --
18   this is response to Interrogatory Number 4.  Is it
19   correct that in December of 1991 you were charged
20   with receiving stolen property and knowingly
21   possession a controlled substance and pled guilty to
22   those charges?
23   A.      No.  It's true that I was charged with
24   receiving stolen property.  And I did -- knowingly

4 (Pages 10 to 13)

Darus Hunter
September 14, 2018

Page 14

1   and I did plead guilty to that charge.  There were
2   no other charges associated with that arrest in
3   December of 1991.
4   Q.      And how long were you incarcerated for that
5   matter?
6   A.      Well, that matter was disposed of in
7   conjunction with other matters.  So they were
8   consolidated and there was a guilty plea.  And the
9   terms of the guilty plea were 11 and a half to 23
10  months followed by five years probation.
11          So that disposed of all of the matters
12  mentioned except for the one -- or all of the
13  matters mentioned in 1991 and 1992 except for the
14  matter of September 30, 1992.
15  Q.      And at some point in January of 1992 you
16  were charged with knowingly possessing a controlled
17  substance and pled guilty to that charge?
18  A.      Yes, that's correct.
19  Q.      And then in May of 1992 you were charged
20  with attempted theft and criminal conspiracy and you
21  pled guilty to those charges?
22  A.      Yes.
23  Q.      And then June of 1992 you were charged with
24  manufacturing a controlled substance, possessing a

Page 15

1   controlled substance and criminal conspiracy --
2   A.      Yes.
3   Q.      -- found guilty at trial?
4   A.      Yes.
5   Q.      And then September of 1992 you were charged
6   with agg assault, robbery, possessing and instrument
7   of a crime and criminal conspiracy in which you pled
8   guilty to?
9   A.      Yes.
10  Q.      And November 2001 you were charged and
11  found guilty at trial of possessing of an instrument
12  of a crime, simple assault, agg assault, terroristic
13  threats and reckless endangerment?
14  A.      No, I was not found guilty of agg assault.
15  Q.      In May of 2015 you were charged with
16  forgery.  What is the -- where is that case
17  currently?
18  A.      It's closed.
19  Q.      It's closed?
20  A.      Yes.
21  Q.      Was it on appeal?
22  A.      The case was on appeal and the Philadelphia
23  District Attorney's Office no longer wanted to stand
24  behind the case.  And as a result, the case was

Page 16

1   closed.
2   Q.      Okay.  So you were charged with anything?
3   A.      I was charged initially with forgery and
4   falsification to authorities, tampering with records
5   and one other charge whose title I'm not completely
6   familiar with at this point, but along the same
7   lines.
8   Q.      So was that still on your record as a
9   charge or no?
10  A.      No.
11  Q.      You're saying it was dismissed?
12  A.      Well, I'm saying that the three charges
13  just mentioned were dismissed.  And the remaining
14  charge initially appealed to -- in the superior and
15  then the supreme courts and then initially being
16  closed, once the Philadelphia District Attorney's
17  Office no longer wanted to pursue the matter.
18  Q.      And then, Mr. Hunter, you mentioned that
19  there was an incident in September of 1992.  Can you
20  tell me what charges you faced at that point in time
21  and in what city and state?
22  A.      That was in Philadelphia, Pennsylvania.
23  You mentioned that.  That was the --
24  Q.      Oh, yes, I did.  I'm sorry.

Page 17

1   A.      -- agg assault.
2   Q.      I'm sorry.  I apologize.  What about the
3   one in -- did you say May of 2005 or May of 2015?
4   A.      2015, I believe it was February.  And that
5   was the forgery charge we just discussed.
6   Q.      Okay.  So nothing in 2005?
7   A.      No.
8   Q.      And how old are you?
9   A.      I'm 45.
10  Q.      What's your date of birth?
11  A.      October 27, 1972.
12  Q.      And what city and state were you born in?
13  A.      I was born in Atlantic City, New Jersey.
14  Q.      When did you move to Philadelphia?
15  A.      At the age of 13 initially.  And I moved
16  back into and out of the city on several other
17  occasions as a minor.
18  Q.      And why was that?
19  A.      Sometimes it was just based on who could
20  take care of me and my family.
21  Q.      How many children do you have?
22  A.      Five.
23  Q.      And what are their names?
24  A.      Ebbonay Outterbridge -- Ebbonay Shanelle

5 (Pages 14 to 17)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 18

1  Outterbridge.
2  Q.    Sorry.  Could you spell the names?
3  A.    Yes.  E-B-B-O-N-A-Y, Outterbridge,
4  O-U-T-T-E-R-B-R-I-D-G-E.
5  Q.    Okay.
6  A.    Darus Hunter, Jr.  Kassim, K-A-S-S-I-M,
7  Hunter, Khadira Muhammad, K-H-A-D-I-R-A, Muhammad,
8  M-U-H-A-M-M-A-D and Syriana, S-Y-R-I-A-N-A, Hunter.
9  Q.    Thank you, Mr. Hunter.  And I'll go
10  individually by child.  Khadira is how old?
11  A.    Khadira is 10.
12  Q.    And who is her mother?
13  A.    Her mother is Cinquetta, C-I-N-Q-U-E-T-T-A,
14  Muhammad.
15  Q.    Thank you.  And Ebbonay, did I say that
16  right?
17  A.    Yes.
18  Q.    How old is she?
19  A.    Ebbonay is 25.
20  Q.    And who is her mother?
21  A.    Her mother is Lisa Outterbridge.
22  Q.    And Darus Hunter, Jr.?
23  A.    Darus is 19.
24  Q.    And who is his mother?

Page 19

1  A.    His mother is Keeshama, K-E-E-S-H-A-M-A,
2  Hunter.  And she's also the mother of my other two
3  children mentioned, Kassim and Syriana.
4  Q.    How old is Kassim?
5  A.    Kassim is 11 -- yeah, he's 11.
6  Q.    And Syriana?
7  A.    She's seven.
8  Q.    Thank you.  And which children reside with
9  you?
10  A.    I'm sorry.  Excuse me.  Kassim is 13.
11  Excuse me.  And Darus and Syriana both reside with
12  me on a full-time basis.  Khadira is in my home
13  three days a week, from Friday until Sunday or
14  Monday.
15  Q.    So that's a shared custody?
16  A.    That's a shared custody, yes.  Well, those
17  are the children living in my home.
18  Q.    Excuse me?
19  A.    Those are the children living in my home.
20  Q.    Okay.  And where are the other children
21  residing?  You don't need to give me their
22  addresses.
23  A.    I don't know where Ebbonay lives.  She's an
24  adult.

Page 20

1  Q.    Do you have contact with her?
2  A.    I don't.  And Kassim is in foster care.
3  Q.    Okay.  How long has he been in foster care?
4  A.    Approximately seven months.
5  Q.    Was he residing with you prior to going in
6  foster care?
7  A.    Yes.
8  Q.    And what is your current address?
9  A.    2521 North Spangler, S-P-A-N-G-L-E-R,
10  Street.  And that's here in Philadelphia.  And my
11  ZIP code is 19132.
12  Q.    Okay.  How long have you been living at
13  this address?
14  A.    Approximately nine months.  Since November
15  30th of last year.
16  Q.    And why did you move to this address?
17  A.    It's the house I purchased and I
18  refurbished and I needed additional space from where
19  I was living prior to this.
20  Q.    And you mentioned that you reside with
21  Darus, Jr. and Syriana.  And who else do you reside
22  with?
23  A.    My wife, Kenya Shujaa.
24  Q.    Are you and Kenya legally married?

Page 21

1  A.    Yes.
2  Q.    When did you get married?
3  A.    In January of 2016.
4  Q.    At any point did you legally separate?
5  A.    We did.
6  Q.    When?
7  A.    We separated from November 30th of last
8  year until sometime in July of this year.
9  Q.    Was there any reason for the separation?
10  A.    Yeah, we -- we weren't getting along very
11  well.  And there was a great deal of stress in my
12  household based on several events including the
13  event that I'm here today for.  And that led to a
14  separation.
15  Q.    You mentioned other events.  What other
16  events are you referring to?
17  A.    Well, I guess things that relate probably
18  to this event.  So I would say other events meaning
19  maybe the police coming into my house and me not
20  being able to do anything.  So maybe not other
21  events, but other details of the event itself.  And
22  in some cases individuals sometimes place blame on
23  each other.
24  Q.    Thank you, Mr. Hunter.  And prior to

6 (Pages 18 to 21)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 22

1  getting married in 2016, did you -- strike that.
2       When did you and Ms. Shujaa meet?
3  A.     In May of 2011.
4  Q.     And when did you start dating?
5  A.     In September of 2011.
6  Q.     And in between September of 2011 until the
7  time you got married, did you guys ever break up?
8  A.     Well, we only dated off and on for a period
9  until sometime in 2012. So I don't know how
10  permanent our relationship was prior to that.
11  Q.     Okay. And when did it become steady?
12  A.     In 2012. Winter of 2012.
13  Q.     And did you break up any time in between
14  the winter of 2012 up until you got married?
15  A.     No.
16  Q.     And prior to living at the 2521 North
17  Spangler address, where were you residing?
18  A.     I was living at 1242 South 51st Street.
19  And the ZIP there is 19143. That's in Philadelphia,
20  Pennsylvania also.
21  Q.     Thank you. And how long were you residing
22  at this address? If you can give me a time frame,
23  that would be great.
24  A.     Approximately three years. So from 2014 --

Page 23

1  from approximately August of 2014 until November of
2  2017 approximately.
3  Q.     And where were you living -- sorry. Who
4  were you residing with when you lived at this
5  address?
6  A.     With Kenya -- initially only Kenya and then
7  later my other two children, Darus and Syriana and
8  eventually Kassim as well.
9  Q.     And when did they -- when did Darus and
10  Syriana move into your 1242 South 51st Street
11  address?
12  A.     Sorry. Actually, please strike previous
13  statement. Darus actually moved into the apartment
14  with us. So at the time we moved in, Darus moved in
15  with us. And Syriana moved in in 2014. And then
16  Kassim moved in in 2016 and was there until 2017.
17  Q.     So you mentioned that Syriana moved in 2014
18  and you moved into the home in August of 2014.
19  About when did they move into the home?
20  A.     In September of 2014.
21  Q.     So a month later?
22  A.     Yes.
23  Q.     And prior to August of 2014, where were you
24  residing?

Page 24

1  A.     At 1618 North 55th Street.
2  Q.     Is that also in Philadelphia?
3  A.     That's in Philadelphia, Pennsylvania. And
4  the ZIP there was 19131.
5  Q.     Okay. And how long were you at this
6  address?
7  A.     Approximately three years.
8  Q.     From what years?
9  A.     So from --
10  Q.     2011?
11  A.     So from January or February of 2011 until
12  around August of 2014.
13  Q.     Did you live anywhere in between the 1618
14  North 55th Street and 1242 South 51st Street?
15  A.     No.
16  Q.     Okay. And who did you reside with at that
17  the address?
18  A.     Initially I lived alone. And later Kenya
19  moved in and then Darus.
20  Q.     Are those the only two individuals who
21  lived at this home with you?
22  A.     Yes.
23  Q.     When did Kenya moved in?
24  A.     Kenya moved in sometime in 2012. I believe

Page 25

1  it was February or March and lived there with me the
2  entire time.
3  Q.     And what about Darus?
4  A.     Darus moved in in 2013 -- around November
5  of 2013.
6  Q.     Where were you before that?
7  A.     Prior to living there -- I don't recall
8  what address I lived in prior to living there.
9  Q.     Do you know who you were living with?
10  A.     I was living alone.
11  Q.     Are you still thinking?
12  A.     I believe I was living alone. I don't
13  remember.
14  Q.     Were you living in Philadelphia?
15  A.     Yes.
16  Q.     So, Mr. Hunter, you said you were currently
17  legally married to Ms. Shujaa?
18  A.     Yes.
19  Q.     Have you ever been married before?
20  A.     Yes.
21  Q.     Prior to Ms. Shujaa, who were you married
22  to?
23  A.     To the mother of the three children I
24  named, Keeshama Hunter.

7 (Pages 22 to 25)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 26

1    Q.    How long was your marriage?
2    A.    Approximately 10 years.
3    Q.    From what years?
4    A.    From 2007 -- excuse me.  From 1997 until
5    2007.
6    Q.    And why did you two get divorced?
7    A.    Irreconcilable differences.
8    Q.    Did you guys ever have any court
9    proceedings --
10   A.    Yes, we did.
11   Q.    -- outside of your divorce?
12   A.    You mean following our divorce or outside
13   of our divorce?
14   Q.    Outside or --
15   A.    Yes.
16   Q.    -- I mean before or after?
17   A.    Yes.
18   Q.    Can you tell me what you're referring to?
19   A.    Yes, there was a domestic violence
20   incident.
21   Q.    Okay.  Can you elaborate further?  Are you
22   saying there was a protection from abuse order?
23   A.    No, there was -- no, there actually was an
24   arrest.  One of the arrests that was explained

Page 27

1    related directly to that.  That was the arrest of
2    2001 of September of 2001.
3    Q.    And there was domestic violence between
4    yourself and Ms. Hunter?
5    A.    Yes.
6    Q.    And who -- can you explain further?
7    A.    What would you like to know?  What's the
8    question?
9    Q.    Who was being abused and who was the
10   abuser?
11   A.    I don't know that there was ongoing abuse.
12   There was an incident in which my wife and I argued
13   over my wife's drug use.  She threw a big wheel or a
14   toy of my son's at me, hit me in the leg.  I picked
15   it up and threw it back at her.  It hit her in the
16   face and closed her eye.  And that was the gist of
17   the disagreement.
18   Q.    Okay.  And you went to domestic violence
19   court for this?
20   A.    I -- I went to court.  I went to criminal
21   court.  Court of Common Pleas handled it.  It was
22   adjudicated specifically as a domestic violence
23   case.
24   Q.    Were there any protection from abuse orders

Page 28

1    over at family court or anywhere else?
2    A.    I believe there was a protection from abuse
3    order.
4    Q.    And who filed that?
5    A.    She would have filed that.
6    Q.    Do you know when that was?
7    A.    I don't know.
8    Q.    And prior to being married to Ms. Hunter,
9    were you married to anyone else?
10   A.    No.
11   Q.    Were you ever in a relationship with
12   Ms. Muhammad?
13   A.    Yes.
14   Q.    Okay.  When were you in a relationship with
15   her?
16   A.    During 2006.  So for probably about six
17   months, which extended from probably maybe October
18   2006 until March of 2007.
19   Q.    Did this overlap with your relationship
20   with Ms. Hunter?
21   A.    No.
22   Q.    Was your divorce in 2007?
23   A.    Yes.
24   Q.    Did you split before 2007?

Page 29

1    A.    Yes, we had been separated for a few years
2    at that point.  Maybe two years.
3    Q.    And was there ever any domestic violence
4    between you and Ms. Muhammad?
5    A.    No.
6    Q.    So if I went over to family court today and
7    I went to obtain any protection from abuse orders
8    filed against you, would there be one for Ms.
9    Muhammad as well as Ms. Hunter?
10             MS. LASTOWSKI:  Objection to
11        form.  Asked and answered.
12             THE WITNESS:  I don't believe
13        there would be one present from Ms.
14        Muhammad that existed at any point.  And as
15        far as Ms. Hunter, as we already spoke of,
16        we did have a protection from abuse order.
17   BY MS. FUNG:
18   Q.    Do you know how many protection from abuse
19   orders were filed from Ms. Hunter?
20   A.    I believe there were two.  There was one
21   initially from 2001.  And there was one later
22   requested and I agreed to.  And this may have been
23   in 2014 or somewhere within that range.
24   Q.    And this was while you were with

8 (Pages 26 to 29)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 30

1    Ms. Shujaa?
2    A.    Yes.
3    Q.    What was -- what were the facts surrounding
4    that?
5    A.    I don't believe that there were any facts
6    surrounding the request.  It was merely a request,
7    which I complied with.
8    Q.    So you were -- Ms. Hunter requested a
9    protection from abuse order against you and you just
10   agreed to it?
11   A.    Well, I felt Ms. Hunter was abusing my
12   children.  At that point I was litigating -- I began
13   litigation in family court in an effort to obtain my
14   children.
15         Ms. Hunter, I believe, she filed a request
16   for an order that was under fraudulent
17   circumstances.  At the time, I was in front of a
18   judge who stated to me in no uncertain terms that he
19   was going to impose the order whether or not I
20   agreed to it.
21         So I agreed to the order and that was the
22   termination of the hearing.  And the order spanned
23   two years and it terminated.
24   Q.    Can you -- was there ever any domestic

Page 31

1    violence between you and Ms. Shujaa?
2    A.    No.
3    Q.    Mr. Hunter, where did you go to high
4    school?
5    A.    I went to Atlantic City High School and
6    then Frankford High School in Philadelphia.
7    Q.    From what years?
8    A.    And I attended high school from 1987 until
9    1990.
10   Q.    Did you graduate?
11   A.    No.
12   Q.    Did you get a GED?
13   A.    I earned a GED in prison in 1995.
14   Q.    How long in total were you -- have you been
15   incarcerated -- or spent in jail?
16   A.    Approximately six years.
17   Q.    And where did you go to college?
18   A.    I went to Philadelphia's Community College.
19   I then went to the University of Pennsylvania.
20   Q.    So taking you back to the Community
21   College, what years did you attend?
22   A.    I attended Community College from 2006
23   until 2008.
24   Q.    And did you receive a degree?

Page 32

1    A.    Only a certificate.  I completed a family
2    home visiting certificate.
3    Q.    And then from there you said you went to...
4    A.    I went to the University of Pennsylvania.
5    Q.    Okay.  And from what years?
6    A.    2009 until 2012.
7    Q.    And what degree -- did you receive a degree
8    there?
9    A.    Yes.
10   Q.    What degree?
11   A.    Completed a bachelor's degree with a
12   biology minor -- or biology major anthropology
13   minor.
14   Q.    And you did that in three years?
15   A.    No, I did it in -- four calendar years.
16   So all of -- so I began in 2009 in January and I
17   concluded in December of 2012.
18   Q.    And did you go anywhere else or receive any
19   further education?
20   A.    Yes.  I took premed courses at Temple
21   University.  So that would be organic chemistry and
22   physics following my time at Penn.  So I would have
23   taken those courses in 2014.  So in the spring of
24   2014.

Page 33

1    Q.    Did you receive a degree from Temple
2    University?
3    A.    I did not.
4    Q.    And why didn't you complete the program?
5    A.    Well, these were -- it wasn't a program.
6    These are -- when you're taking these pre-med
7    courses, there are courses that medical schools
8    require as prerequisites in order to apply.
9          And whatever you haven't completed, you're
10   free to complete at your leisure at any quality
11   school.  So at that point I had completed all
12   prerequisites besides physical -- physics and
13   organic chemistry.  So I was free to take them
14   anywhere.
15   Q.    So you just -- you got your bachelor's
16   degree from UPenn and from there you decided you
17   wanted to go to med school, so you wanted to
18   complete the prerequisites prior to taking the MCAT
19   and applying for med school?
20   A.    Yes, that's right.
21   Q.    And then did you receive any further
22   education from there?
23   A.    Yes.  I attended Chestnut Hill College.
24   Q.    From what years?

9 (Pages 30 to 33)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 34

```
 1    A.    From 2014 -- from May of 2014 until
 2  December of 2016.
 3    Q.    Did you receive a degree from this program?
 4    A.    I completed a degree requirements, but I
 5  never actually applied for or received the degree.
 6    Q.    How come?
 7    A.    I decided that I was going to work in a
 8  different field, so I just -- I didn't feel the need
 9  to get the actual paper degree.
10    Q.    But you finished all of your requirements?
11    A.    Yes.
12    Q.    So you were entitled to the degree?
13    A.    Yes.
14    Q.    And you just chose not to get it?
15    A.    Well, I'll get.  It's -- it's not as if
16  it's expired.
17    Q.    What years did you attend Chestnut Hill
18  College?
19    A.    From May of 2014 until December of 2016.
20    Q.    Any other further education?
21    A.    No.
22    Q.    What's your current occupation?
23    A.    I'm a contractor -- a building contractor.
24    Q.    Do you own a company?
```

Page 35

```
 1    A.    Yes.  My company is DRS Contracting, LLC.
 2    Q.    How long have you owned this company?
 3    A.    Approximately three years.
 4    Q.    Do you do this full time?
 5    A.    Yes.
 6    Q.    How many hours do you work a week?
 7    A.    Approximately 70.
 8    Q.    Have you worked this week?
 9    A.    Yes.
10    Q.    So you've owned this business for three
11  years.  So in 2015 some time?
12    A.    Yes.
13    Q.    And where were you working before that?
14    A.    Prior to that I was a full-time graduate
15  student.
16    Q.    No employment outside of school?
17    A.    Actually, I'd like to check the last
18  answer.  I think I've earned the -- I mean, owned
19  the company for approximately two years.  I think
20  it's been only around two years.  So since 2016.
21    Q.    Where is it located?  Do you have an
22  office?
23    A.    I don't.  My office is from my home.
24    Q.    And prior to 2016, where were you -- you
```

Page 36

```
 1  said you were working where?
 2    A.    I was a full-time student at Chestnut Hill
 3  College.
 4    Q.    And not working during that time?
 5    A.    No.
 6    Q.    So you were at Chestnut Hill College for
 7  two years?
 8    A.    Yes.
 9    Q.    So in the two years you didn't have any
10  employment?
11    A.    No, not while I was a graduate student.
12    Q.    How are you maintaining the house during
13  that time?
14    A.    Using student loans.
15    Q.    Prior to 2014, where were you working?
16    A.    I worked at -- briefly I worked at a
17  company titled Interstate Blood Bank.
18    Q.    What did they do there?  I mean, clearly
19  it's a blood bank, but was your role?
20    A.    I was a center fused technician.  So my job
21  was to separate blood into its various molecular
22  components.  So re blood cells, white blood cells
23  and platelets.
24    Q.    And that was from what years to what years?
```

Page 37

```
 1    A.    And that was in -- that was from 2013 --
 2  actually, it was 2013.  So it was all in 2013.
 3    Q.    So for the year -- for one year?
 4    A.    Yes.
 5    Q.    And what about prior to 2013?
 6    A.    I worked in the biomedical library -- well,
 7  also in 2013, prior to that, I worked in the
 8  biomedical library at the University of
 9  Pennsylvania.
10    Q.    And how long did you work there?
11    A.    Approximately six months.
12    Q.    So your job at the Interstate Blood Bank,
13  was that full time?
14    A.    Yes.
15    Q.    And what about working at the library?
16    A.    That was full time.
17    Q.    Where were you before that?
18    A.    And before that I was an undergraduate
19  student.
20    Q.    So full-time student --
21    A.    Yes.
22    Q.    -- not working?
23    A.    No, I didn't work.  I was a full-time
24  students.
```

10 (Pages 34 to 37)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 38

1    Q.    Living off of loans?
2    A.    Yes.
3    Q.    Mr. Hunter, have the police ever been
4    called out to your home prior to the incident on
5    September 15th -- or 14th?
6          MS. LASTOWSKI:  2015.
7          MS. FUNG:  Yes.  Thank you.
8          THE WITNESS:  Yes.  Yes.  I
9    called the police previously based on an
10   incident involving minor children.
11   BY MS. FUNG:
12   Q.    And when was this?
13   A.    And this was in 2014.
14   Q.    Do you know what month?
15   A.    I don't.
16   Q.    And you called the police to your home?
17   A.    Yes.
18   Q.    Okay.  And that was regarding --
19   A.    This was an incident involving my minor
20   children, which I wouldn't go into details.
21   Q.    Okay.  But was this regarding the children
22   of Ms. -- who was the mother of the children that
23   this was regarding?
24   A.    Ms. Keeshama Hunter.

Page 39

1    Q.    Any other times before that?
2    A.    Not that I can recall.
3    Q.    So the police have never been sent out to
4    your home besides the one time that you called for
5    them to call you to your home?
6          MS. LASTOWSKI:  Objection.  Asked
7    and answered.
8          THE WITNESS:  Not that I can
9    recall, no.
10   BY MS. FUNG:
11   Q.    Have you ever filed a complaint against
12   police officers before?
13   A.    Yes, after this incident -- the incident
14   which we're here today.
15   Q.    But outside of the incident from September
16   of 2015, have you ever made a complaint against a
17   police officer?
18   A.    No, not that I can remember.
19   Q.    When did you first find out that Ms. Shujaa
20   was pregnant?
21   A.    I don't remember.
22   Q.    Do you know if it was a month before
23   September of 2015?  Two months?
24   A.    I don't remember, but I think it was more

Page 40

1    than two months.
2    Q.    Okay.  Do you think it could be more than
3    three?
4    A.    I don't know.
5    Q.    And she was your wife at the time.  To your
6    knowledge, how many times has Ms. Shujaa been
7    pregnant?
8    A.    I don't know.
9    Q.    Has she ever been pregnant before with your
10   child?
11         MS. LASTOWSKI:  Objection.  He
12   just said he didn't know how many time she
13   had been pregnant.
14         THE WITNESS:  Yeah, I don't know.
15   BY MS. FUNG:
16   Q.    Does she have any biological children?
17   A.    No, not that I'm aware of.
18   Q.    Any adopted children?
19   A.    No, not that I'm aware of.
20   Q.    Did Ms. Shujaa ever receive prenatal care?
21   A.    No.
22   Q.    Do you know why not?
23         MS. LASTOWSKI:  Objection.  Calls
24   for speculation.

Page 41

1          THE WITNESS:  Well, I monitored a
2    great deal of her care.  And we have
3    skepticism regarding some of the early
4    interventions and prenatal care that takes
5    place and some of the connections that I
6    believe exist with autism spectrum disorder
7    and some of those -- some of the prenatal
8    engagements which are, I guess,
9    administered on patients.
10   BY MS. FUNG:
11   Q.    Can you elaborate on that?
12   A.    I believe that in some instances, devices
13   and/or chemicals utilized create problems with
14   cellular dysjunction and other issues that relate to
15   human development.
16   Q.    And so did you and Ms. Shujaa agree that
17   she would not receive prenatal care during her
18   pregnancy?
19   A.    Well, we did intend to engage in prenatal
20   care as time progressed, but we did agree that --
21   initially that I would monitor her pregnancy.
22   Q.    And what made you feel you were or had the
23   ability to monitor her pregnancy?
24   A.    Based on my education.

11 (Pages 38 to 41)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 42

1    Q.      And when did you think would be a good time
2    for Ms. Shujaa to begin prenatal care?
3    A.      We were intending for her to have prenatal
4    care for most of -- really her last trimester.
5    Q.      Mr. Hunter, does Ms. Shujaa use
6    recreational drugs?
7            MS. LASTOWSKI: Objection. Calls
8        for speculation.
9            THE WITNESS: It depends on which
10       recreational drugs, I guess.
11   BY MS. FUNG:
12   Q.      Which ones does she use?
13   A.      I know that Ms. Shujaa has used marijuana.
14   Q.      Anything else?
15   A.      No, not that I know of.
16   Q.      Was she using marijuana throughout her
17   pregnancy?
18   A.      Yes.
19   Q.      How often?
20   A.      Maybe -- I'm not sure. But I would say
21   small amounts on intermittent days depending on her
22   symptoms.
23   Q.      What do you consider small amounts?
24   A.      So I'm thinking of a marijuana joint. And

Page 43

1    maybe I'm smoking a marijuana joint and maybe
2    Ms. Shujaa takes three or four puffs of that
3    marijuana joint.
4    Q.      Okay. And where would you guys smoke?
5    A.      Generally in my bedroom with a -- I had a
6    back door that adjoined with the bedroom. So I
7    would open that door usually.
8    Q.      Okay. And where else?
9    A.      There and/or possibly the backyard, which
10   adjoins directly with that bedroom. That's it.
11   Q.      And you mentioned you were monitoring
12   Ms. Shujaa's pregnancy?
13   A.      Yes.
14   Q.      Did you feel it was a good idea to be
15   smoking marijuana with her?
16           MS. LASTOWSKI: Objection to
17       form.
18           THE WITNESS: Based on the
19       reasons, yes. And the marijuana was used
20       to enhance her appetite as well to at
21       various time quell nausea.
22           And I believe that the trade off
23       as far as her eating and ingesting
24       nutrition was worth while.

Page 44

1    BY MS. FUNG:
2    Q.      You mentioned it as a trade off. A trade
3    off for what?
4    A.      I trade off for any negative consequences
5    that could result. And I guess negative
6    consequences could be dry mouth or being sleepy or
7    excessively tired, something to that effect. And I
8    think that ingestion of the necessary nutrients to
9    nourish a baby, I think that -- yes, that was
10   worthwhile to exchange for any of those symptoms
11   that might be experience.
12   Q.      And what about the affects of the marijuana
13   on the child?
14   A.      Well, I don't believe that there -- at that
15   point would have been any negative effects on the
16   developing fetus.
17   Q.      And why is that?
18   A.      There were, from my knowledge, no effects
19   that I was aware of.
20   Q.      Mr. Hunter, does Ms. Shujaa smoke
21   cigarettes?
22   A.      Yes.
23   Q.      Okay. Was she smoking during her
24   pregnancy?

Page 45

1    A.      No.
2    Q.      And how -- sorry. Strike that.
3            Prior to her finding out she was pregnant,
4    was she smoking cigarettes?
5    A.      Yes.
6    Q.      How often?
7    A.      I don't know. She never smoked in front of
8    me.
9    Q.      How did you know that she smoked?
10   A.      Well, I'm aware that she smokes. I've
11   smelled cigarette smoke maybe in her hair or
12   somewhere else. And she doesn't in any way obscure
13   the fact that she smokes, but she just doesn't smoke
14   when I'm around.
15   Q.      Okay. And how do you know she stopped
16   smoking during the pregnancy, cigarettes?
17   A.      Because we discussed the matter. And she
18   told me she wasn't smoking and I -- I don't believe
19   she had cigarettes at all in the house.
20   Q.      Did she need anything to help to wean off
21   the cigarettes?
22   A.      I don't think so, no.
23   Q.      And, Mr. Hunter, you mentioned that, in
24   your words, you said that, you know, might smoke a

12 (Pages 42 to 45)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Page 46

1    joint?
2    A.      Yes.
3    Q.      How often do you smoke marijuana?
4    A.      I smoke marijuana probably -- I would say
5    five or six days a week, sometimes seven days a
6    week.
7    Q.      Do you ever sell marijuana?
8    A.      No.
9    Q.      Do you use any other recreational drugs?
10   A.      No.
11   Q.      Do you drink alcohol?
12   A.      Occasionally, yes.
13   Q.      How often do you drink alcohol?
14   A.      It just depends on circumstances.  For
15   instance, sitting here today, I haven't drank in two
16   months.  But I could go out and I have a drink at
17   any time.
18   Q.      What about Ms. Shujaa?
19   A.      As far as I know, Ms. Shujaa hasn't had
20   anything to drink in at least two-and-a-half months,
21   as long as we've been reunited.  So prior to that --
22   immediately prior to that, I wouldn't know.
23   Q.      Is there a reason that she -- that you two
24   haven't had any alcohol for two months?

Page 47

1    A.      No.  No.  No particular reason.  I mean, I
2    drink at any time.
3    Q.      What about during September of 2015, what
4    was Ms. Shujaa's alcohol use like?
5    A.      There was no alcohol use.
6    Q.      Have you ever known her to have any issue
7    with alcohol or yeah --
8            MS. LASTOWSKI:  Objection to
9    form.
10           THE WITNESS:  When you say an
11   issue, do you mean a problem?
12   BY MS. FUNG:
13   Q.      Yes.
14   A.      I don't know personally or I haven't
15   witnessed her personally having had a problem with
16   alcohol.  But she did report to me that earlier in
17   her life during her college years that she drank too
18   much.
19   Q.      Do you receive any public assistance?
20   A.      Yes.
21   Q.      For what?
22   A.      I receive health insurance for myself and
23   my children and $70 in food stamps monthly.
24   Q.      And how long have been receiving public

Page 48

1    assistance?
2    A.      For approximately the last five years.
3    Q.      Were you receiving any sort of assistance
4    before 2013?
5    A.      Yes, but it was intermittent.  There had
6    been public assistance received at different times.
7    Q.      Always in the form of health insurance and
8    food stamps?
9    A.      Yes.
10   Q.      Anything else?
11   A.      No.  My son receives Social Security
12   income.
13   Q.      And that's for his disability?
14   A.      Yes.
15   Q.      And that's Darus Hunter, Jr.?
16   A.      That's right, yes.
17   Q.      Thank you.  Mr. Hunter, how is Ms.
18   Muhammad's relationship with Ms. Shujaa as of today?
19           MS. LASTOWSKI:  Objection to
20   form.  And calls for speculation.  Answer
21   to the extent that you know.
22           THE WITNESS:  I don't know.
23   There's -- I've never known them to have
24   more of a relationship -- anything more of

Page 49

1    a relationship than just saying hello.
2            So I imagine that it's never been
3    closer than that.  And at present, they
4    generally don't exchange pleasantries now.
5    So I would say that there's no
6    relationship.  They don't relate to one
7    another.
8    BY MS. FUNG:
9    Q.      What about in September of 2015?
10           MS. LASTOWSKI:  Same objection.
11           THE WITNESS:  I feel that Ms.
12   Shujaa had no ill feelings towards
13   Ms. Muhammad.  Ms. Muhammad appeared to
14   harbor ill feelings towards many Ms.
15   Shujaa.
16   BY MS. FUNG:
17   Q.      And why do you say that?
18   A.      Because -- actually -- and I need to
19   correct an answer from earlier because as I do
20   recall, Ms. Muhammad called the police to my house
21   on a previous occasion stating that she believed
22   that my daughter was not home on time.  And during
23   that time, when police arrived at my home,
24   Ms. Muhammad made elicit and rude comments in the

13 (Pages 46 to 49)

Darus Hunter
September 14, 2018

Page 50

1   direction of Ms. Shujaa.
2       So, therefore, was very easy -- it was easy
3   to the volatility of the relationship and Ms. Shujaa
4   didn't respond.
5   Q.     How is your relationship with Ms. Muhammad
6   today?
7           MS. LASTOWSKI:  Objection to
8       form.
9           THE WITNESS:  It's cordial enough
10      to facilitate the exchange of my child when
11      she drops her off or when I'm dropping her
12      off at Ms. Muhammad's house.  But outside
13      of that, we're not friendly.
14  BY MS. FUNG:
15  Q.     And what about in September of 2015?
16          MS. LASTOWSKI:  Same objection.
17          THE WITNESS:  And I would say in
18      September of 2015 the relationship was very
19      similar and there had been incidents or
20      issues of volatility expressed toward me
21      from Ms. Muhammad.
22  BY MS. FUNG:
23  Q.     Can you describe what you mean by the
24  volatility expressed by Ms. Muhammad?

Page 51

1   A.     There have been statements regarding my not
2   being involved with Ms. Muhammad and there being
3   problematic feelings associated with their lack of
4   involvement.
5   Q.     You mean involvement with her specifically
6   or her --
7   A.     Yes, with her specifically.  That I should
8   be marrying her or something at the time I was
9   getting married.
10  Q.     When's the last time you two were involved?
11          MS. LASTOWSKI:  Object to form.
12          THE WITNESS:  In 2007.
13  BY MS. FUNG:
14  Q.     So, Mr. Hunter, throughout your life you've
15  had different interactions with police officers; is
16  that correct?
17  A.     Yes.
18  Q.     How do you feel about police officers?
19  A.     I don't have a general feeling.  I feel
20  that each of them is an individual person who is
21  employed by the police.  So, therefore, any officer
22  is subject to whoever he or she happens to be as a
23  person.  So I -- I believe it's a case-by-case
24  basis.

Page 52

1   Q.     Have you ever had any negative interactions
2   with police officers prior to September of 2015?
3   A.     It depends on what you mean negative.  It
4   could be interpreted as negative if I were arrested
5   because obviously I'm on the negative end of the
6   circumstances.  But, no, no volatility as far as
7   police officers and myself and me accusing of police
8   engaging in misconduct direct toward me.
9   Q.     Thank you.  And what about since the
10  incident in September of 2015 outside of
11  interactions with officers on that night?
12  A.     No, there have been no incidents.  There
13  have been no incidents.
14  Q.     Taking you to the day of September 13th of
15  2015, can you tell me about your day?  And this is
16  specifically before any interaction with police
17  officers.
18  A.     I don't remember all of what I did that
19  day.  I can -- I can give you a play by play from
20  dinner time on.  So I would say at dinner my
21  children and I had dinner.  Following that, each of
22  my children was -- took a shower or a bath.  And
23  following that time period, my daughters utilized
24  roll out cots or beds which were organized in my

Page 53

1   living room.
2       And that's where they set up and laid down.
3   Darus was in his bed and my then girlfriend, now
4   wife and I laid down in bed, watched TV and then
5   went to sleep.  So that's basically the -- that was
6   the list of activities in my home from dinnertime
7   until just before the incident with police.
8   Q.     What time did you go to sleep or attempt
9   to?
10  A.     I think around 11:00.
11  Q.     Did you have any interactions with Ms.
12  Muhammad that day?
13  A.     No.
14  Q.     No text or phone calls?
15          MS. LASTOWSKI:  Objection.  Asked
16      and answered.
17          THE WITNESS:  No.
18  BY MS. FUNG:
19  Q.     Did Ms. Shujaa have any contact with Ms.
20  Muhammad?
21  A.     No.
22  Q.     How many bedrooms were in your home located
23  at 1242 South 51st Street?
24  A.     There were two and a third that we

14 (Pages 50 to 53)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 54

1    converted -- or we converted or living room into a
2    bedroom.
3    Q.    How about bathrooms?
4    A.    And there was one bathroom.
5    Q.    I'm going to ask you to draw a quick sketch
6    of the layout of your home.  And we'll mark this as
7    Hunter-1.
8    A.    (Witness complies.)
9          MS. LASTOWSKI:  Tara, after you
10   finish with this exhibit, can we take a
11   quick break so Michaela and I can switch
12   spots?  Thanks.
13         (Whereupon, Hunter-1 was marked
14   for identification.)
15   BY MS. FUNG:
16   Q.    Thank you, Mr. Hunter.  Can you also draw
17   in the diagram where the windows are and how many
18   are there?
19   A.    (Witness complies.)
20   Q.    Thank you, Mr. Hunter.  And where are the
21   phones located in the house?  Can you please add
22   those in the diagram?
23   A.    (Witness complies.)
24   Q.    Thank you.  These telephones that you've

Page 55

1    drawn -- for the record, it looks like there are
2    two, one in the front of the house and one in the
3    back?
4    A.    Yes, that's correct.
5    Q.    And are they mounted to the wall?  How are
6    the phones set up in the house?
7    A.    No, this one, which I drew a coffee table,
8    it sat on our coffee table.  And the other one,
9    which was in the bedroom, it was a cordless phone.
10   So it was rarely mounted to the base.  So the base
11   was mounted to the wall, but it was a cordless
12   phone, so usually it was somewhere in the room.
13   Q.    Okay.  And starting from the front door,
14   you have your living room here (indicating).  Where
15   are the cots located?
16   A.    You can proceed into the front door here
17   (indicating).  As you're here in this living room,
18   now this difficult to see, so it's probably about --
19   this room as a length about 10 feet.  So the cots
20   are -- so the cots are here (indicating).
21         So as you proceed into the front door,
22   there's probably a gap of about three or four feet
23   before the cots are reached.  And then after the
24   cots, there's another gap of about three feet before

Page 56

1    the kitchen is reached.
2    Q.    Thank you, Mr. Hunter.  And you've
3    indicated that there are two cots in the living room
4    and it looks like two bedrooms.  Can you indicate
5    which bedroom -- which bedroom you and your wife
6    reside in and whose bedroom the other one is?
7    A.    (Witness complies.)  KD is applying Kenya
8    and Darus in that bed.  This bed implies -- it says
9    Darus, Jr., so that is where he slept.
10   Q.    Who set on the cots?
11   A.    Khadira and Syriana slept on the cots.
12   Q.    Thank you, Mr. Hunter.  So later into the
13   night of September 13th leading into September 14th,
14   at some point officers arrive at your home; is that
15   correct?
16   A.    Yes.
17   Q.    Around what time is it?
18   A.    It's close to 12:00 a.m.  So it's around, I
19   think, 11:58 or very close to 12:00 a.m.
20   Q.    How many officers came out to your home?
21   A.    Two.
22   Q.    And how did you notice the officer's
23   presence?
24   A.    Initially there was loud banging on my door

Page 57

1    and there -- the banging went on for a couple
2    minutes before I realized that it was my door.  And
3    I began to walk from my bedroom toward the living
4    room.  And Darus, Jr., whose room is closer than
5    mine, I guess, heard it sooner and got up.
6          And by the time I arrived in the living
7    room, maybe here at this threshold (indicating)
8    which separates the kitchen and the living room, I
9    saw officers in my -- well, Officer Schutte in my
10   house.  And at that point, he was -- he had
11   proceeded several feet into the living room because
12   he was standing where these two beds or these two
13   cots are indicated, he was standing and shining his
14   flashlights or shining his flash light.
15   Q.    At Khadira's bed?
16   A.    At both beds and I -- I think he was
17   attempting to identify which, if any of the girls,
18   were Khadira.
19   Q.    Was he speaking to them?
20   A.    They said he did, but by the time I was
21   there, I didn't see them speaking to him.  I just --
22   Q.    How long did it take you from the knocking
23   on the door to get to the front door?
24   A.    Probably two minutes.  And that's based on

15 (Pages 54 to 57)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 58

1   now -- you mean from the time the knocking began or
2   from the time that I acknowledged the knocking was
3   on my door?
4   Q.      What time did you acknowledge the knocking
5   was on your door?
6   A.      About 10 seconds.
7   Q.      Okay.  So you said that you saw Officer
8   Schutte shining his light.  Where was Officer
9   Navedo?
10  A.      On my front porch.
11  Q.      So he had not entered your home?
12  A.      No.
13          MS. FUNG:  Can we go off the
14  record for a second?
15          (Whereupon, a discussion was held
16  off the record and Alexandra Lastowski left
17  the deposition and Michaela Dragalin Young
18  took over.)
19          MS. FUNG:  Can you read back the
20  last question?
21          (Whereupon, the court reporter
22  read back from the record as was
23  requested.)
24          THE WITNESS:  So that was what I

Page 59

1   was stating I wanted to correct.  At the
2   time I did address Officer Schutte
3   directly, who was shining his flashlight
4   and more -- and active.  He was moving
5   around and shining his light.  And I
6   addressed him when I arrived in the living
7   room and kind of guided him back to the
8   porch.
9           But now that I recall, Officer
10  Navedo had to have entered my home because
11  I can recall that I reached the porch and
12  at that point I spoke with both officers
13  and there was no feeling or element of
14  surprise as if he had a partner with him.
15          So even though I hadn't addressed
16  him directly, I'm certain that he was in
17  the peripheral within my home because
18  outside of that I would have -- I would
19  have experienced an element of surprise of
20  seeing him when I reached the porch.  I
21  would have said, Oh, you have a partner.
22  And I didn't.  He had to have entered my
23  home.
24  BY MS. FUNG:

Page 60

1   Q.      So you're saying he had to have entered
2   your home, but you don't know where he was in your
3   home and you don't specifically remember seeing him?
4   A.      No, I don't specifically remember seeing
5   him.  And I'm just -- as a result, to give the most
6   truthful answer, I believe that deductive reasoning
7   forces me to believe that he was in my home because
8   I think that, knowing myself, I would have
9   experienced an element of surprise when I reached
10  the porch and he was standing there.
11  Q.      Okay.  But standing here today, you can't
12  say he was in your house?
13  A.      That's right.  I don't specifically recall.
14  Q.      Okay.  And what was your interaction like
15  with Mr. Schutte?  Was this -- did you first begin
16  interacting with him inside of the home?
17  A.      Yes.
18  Q.      Okay.  And where was Darus, Jr.?
19  A.      Darus, Jr. was standing maybe two or three
20  feet from us.
21  Q.      And you're saying that Darus, Jr. is the
22  one who opened the door?
23  A.      Yes.
24  Q.      How do you know he opened the door?

Page 61

1   A.      He was standing at the door, his hand on
2   was the knob and it was open and it was partially
3   ajar.  And all other children were still in their
4   beds.
5   Q.      Okay.  When was Officer Schutte was shining
6   his light, what were -- what did your other two
7   children who were sleeping on the cot do?
8   A.      They appeared to look up and become
9   restless.
10  Q.      Can you describe what you mean by that?
11  A.      They began to move and toss and turn on
12  their cots and as well as appear to look in the
13  direction of the ongoing action.
14  Q.      Okay.  Was Officer Schutte speaking to the
15  children?
16  A.      I didn't personally see him speak to the
17  children.
18  Q.      Okay.  And where was Ms. Shujaa at this
19  time?
20  A.      I believe she was still in our bedroom.
21  Q.      Okay.  And then what happened next?
22  A.      At that point I asked Officer Schutte if we
23  could take this action to the porch, and he did or
24  we did.  And at that time, he explained to me that

16 (Pages 58 to 61)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 62

1    he was there because my daughter was late or that
2    she wasn't home.  And he asked me where she was.  I
3    told him she was one of the children that he just
4    seen in the bed.
5         He then told me to get her up.  I did.  He
6    looked at her and then he said, Okay.  You can tell
7    her to get back into the back.  At that point he
8    asked me about any custody arrangement that exists.
9    And my then girlfriend, Ms. Shujaa, went and got our
10   -- well, the custody agreement I had that existed.
11        Officer Schutte and I reviewed the customer
12   -- or, excuse me, the custody agreement together.
13   And I alluded to the fact -- or to one part on the
14   custody agreement which gives me a provision of
15   keeping my daughter an additional day on weekends
16   when there's a holiday following a Sunday.
17        And I illustrated to him that this was, in
18   fact, in effect and that we were experiencing one of
19   those Sunday and Monday holidays.  And I also showed
20   him with my telephone the text message record that
21   illustrated that Cinquetta Muhammad and I had done
22   just that same behavior as far as my daughter
23   staying at my house for an additional day the
24   previous week, which had been Labor Day.  And the

Page 63

1    officer behaved as if he was satisfied with
2    everything I showed him and he left.
3    Q.    You say behaved as if he was satisfied,
4    what do you mean by that?
5    A.    He said, Okay.  Okay.  This is all right.
6    Everything's fine.  She can go to bed and talk to
7    her mother or whatever and left.
8    Q.    He said he'll talk to her mother?
9    A.    No, he's like --
10   Q.    Told you to?
11   A.    -- kind of giving me advice.
12   Q.    Okay.  Like you guys --
13   A.    Just general advice.  Like you probably
14   should talk to her mother, whatever and he left.
15   Q.    Thank you.  And when you say that one of
16   the officers did a check on your daughter, which
17   officer was that?
18   A.    Schutte, Officer Schutte.
19   Q.    And how did the check occur?  Where was --
20   A.    He was shining his light.
21   Q.    Can you -- sorry.  Can you just let me
22   finish my question.  Where was Mr. Schutte -- or
23   Officer Schutte in respect to your daughter?  Where
24   was he standing and where was your daughter standing

Page 64

1    and how did the check occur?
2    A.    By the time he asked me to get her up, he
3    was standing on the porch.  She stood up and he was
4    maybe five or six feet from her at that point.  He
5    just saw her stand up and that was the extent of his
6    check.
7    Q.    Okay.  So he was looking at her through the
8    door?
9    A.    Yes.
10   Q.    Okay.  Were your windows or window open on
11   your porch?
12   A.    No.
13   Q.    They were closed?
14   A.    Yes.
15   Q.    Were there blinds?
16   A.    Yes.
17   Q.    And the blinds were closed?
18   A.    Yes.
19   Q.    So after Officer Schutte sees or lays eyes
20   on your daughter you said that at some point Ms.
21   Shujaa comes to bring the custody agreement?
22   A.    Yes.
23   Q.    About how long after you went onto the
24   porch did Ms. Shujaa make her way to the porch?

Page 65

1    A.    I'd estimate around three minutes.
2    Q.    And how would you describe the officers
3    behaviors at this point?
4    A.    At that point they just seemed slightly
5    hyperactive, but not necessarily behaving in a
6    problematic fashion.
7    Q.    Were they yelling at you in any way?
8    A.    Not at that point.  Initially when I guided
9    them to the porch he was talking kind of loud and in
10   a more than -- I guess he was in -- acting in a
11   manner more aggressive than commonplace or more
12   aggressive than the manner in which I'm speaking
13   with you now.
14   Q.    How --
15   A.    It was a slightly elevated tone.
16   Q.    And which officer are you referring to?
17   A.    Officer Schutte.
18   Q.    Okay.  And how -- you described it using
19   aggressive.  What was aggressive about his tone?
20   A.    I believe that the level that he spoke at
21   was slightly more elevated than is normal and --
22   probably just that.  Probably just speaking in a
23   manner suggestive of a temperament that is slightly
24   elevated above a level of normal or friendly

17 (Pages 62 to 65)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 66

1  interaction.  So just a level that places -- or I
2  think placed me on guard a little bit.
3  Q.    Do you mean that his voice was just
4  elevated or are you saying that --
5  A.    Yeah.  I mean he was speaking a little
6  louder than we are now.  And the demeanor expressed
7  in his voice, it was not necessarily unfriendly, but
8  what I felt was slightly standoffish or...
9  Q.    Okay.  And how was your voice and demeanor?
10  A.    I would say probably very similar to how it
11  is now.
12  Q.    So you were calm when the officers were at
13  your home?
14  A.    Yes, even though -- I probably didn't feel
15  completely calm, but, yes, I would have behaved in a
16  manner suggestive of calm.
17  Q.    On this night -- had you been smoking that
18  night?
19  A.    No.
20  Q.    Had Ms. Shujaa?
21  A.    No.
22  Q.    What was Officer Navedo doing during this
23  interaction -- your interaction with Officer
24  Schutte?

Page 67

1  A.    I only recall him standing there.
2  Q.    So after the officers reviewed the custody
3  -- well, Officer Schutte reviewed the custody
4  agreement, what happened next?
5  A.    He left.
6  Q.    And then what did you do?
7  A.    I called -- I then called 911 and stated --
8  or I may have called the 12th District and I stated
9  that I wanted to complain on the officers.
10  Q.    And why did you want to complain on the
11  officers?
12  A.    Because when I arrived in the living room
13  they were in my home.
14  Q.    Is that what you said on the call?
15  A.    Yes.
16  Q.    Is there anything else you were complaining
17  about?
18  A.    I don't know of anything else I complained
19  about other than the officers intruding into my
20  home.
21  Q.    Well, as far as you know you only saw
22  Officer Schutte in your home?
23  A.    Right.
24  Q.    Did Officer Schutte do anything else while

Page 68

1  he was in your home besides shining the light?
2  A.    No, not that I can recall.
3  Q.    So after you made your call, who did you
4  first call?
5  A.    I believe I called the 12th District.
6  Q.    Okay.  And who did you speak to at the 12th
7  District?
8  A.    I didn't know who the person was who
9  answered the phone -- the telephone.
10  Q.    Do you know now standing here today?
11  A.    I still don't.  And I've been informed that
12  it could have been any number of officers who might
13  have answered the phone.
14  Q.    Okay.  And where did you learn that from?
15  A.    From the -- from experiencing the
16  deposition of Officer -- or excuse me, the
17  deposition of Officer Melvin or Sergeant Melvin in
18  which he stated that in-house operations -- during
19  that -- within the district headquarters there are
20  several individuals, one of which who might answer
21  the telephone at any time.
22  Q.    Sitting through the depositions of Officer
23  Navedo and Sergeant Melvin, standing here today, has
24  that changed anything regarding your testimony?

Page 69

1  A.    No.  I'm only supplied with the knowledge
2  that anyone might answer the telephone within the
3  district headquarters that there isn't one specific
4  person designated to do that.
5  Q.    Has it influenced your answers in any
6  aspect?
7  A.    No.
8  Q.    So when you had your call -- when you
9  called into the 12th District, what happened after
10  that?  Or sorry.  Strike that.
11       What was the conversation that you had?
12  A.    I asked to speak with a supervisor.
13  Q.    And what happened after that?
14  A.    I was transferred to a supervisor.
15  Q.    Do you know who you spoke with?
16  A.    Yes, with a Sergeant Melvin.
17  Q.    Tell me about your conversation with
18  Sergeant Melvin.
19  A.    I called Sergeant Melvin and I stated that
20  I wished to complain because two officers had
21  entered my home in an unauthorized fashion.  At that
22  point he advised me that I needed to call 911 in
23  order to file a complaint.
24  Q.    Did you say anything to Sergeant Melvin --

18 (Pages 66 to 69)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 70

1    sorry.  Did you -- strike that.
2          Did you curse at Officer -- Sergeant Melvin
3    at any time point?
4    A.    No.
5    Q.    Did you threaten him at any point?
6    A.    No.
7    Q.    And what did you do when Sergeant Melvin
8    suggested you call 911?
9    A.    I did.  I hung -- I -- excuse me, I ended
10   the call with Sergeant Melvin and I called 911.
11   Q.    Did you -- was a phone call with Sergeant
12   Melvin over or did you hang up the phone on him?
13   A.    No.  Our phone call was over.
14   Q.    Okay.  So then you called 911, and who did
15   you speak with?
16   A.    I initially spoke with a 911 telephone
17   operator whose identity I didn't know then and I
18   still don't.
19   Q.    Okay.  And what happened during that
20   conversation?
21   A.    So during that conversation I explained to
22   the 911 operator that I wanted to file a complaint.
23   And then I was advised that I needed to contact the
24   district that, I guess, supervised the officers

Page 71

1    about which I was complaining.
2    Q.    So then what did you do?
3    A.    Believe that I ended that call and called
4    the 12th District again.
5    Q.    And then who did you speak with at the 12th
6    District?
7    A.    And once again, I don't know who answered
8    the telephone.  I was transferred to Sergeant Melvin
9    who identified himself as Sergeant Melner at the
10   time.  And he then -- I then informed him again that
11   I wished to file a complaint.
12         He then -- he again told me that I needed
13   to call 911 in order to file a complaint.  I stated
14   to him that I called 911 and that they told me I
15   needed to call him.  He then voiced in a more
16   aggressive fashion, Listen, man, I'm telling you
17   that need to call 911.  So I hung feeling I had no
18   choice.  I then called 911 again.
19   Q.    Okay.  And during -- did you have more than
20   two conversations with Sergeant Melvin?
21   A.    I believe I had three conversations with
22   Sergeant Melvin.
23   Q.    Okay.  During the first conversation you
24   had with Sergeant Melvin, about how long was that

Page 72

1    conversation?
2    A.    I think it was around two minutes.
3    Q.    Did you give him any information about the
4    officers?
5    A.    No.
6    Q.    Did you give them your address?
7    A.    I don't know, but I think so.
8    Q.    But you're not sure?
9    A.    I'm not sure.
10   Q.    What about the second time you spoke with
11   Sergeant Melvin, did you give him the officers's
12   names?
13   A.    No.
14   Q.    Did you give your address?
15   A.    I don't know, but I think so.  I think I
16   had given it at one point or another.
17   Q.    Okay.  But not sure?
18   A.    I'm not sure which of the phone calls I
19   gave the address.  I did give him the address, but I
20   don't know during which phone call.
21   Q.    Okay.  So after the second call with
22   Sergeant Melvin, about how long was that call?
23   A.    The second call?
24   Q.    Yes.

Page 73

1    A.    I think it was only about another two
2    minutes again.
3    Q.    So then you called 911 again?
4    A.    Yes.
5    Q.    And what happened on this call?  Do you
6    know who you spoke with?
7    A.    No.  I spoke with an operator.  And at that
8    point I asked to be transferred to a supervisor.
9    Q.    Okay.  And then who do you speak with?
10   A.    I spoke with a supervisor who stated that
11   his name was Sergeant Hameen, H-A-M-E-E-N.
12   Q.    And tell me about your conversation with
13   Sergeant Hameen?
14   A.    I explained to Sergeant Hameen that I
15   wished to file a complaint against the officers who
16   were coming back at that point.  I believe they had
17   already returned to my home.  So I was explaining to
18   him that I wish to file a complaint against officers
19   who were coming in my home, harassing my family and
20   I.
21         And he stated that he wasn't able to
22   identify the identity of the officers.  At that
23   point I then began to express my disbelief in what
24   he was saying.

19 (Pages 70 to 73)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 74

1        And as a result of him noticing my
2   disbelief and my concern, he then gave his name and
3   police radio number as assurity that he was being
4   truthful.  And he then communicated to me that the
5   district supervisor would be able to identify who
6   the officers were.
7        And I stated to him that the district
8   supervisor stated that 911 would do that.  He then
9   appealed to my sense of logic and he said, Well, I'm
10  here at 911 in the emergency headquarters, how could
11  I possibly know who's coming to your house from a
12  district.
13       And he said, Please tell this person my
14  name and my badge radio number and tell them
15  personally that I said he's lying if he doesn't know
16  who the officers are.  That was -- and then after
17  that I thanked him and that was the end of the
18  conversation.
19       MS. YOUNG:  And if I could just
20  remind you to just answer her question
21  directly so we don't -- it just can get
22  really long if you go on long answers.
23       MS. FUNG:  Thank you.
24  BY MS. FUNG:

Page 75

1   Q.     What information did you give Sergeant
2   Melvin to identify who the officers were at your
3   home?
4   A.     I gave Sergeant Melvin my address.
5   Q.     But you don't know when you gave him the
6   address?
7   A.     No, I don't know if it was the first or
8   second call, but --
9   Q.     Or third?
10  A.     Well, I'm sure that it was before that
11  third call.  And I would say that -- just thinking
12  practically that it makes sense to me that I would
13  have given him the address on the first telephone
14  call, because if he gave me or asked me for any
15  information which would help him identify the
16  officers, then that's what I would have supplied to
17  him.
18       So whenever I expressed to him that there
19  were officers at my home and if he replied to me
20  that he didn't know who they were and that there was
21  some information that I could give him which would
22  help him supply the information, than I'm certain
23  that I would have given it to him.
24  Q.     But standing here today you're not sure?

Page 76

1   A.     I don't know.
2   Q.     So after speaking with Sergeant Hameen,
3   what did you do next?
4   A.     I recalled the 12th District.
5   Q.     And did you speak with Sergeant Melvin
6   again?
7   A.     After speaking with an operator who
8   answered or someone in the district who transferred
9   me to him.
10  Q.     Okay.  And what happened during that
11  conversation?
12  A.     I then asked him for the names of the
13  officers that had come to my home.  And he already
14  had the address because I'm certain at that point
15  that I didn't need to give him the address.  And he
16  then began to state to me that I needed to call 911
17  to get the officers's name.
18       So I listened to the entirety of that.  And
19  at the conclusion I then stated to him what Sergeant
20  Hameen had stated to me from police radio.  And I
21  relied his name and his badge number.  And at that
22  point he told me the officers's names were Officer
23  Schutte and Navedo.
24  Q.     When the officers were at your home, why

Page 77

1   didn't you ask them for their names and badge
2   numbers?
3   A.     I don't know.
4   Q.     As soon as the officers left you decided to
5   call into the district?
6   A.     Yes.
7   Q.     So what happened after your last call with
8   Sergeant Melvin?
9   A.     Well, I don't know the particular order of
10  when the officers came back, if it was following my
11  last call with Sergeant Melvin or -- no, it was
12  after either the first or second call.  It wasn't
13  after the last call.  And police officers came back
14  to my house.
15  Q.     I'm sorry.  That wasn't clear.  Can you try
16  to clarify a little bit --
17  A.     Sorry.
18  Q.     -- just for the record?
19  A.     So following my last call with Sergeant
20  Melvin, I'm not sure what, if anything, occurred at
21  that point.
22  Q.     Okay.  So you don't know when the officers
23  came back to your home at another?  You can't say
24  when it occurred during your phone calls?  Is that

20  (Pages 74 to 77)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 78

1    what you're saying?
2    A.    Right.  I can't say when in -- as far as in
3    perspective related to Sergeant Melvin.  So as it
4    relates to my conversations with Sergeant Melvin,
5    no, I can't say with assurity when these visits --
6    when the subsequent visits occurred, if they were
7    before or after my second or third telephone
8    conversations with Sergeant Melvin.
9    Q.    Okay.  So at some point the officers come
10   back to your home, you're just --
11   A.    Yes.
12   Q.    -- not sure how it falls on your call log
13   with the --
14   A.    Right.
15   Q.    -- district 911 and whoever else?
16   A.    Right.
17   Q.    Okay.  So at some point the officers come
18   back to your home?
19   A.    Yes.
20   Q.    Tell me about that.
21   A.    The officers came back to my home and
22   banged on and sounded as if someone was kicking the
23   door as well because of the places where the noise
24   was coming from, meaning at the bottom and the top.

Page 79

1         And there's banging and there's a verbal
2    tone outside of the door saying you better open this
3    fucking door.  And at that point my wife -- well,
4    then girlfriend is at the door.  I'm there as well.
5    So she began to --
6    Q.    Can I just stop you.  I just want to try to
7    make sure we have this chronological.  So you said
8    that the officer was saying, you know, open the
9    fucking door?
10   A.    Right.
11   Q.    Do you know which officer that was?
12   A.    Yes.
13   Q.    Which officer?
14   A.    Officer Schutte.  And I know because I
15   could recognize his voice.
16   Q.    Okay.  So you said you're by the door and
17   you hear the officers knocking on the door.
18   Ms. Shujaa's at the door with you, right?
19   A.    Yes.
20   Q.    Now tell me what happens after that.
21   A.    So she starts unlocking the door.  And
22   she's unlocking the door and turns the knob -- as
23   the door becomes ajar, the officer with his foot and
24   I believe hand pushes the door open as if it wasn't

Page 80

1    opening fast enough.
2    Q.    And while this was occurring, was
3    Ms. Shujaa on the phone at any point?
4    A.    I know that she was on the telephone, but I
5    don't think she still -- I don't think she's still
6    on the phone at the time when the officer comes in.
7    Q.    Okay.  Are you sure that she wasn't or you
8    just don't think so?
9    A.    I don't think so.
10   Q.    Okay.  Prior to the officers coming back
11   the second time, had Ms. Shujaa made any calls?
12   A.    I think she called the 911 operator to
13   complain about what as going on.  I think, I don't
14   know.
15   Q.    Was that before or after the officers came
16   back a second time?
17   A.    I believe it was before.
18   Q.    Before they came back the second time?
19   A.    Yes.
20   Q.    So you said the officers knocked on the
21   door.  And who forced open the door?
22   A.    Officer Schutte.
23   Q.    Okay.  And then tell me about what happened
24   after that.

Page 81

1    A.    So he forced the door open and knocked my
2    girlfriend backward.  And at that point I looked at
3    him and said something like, What the hell are you
4    doing or something to that effect.
5         And he then kind of reminded me that I
6    don't need to get myself locked up, which did calm
7    me.  And at that point I kind of just fielded the
8    rest of his questions which were asking me if I
9    wanted to file a complaint.  And I said, No, I just
10   wanted them to leave.
11   Q.    Who asked you if you wanted to file a
12   complaint?
13   A.    Officer Schutte.
14   Q.    Did you have any interactions with Officer
15   Navedo?
16   A.    Well, they both looked at -- I think they
17   both looked at the custody agreement and like nodded
18   their heads and saying that that was okay.  But I don't
19   think that there was anything more substantial than
20   that with Officer Navedo.
21   Q.    And how -- when Ms. Shujaa stumbled back,
22   right, did she fall?
23   A.    No.
24   Q.    Can you describe how she stumbled back?

21 (Pages 78 to 81)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 82

1    A.    I don't know what you want in the
2    description.
3    Q.    Did you hear any sounds when the door hit
4    Ms. Shujaa?
5    A.    Not that I recall.
6    Q.    Did you think that the door hit Ms. Shujaa
7    hard?
8          MS. YOUNG: Objection. Calls for
9    speculation.
10         THE WITNESS: It's difficult to
11   determine such an abstract term as hard or
12   soft. I think that it was forceful enough
13   to knock her off balance.
14   BY MS. FUNG:
15   Q.    What about forceful enough to hurt her?
16         MS. YOUNG: Objection. Calls for
17   speculation.
18         THE WITNESS: I think it was
19   forceful enough to injure her. I don't
20   know as far as hurt or physical pain. I
21   don't know, but I think it was forceful
22   enough to injure Ms. Shujaa in the state
23   she was in at that time.
24   BY MS. FUNG:

Page 83

1    Q.    Where did the door hit her?
2    A.    In her belly.
3    Q.    Did she hit anything after the door hit
4    her?
5    A.    I think she hit the radiator. Now I don't
6    know if she hit that very forcefully, but I think
7    she hit the radiator, which is immediately on the
8    wall behind the door. So if we're here coming into
9    the home (indicating) and this is the front door
10   which has a right swing. So it's going to swing
11   from here against this wall, the wall here
12   (indicating), which I didn't draw that in, but right
13   here there's a radiator (indicating). And that's
14   what I believe she was knocked backward into.
15         MS. YOUNG: And just for the
16   record, Plaintiff Hunter made another note
17   on Exhibit 1.
18         THE WITNESS: Yes.
19         MS. FUNG: Indicating a radiator
20   near the front door.
21   BY MS. FUNG:
22   Q.    Do you think that Ms. Shujaa was injured
23   after the door hit her?
24         MS. YOUNG: Objection calls for

Page 84

1    speculation.
2          THE WITNESS: Immediately
3    following that, I don't think that that was
4    something that we addressed.
5    BY MS. FUNG:
6    Q.    Did you have any concern that she was
7    injured?
8    A.    No.
9    Q.    Why not?
10   A.    I just didn't consider it based on the
11   heightened emotional state regarding the other
12   events. So I was already upset because officers had
13   come into my home. I became more upset when
14   officers returned and behaved in an irate manner.
15         So at that point, my consideration of what
16   had occurred just hadn't happened yet. I hadn't
17   really concerned any consequences of anything that
18   was ongoing at that point.
19   Q.    So what did Officer Schutte do -- sorry.
20   Strike that.
21         Did he realize that he hit Ms. Shujaa with
22   the door?
23         MS. YOUNG: Objection. Calls for
24   speculation.

Page 85

1          THE WITNESS: I don't know, but
2    I'm doubtful.
3    BY MS. FUNG:
4    Q.    Why are you doubtful?
5    A.    Because he didn't say anything to
6    acknowledge having done it.
7    Q.    So when Ms. Shujaa stumbled, how obvious
8    was it that she stumbled to you?
9    A.    It was perfectly evident, but obviously I'm
10   on the inside of the door. So I don't think that
11   she would -- I don't think that that would have been
12   something that an officer would have been able to
13   see because I think based on the door and the
14   orientation of it that her particular perspective or
15   looking directly at it, I think his vantage point
16   would have been completely obscured because he's on
17   the outside of the door.
18         The door is opening in a right swing and
19   Ms. Shujaa in this room is in a place similar to
20   where that door stop would be. So the door itself
21   obscures the person who's opening the door. So,
22   therefore, as the door is forced open, the door is
23   between and the individual forcing the door open,
24   therefore, your particular -- a full visual of you

22 (Pages 82 to 85)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 86

1    is obscured by the door itself.
2    Q.     Does the door open outward to the porch --
3    A.     Inward.
4    Q.     -- or does it open inward?
5           MS. YOUNG: Let her finish the
6    question.
7           THE WITNESS: Okay. Sorry.
8    BY MS. FUNG:
9    Q.     Did you ever tell Officer Schutte that he
10   hit Ms. Shujaa with the door?
11   A.     No.
12   Q.     Did Ms. Shujaa ever say that to Officer
13   Schutte?
14   A.     No. Not that I know of, no.
15   Q.     So after the officers asked you if you
16   wanted to -- so Officer Schutte asked if you wanted
17   to file a complaint, what happened then?
18   A.     I said, No, I didn't and I just wanted them
19   to leave. And so he said a couple more things like,
20   Are you sure? I heard you wanted to file a
21   complaint. And I said, No, I don't want to file a
22   complaint and so he left.
23   Q.     So you were calm this whole time?
24   A.     Well, you mean behavior or feelings?

Page 87

1    Q.     Behavioral.
2    A.     Yes.
3    Q.     So after the officer hit your pregnant wife
4    in the belly with a door, you were calm
5    behaviorally?
6           MS. YOUNG: Objection to form,
7    and mischaracterizes his testimony.
8           THE WITNESS: Immediately
9    following that my tone -- my vocal tone was
10   elevated. And there would have been a
11   level of heightened alertness as well as --
12   I would have -- I would likely have
13   expressed to the officer that I was
14   concerned and, yeah, my vocal tones would
15   have been louder.
16          And the officer did sense that
17   because he said or reminded me not to get
18   locked up as a means of calming me. And
19   that was enough to bring me back to ground
20   zero.
21   BY MS. FUNG:
22   Q.     Did Ms. Shujaa sustain any bruising as a
23   result of this incident?
24   A.     I don't know.

Page 88

1    Q.     Did you observe any bruises?
2    A.     No.
3    Q.     How long was the second interaction with
4    the officers at your home?
5    A.     I would guess -- I estimated a total of
6    three minutes.
7    Q.     Okay. And -- so after the officer --
8    Officer Schutte hit Ms. Shujaa with the door, they
9    asked -- Officer Schutte asked if you wanted to file
10   a complaint. You said no. Did you they leave after
11   that?
12   A.     Yes.
13   Q.     What happened after the officers left?
14   A.     I believe I called the 12th District again
15   complaining.
16   Q.     Is this outside of the discussions we've
17   already had or is this another call?
18   A.     This is -- this is another call -- well,
19   no, this is within the perimeters of the discussions
20   we've had.
21   Q.     Thank you. And at what point did you or
22   did you ever request a supervisor?
23   A.     I don't recall ever requesting a
24   supervisor. Only that I wanted to file a complaint

Page 89

1    and only asking to speak with a supervisor. I don't
2    actually recall asking for a supervisor.
3    Q.     How come you didn't wait until the next day
4    to go to the district?
5    A.     Instead of calling?
6    Q.     Yes.
7    A.     The matter was urgent and I felt that I
8    needed to address it immediately. And I was
9    concerned that the officer was continually visiting
10   my home or maybe that he was going to revisit my
11   home.
12          So I just wanted to address this right now
13   before something else could possibly happen as well
14   as just my overall concern and this -- this
15   contentment with the resolution of things.
16   Q.     So at the time the officers leave the
17   second time, was anyone injured?
18   A.     Yes.
19          MS. YOUNG: Objection. Form.
20   BY MS. FUNG:
21   Q.     Who was injured?
22   A.     My wife, Ms. Shujaa.
23   Q.     And how did you know she was injured at
24   this point?

23 (Pages 86 to 89)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 90

1    A.    I didn't.
2    Q.    Okay.  So my question is:  The day of, when
3    the officers left the second time, was anyone
4    injured to your knowledge?
5    A.    At that time I wasn't aware that anyone was
6    injured.
7    Q.    Okay.  So did you have any additional
8    interactions with the officers or any officers that
9    night?
10   A.    Yes.
11   Q.    Tell me about that.
12   A.    They came to my house a third time.
13   Q.    Who is they?
14   A.    The Officers Navedo -- Officers Navedo and
15   Officer Schutte.
16   Q.    Okay.  Tell me about this time.
17   A.    They again banged on my door and I -- I
18   believe that I answered the door, but I only -- I
19   opened the door and they, again, asked if I wished
20   to file a complaint.  And at that point I stated,
21   No, I just wanted to go to bed and they left.
22   Q.    And is that all that happened?
23   A.    Well, heard noise in my backyard following
24   that.  I looked out my window.  I could see that

Page 91

1    there were police officers.  I couldn't see clearly
2    who it was, but I suspected that it was still
3    Officers Navedo and Schutte.
4         And other than that, no, I don't recall
5    anything else occurring, but just that they were in
6    the backyard making noise and I looked out and then
7    -- as well as in the front of the house.
8         And so I looked out and saw that there were
9    police officers doing something, but I -- they
10   weren't close enough to specifically identify that
11   it was Officers Navedo and Schutte after that third
12   encounter.
13   Q.    And you mentioned officers in your
14   backyard.  You didn't actually see who was in your
15   backyard, correct?
16   A.    Well, I could see that -- I could clearly
17   see that there were -- that they were police
18   uniforms.  And all of the -- there was a guy and it
19   goes along where -- that is part of a police
20   uniform, meaning a night stick, handcuffs, and all
21   those things.
22        I could clearly see that these were police
23   uniforms.  I just couldn't see clearly enough the
24   faces of the individuals or any tags or any other

Page 92

1    identifying information.
2    Q.    And when you opened the door the third time
3    you're saying you saw Officer Schutte and Navedo?
4    A.    Yes.
5    Q.    And only them?
6    A.    Yes.
7    Q.    And who asked you if you wanted to file a
8    complaint?
9    A.    Officer Schutte.
10   Q.    And after this interaction, Mr. Hunter,
11   were you concerned about Ms. Shujaa's well being?
12   A.    Immediately?
13   Q.    Yeah.
14   A.    And when I'm asking immediately, I mean --
15   you said after the incident.
16   Q.    The day of.
17   A.    Okay.  So immediately following the
18   incident, no, there -- I didn't have any concern.
19   Q.    And why didn't you have concern?
20   A.    I didn't think that -- at that time I just
21   hadn't concerned that my wife was injured.  I didn't
22   think about it.  There was -- there was nothing that
23   I had noted or that she complained of in the way of
24   pain or symptoms associated with any problems.

Page 93

1    Q.    When did you first start having concerns
2    regarding Ms. Shujaa's well being?
3    A.    Maybe two days later, something like that.
4    She started experiencing pain in her belly.
5    Q.    Anything else to your knowledge?
6    A.    Yes.  She told me that she was also
7    experiencing a discharge that she was seeing on her
8    leg at that point.  And I don't know what that was.
9    Maybe it was amniotic fluid, but there -- there was
10   a discharge of some fluid.
11   Q.    So what made you think it was amniotic
12   fluid?
13   A.    Well, now at this point -- now based on my
14   understanding of what occurred that that's -- that's
15   what I would -- that's what I think based on just
16   being able to deduct the understanding that her
17   uterus was compromised, it's filled with amniotic
18   fluid and that it wasn't.
19   Q.    Did you review Ms. Shujaa's medical
20   records?
21   A.    Yes.
22   Q.    And when did you decide to seek medical
23   intervention?
24   A.    As soon as she felt pain.  As soon as she

24 (Pages 90 to 93)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 94

1  started having problems.  So this was maybe two days
2  later, she said she felt pain.  And at that same
3  time she also noticed -- the fluid.  So at that time
4  we called for a paramedic?
5  Q.    And this was the day -- the same day that
6  she started experiencing symptoms you called the
7  paramedic?
8  A.    Yes.
9        MR. MCCLAM:  Objection.  Calls
10       for speculation.
11 BY MS. FUNG:
12 Q.    Around what time was this?
13       MR. MCCLAM:  Objection.  Vague as
14 to this.
15       MS. FUNG:  I'm sorry.  What?
16       MR. MCCLAM:  What do you mean by
17 this.
18       MS. FUNG:  Can you read back the
19 question?
20       (Whereupon, the court reporter
21 read back from the record as was
22 requested.)
23 BY MS. FUNG:
24 Q.    Around what time did you seek medical

Page 95

1  attention?
2  A.    I believe it was around 11:00 p.m.  I don't
3  recall exactly.
4  Q.    Andy you believe this was maybe on
5  September 17th or 16th?
6  A.    Yes, I believe it was on September 16th --
7  15th or 16th.
8  Q.    And so you called 911 regarding
9  Ms. Shujaa's symptoms?
10 A.    Yes.
11 Q.    And you called for an ambulance?
12 A.    Yes.
13 Q.    And an ambulance comes to pick her up?
14 A.    Yes.
15 Q.    Did you go with her?
16 A.    No.
17 Q.    Why didn't you go with her?
18 A.    I had three minor children that I couldn't
19 take with me.  All of them had school the next day.
20 And as I said, my minor children are very small.
21 And at that time I also didn't have an automobile.
22       So the minor children and myself were not
23 all going to permitted to ride in the paramedic, and
24 I had no other means of transporting myself.

Page 96

1  Q.    How far is Mercy Hospital from your home?
2  Can you estimate?
3  A.    Around two and a half miles.
4  Q.    What does that calculate to in minutes?
5        MS. YOUNG:  Objection.  What kind
6  of minutes?
7        MS. YOUNG:  How many minutes does
8  it take to get from his --
9        MS. YOUNG:  To walk?
10       THE WITNESS:  Walk?
11 BY MS. FUNG:
12 Q.    Oh, walk.  That's better.  Yeah.  Walk.
13 A.    Around 40 minutes.
14 Q.    For two and a half miles?
15 A.    Okay.  I think it's probably about three
16 and a half miles.  And I'll say around half hour,
17 actually.
18 Q.    And how long was Ms. Shujaa in the hospital
19 all together, and this includes any hospital visit
20 on September 16th or the 17th?
21 A.    I believe totally, around 12 hours.
22 Q.    At any point did you go to the hospital to
23 see her?
24 A.    Yes.

Page 97

1  Q.    When did you go?
2  A.    On the following morning after taking my
3  children to school I then attended court.  And I
4  attended court remotely at that point.  I had a
5  court date already.  And following that, which would
6  have been around 10:00 a.m., I immediately went to
7  the hospital with her.
8  Q.    What hospital is the that?
9  A.    That was HUP, Hospital of the University of
10 Pennsylvania.
11 Q.    Mr. Hunter, did you know that Ms. Shujaa
12 was having a miscarriage?
13 A.    When?
14 Q.    When you called 911.
15 A.    No.
16 Q.    When did you find out she was suffering
17 from a miscarriage?
18       MS. YOUNG:  Objection.  Form.
19       THE WITNESS:  When the -- I was
20 informed of the information at the Hospital
21 of the University of Pennsylvania.
22 BY MS. FUNG:
23 Q.    At that point had she already miscarried?
24 A.    Yes.

25 (Pages 94 to 97)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 98

1    Q.    Did you have an opportunity to view the
2    birth certificate?
3    A.    Yes.
4    Q.    Is there a reason that your name isn't
5    listed as a father?
6            MS. YOUNG: Objection. Form.
7            THE WITNESS: I don't know.
8    BY MR. FUNG:
9    Q.    Do you know why the child was given
10   Ms. Shujaa's last name?
11           MS. YOUNG: Objection. Form --
12           THE WITNESS: I don't know.
13           MS. YOUNG: -- and calls for
14      speculation. Give me a chance to object.
15   BY MS. FUNG:
16   Q.    At some point you were able to file a
17   complaint against the officers; is that correct?
18   A.    Yes.
19   Q.    And when did you officially do that?
20   A.    I believe it was on the 20th of September.
21   Q.    Is there a reason why you waited until then
22   to file it?
23   A.    No specific reason and -- just fairly busy
24   and just handling whatever activities I need to as I

Page 99

1    need to handle them. And I would have filed a
2    complaint when it become readily convenient.
3    Q.    Did you ever receive any injuries regarding
4    -- did you ever receive any injuries on the night of
5    October 15th -- or 14th, 2015?
6    A.    What type of injuries?
7    Q.    Physical injuries.
8    A.    No.
9    Q.    What other injury were you referring to?
10   A.    Damage to one's psyche.
11   Q.    Did you seek out any therapeutic
12   interventions?
13   A.    No.
14   Q.    Why is that?
15   A.    Well, at the time I was attending therapy,
16   and this was something that was mentioned. But I
17   was -- I was attending therapy at that time and
18   dealing with feelings that I had regarding a knee
19   surgery that I had recently experienced.
20   Q.    Are you talking about physical therapy or
21   intervention?
22   A.    No, I meant that I was seeing an individual
23   counselor regarding --
24   Q.    Where?

Page 100

1    A.    At Dunbar Counseling Associates.
2    Q.    Who was your doctor?
3    A.    I don't remember his name. His name was
4    Jonathan something.
5    Q.    How long were you attending there?
6    A.    Approximately four months.
7    Q.    Four months?
8    A.    Yes.
9    Q.    Can you good give me a time frame?
10   A.    I don't know remember exactly, but
11   somewhere around this incident. It may have been
12   longer. I'm not sure, though. I don't remember.
13   Q.    Did you -- are you able to provide your
14   attorney with a copy of that documentation?
15   A.    No.
16   Q.    Why is that?
17   A.    I don't have it and there was nothing
18   specific regarding this incident as far as the
19   therapy.
20   Q.    I thought you said earlier that it was
21   being addressed in therapy?
22   A.    Well, I mentioned it to the therapist, but
23   we were focused in another area. And I guess the
24   therapist handled my general feeling overall, but

Page 101

1    the specifics of -- I don't believe the specifics of
2    that incident were explored in great detail.
3    Q.    And why is that?
4    A.    I know that the therapy terminated not soon
5    -- not long after that. So I don't know exactly why
6    we didn't address that more intimately.
7    Q.    Mr. Hunter, if it was affecting you, why
8    was not that not discussed in therapy?
9    A.    I didn't want to discuss it. I didn't want
10   to really discuss this event.
11   Q.    Will you be willing to give your attorney
12   proof of treatment at Dunbar?
13   A.    No, because I'm not citing treatment as
14   Dunbar -- in relation to this, but if that's
15   something that you'd like, then you can get
16   information on Dunbar itself and, I guess, attempt
17   to address anything that may have been addressed
18   there or attempt to access anything that may have
19   been addressed there. But I'm not certain that
20   there was anything specific.
21           MS. YOUNG: Should we go off the
22      record for a second?
23           MS. FUNG: Yeah.
24      (Whereupon, a discussion was held

26  (Pages 98 to 101)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 102

1        off the record.)
2    BY MS. FUNG:
3    Q.      Did you miss any work as a result of the
4    incidents that occurred?
5    A.      No, I was a graduate student at the time.
6    I didn't have a job.
7    Q.      Did you miss school at all?
8    A.      No.
9    Q.      Mr. Hunter, what are your damages?
10   A.      My damages are based on the feelings that
11   were encountered from this event and my feelings
12   regarding the claims of retaliation as far as me not
13   being able to complain about something.
14        And also an infringement on my freedoms as
15   far as speech, being able to complain in a manner
16   that is protected or should be protected within my
17   society. Also an infringement on my freedoms as far
18   as trespassing into my home and invading my privacy.
19        I believe that as a citizen I should enjoy
20   an element of privacy which shouldn't be infringed
21   upon by a public official. And I believe that all
22   of those claims extend to myself and the other
23   members of my family as well.
24        And I think that all of those freedoms that

Page 103

1    we sometimes take for granted were all violated.
2    And these were things that were taken from me and
3    these are concerns that I continue to harbor to
4    going forward just understanding that something of
5    this nature is possible and can take place at any
6    time.
7    Q.      So, Mr. Hunter, at some point in time you
8    were -- a couple days later, right, you were able to
9    file a complaint, correct?
10   A.      Yes.
11   Q.      You testified that Officer Navedo didn't
12   have any involvement in the incident that occurred?
13        MS. YOUNG:  Objection.
14        Mischaracterizes the testimony.
15   BY MS. FUNG:
16   Q.      What did Mr. Navedo do?
17        MS. YOUNG:  Objection. Asked and
18        answered. We've gone through step by step
19        what each officer did.
20   BY MS. FUNG:
21   Q.      You can answer.
22   A.      Navedo was -- Officer Navedo was present
23   during all of these interactions. And as I stated,
24   just on what I believe -- in my ability to deduce

Page 104

1    information, I believe that he also invaded my
2    privacy and came into my home.
3        And aside from anything that Officer
4    Schutte would have done, I would have to say that
5    Officer Navedo was a corroborator. He never left.
6    I never saw him say to Officer Schutte we should
7    stop doing this or we shouldn't be doing this. I
8    never saw him physically separate himself from
9    Officer Schutte as an implication that he was not on
10   board with the events that were ongoing.
11        So I think that just as anyone else who
12   accompanies someone could be subject to be a
13   conspirator of those behaviors, I think that that
14   extends to police officers or anyone else. So I
15   think that Officer Navedo illustrated that he was in
16   compliance with what Officer Schutte did by not
17   complaining or removing himself.
18   Q.      Thank you. So you mentioned the treatment
19   that you received at Dunbar. Outside of that, have
20   you received any sort of therapeutic intervention?
21   A.      No.
22        MS. FUNG:  That's all I have.
23        MS. YOUNG:  Can we just go off
24        the record?

Page 105

1        (Whereupon, a discussion was held
2    off the record.)
3        MS. FUNG:  I would just like to
4    note for the record that at the close of
5    defendant's deposition taking, plaintiff's
6    counsel had a discussion with her client
7    before beginning her questioning.
8        ---
9        CROSS-EXAMINATION
10        ---
11   BY MS. YOUNG:
12   Q.      I just have a few questions. Darus, I'm
13   going to kind of just go through the timeline of
14   your interactions with the police officers just with
15   a little bit more detail, but short.
16        You had mentioned that your son Darus
17   Hunter, Jr. had his hand on the doorknob when you
18   came into the living room; is that right?
19   A.      Yes, that's correct.
20   Q.      Did you talk to him at all while the police
21   officers were there?
22   A.      No, and -- I didn't. And my son has a very
23   limited verbal capacity.
24   Q.      Can you just give us some more information

27 (Pages 102 to 105)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 106

1    on that?
2    A.    Yes.  I would say at that time he was
3    almost completely nonverbal.  Now he has mastery of
4    around 50 words or so that he can use and
5    understand.  But at time, no, he would wouldn't have
6    been able to understand the logistics of the
7    situation or to give permission for someone to enter
8    my home.
9    Q.    Would he be able to speak with the police
10   officers?
11   A.    No.  No.  As I said, even at present he's
12   not able to engage in articulate speech with
13   someone, but at that time there was virtually no
14   verbal communications as far as his skills.
15   Q.    And his impairments with speech, would that
16   be something that a person would be able to notice
17   if they're interacting with him?
18         MS. FUNG:  Objection to form.
19   Calls for speculation.
20         THE WITNESS:  Yes, I think that
21   my son -- I think that he behaves in a
22   manner that is representative of his
23   disabilities.  And his mental disabilities
24   are evident to any person who has a -- has

Page 107

1    an understanding of normalized individuals
2    within the society as far as our
3    psychological conditions.
4    BY MS. YOUNG:
5    Q.    And you had mentioned that you spoke to
6    your daughters during the incident?
7    A.    Yes.
8    Q.    And they had told you that one of the
9    officers had spoken to them?
10   A.    Yes.
11   Q.    Can you just tell me more about that?
12         MS. FUNG:  Objection to form.  I
13   believe it mischaracterizes the testimony.
14         THE WITNESS:  Yes.  One of my
15   daughters, the youngest one said that the
16   officers were shining the lights in her and
17   her sister's face -- or faces.
18         And then the officer -- she said
19   that he asked her if she was up and if she
20   was alive.  But -- and that's the totality
21   of it.  And that was from my youngest
22   daughter.  Her eldest sister didn't report
23   anything.
24   BY MS. YOUNG:

Page 108

1    Q.    So that's Syriana?
2    A.    That's Syriana.
3    Q.    And did she say which police officer spoke
4    to her?
5    A.    She did not.
6    Q.    And which police officer would have been
7    the one who would have spoken to her?
8         MS. FUNG:  Objection to form.
9    Calls for speculation.
10         THE WITNESS:  In this particular
11   incident, Officer Schutte was the only
12   officer that I observed being vocal at any
13   point.
14   BY MS. YOUNG:
15   Q.    And how far away was Syriana from Officer
16   Navedo?
17   A.    Approximately 18 inches.
18   Q.    During their first visit to your home, did
19   either of the police officers tell you their badge
20   numbers?
21   A.    No, they didn't tell me their badge numbers
22   nor their names.
23   Q.    During their second visit did they tell you
24   their badge numbers?

Page 109

1    A.    No, they did not.
2    Q.    Did they tell you their names during the
3    second visit?
4    A.    No, they did not.
5    Q.    Did you ever tell Sergeant Melvin when you
6    spoke to him on the phone the officers's badge
7    numbers?
8    A.    No, I never learned the officer's badge
9    numbers nor their names until Sergeant Melvin, in
10   fact, told me.
11   Q.    And when I say the officers, I mean
12   Officers Schutte and Navedo.
13   A.    Yes, I never knew the identities of either
14   Officer Schutte or Officer Navedo until my third
15   conversation with Sergeant Melvin in which he
16   revealed their names to me.
17   Q.    And you had mentioned that during the
18   officers's second visit to your home one of the
19   officers said -- asked you if you wanted to file a
20   complaint?
21   A.    Yes.  Yes.  Officer Schutte asked me in a
22   very condescending and loud tone if I wanted to file
23   a complaint.  And at that point I did want to file a
24   complaint, but I was intimidated and afraid to tell

28 (Pages 106 to 109)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

Page 110

1  him that I wanted to file a complain.
2  Q.     So I think -- and I have written it down, I
3  think you said that Officer Schutte said to you, You
4  sure, I heard you wanted you to file a complaint; is
5  that right?
6  A.     Yes, that is correct.
7  Q.     And you, when you were saying that earlier
8  today, kind of used an animated voice, but it
9  wouldn't reflected in the written record, so can you
10 just describe that tone to us?
11 A.     Yes.
12         MS. FUNG:  Objection.  Asked and
13 answered, but go ahead.
14         THE WITNESS:  Yes, I think that
15 the -- that the question -- So are you sure
16 you don't want to file a complaint, I think
17 it was stated in a tone and a demeanor
18 representative of contention and one
19 speaking in a very facetious manner
20 implicative of their there being some
21 negative consequences associated with
22 filing a complaint.
23 BY MS. YOUNG:
24 Q.     And in that moment did you feel that you

Page 111

1  could file a complaint?
2  A.     No, not safely.
3  Q.     And in general, Mr. Hunter, can you just
4  tell us how this incident had -- and the subsequent
5  miscarriage has affected you?
6         MS. FUNG:  Objection.  Asked and
7  answered.
8         THE WITNESS:  It's had a
9  pronounced affect on my feelings regarding
10 the incident, my feelings regarding my
11 family and my children being safe in my
12 home.  My own understanding as far as -- it
13 changed the face of things that my child
14 would have been a few years old now.
15         Like, just -- it's a great number
16 of affects that take place from it, but
17 just that it really just -- understanding
18 the event, the police officers interaction
19 with me and what that means as far as
20 myself and my state in the country or in
21 the city as far as just how I'm viewed by
22 police officers and other officials, that's
23 always a concern as far as my value or my
24 worth.

Page 112

1         And as I said, the loss of a
2  child and that affect on my family, even my
3  daughter who understands that she would
4  have had a little sister.
5         MS. YOUNG:  No further questions.
6         MR. MCCLAM:  I have two
7  questions.
8            - - -
9         CROSS-EXAMINATION
10           - - -
11 BY MR. MCCLAM:
12 Q.     Do you recall earlier today when Ms. Fung
13 asked you about why you waited until September 20th
14 to file a complaint?
15 A.     Yes.
16 Q.     And was one of those reasons because you
17 were helping to take care of your girlfriend, Ms.
18 Shujaa, after her miscarriage?
19         MS. FUNG:  Objection to form.
20         THE WITNESS:  Yes.
21         MR. MCCLAM:  That's all I have.
22           - - -
23         REDIRECT EXAMINATION
24           - - -

Page 113

1  BY MS. FUNG:
2  Q.     I just have one question.  Mr. Hunter, when
3  your attorney Ms. Dragalin Young was asking you just
4  questions just now mentioned the city of
5  Philadelphia and how you feel about police officers.
6  Can you elaborate on that?
7  A.     Yes.  There's a concern, not necessarily an
8  understanding, but just a concern that in some
9  instances maybe police officers don't view some
10 citizens as valuable enough to be safe or to be
11 given peace in their homes.
12         And even in situations in which there is no
13 allegation of any criminal activity, a police
14 officer arriving at my home and behaving in a manner
15 suggestive of me being a criminal or some other
16 individual that is unfavorable to police officers.
17 And on his day I'm doing nothing wrong, so I just
18 didn't understand the contentious engagements that
19 we had.
20         MS. FUNG:  No further questions.
21         (Witness excused.)
22         (The deposition concluded at
23 3:09 p.m.)
24

29 (Pages 110 to 113)

fd5d565e-0a42-4147-b940-b0694c1ae5ef

Darus Hunter
September 14, 2018

                                    Page 114

1    C E R T I F I C A T I O N
2
3     .
4         I, ALEXANDRA ALVARADO, Court
5    Reporter, certify that the foregoing
6    is a true and accurate transcript of
7    the foregoing deposition, that the
8    witness was first sworn by me at the
9    time, place and on the date herein
10   before set forth.
11       I further certify that I am
12   neither attorney nor counsel for, not
13   related to nor employed by any of the
14   parties to the action in which this
15   deposition was taken; further, that I
16   am not a relative or employee of any
17   attorney or counsel employed in this
18   case, nor am I financially interested
19   in this action.
20
21
     _____
22         Alexandra Alvarado
           Court Reporter
23         and Notary Public
           Dated:_____
24

30 (Page 114)

Darus Hunter
September 14, 2018

**A**

**a.m** 56:18,19
97:6
**ability** 41:23
103:24
**able** 21:20
73:21 74:5
85:12 93:16
98:16
100:13
102:13,15
103:8 106:6
106:9,12,16
**abstract**
82:11
**abuse** 26:22
27:11,24
28:2 29:7
29:16,18
30:9
**abused** 27:9
**abuser** 27:10
**abusing**
30:11
**access** 101:18
**accompanies**
104:12
**accurate**
114:6
**accusing** 52:7
**acknowledge**
58:4 85:6
**acknowledg...**
58:2
**acting** 65:10
**action** 1:2
61:13,23
114:14,19
**active** 59:4
**activities** 53:6
98:24
**activity**
113:13
**actual** 34:9
**add** 54:21
**additional**
20:18 62:15
62:23 90:7
**address** 20:8
20:13,16
22:17,22
23:5,11
24:6,17

25:8 59:2
72:6,14,19
72:19 75:4
75:6,13
76:14,15
89:8,12
101:6,17
**addressed**
59:6,15
84:4 100:21
101:17,19
**addresses**
19:22
**adjoined** 43:6
**adjoins** 43:10
**adjudicated**
27:22
**administered**
41:9
**adopted**
40:18
**adult** 19:24
**advice** 63:11
63:13
**advised** 69:22
70:23
**affect** 111:9
112:2
**afraid** 109:24
**afternoon**
4:18,20,22
**age** 17:11
**AGENCY**
1:21
**agg** 15:6,12
15:14 17:1
**aggressive**
65:11,12,19
65:19 71:16
**agree** 41:16
41:20
**agreed** 29:22
30:10,20,21
**agreement**
4:4 62:10
62:12,14
64:21 67:4
81:17
**ahead** 110:13
**ajar** 61:3
79:23
**al** 1:4,7
**alcohol** 46:11

46:13,24
47:4,5,7,16
**alertness**
87:11
**Alexandra**
1:15 2:3 9:7
58:16 114:4
114:22
**Alexandra.l...**
2:5
**aliases** 5:14
5:19,22 6:4
6:17
**alive** 107:20
**allegation**
113:13
**alluded** 62:13
**Alvarado**
1:15 114:4
114:22
**ambulance**
95:11,13
**amniotic** 93:9
93:11,17
**amounts**
42:21,23
**and/or** 41:13
43:9
**Andy** 95:4
**animated**
110:8
**answer** 8:22
35:18 48:20
49:19 60:6
68:20 69:2
74:20
103:21
**answered**
29:11 39:7
53:16 68:9
68:13 71:7
76:8 90:18
103:18
110:13
111:7
**answering**
7:21,22
**answers** 69:5
74:22
**anthropology**
32:12
**apartment**
23:13

**apologize**
9:15 17:2
**appeal** 15:21
15:22
**appealed**
16:14 74:9
**appear** 61:12
**appeared**
49:13 61:8
**appetite**
43:20
**applied** 34:5
**apply** 33:8
**applying**
33:19 56:7
**approximat...**
20:4,14
22:24 23:1
23:2 24:7
26:2 31:16
35:3,7,19
37:11 48:2
100:6
108:17
**Arch** 1:17 2:9
2:13
**area** 100:23
**argued** 27:12
**arrangement**
62:8
**arrest** 7:9
14:2 26:24
27:1
**arrested** 6:23
7:6 12:19
12:22,23,24
12:24 13:1
13:2,3 52:4
**arrests** 26:24
**arrive** 56:14
**arrived** 49:23
57:6 59:6
67:12
**arriving**
113:14
**articulate**
106:12
**aside** 104:3
**asked** 29:11
39:6 53:15
61:22 62:2
62:8 64:2
69:12 73:8

75:14 76:12
81:11 86:15
86:16 88:9
88:9 90:19
92:7 103:17
107:19
109:19,21
110:12
111:6
112:13
**asking** 7:20
81:8 89:1,2
92:14 113:3
**aspect** 69:6
**assault** 15:6
15:12,12,14
17:1
**assistance**
47:19 48:1
48:3,6
**associated**
14:2 51:3
92:24
110:21
**Associates**
1:20 100:1
**assurity** 74:3
78:5
**Atlantic**
17:13 31:5
**attempt** 53:8
101:16,18
**attempted**
14:20
**attempting**
6:23 57:17
**attend** 31:21
34:17
**attended** 31:8
31:22 33:23
97:3,4
**attending**
99:15,17
100:5
**attention**
95:1
**attorney** 8:11
8:23 9:2,5,7
9:8 100:14
101:11
113:3
114:12,17
**Attorney's**

15:23 16:16
**attorneys**
5:24 6:4
8:16 9:16
9:18,21
10:1,4,13
**August** 23:1
23:18,23
24:12
**authorities**
16:4
**Authority**
12:1
**autism** 41:6
**automobile**
95:21
**aware** 40:17
40:19 44:19
45:10 90:5

**B**

**B** 3:13
**baby** 44:9
**bachelor's**
32:11 33:15
**back** 17:16
27:15 31:20
43:6 55:3
58:19,22
59:7 62:7,7
73:16 77:10
77:13,23
78:10,18,21
80:10,16,18
81:21,24
87:19 94:18
94:21
**backward**
81:2 83:14
**backyard**
43:9 90:23
91:6,14,15
**badge** 74:14
76:21 77:1
108:19,21
108:24
109:6,8
**balance** 82:13
**banged** 78:22
90:17
**banging**
56:24 57:1
79:1
**bank** 36:17

36:19 37:12
**Baptist** 11:14
**base** 55:10,10
**based** 6:22
17:19 21:12
38:9 41:24
43:18 57:24
84:10 85:13
93:13,15
102:10
**basically** 53:5
**basis** 19:12
51:24
**bath** 52:22
**bathroom**
54:4
**bathrooms**
54:3
**bed** 53:3,4
56:8,8
57:15 62:4
63:6 90:21
**bedroom** 43:5
43:6,10
54:2 55:9
56:5,5,6
57:3 61:20
**bedrooms**
53:22 56:4
**beds** 52:24
57:12,16
61:4
**began** 30:12
32:16 57:3
58:1 61:11
73:23 76:16
79:5
**beginning**
105:7
**behaved** 63:1
63:3 66:15
84:14
**behaves**
106:21
**behaving**
65:5 113:14
**behavior**
36:19,21,22
62:22 86:24
**Behavioral**
87:1
**behaviorally**
87:5
**behaviors**

65:3 104:13
**believe** 6:11
6:16 7:8
10:6 12:5
13:4 17:4
24:24 25:12
28:2 29:12
29:20 30:5
30:15 41:6
41:12 43:22
44:14 45:18
51:23 60:6
60:7 61:20
65:20 68:5
71:3,21
73:16 79:24
80:17 83:14
88:14 90:18
95:2,4,6
96:21 98:20
101:1
102:19,21
103:24
104:1
107:13
**believed**
49:21
**belly** 83:2
87:4 93:4
**better** 79:2
96:12
**big** 27:13
**biological**
40:16
**biology** 32:12
32:12
**biomedical**
37:6,8
**birth** 5:4
17:10 98:2
**bit** 66:2 77:16
105:15
**blame** 21:22
**blinds** 64:15
64:17
**blood** 36:17
36:19,21,22
36:22 37:12
**board** 104:10
**born** 17:12
17:13
**bottom** 78:24
**break** 22:7,13

Darus Hunter
September 14, 2018

54:11
**briefly** 8:12
36:16
**bring** 64:21
87:19
**bruises** 88:1
**bruising**
87:22
**building** 9:9
34:23
**business**
35:10
**busy** 98:23

**— C —**
**C** 2:1 114:1,1
**C-I-N-Q-U-...**
18:13
**calculate** 96:4
**calendar**
32:15
**call** 39:5
67:14 68:3
68:4 69:8
69:22 70:8
70:10,11,13
71:3,13,15
71:17 72:20
72:21,22,23
73:5 75:8
75:11,14
76:16 77:5
77:7,11,12
77:13,19
78:12 88:17
88:18
**called** 38:4,9
38:16 39:4
49:20 67:7
67:7,8 68:5
69:9,19
70:10,14
71:3,14,18
73:3 80:12
88:14 94:4
94:6 95:8
95:11 97:14
**calling** 89:5
**calls** 40:23
42:7 48:20
53:14 72:18
77:24 80:11
82:8,16
83:24 84:23

94:9 98:13
106:19
108:9
**calm** 66:12
66:15,16
81:6 86:23
87:4
**calming**
87:18
**capacity**
105:23
**care** 17:20
20:2,3,6
40:20 41:2
41:4,17,20
42:2,4
112:17
**case** 10:17
11:15,16,17
11:18,20
12:10 15:16
15:22,24,24
27:23
114:18
**case-by-case**
51:23
**cases** 21:22
**caution** 8:14
**cells** 36:22,22
**cellular** 41:14
**center** 36:20
**certain** 59:16
75:22 76:14
101:19
**certificate**
32:1,2 98:2
**certification**
4:6
**certify** 114:5
114:11
**chance** 98:14
**changed**
68:24
111:13
**charge** 14:1
14:17 16:5
16:9,14
17:5
**charged**
13:19,23
14:16,19,23
15:5,10,15
16:2,3

**charges** 13:22
14:2,21
16:12,20
**check** 35:17
63:16,19
64:1,6
**chemicals**
41:13
**chemistry**
32:21 33:13
**Chestnut**
33:23 34:17
36:2,6
**child** 18:10
40:10 44:13
50:10 98:9
111:13
112:2
**children**
17:21 19:3
19:8,17,19
19:20 23:7
25:23 30:12
30:14 38:10
38:20,21,22
40:16,18
47:23 52:21
52:22 61:3
61:7,15,17
62:3 95:18
95:20,22
97:3 111:11
**choice** 71:18
**chose** 34:14
**chronological**
79:7
**Church** 11:14
**cigarette**
45:11
**cigarettes**
44:21 45:4
45:16,19,21
**Cinquetta**
18:13 62:21
**circumstan...**
30:17 46:14
52:6
**citing** 101:13
**citizen** 102:19
**citizens**
113:10
**city** 1:7,16
2:12 16:21

17:12,13,16
31:5 111:21
113:4
**civil** 1:2 11:5
**claims** 102:12
102:22
**clarify** 9:12
77:16
**clear** 13:13
77:15
**clearly** 36:18
91:1,16,22
91:23
**client** 105:6
**close** 56:18,19
91:10 105:4
**closed** 15:18
15:19 16:1
16:16 27:16
64:13,17
**closer** 49:3
57:4
**code** 20:11
**coffee** 55:7,8
**college** 31:17
31:18,21,22
33:23 34:18
36:3,6
47:17
**come** 6:15
34:6 76:13
78:9,17
84:13 89:3
**comes** 64:21
80:6 95:13
**coming** 8:8
21:19 73:16
73:19 74:11
78:24 80:10
83:8
**commencing**
1:18
**comments**
49:24
**Common**
27:21
**commonpla...**
65:11
**communica...**
74:4
**communica...**
8:15,20
106:14

**Community**
31:18,20,22
**company**
12:2 34:24
35:1,2,19
36:17
**complain**
67:9,10
69:20 80:13
102:13,15
110:1
**complained**
67:18 92:23
**complaining**
67:16 71:1
88:15
104:17
**complaint**
39:11,16
69:23 70:22
71:11,13
73:15,18
81:9,12
86:17,21,22
88:10,24
90:20 92:8
98:17 99:2
103:9
109:20,23
109:24
110:4,16,22
111:1
112:14
**complete** 33:4
33:10,18
**completed**
32:1,11
33:9,11
34:4
**completely**
16:5 66:15
85:16 106:3
**compliance**
104:16
**complied**
30:7
**complies** 5:13
54:8,19,23
56:7
**components**
36:22
**compromised**
93:17

**concern** 74:2
84:6 89:14
92:18,19
111:23
113:7,8
**concerned**
84:17 87:14
89:9 92:11
92:21
**concerns** 93:1
103:3
**concluded**
32:17
113:22
**conclusion**
76:19
**condescend...**
109:22
**conditions**
107:3
**CONFIDE...**
4:2
**confusing**
9:16
**conjunction**
14:7
**connections**
41:5
**consequences**
44:4,6
84:17
110:21
**consider**
42:23 84:10
**consideration**
84:15
**consolidated**
14:8
**conspiracy**
14:20 15:1
15:7
**conspirator**
104:13
**contact** 20:1
53:19 70:23
**contention**
110:18
**contentious**
113:18
**contentment**
89:15
**continually**
89:9

**continue**
103:3
**Contracting**
35:1
**contractor**
34:23,23
**controlled**
13:21 14:16
14:24 15:1
**convenient**
99:2
**conversation**
69:11,17
70:20,21
71:23 72:1
73:12 74:18
76:11
109:15
**conversations**
71:20,21
78:4,8
**converted**
54:1,1
**copy** 100:14
**cordial** 50:9
**cordless** 55:9
55:11
**correct** 6:8,10
7:15 13:17
13:19 14:18
49:19 51:16
55:4 56:15
59:1 91:15
98:17 103:9
105:19
110:6
**corroborator**
104:5
**cot** 61:7
**cots** 52:24
55:15,19,20
55:23,24
56:3,10,11
57:13 61:12
**counsel** 2:6
2:11,15 4:4
10:17 13:9
105:6
114:12,17
**Counseling**
100:1
**counselor**
99:23

**country**
111:20
**couple** 57:1
86:19 103:8
**courses** 32:20
32:23 33:7
33:7
**court** 1:1,21
7:17 26:8
27:19,20,21
27:21 28:1
29:6 30:13
58:21 94:20
97:3,4,5
114:4,22
**courts** 16:15
**create** 41:13
**crime** 15:7,12
**criminal** 6:16
13:6 14:20
15:1,7
27:20
113:13,15
**CROSS-EX...**
105:9 112:9
**current** 20:8
34:22
**currently**
15:17 25:16
**curse** 70:2
**custody** 19:15
19:16 62:8
62:10,12,14
64:21 67:2
67:3 81:17
**customer**
62:11

**— D —**
**D** 3:1
**Damage**
99:10
**damages**
102:9,10
**Darius** 4:19
**Darrell** 5:17
5:18 6:13
6:20 7:11
**Darus** 1:4,14
3:4 4:11 5:3
6:21 18:6
18:22,23
19:11 20:21
23:7,9,13

Darus Hunter
September 14, 2018

23:14 24:19
25:3,4
48:15 53:3
56:8,9 57:4
60:18,19,21
105:12,16
**date** 17:10
97:5 114:9
**dated** 22:8
114:23
**dating** 22:4
**daughter**
49:22 62:1
62:15,22
63:16,23,24
64:20
107:22
112:3
**daughters**
52:23 107:6
107:15
**day** 52:14,15
52:19 53:12
62:15,23,24
89:3 90:2
92:16 94:5
94:5 95:19
113:17
**days** 19:13
42:21 46:5
46:5 93:3
94:1 103:8
**DE** 1:23
**deal** 21:11
41:2
**dealing** 99:18
**December**
12:23 13:19
14:3 32:17
34:2,19
**DECHERT**
2:8
**decide** 93:22
**decided** 33:16
34:7 77:4
**deduce**
103:24
**deduct** 93:16
**deductive**
60:6
**defendant**
11:2 12:17
**defendant's**

105:5
**Defendants**
1:8 2:15
**degree** 31:24
32:7,7,10
32:11 33:1
33:16 34:3
34:4,5,9,12
**demeanor**
66:6,9
110:17
**DEPARTM...**
1:17 2:12
**depending**
42:21
**depends** 42:9
46:14 52:3
**deposed** 12:5
12:12
**deposition**
1:14 9:17
9:22 10:5,7
10:17,19
11:1 12:4
58:17 68:16
68:17 105:5
113:22
114:7,15
**depositions**
10:9,14
68:22
**Depot** 12:9
12:11
**describe**
50:23 61:10
65:2 81:24
110:10
**described**
65:18
**description**
3:15 82:2
**designated**
69:4
**detail** 101:2
105:15
**details** 11:6
21:21 38:20
**determine**
82:11
**developing**
44:16
**development**
41:15

**devices** 41:12
**diagram**
54:17,22
**differences**
26:7
**different** 34:8
48:6 51:15
**difficult**
55:18 82:10
**dinner** 52:20
52:20,21
**dinnertime**
53:6
**direct** 4:15
52:8
**direction** 50:1
61:13
**directly** 27:1
43:10 59:3
59:16 74:21
85:15
**disabilities**
106:23,23
**disability**
48:13
**disagreement**
27:17
**disbelief**
73:23 74:2
**discharge**
93:7,10
**disclose** 8:14
8:19
**discuss** 10:13
101:9,10
**discussed**
17:5 45:17
101:8
**discussion**
58:15
101:24
105:1,6
**discussions**
88:16,19
**dismissed**
16:11,13
**disorder** 41:6
**disposed** 14:6
14:11
**disposition**
11:19 12:10
**district** 1:1,1
15:23 16:16

67:8 68:5,7
68:19 69:3
69:9 70:24
71:4,6 74:5
74:7,12
76:4,8 77:5
78:15 88:14
89:4
**divorce** 26:11
26:12,13
28:22
**divorced** 26:6
**doctor** 100:2
**documentat...**
100:14
**documents**
8:8
**doing** 4:22,23
66:22 81:4
91:9 104:7
104:7
113:17
**domestic**
26:19 27:3
27:18,22
29:3 30:24
**door** 43:6,7
55:13,16,21
56:24 57:2
57:23,23
58:3,5
60:22,24
61:1 64:8
78:23 79:2
79:3,4,9,16
79:17,18,21
79:22,23,24
80:21,21
81:1 82:3,6
83:1,3,8,9
83:20,23
84:22 85:10
85:13,17,18
85:20,20,21
85:22,22,23
86:1,2,10
87:4 88:8
90:17,18,19
92:2
**doorknob**
105:17
**doubtful** 85:2
85:4

**Dragalin** 2:3
58:17 113:3
**drank** 46:15
47:17
**draw** 54:5,16
83:12
**Drawing** 3:16
**drawn** 55:1
**drew** 55:7
**drink** 46:11
46:13,16,20
47:2
**dropping**
50:11
**drops** 50:11
**DRS** 35:1
**drug** 27:13
**drugs** 42:6,10
46:9
**dry** 44:6
**duly** 4:12
**Dunbar**
100:1
101:12,14
101:16
104:19
**dysjunction**
41:14

_____
**E**
_____
**E** 2:1,1 3:1,13
114:1
**E-B-B-O-N-...**
18:3
**earlier** 47:16
49:19
100:20
110:7
112:12
**early** 41:3
**earned** 31:13
35:18
**Eastern** 1:1
11:24
**easy** 50:2,2
**eating** 43:23
**Ebbonay**
17:24,24
18:15,19
19:23
**education**
32:19 33:22
34:20 41:24
**effect** 44:7

62:18 81:4
**effects** 44:15
44:18
**effort** 6:21
7:10 30:13
**either** 77:12
108:19
109:13
**elaborate**
26:21 41:11
113:6
**eldest** 107:22
**element**
59:13,19
60:9 102:20
**elevated**
65:15,21,24
66:4 87:10
**elicit** 49:9
**emergency**
74:10
**emotional**
84:11
**employed**
51:21
114:13,17
**employee**
114:16
**employment**
35:16 36:10
**encounter**
91:12
**encountered**
102:11
**endangerm...**
15:13
**ended** 70:9
71:3
**engage** 41:19
106:12
**engagements**
41:8 113:18
**engaging**
52:8
**enhance**
43:20
**enjoy** 102:19
**enter** 106:7
**entered** 58:11
59:10,22
60:1 69:21
**entire** 25:2
**entirety**

76:18
**entitled** 34:12
**ESQUIRE**
2:3,3,8,13
**estimate** 65:1
96:2
**estimated**
88:5
**et** 1:4,7
**evade** 6:21
7:11
**event** 21:13
21:18,21
101:10
102:11
111:18
**events** 21:12
21:15,16,18
21:21 84:12
104:10
**eventually**
23:8
**Everything's**
63:6
**evident** 85:9
106:24
**exactly** 95:3
100:10
101:5
**EXAMINA...**
3:5 4:15
112:23
**examined**
4:12
**excessively**
44:7
**exchange**
44:10 49:4
50:10
**excuse** 19:10
19:11,18
26:4 62:12
68:16 70:9
**excused**
113:21
**exhibit** 54:10
83:17
**exist** 41:6
**existed** 29:14
62:10
**exists** 62:8
**experience**
44:11

**experienced**
59:19 60:9
99:19
**experiencing**
62:18 68:15
93:4,7 94:6
**expired** 34:16
**explain** 6:18
27:6
**explained**
26:24 61:24
70:21 73:14
**explaining**
73:17
**explored**
101:2
**express** 73:23
**expressed**
50:20,24
66:6 75:18
87:13
**extend**
102:22
**extended**
28:17
**extends**
104:14
**extent** 48:21
64:5
**eye** 27:16
**eyes** 64:19

_____
**F**
_____
**F** 114:1
**face** 27:16
107:17
111:13
**faced** 16:20
**faces** 91:24
107:17
**facetious**
110:19
**facilitate**
50:10
**fact** 45:13
62:13,18
109:10
**facts** 30:3,5
**fairly** 98:23
**fall** 81:22
**falls** 78:12
**falsification**
16:4
**familiar** 16:6

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Darus Hunter
September 14, 2018

family 17:20
28:1 29:6
30:13 32:1
73:19
102:23
111:11
112:2
far 29:15
43:23 46:19
52:6 62:22
67:21 78:2
82:20 96:1
100:18
102:12,15
102:17
106:14
107:2
108:15
111:12,19
111:21,23
Farm 12:1
fashion 65:6
69:21 71:16
fast 80:1
father 98:5
February
12:24 13:4
17:4 24:11
25:1
feel 34:8
41:22 43:14
49:11 51:18
51:19 66:14
110:24
113:5
feeling 51:19
59:13 71:17
100:24
feelings 49:12
49:14 51:3
86:24 99:18
102:10,11
111:9,10
feet 55:19,22
55:24 57:11
60:20 64:4
felt 30:11
66:8 89:7
93:24 94:2
fetus 44:16
field 34:8
fielded 81:7
file 69:23

70:22 71:11
71:13 73:15
73:18 81:9
81:11 86:17
86:20,21
88:9,24
90:20 92:7
98:16,22
103:9
109:19,22
109:23
110:1,4,16
111:1
112:14
filed 28:4,5
29:8,19
30:15 39:11
99:1
filing 4:5
110:22
filled 93:17
financially
114:18
find 39:19
97:16
finding 45:3
fine 4:24 63:6
finish 54:10
63:22 86:5
finished
34:10
first 9:1,4,6
10:3 39:19
60:15 68:4
71:23 75:7
75:13 77:12
93:1 108:18
114:8
five 14:10
17:22 46:5
48:2 64:4
flash 57:14
flashlight
59:3
flashlights
57:14
Floor 1:18
2:9,14
fluid 93:9,10
93:12,18
94:3
focused
100:23

followed
14:10
following 7:9
26:12 32:22
52:21,23
62:16 77:10
77:19 84:3
87:9 90:23
92:17 97:2
97:5
follows 4:13
food 47:23
48:8
foot 79:23
forced 80:21
81:1 85:22
forceful 82:12
82:15,19,21
forcefully
83:6
forces 60:7
forcing 85:23
foregoing
114:5,7
forgery 15:16
16:3 17:5
form 4:8
29:11 43:17
47:9 48:7
48:20 50:8
51:11 87:6
89:19 97:18
98:6,11
106:18
107:12
108:8
112:19
forth 114:10
forward
103:4
foster 20:2,3
20:6
found 11:21
12:11 15:3
15:11,14
four 32:15
43:2 55:22
100:6,7
frame 22:22
100:9
Frankford
31:6
fraudulent

30:16
free 33:10,13
freedoms
102:14,17
102:24
Friday 1:11
19:13
friendly
50:13 65:24
FRIENDS
1:21
front 9:8
30:17 45:7
55:2,13,16
55:21 57:23
58:10 83:9
83:20 91:7
fucking 79:3
79:9
full 1:21 5:1
35:4 37:13
37:16 85:24
full-time
19:12 35:14
36:2 37:20
37:23
Fung 2:13 3:6
4:17 6:8,9
8:21 9:14
13:9,16
29:17 38:7
38:11 39:10
40:15 41:10
42:11 44:1
47:12 49:8
49:16 50:14
50:22 51:13
53:18 54:15
58:13,19
59:24 74:23
74:24 82:14
82:24 83:19
83:21 84:5
85:3 86:8
87:21 89:20
94:11,15,18
94:23 96:7
96:11 97:22
98:8,15
101:23
102:2
103:15,20
104:22

105:3
106:18
107:12
108:8
110:12
111:6
112:12,19
113:1,20
further 26:21
27:6 32:19
33:21 34:20
112:5
113:20
114:11,15
fused 36:20

_____

G

gap 55:22,24
GED 31:12
31:13
general 51:19
63:13
100:24
111:3
generally
43:5 49:4
getting 21:10
22:1 51:9
girlfriend
53:3 62:9
79:4 81:2
girls 57:17
gist 27:16
give 19:21
22:22 52:19
60:5 72:3,6
72:11,14,19
75:1,21
76:15 98:14
100:9
101:11
105:24
106:7
given 72:16
75:13,23
98:9 113:11
gives 62:14
giving 63:11
go 5:14,18,21
13:6 18:9
31:3,17
32:18 33:17
38:20 46:16

53:8 58:13
63:6 74:22
89:4 90:21
95:15,17
96:22 97:1
101:21
104:23
105:13
110:13
goes 91:19
going 8:14
20:5 30:19
34:7 54:5
80:13 83:10
89:10 95:23
103:4
105:13
good 4:18,20
4:22 42:1
43:14 100:9
graduate
31:10 35:14
36:11 102:5
granted
103:1
great 21:11
22:23 41:2
101:2
111:15
ground 87:19
103:3
guard 66:2
guess 21:17
41:8 42:10
44:5 57:5
65:10 70:24
88:5 100:23
101:16
guided 59:7
65:8
guilty 13:21
14:1,8,9,17
14:21 15:3
15:8,11,14
guy 91:18
guys 22:7
26:8 43:4
63:12

_____

H

H 3:13
H-A-M-E-...
73:11
hair 45:11
half 14:9 96:3

96:14,16,16
Hameen
73:11,13,14
76:2,20
hand 61:1
79:24
105:17
handcuffs
91:20
handle 99:1
handled
27:21
100:24
handling
98:24
hang 70:12
happen 89:13
happened
61:21 67:4
69:9,13
70:19 73:5
76:10 77:7
80:23 84:16
86:17 88:13
90:22
happens
51:22 79:20
harassing
73:19
harbor 49:14
103:3
hard 82:7,11
he'll 63:8
head 8:1
headquarters
68:19 69:3
74:10
heads 81:18
health 47:22
48:7
hear 79:17
82:3
heard 57:5
86:20 90:23
110:4
hearing 30:22
heightened
84:11 87:11
held 58:15
101:24
105:1
hell 81:3
hello 49:1

96:14,16,16
help 45:20
75:15,22
helping
112:17
high 31:3,5,6
31:8
Hill 33:23
34:17 36:2
36:6
hit 27:14,15
82:3,6 83:1
83:3,3,5,6,7
83:23 84:21
86:10 87:3
88:8
holiday 62:16
holidays
62:19
home 12:8,11
19:12,17,19
23:18,19
24:21 32:2
35:23 38:4
38:16 39:4
39:5 49:22
49:23 53:6
53:22 54:6
56:14,20
58:11 59:10
59:17,23
60:2,3,7,16
62:2 66:13
67:13,20,22
68:1 69:21
73:17,19
75:3,19
76:13,24
77:23 78:10
78:18,21
83:9 84:13
88:4 89:10
89:11 96:1
102:18
104:2 106:8
108:18
109:18
111:12
113:14
homes 113:11
hospital 96:1
96:18,19,22
97:7,8,9,20
hour 96:16

Darus Hunter
September 14, 2018

**hours** 35:6
96:21
**house** 20:17
21:19 36:12
45:19 49:20
50:12 54:21
55:2,6
57:10 60:12
62:23 74:11
77:14 90:12
91:7
**household**
21:12
**huh-huhs** 8:2
**human** 41:15
**hung** 70:9
71:17
**Hunter** 1:4
1:15 3:4
4:11,18,19
5:3,23 6:21
7:14 9:15
10:8 13:5
13:17 16:18
18:6,7,8,9
18:22 19:2
21:24 25:16
25:24 27:4
28:8,20
29:9,15,19
30:8,11,15
31:3 38:3
38:24 42:5
44:20 45:23
48:15,17
51:14 54:16
54:20 56:2
56:12 83:16
92:10 97:11
101:7 102:9
103:7
105:17
111:3 113:2
**Hunter-1**
3:16 54:7
54:13
**Huntly** 5:17
5:18 6:13
6:20 7:11
**HUP** 97:9
**hurt** 82:15,20
**hyperactive**
65:5

**I**
**ID** 5:7,9
**idea** 43:14
**identification**
54:14
**identified**
71:9
**identify** 57:17
73:22 74:5
75:2,15
91:10
**identifying**
92:1
**identities**
109:13
**identity** 6:24
70:17 73:22
**ill** 49:12,14
**illustrated**
62:17,21
104:15
**imagine** 49:2
**immediately**
46:22 83:7
84:2 87:8
89:8 92:12
92:14,17
97:6
**impairments**
106:15
**implication**
104:9
**implicative**
110:20
**implies** 56:8
**impose** 30:19
**in-house**
68:18
**incarcerated**
14:4 31:15
**inches** 108:17
**incident**
16:19 26:20
27:12 38:4
38:10,19
39:13,13,15
52:10 53:7
87:23 92:15
92:18
100:11,18
101:2
103:12
107:6

108:11
111:4,10
**incidents**
50:19 52:12
52:13 102:4
**includes**
96:19
**including**
21:12
**income** 48:12
**indicate** 56:4
**indicated**
56:3 57:13
**indicating**
55:14,17,20
57:7 83:9
83:12,13,19
**individual**
51:20 85:23
99:22
113:16
**individually**
18:10
**individuals**
21:22 24:20
68:20 91:24
107:1
**influenced**
69:5
**information**
8:17 72:3
75:1,15,21
75:22 92:1
97:20
101:16
104:1
105:24
**informed**
68:11 71:10
97:20
**infringed**
102:20
**infringement**
102:14,17
**ingesting**
43:23
**ingestion**
44:8
**initial** 7:9
**initially** 16:3
16:14,15
17:15 23:6
24:18 29:21

41:21 56:24
65:8 70:16
**injure** 82:19
82:22
**injured** 83:22
84:7 89:17
89:21,23
90:4,6
92:21
**injuries** 99:3
99:4,6,7
**injury** 99:9
**inside** 60:16
85:10
**instance**
46:15
**instances**
12:14 41:12
113:9
**instructing**
8:18
**instrument**
15:6,11
**insurance**
12:2 47:22
48:7
**intend** 41:19
**intending**
42:3
**interacting**
60:16
106:17
**interaction**
52:16 60:14
66:1,23,23
88:3 92:10
111:18
**interactions**
51:15 52:1
52:11 53:11
81:14 90:8
103:23
105:14
**interested**
114:18
**intermittent**
42:21 48:5
**interpreted**
52:4
**Interrogato...**
6:1
**Interrogato...**
13:10,14,18

**Interstate**
36:17 37:12
**intervention**
93:23 99:21
104:20
**interventions**
41:4 99:12
**intimately**
101:6
**intimidated**
109:24
**intruding**
67:19
**invaded**
104:1
**invading**
102:18
**involved** 51:2
51:10
**involvement**
51:4,5
103:12
**involving**
38:10,19
**inward** 86:3,4
**irate** 84:14
**Irreconcila...**
26:7
**issue** 47:6,11
**issued** 5:6,9
**issues** 41:14
50:20

**J**
**Jackson** 5:20
5:21 6:13
7:4,5
**jail** 31:15
**January**
14:15 21:3
24:11 32:16
**Jehovah**
11:14
**Jersey** 17:13
**Jireh** 11:14
**job** 36:20
37:12 102:6
**JOHN** 2:8
**joint** 42:24
43:1,3 46:1
**Jonathan**
100:4
**Jr** 18:6,22
20:21 48:15

56:9 57:4
60:18,19,21
105:17
**judge** 30:18
**July** 21:8
**June** 13:1
14:23

**K**
**K-A-S-S-I-M**
18:6
**K-E-E-S-H-...**
19:1
**K-H-A-D-I-...**
18:7
**Kassim** 18:6
19:3,4,5,10
20:2 23:8
23:16
**KD** 56:7
**keeping**
62:15
**Keeshama**
19:1 25:24
38:24
**Kenya** 2:11
20:23,24
23:6,6
24:18,23,24
56:7
**Khadira** 18:7
18:10,11
19:12 56:11
57:18
**Khadira's**
57:15
**kicking** 78:22
**kind** 59:7
63:11 65:9
81:5,7 96:5
105:13
110:8
**kitchen** 56:1
57:8
**knee** 99:18
**knew** 6:23
109:13
**knob** 61:2
79:22
**knock** 82:13
**knocked**
80:20 81:1
83:14
**knocking**

57:22 58:1
58:2,4
79:17
**know** 7:8
8:17 19:23
22:9 25:9
27:7,11
28:6,7
29:18 38:14
39:22 40:4
40:8,12,14
40:22 42:13
42:15 45:7
45:9,15,24
46:19,22
47:14 48:21
48:22 60:2
60:24 67:18
67:21 68:8
68:10 69:15
70:17 71:7
72:7,15,20
73:6 74:11
74:15 75:5
75:7,20
76:1 77:3,9
77:22 79:8
79:11,14
80:4,14
82:1,20,21
83:6 85:1
86:14 87:24
89:23 93:8
97:11 98:7
98:9,12
100:10
101:4,5
**knowing** 60:8
**knowingly**
13:20,24
14:16
**knowledge**
40:6 44:18
69:1 90:4
93:5
**known** 6:12
47:6 48:23

**L**
**Labor** 62:24
**lack** 51:3
**laid** 53:2,4
**LANE** 1:21
**Lastowski** 2:3

6:6 8:13 9:7
9:11 13:12
29:10 38:6
39:6 40:11
40:23 42:7
43:16 47:8
48:19 49:10
50:7,16
51:11 53:15
54:9 58:16
62:1
**LAW** 1:17
2:12
**layout** 54:6
**lays** 64:19
**leading** 56:13
**learn** 68:14
**learned** 109:8
**leave** 81:10
86:19 88:10
89:16
**led** 21:13
**left** 58:16
63:2,7,14
67:5 77:4
86:22 88:13
90:3,21
104:5
**leg** 27:14 93:8
**legally** 20:24
21:4 25:17
**leisure** 33:10
**length** 55:19
**Leon** 4:19 5:3
**level** 65:20,24
66:1 87:11
**LEWIS** 2:2
**liable** 11:21
12:11
**library** 37:6,8
37:15
**life** 47:17
51:14
**light** 57:14
58:8 59:5
61:6 63:20
68:1
**lights** 107:16
**limited**
105:23
**lines** 16:7
**Lisa** 18:21
**list** 53:6

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Darus Hunter
September 14, 2018

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **listed** 98:5 | **longer** 15:23 | 25:17,19,21 | 75:4 76:5 | 107:13 | 50:21,24 | **negative** 44:4 | 111:15 |
| **Listen** 71:16 | 16:17 | 28:8,9 51:9 | 77:8,11,20 | **misconduct** | 51:2 53:12 | 44:5,15 | **numbers** 77:2 |
| **listened** 76:18 | 100:12 | **marrying** | 78:3,4,8 | 52:8 | 53:20 62:21 | 52:1,3,4,5 | 108:20,21 |
| **litigating** | **look** 5:12 | 51:8 | 109:5,9,15 | **molecular** | **Muhamma...** | 110:21 | 108:24 |
| 30:12 | 61:8,12 | **mastery** | **members** | 36:21 | 48:18 50:12 | **neither** | 109:7,9 |
| **litigation** | **looked** 62:6 | 106:3 | 102:23 | **moment** | ‾‾‾‾‾‾‾‾‾ | 114:12 | **nutrients** |
| 30:13 | 81:2,16,17 | **matter** 11:4,5 | **mental** | 110:24 | **N** | **never** 34:5 | 44:8 |
| **little** 66:2,5 | 90:24 91:6 | 11:6,13 | 106:23 | **Monday** | N 2:1 3:1 | 39:3 45:7 | **nutrition** |
| 77:16 | 91:8 | 12:7,8,15 | **mentioned** | 19:14 62:19 | 114:1 | 48:23 49:2 | 43:24 |
| 105:15 | **looking** 64:7 | 14:5,6,14 | 14:12,13 | **monitor** | **name** 4:19,21 | 104:5,6,8 | **NY** 1:23 |
| 112:4 | 85:15 | 16:17 45:17 | 16:13,18,23 | 41:21,23 | 5:1,4,6 6:20 | 109:8,13 | ‾‾‾‾‾‾‾‾‾ |
| **live** 24:13 | **looks** 55:1 | 89:7 | 19:3 20:20 | **monitored** | 7:1,11 | **New** 17:13 | **O** |
| **lived** 23:4 | 56:4 | **matters** 14:7 | 21:15 23:17 | 41:1 | 73:11 74:2 | **NEWTOWN** | **O** 114:1 |
| 24:18,21 | **loss** 112:1 | 14:11,13 | 43:11 44:2 | **monitoring** | 74:14 76:17 | 1:22 | **O-U-T-T-E...** |
| 25:1,8 | **loud** 56:24 | **MCAT** 33:18 | 45:23 91:13 | 43:11 | 76:21 98:4 | **nicknames** | 18:4 |
| **lives** 19:23 | 65:9 109:22 | **McClam** 2:8 | 99:16 | **month** 23:21 | 98:10 100:3 | 5:15 | **oath** 7:15 |
| **living** 19:17 | **louder** 66:6 | 3:8 94:9,13 | 100:22 | 38:14 39:22 | 100:3 | **night** 52:11 | **object** 51:11 |
| 19:19 20:12 | 87:15 | 94:16 112:6 | 104:18 | **monthly** | **named** 25:24 | 56:13 66:17 | 98:14 |
| 20:19 22:16 | **lying** 74:15 | 112:11,21 | 105:16 | 47:23 | **names** 5:15 | 66:18 90:9 | **objection** |
| 22:18 23:3 | ‾‾‾‾‾‾‾‾‾ | **mean** 9:3,13 | 107:5 | **months** 14:10 | 6:5,15 | 91:20 99:4 | 8:13 29:10 |
| 25:7,8,9,10 | **M** | 9:13 26:12 | 109:17 | 20:4,14 | 17:23 18:2 | **nine** 20:14 | 39:6 40:11 |
| 25:12,14 | **M** 2:3 | 26:16 35:18 | 113:4 | 28:17 37:11 | 72:12 76:12 | **NJ** 1:23 | 40:23 42:7 |
| 38:1 53:1 | **M-U-H-A-...** | 36:18 47:1 | **Mercy** 96:1 | 39:23 40:1 | 76:22 77:1 | **nodded** 81:17 | 43:16 47:8 |
| 54:1 55:14 | 18:8 | 47:11 50:23 | **merely** 30:6 | 46:16,20,24 | 108:22 | **nods** 8:2 | 48:19 49:10 |
| 55:17 56:3 | **maintaining** | 51:5 52:3 | **message** | 100:6,7 | 109:2,9,16 | **noise** 78:23 | 50:7,16 |
| 57:3,6,8,11 | 36:12 | 58:1 61:10 | 62:20 | **MORGAN** | **nature** 103:5 | 90:23 91:6 | 53:15 82:8 |
| 59:6 67:12 | **major** 32:12 | 63:4 66:3,5 | **met** 8:23 9:1 | 2:2 | **nausea** 43:21 | **nonverbal** | 82:16 83:24 |
| 105:18 | **making** 91:6 | 86:24 92:14 | 9:4,6,7,13 | **morning** 97:2 | **Navedo** 10:9 | 106:3 | 84:23 87:6 |
| **LLC** 35:1 | **man** 71:16 | 94:16 | 9:16,21 | **mother** 18:12 | 58:9 59:10 | **normal** 65:21 | 89:19 94:9 |
| **LLP** 2:8 | **manner** | 109:11 | 10:3,12 | 18:13,20,21 | 66:22 68:23 | 65:24 | 94:13 96:5 |
| **loans** 36:14 | 65:11,12,23 | **meaning** | **Michaela** 2:3 | 18:24 19:1 | 76:23 81:15 | **normalized** | 97:18 98:6 |
| 38:1 | 66:16 84:14 | 21:18 78:24 | 54:11 58:17 | 19:2 25:23 | 81:20 90:14 | 107:1 | 98:11 |
| **located** 35:21 | 102:15 | 91:20 | **miles** 96:3,14 | 38:22 63:7 | 90:14 91:3 | **North** 20:9 | 103:13,17 |
| 53:22 54:21 | 106:22 | **means** 87:18 | 96:16 | 63:8,14 | 91:11 92:3 | 22:16 24:1 | 106:18 |
| 55:15 | 110:19 | 95:24 | **mind** 13:10 | **mounted** 55:5 | 103:11,16 | 24:14 | 107:12 |
| **locked** 81:6 | 113:14 | 111:19 | **mine** 57:5 | 55:10,11 | 103:22,22 | **Notary** 1:16 | 108:8 |
| 87:18 | **manufactur...** | **meant** 99:22 | **minor** 17:17 | **mouth** 44:6 | 104:5,15 | 114:23 | 110:12 |
| **log** 78:12 | 14:24 | **med** 33:17,19 | 32:12,13 | **move** 17:14 | 108:16 | **note** 83:16 | 111:6 |
| **logic** 74:9 | **March** 25:1 | **medical** 33:7 | 38:10,19 | 20:16 23:10 | 109:12,14 | 105:4 | 112:19 |
| **logistics** | 28:18 | 93:19,22 | 95:18,20,22 | 23:19 61:11 | **near** 83:20 | **noted** 92:23 | **objections** 4:7 |
| 106:6 | **marijuana** | 94:24 | **minutes** 57:2 | **moved** 17:15 | **necessarily** | **notice** 56:22 | **obscure** 6:24 |
| **long** 13:13 | 42:13,16,24 | **meet** 8:11 | 57:24 65:1 | 23:13,14,14 | 65:5 66:7 | 106:16 | 45:12 |
| 14:4 20:3 | 43:1,3,15 | 9:24 22:2 | 72:2 73:2 | 23:15,16,17 | 113:7 | **noticed** 94:3 | **obscured** |
| 20:12 22:21 | 43:19 44:12 | **meeting** 5:23 | 88:6 96:4,6 | 23:18 24:19 | **necessary** | **noticing** 74:1 | 85:16 86:1 |
| 24:5 26:1 | 46:3,4,7 | **Melner** 71:9 | 96:7,13 | 24:23,24 | 44:8 | **nourish** 44:9 | **obscures** |
| 31:14 35:2 | **mark** 54:6 | **Melvin** 10:10 | **miscarriage** | 25:4 | **need** 19:21 | **November** | 85:21 |
| 37:10 46:21 | **marked** 3:15 | 68:17,17,23 | 97:12,17 | **moving** 59:4 | 34:8 45:20 | 13:3 15:10 | **observe** 88:1 |
| 47:24 57:22 | 4:2 54:13 | 69:16,18,19 | 111:5 | **Muhammad** | 49:18 71:17 | 20:14 21:7 | **observed** |
| 64:23 71:24 | **Market** 2:4 | 69:24 70:2 | 112:18 | 18:7,7,14 | 76:15 81:6 | 23:1 25:4 | 108:12 |
| 72:22 74:22 | **marriage** | 70:7,10,12 | **miscarried** | 28:12 29:4 | 98:24 99:1 | **number** 3:15 | **obtain** 29:7 |
| 74:22 88:3 | 26:1 | 71:8,20,22 | 97:23 | 29:9,14 | **needed** 20:18 | 13:18 68:12 | 30:13 |
| 96:18 100:5 | **married** | 71:24 72:11 | **mischaract...** | 49:13,13,20 | 69:22 70:23 | 74:3,14 | **obvious** 85:7 |
| 101:5 | 20:24 21:2 | 72:22 75:2 | 87:7 103:14 | 49:24 50:5 | 71:12,15 | 76:21 | **obviously** |
| | 22:1,7,14 | | | | 76:16 89:8 | | 52:5 85:9 |

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Darus Hunter
September 14, 2018

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| occasion | 108:3,6,11 | 111:22 | 85:22,23 | pain 82:20 | Philadelphia | please 5:1,12 | 60:10 61:23 |
| 49:21 | 108:12,15 | Oh 16:24 | 86:2,4 | 92:24 93:4 | 1:7,17,18 | 7:20 23:12 | 64:3,11,24 |
| Occasionally | 109:14,14 | 59:21 96:12 | opened 60:22 | 93:24 94:2 | 2:4,10,12 | 54:21 74:13 | 64:24 65:9 |
| 46:12 | 109:21 | okay 6:15,18 | 60:24 90:19 | paper 34:9 | 2:14 15:22 | pled 13:21 | 86:2 |
| occasions | 110:3 | 7:1,4,10,23 | 92:2 | paramedic | 16:16,22 | 14:17,21 | possessing |
| 17:17 | 113:14 | 7:24 9:24 | opening 80:1 | 94:4,7 | 17:14 20:10 | 15:7 | 14:16,24 |
| occupation | officer's | 10:12 11:4 | 85:18,21 | 95:23 | 22:19 24:2 | point 9:21 | 15:6,11 |
| 34:22 | 56:22 109:8 | 11:7 12:14 | operations | part 62:13 | 24:3 25:14 | 10:12 14:15 | possession |
| occur 63:19 | officers 39:12 | 13:8 16:2 | 68:18 | 91:19 | 31:6 113:5 | 16:6,20 | 13:21 |
| 64:1 | 51:15,18 | 17:6 18:5 | operator | partially 61:2 | Philadelphi... | 21:4 29:2 | possible |
| occurred | 52:2,7,11 | 19:20 20:3 | 70:17,22 | particular | 31:18 | 29:14 30:12 | 103:5 |
| 77:20,24 | 52:17 56:14 | 20:12 22:11 | 73:7 76:7 | 47:1 77:9 | phone 53:14 | 33:11 44:15 | possibly 43:9 |
| 78:6 84:16 | 56:20 57:9 | 24:5,16 | 80:12 | 85:14,24 | 55:9,12 | 56:14 57:10 | 74:11 89:13 |
| 93:14 102:4 | 59:12 63:16 | 26:21 27:18 | opportunity | 108:10 | 68:9,13 | 59:12 61:22 | practically |
| 103:12 | 65:2 66:12 | 28:14 32:5 | 98:1 | parties 11:24 | 70:11,12,13 | 62:7 64:4 | 75:12 |
| occurring | 67:2,9,11 | 38:18,21 | order 26:22 | 114:14 | 72:18,20 | 64:20 65:3 | pre-med 33:6 |
| 80:2 91:5 | 67:19 68:12 | 40:2 43:4,8 | 28:3 29:16 | partner 59:14 | 77:24 80:3 | 65:4,8 | pregnancy |
| October | 69:20 70:24 | 44:23 45:15 | 30:9,16,19 | 59:21 | 80:6 109:6 | 69:22 70:3 | 41:18,21,23 |
| 17:11 28:17 | 72:4 73:15 | 55:13 58:7 | 30:21,22 | party 11:22 | phones 54:21 | 70:5 72:16 | 42:17 43:12 |
| 99:5 | 73:18,22 | 60:11,14,18 | 33:8 69:23 | patients 41:9 | 55:6 | 73:8,16,23 | 44:24 45:16 |
| offenses 13:6 | 74:6,16 | 61:5,14,18 | 71:13 77:9 | peace 113:11 | physical | 76:14,22 | pregnant |
| office 8:24 9:8 | 75:2,16,19 | 61:21 62:6 | orders 27:24 | Penn 32:22 | 33:12 82:20 | 77:21 78:9 | 39:20 40:7 |
| 15:23 16:17 | 76:13,24 | 63:5,5,12 | 29:7,19 | Pennsylvania | 99:7,20 | 78:17 79:3 | 40:9,13 |
| 35:22,23 | 77:4,10,13 | 64:7,10 | organic 32:21 | 1:1,18,22 | physically | 80:3 81:2,7 | 45:3 87:3 |
| officer 7:6 | 77:22 78:9 | 65:18 66:9 | 33:13 | 2:4,10,14 | 104:8 | 84:15,18 | premed 32:20 |
| 10:9 39:17 | 78:17,21 | 68:6,14 | organized | 12:1 16:22 | physics 32:22 | 85:15 88:21 | prenatal |
| 51:21 57:9 | 79:17 80:10 | 70:14,19 | 52:24 | 22:20 24:3 | 33:12 | 89:24 90:20 | 40:20 41:4 |
| 58:7,8 59:2 | 80:15,20 | 71:19,23 | orientation | 31:19 32:4 | pick 95:13 | 93:8,13 | 41:7,17,19 |
| 59:9 61:5 | 84:12,14 | 72:17,21 | 85:14 | 37:9 97:10 | picked 27:14 | 96:22 97:4 | 42:2,3 |
| 61:14,22 | 86:15 88:4 | 73:9 76:10 | outcome | 97:21 | place 21:22 | 97:23 98:16 | preparation |
| 62:11 63:1 | 88:13 89:16 | 77:22 78:9 | 11:15 | perfectly 85:9 | 41:5 85:19 | 103:7 | 9:22 |
| 63:17,18,23 | 90:3,8,8,14 | 78:17 79:16 | outside 10:16 | perimeters | 103:5 | 108:13 | prepare 9:17 |
| 64:19 65:16 | 90:14 91:1 | 80:7,10,23 | 26:11,12,14 | 88:19 | 111:16 | 109:23 | 9:19 |
| 65:17 66:22 | 91:3,9,11 | 81:18 86:7 | 35:16 39:15 | period 22:8 | 114:9 | police 7:5 | prerequisites |
| 66:23 67:3 | 91:13 98:17 | 88:7 90:2,7 | 50:12 52:10 | 52:23 | placed 66:2 | 21:19 38:3 | 33:8,12,18 |
| 67:22,24 | 104:14 | 90:16 92:17 | 59:18 79:2 | peripheral | places 66:1 | 38:9,16 | presence |
| 68:16,17,22 | 105:14,21 | 96:15 | 85:17 88:16 | 59:17 | 78:23 | 39:3,12,17 | 56:23 |
| 70:2 76:22 | 106:10 | old 17:8 | 104:19 | permanent | plaintiff 11:1 | 49:20,23 | present 29:13 |
| 79:8,11,13 | 107:9,16 | 18:10,18 | Outterbridge | 22:10 | 11:3,12 | 51:15,18,21 | 49:3 103:22 |
| 79:14,23 | 108:19 | 19:4 111:14 | 17:24 18:1 | permission | 12:9,15 | 52:2,7,7,16 | 106:11 |
| 80:6,22 | 109:11,12 | once 16:16 | 18:3,21 | 106:7 | 83:16 | 53:7 74:3 | preventing |
| 81:13,14,20 | 109:19 | 71:7 | outward 86:2 | permitted | plaintiff's | 76:20 77:13 | 8:5 |
| 84:19 85:12 | 111:18,22 | one's 99:10 | overall 89:14 | 95:23 | 105:5 | 91:1,9,17 | previous |
| 86:9,12,16 | 113:5,9,16 | ones 13:7 | 100:24 | person 51:20 | Plaintiffs 1:5 | 91:19,22 | 23:12 49:21 |
| 87:3,13,16 | officers's | 42:12 | overlap 28:19 | 51:23 68:8 | 2:6 | 104:14 | 62:24 |
| 88:7,8,9 | 72:11 76:17 | ongoing | owned 35:2 | 69:4 74:13 | platelets | 105:14,20 | previously |
| 89:9 90:15 | 76:22 109:6 | 27:11 61:13 | 35:10,18 | 85:21 | 36:23 | 106:9 108:3 | 10:23,23 |
| 92:3,9 | 109:18 | 84:18 | | 106:16,24 | play 52:19,19 | 108:6,19 | 38:9 |
| 103:11,19 | official | 104:10 | ———— | personally | plea 14:8,9 | 111:18,22 | prior 6:16 9:8 |
| 103:22 | 102:21 | open 43:7 | **P** | 47:14,15 | plead 14:1 | 113:5,9,13 | 20:5,19 |
| 104:3,5,6,9 | officially | 61:2 64:10 | P 2:1,1,8 | 61:16 74:15 | Pleas 27:21 | 113:16 | 21:24 22:10 |
| 104:15,16 | 98:19 | 79:2,8,24 | p.m 1:19 95:2 | perspective | pleasantries | porch 58:10 | 22:16 23:23 |
| 107:18 | officials | 80:21 81:1 | 113:23 | 78:3 85:14 | 49:4 | 59:8,11,20 | 25:7,8,21 |
| | | | PA 1:23 | | | | |
| | | | PAGE 3:5,14 | | | | |

Darus Hunter
September 14, 2018

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 28:8 33:18 | 30:9 | 94:18,21 | 101:22 | 52:18 60:3 | **result** 15:24 | 63:3 | 109:3,18 |
| 35:14,24 | **provide** | **readily** 99:2 | 102:1 | 60:4 100:3 | 44:5 60:5 | saw 57:9 58:7 | **seconds** 58:6 |
| 36:15 37:5 | 100:13 | **reading** 4:5 | 104:24 | 100:10,12 | 74:1 87:23 | 64:5 67:21 | **Security** |
| 37:7 38:4 | **provision** | 13:10,15 | 105:2,4 | **remind** 74:20 | 102:3 | 91:8 92:3 | 48:11 |
| 45:3 46:21 | 62:14 | **realize** 84:21 | 110:9 | **reminded** | **retaliation** | 104:6,8 | **see** 55:18 |
| 46:22 52:2 | **psyche** 99:10 | **realized** 57:2 | **records** 16:4 | 81:5 87:17 | 102:12 | saying 6:8 | 57:21 61:16 |
| 80:10 | **psychological** | **really** 42:4 | 93:20 | **remotely** 97:4 | **returned** | 7:18,19 | 85:13 90:24 |
| **prison** 31:13 | 107:3 | 74:22 84:17 | **recreational** | **removing** | 73:17 84:14 | 16:11,12 | 91:1,14,16 |
| **privacy** | **public** 1:16 | 101:10 | 42:6,10 | 104:17 | **reunited** | 26:22 49:1 | 91:17,22,23 |
| 102:18,20 | 47:19,24 | 111:17 | 46:9 | **replied** 75:19 | 46:21 | 60:1,21 | 96:23 |
| 104:2 | 48:6 102:21 | **reason** 7:19 | **REDIRECT** | **report** 47:16 | **revealed** | 66:4 73:24 | **seeing** 59:20 |
| **probably** | 114:23 | 8:1 21:9 | 112:23 | 107:22 | 109:16 | 78:1 79:2,8 | 60:3,4 93:7 |
| 21:17 28:16 | **puffs** 43:2 | 46:23 47:1 | **referring** | **reporter** 1:16 | **review** 8:9 | 81:18 92:3 | 99:22 |
| 28:17 46:4 | **purchased** | 98:4,21,23 | 21:16 26:18 | 7:17 58:21 | 93:19 | 110:7 | **seek** 93:22 |
| 55:18,22 | 20:17 | **reasoning** | 65:16 99:9 | 94:20 114:5 | **reviewed** | says 56:8 | 94:24 99:11 |
| 57:24 63:13 | **pursue** 16:17 | 60:6 | **reflected** | 114:22 | 62:11 67:2 | **school** 31:4,5 | **seen** 62:4 |
| 65:22,22 | **pushes** 79:24 | **reasons** 43:19 | 110:9 | **REPORTI...** | 67:3 | 31:6,8 | **sees** 64:19 |
| 66:10,14 | ——————— | 112:16 | **refurbished** | 1:21 | **revisit** 89:10 | 33:11,17,19 | **sell** 46:7 |
| 96:15 | **Q** | **recall** 11:6 | 20:18 | **representat...** | **ride** 95:23 | 35:16 95:19 | **sense** 13:6 |
| **probation** | **quality** 33:10 | 12:13,16,18 | **regarding** | 106:22 | **right** 7:17 | 97:3 102:7 | 74:9 75:12 |
| 14:10 | **quell** 43:21 | 25:7 39:2,9 | 9:21 10:4,6 | 110:18 | 18:16 33:20 | **schools** 33:7 | 87:16 |
| **problem** | **question** 4:8 | 49:20 59:9 | 10:13,17 | **request** 30:6 | 48:16 60:13 | **Schutte** 57:9 | **sent** 39:3 |
| 47:11,15 | 6:7 7:20 | 59:11 60:13 | 13:11 38:18 | 30:6,15 | 63:5 67:23 | 58:8 59:2 | **separate** 21:4 |
| **problematic** | 9:12 27:8 | 67:1 68:2 | 38:21,23 | 88:22 | 78:2,14,16 | 60:15 61:5 | 36:21 104:8 |
| 51:3 65:6 | 58:20 63:22 | 82:5 88:23 | 41:3 51:1 | **requested** | 79:10,18 | 61:14,22 | **separated** |
| **problems** | 74:20 86:6 | 89:2 91:4 | 68:24 84:11 | 29:22 30:8 | 81:22 83:10 | 62:11 63:18 | 21:7 29:1 |
| 41:13 92:24 | 90:2 94:19 | 95:3 112:12 | 93:2 95:8 | 58:23 94:22 | 83:12 85:18 | 63:18,22,23 | **separates** |
| 94:1 | 110:15 | **recalled** 76:4 | 99:3,18,23 | **requesting** | 89:12 103:8 | 64:19 65:17 | 57:8 |
| **proceed** | 113:2 | **receive** 31:24 | 100:18 | 88:23 | 105:18 | 66:24 67:3 | **separation** |
| 55:16,21 | **questioning** | 32:7,18 | 102:12 | **require** 33:8 | 110:5 | 67:22,24 | 21:9,14 |
| **proceeded** | 105:7 | 33:1,21 | 111:9,10 | **requirements** | **robbery** 15:6 | 76:23 79:14 | **SEPTA** 11:24 |
| 57:11 | **questions** 6:3 | 34:3 40:20 | **relate** 21:17 | 34:4,10 | **role** 36:19 | 80:22 81:13 | **September** |
| **proceedings** | 6:10 7:22 | 41:17 47:19 | 41:14 49:6 | **reserved** 4:9 | **roll** 52:24 | 84:19 86:9 | 1:11 13:2 |
| 26:9 | 81:8 105:12 | 47:22 99:3 | **related** 27:1 | **reside** 19:8,11 | **room** 53:1 | 86:13,16 | 14:14 15:5 |
| **Professional** | 112:5,7 | 99:4 | 78:3 114:13 | 20:20,21 | 54:1 55:12 | 88:8,9 | 16:19 22:5 |
| 1:16 | 113:4,20 | **received** 34:5 | **relates** 78:4 | 24:16 56:6 | 55:14,17,19 | 90:15 91:3 | 22:6 23:20 |
| **program** 33:4 | **quick** 54:5,11 | 48:6 104:19 | **relation** | **residing** | 56:3 57:4,4 | 91:11 92:3 | 27:2 38:5 |
| 33:5 34:3 | | 104:20 | 101:14 | 19:21 20:5 | 57:7,8,11 | 92:9 104:4 | 39:15,23 |
| **progressed** | **R** | **receives** | **relationship** | 22:17,21 | 59:7 67:12 | 104:6,9,16 | 47:3 49:9 |
| 41:20 | **R** 2:1 114:1 | 48:11 | 22:10 28:11 | 23:4,24 | 85:19 | 108:11 | 50:15,18 |
| **pronounced** | **radiator** 83:5 | **receiving** | 28:14,19 | **resolution** | 105:18 | 109:12,14 | 52:2,10,14 |
| 111:9 | 83:7,13,19 | 13:20,24 | 48:18,24 | 89:15 | **rude** 49:24 | 109:21 | 56:13,13 |
| **proof** 101:12 | **radio** 74:3,14 | 47:24 48:3 | 49:1,6 50:3 | **respect** 63:23 | ——————— | 110:3 | 95:5,6 |
| **property** | 76:20 | **reckless** | 50:5,18 | **respond** 6:12 | **S** | **sealing** 4:5 | 96:20 98:20 |
| 13:20,24 | **Raheem** 5:20 | 15:13 | **relative** | 6:14 50:4 | **S** 2:1 3:13 | **second** 11:11 | 112:13 |
| **prosecution** | 5:21 6:13 | **recognize** | 114:16 | **responding** | **S-P-A-N-G...** | 58:14 72:10 | **Sergeant** |
| 6:21 7:11 | 7:4,5 | 79:15 | **relied** 76:21 | 5:24 | 20:9 | 72:21,23 | 10:10 68:17 |
| **protected** | **range** 29:23 | **record** 5:2 | **remaining** | **response** 8:3 | **S-Y-R-I-A-...** | 75:8 77:12 | 68:23 69:16 |
| 102:16,16 | **rarely** 55:10 | 6:16 13:13 | 16:13 | 13:14,18 | 18:8 | 78:7 80:11 | 69:18,19,24 |
| **protection** | **reached** | 16:8 55:1 | **remember** | **responses** | **safe** 111:11 | 80:16,18 | 70:2,7,10 |
| 26:22 27:24 | 55:23 56:1 | 58:14,16,22 | 5:23 11:9 | 13:11 | 113:10 | 88:3 89:17 | 70:11 71:8 |
| 28:2 29:7 | 59:11,20 | 62:20 77:18 | 11:22 25:13 | **rest** 81:8 | **safely** 111:2 | 90:3 101:22 | 71:9,20,22 |
| 29:16,18 | 60:9 | 83:16 94:21 | 39:18,21,24 | **restless** 61:9 | **sat** 55:8 | 108:23 | 71:24 72:11 |
| | **read** 58:19,22 | | | | **satisfied** 63:1 | | |

Darus Hunter
September 14, 2018

72:22 73:11
73:13,14
75:1,4 76:2
76:5,19
77:8,11,19
78:3,4,8
109:5,9,15
**served** 13:7
**SERVICE**
1:21
**SERVING**
1:23
**set** 53:2 55:6
56:10
114:10
**settled** 11:16
11:18,20
**seven** 19:7
20:4 46:5
**Shanelle**
17:24
**share** 8:16,18
**shared** 19:15
19:16
**shining** 57:13
57:14 58:8
59:3,5 61:5
63:20 68:1
107:16
**short** 105:15
**showed** 62:19
63:2
**shower** 52:22
**Shujaa** 2:11
20:23 22:2
25:17,21
30:1 31:1
39:19 40:6
40:20 41:16
42:2,5,13
43:2 44:20
46:18,19
48:18 49:12
49:15 50:1
50:3 53:19
61:18 62:9
64:21,24
66:20 80:3
80:11 81:21
82:4,6,22
83:22 84:21
85:7,19
86:10,12

87:22 88:8
89:22 96:18
97:11
112:18
**Shujaa's**
43:12 47:4
79:18 92:11
93:2,19
95:9 98:10
**side** 11:23
**signing** 4:5
**similar** 50:19
66:10 85:19
**simple** 15:12
**sister** 107:22
112:4
**sister's**
107:17
**sitting** 10:8
46:15 68:22
**situation**
106:7
**situations**
113:12
**six** 28:16
31:16 37:11
46:5 64:4
**skepticism**
41:3
**sketch** 54:5
**skills** 106:14
**sleep** 53:5,8
**sleeping** 61:7
**sleepy** 44:6
**slept** 56:9,11
**slightly** 65:4
65:15,21,23
66:8
**small** 42:21
42:23 95:20
**smelled** 45:11
**smoke** 43:4
44:20 45:11
45:13,24
46:3,4
**smoked** 45:7
45:9
**smokes** 45:10
45:13
**smoking** 43:1
43:15 44:23
45:4,16,18
66:17

**Social** 48:11
**society**
102:17
107:2
**soft** 82:12
**son** 48:11
105:16,22
106:21
**son's** 27:14
**soon** 77:4
93:24,24
101:4
**sooner** 57:5
**sorry** 4:19
16:24 17:2
18:2 19:10
23:3,12
45:2 63:21
69:10 70:1
77:15,17
84:19 86:7
94:15
**sort** 48:3
104:20
**sounded**
78:22
**sounds** 82:3
**South** 11:24
22:18 23:10
24:14 53:23
**space** 20:18
**Spangler**
20:9 22:17
**spanned**
30:22
**speak** 61:16
68:6 69:12
70:15 71:5
73:9 76:5
89:1 106:9
**speaking**
57:19,21
61:14 65:12
65:22 66:5
76:2,7
110:19
**specific** 69:3
98:23
100:18
101:20
**specifically**
9:20 10:6
27:22 51:5

51:7 52:16
60:3,4,13
91:10
**specifics**
101:1,1
**spectrum**
41:6
**speculation**
40:24 42:8
48:20 82:9
82:17 84:1
84:24 94:10
98:14
106:19
108:9
**speech**
102:15
106:12,15
**spell** 18:2
**spent** 31:15
**split** 28:24
**spoke** 8:12
29:15 59:12
65:20 69:15
70:16 72:10
73:6,7,10
107:5 108:3
109:6
**spoken** 10:16
107:9 108:7
**spots** 54:12
**spring** 32:23
**stamps** 47:23
48:8
**stand** 15:23
64:5
**standing**
57:12,13
60:10,11,19
61:1 63:24
67:1 68:10
68:23 75:24
**standoffish**
66:8
**start** 22:4
93:1
**started** 93:4
94:1,6
**starting**
55:13
**starts** 79:21
**state** 5:1,6,9

12:1 16:21
17:12 76:16
82:22 84:11
111:20
**stated** 30:18
67:7,8
68:18 69:19
71:13 73:10
73:21 74:7
74:8 76:19
76:20 90:20
103:23
110:17
**statement**
23:13
**statements**
51:1
**STATES** 1:1
**stating** 49:21
59:1
**staying** 62:23
**steady** 22:11
**step** 103:18
103:18
**stick** 91:20
**stolen** 13:20
13:24
**stood** 64:3
**stop** 10:24
79:6 85:20
104:7
**stopped**
45:15
**Street** 1:17
2:4,9,13
20:10 22:18
23:10 24:1
24:14,14
53:23
**STREHLOW**
1:20
**stress** 21:11
**strike** 22:1
23:12 45:2
69:10 70:1
84:20
**student** 35:15
36:2,11,14
37:19,20
102:5
**students**
37:24
**stumbled**

81:21,24
85:7,8
**subject** 51:22
104:12
**submitted** 6:3
**subsequent**
78:6 111:4
**substance**
8:19 13:21
14:17,24
15:1
**substantial**
81:19
**suffering**
97:16
**suggested**
70:8
**suggestive**
65:23 66:16
113:15
**suing** 11:7,9
11:13,14
**SUITE** 1:21
**suitor** 11:21
**Sunday** 19:13
62:16,19
**superior**
16:14
**supervised**
70:24
**supervisor**
69:12,14
73:8,10
74:5,8
88:22,24
89:1,2
**supplied** 69:1
75:16
**supply** 75:22
**supreme**
16:15
**sure** 42:20
72:8,9,17
72:18 75:10
75:24 77:20
78:12 79:7
80:7 86:20
100:12
110:4,15
**surgery** 99:19
**surprise**
59:14,19
60:9

**surrounding**
30:3,6
**suspected**
91:2
**sustain** 87:22
**swing** 83:10
83:10 85:18
**switch** 54:11
**sworn** 4:12
114:8
**symptoms**
42:22 44:10
92:24 94:6
95:9
**Syriana** 18:8
19:3,6,11
20:21 23:7
23:10,15,17
56:11 108:1
108:2,15

___

**T**

**T** 3:13 114:1
114:1
**table** 55:7,8
**tags** 91:24
**take** 5:12
17:20 33:13
54:10 57:22
61:23 95:19
96:8 103:1
103:5
111:16
112:17
**taken** 1:15
10:19 12:4
32:23 103:2
114:15
**takes** 41:4
43:2
**talk** 63:6,8,14
105:20
**talking** 65:9
99:20
**tampering**
16:4
**Tara** 2:13
54:9
**technician**
36:20
**telephone**
62:20 68:9
68:21 69:2
70:16 71:8

75:13 78:7
80:4
**telephones**
54:24
**tell** 13:7
16:20 26:18
52:15 62:6
69:17 73:12
74:13,14
78:20 79:20
80:23 86:9
90:11,16
107:11
108:19,21
108:23
109:2,5,24
111:4
**telling** 71:16
**temperament**
65:23
**Temple** 32:20
33:1
**term** 82:11
**terminated**
30:23 101:4
**termination**
30:22
**terms** 14:9
30:18
**terroristic**
15:12
**testified** 4:12
103:11
**testifying** 8:6
**testimony**
68:24 87:7
103:14
107:13
**text** 53:14
62:20
**Thank** 5:14
18:9,15
19:8 21:24
22:21 38:7
48:17 52:9
54:16,20,24
56:2,12
63:15 74:23
88:21
104:18
**thanked**
74:17
**Thanks** 54:12

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Darus Hunter
September 14, 2018

**theft** 14:20
**therapeutic**
99:11
104:20
**therapist**
100:22,24
**therapy**
99:15,17,20
100:19,21
101:4,8
**things** 21:17
86:19 89:15
91:21 103:2
111:13
**think** 6:14
9:11 13:5
13:12 35:18
35:19 39:24
40:2 42:1
44:8,9
45:22 53:10
56:19 57:16
60:8 66:2
72:2,7,15
72:15 73:1
80:5,5,8,9
80:12,13
81:16,19
82:6,12,18
82:21 83:5
83:6,22
84:3 85:10
85:11,13,15
92:20,22
93:11,15
96:15
102:24
104:11,13
104:15
106:20,21
110:2,3,14
110:16
**thinking**
25:11 42:24
75:11
**third** 53:24
75:9,11
78:7 90:12
91:11 92:2
109:14
**thought** 4:20
100:20
**threaten** 70:5

**threats** 15:13
**three** 16:12
19:13 22:24
24:7 25:23
32:14 35:3
35:10 40:3
43:2 55:22
55:24 60:19
65:1 71:21
88:6 95:18
96:15
**threshold**
57:7
**threw** 27:13
27:15
**time** 4:9 6:17
9:1,4,6 10:3
10:4 11:11
12:22 13:7
16:20 22:7
22:13,22
23:14 25:2
30:17 32:22
35:4,11
36:4,13
37:13,16
39:4 40:5
40:12 41:20
42:1 43:21
46:17 47:2
49:22,23
51:8,10
52:20,23
53:8 56:17
57:6,20
58:1,2,4
59:2 61:19
61:24 64:2
68:21 70:3
71:10 72:10
80:6,11,16
80:18 82:23
86:23 89:16
89:17 90:3
90:5,12,16
92:2,20
94:3,3,12
94:24 95:21
99:15,17
100:9 102:5
103:6,7
106:2,5,13
114:9

**timeline**
105:13
**times** 12:3,12
12:21,22
39:1 40:6
48:6
**tired** 44:7
**title** 16:5
**titled** 36:17
**today** 5:10
7:15 8:6,8
9:4,18,20
21:13 29:6
39:14 46:15
48:18 50:6
60:11 68:10
68:23 75:24
110:8
112:12
**today's** 9:17
**told** 45:18
62:3,5
63:10 71:12
71:14 76:22
93:6 107:8
109:10
**tone** 65:15,19
79:2 87:9,9
109:22
110:10,17
**tones** 87:14
**top** 78:24
**toss** 61:11
**total** 31:14
88:5
**totality**
107:20
**totally** 96:21
**toy** 27:14
**trade** 43:22
44:2,2,4
**transcribing**
7:18
**transcript**
1:14 4:2,6
114:6
**transferred**
69:14 71:8
73:8 76:8
**Transporta...**
12:1
**transporting**
95:24

**treatment**
101:12,13
104:18
**trespassing**
102:18
**trial** 4:9 15:3
15:11
**trimester**
42:4
**true** 13:23
114:6
**truthful** 60:6
74:4
**truthfully** 8:6
**try** 77:15
79:6
**turn** 61:11
**turns** 79:22
**TV** 53:4
**two** 19:2 23:7
24:20 26:6
29:2,20
30:23 35:19
35:20 36:7
36:9 39:23
40:1 46:15
46:23,24
51:10 53:24
55:2 56:3,4
56:21 57:12
57:12,24
60:19 61:6
69:20 71:20
72:2 73:1
93:3 94:1
96:3,14
112:6
**two-and-a-...**
46:20
**type** 8:17
99:6

_____
**U**

**unauthorized**
69:21
**uncertain**
30:18
**undergrad...**
37:18
**understand**
7:14 8:3
106:5,6
113:18
**understand...**

93:14,16
103:4 107:1
111:12,17
113:8
**understands**
112:3
**unfavorable**
113:16
**unfriendly**
66:7
**uniform**
91:20
**uniforms**
91:18,23
**UNITED** 1:1
**University**
31:19 32:4
32:21 33:2
37:8 97:9
97:21
**unlocking**
79:21,22
**UPenn** 33:16
**upset** 84:12
84:13
**urgent** 89:7
**use** 27:13
42:5,12
46:9 47:4,5
106:4
**usually** 43:7
55:12
**uterus** 93:17
**utilized** 6:17
41:13 52:23

_____
**V**

**Vague** 94:13
**valuable**
113:10
**value** 111:23
**vantage**
85:15
**various** 36:21
43:21
**verbal** 79:1
105:23
106:14
**verbalize** 8:2
**versus** 12:8
**view** 98:1
113:9
**viewed**
111:21

**violated**
103:1
**violence**
26:19 27:3
27:18,22
29:3 31:1
**virtually**
106:13
**visit** 96:19
108:18,23
109:3,18
**visiting** 32:2
89:9
**visits** 78:5,6
**visual** 85:24
**vocal** 87:9,14
108:12
**voice** 66:3,7,9
79:15 110:8
**voiced** 71:15
**volatility** 50:3
50:20,24
52:6
**vs** 1:6

_____
**W**

**wait** 7:21,22
89:3
**waited** 98:21
112:13
**waived** 4:7
**walk** 57:3
96:9,10,12
96:12
**wall** 55:5,11
83:8,11,11
**want** 67:10
79:6 82:1
86:21 101:9
101:9
109:23
110:16
**wanted** 15:23
16:17 33:17
33:17 59:1
67:9 70:22
81:9,10,11
86:16,16,18
86:20 88:9
88:24 89:12
90:21 92:7
109:19,22
110:1,4
**wasn't** 33:5

45:18 62:2
73:21 77:12
77:15 79:24
80:7 90:5
93:18
**watched** 53:4
**way** 45:12
64:24 65:7
92:23
**we'll** 54:6
**we're** 39:14
50:13 83:8
**we've** 46:21
88:16,20
103:18
**wean** 45:20
**week** 19:13
35:6,8 46:5
46:6 62:24
**weekends**
62:15
**went** 27:18,20
27:20 29:6
29:7 31:5
31:18,19
32:3,4 53:5
57:1 62:9
64:23 97:6
**weren't** 21:10
91:10
**wheel** 27:13
**When's** 51:10
**white** 36:22
**wife** 20:23
**wife's** 27:13
**willing**
101:11
**window** 64:10
90:24
**windows**
54:17 64:10
**winter** 22:12
22:14
**wish** 73:18
**wished** 69:20
71:11 73:15
90:19
**witness** 3:3
5:13 29:12

38:8 39:8
40:14 41:1
42:9 43:18
47:10 48:22
49:11 50:9
50:17 51:12
53:17 54:8
54:19,23
56:7 58:24
82:10,18
83:18 84:2
85:1 86:7
87:8 96:10
97:19 98:7
98:12
106:20
107:14
108:10
110:14
111:8
112:20
113:21
114:8
**witnessed**
47:15
**words** 45:24
106:4
**work** 34:7
35:6 37:10
37:23 102:3
**worked** 35:8
36:16,16
37:6,7
**working**
35:13 36:1
36:4,15
37:15,22
**worth** 43:24
111:24
**worthwhile**
44:10
**wouldn't**
38:20 46:22
106:5 110:9
**written** 110:2
110:9
**wrong** 113:17

_____
**X**

**X** 3:1,13

_____
**Y**

**yeah** 19:5
21:10 40:14

47:7 66:5
87:14 92:13
96:12
101:23
**year** 20:15
21:8,8 37:3
37:3
**years** 14:10
22:24 24:7
24:8 26:2,3
29:1,2
30:23 31:7
31:16,21
32:5,14,15
33:24 34:17
35:3,11,19
35:20 36:7
36:9,24,24
47:17 48:2
111:14
**yelling** 65:7
**Yesterday**
10:2
**Young** 2:3
3:7 58:17
74:19 82:8
82:16 83:15
83:24 84:23
86:5 87:6
89:19 96:5
96:9 97:18
98:6,11,13
101:21
103:13,17
104:23
105:11
107:4,24
108:14
110:23
112:5 113:3
**youngest**
107:15,21

**Z**
**zero** 87:20
**ZIP** 20:11
22:19 24:4

**0**

**1**
**1** 83:17
**10** 18:11 26:2
55:19 58:6

**10:00** 97:6
**105** 3:7
**11** 14:9 19:5
19:5
**11:00** 53:10
95:2
**11:58** 56:19
**112** 3:6,8
**116** 1:21
**12** 96:21
**12:00** 56:18
56:19
**12:47** 1:19
**1242** 22:18
23:10 24:14
53:23
**12th** 67:8
68:5,6 69:9
71:4,5 76:4
88:14
**13** 17:15
19:10
**13th** 52:14
56:13
**14** 1:11
**14th** 1:17 2:9
2:14 38:5
56:13 99:5
**1515** 1:17
2:13
**15th** 38:5
95:7 99:5
**1618** 24:1,13
**16th** 95:5,6,7
96:20
**17-0889** 1:4
**1701** 2:4
**17th** 95:5
96:20
**18** 108:17
**18940** 1:22
**19** 18:23
**19102** 2:14
**19103** 2:4
**19104** 2:10
**19131** 24:4
**19132** 20:11
**19143** 22:19
**1972** 17:11
**1987** 31:8
**1990** 31:9
**1991** 12:23
13:19 14:3

14:13
**1992** 6:22
7:13 12:24
13:1,1,2
14:13,14,15
14:19,23
15:5 16:19
**1995** 31:13
**1997** 26:4
**1st** 12:23

**2**
**2001** 12:6
13:2,3
15:10 27:2
27:2 29:21
**2005** 17:3,6
**2006** 28:16
28:18 31:22
**2007** 26:4,5
28:18,22,24
51:12
**2008** 31:23
**2009** 32:6,16
**2011** 22:3,5,6
24:10,11
**2012** 10:23
10:24 11:17
22:9,12,12
22:14 24:24
32:6,17
**2013** 25:4,5
37:1,2,2,5,7
48:4
**2014** 22:24
23:1,15,17
23:18,20,23
24:12 29:23
32:23,24
34:1,1,19
36:15 38:13
**2015** 10:23
11:12 13:3
13:4 15:15
17:3,4
35:11 38:6
39:16,23
47:3 49:9
50:15,18
52:2,10,15
99:5
**2016** 21:3
22:1 23:16
34:2,19

35:20,24
**2017** 23:2,16
**2018** 1:11
**20th** 98:20
112:13
**215** 1:22 2:5
2:10,15
**23** 14:9
**25** 18:19
**2521** 20:9
22:16
**27** 17:11
**2929** 2:9

**3**
**3:09** 113:23
**30** 14:14
**30th** 20:15
21:7

**4**
**4** 3:6 13:18
**40** 96:13
**45** 17:9

**5**
**50** 106:4
**504-4622**
1:22
**51st** 22:18
23:10 24:14
53:23
**54** 1:21 3:16
**55th** 24:1,14

**6**
**683-5389**
2:15

**7**
**70** 35:7 47:23

**8**

**9**
**911** 67:7
69:22 70:8
70:10,14,16
70:22 71:13
71:14,17,18
73:3 74:8
74:10 76:16
78:15 80:12
95:8 97:14

**963-5608** 2:5
**994-2046**
2:10