EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION NO. 17-0889

DARUS HUNTER and KENYA
SHUJAA

               :

     Plaintiffs,     :

               :

   vs.           :

               :

CITY OF PHILADELPHIA,
ROBERT SCHUTTE, MICHAEL:
NAVEDO and MICHAEL
MELVIN,             :

     Defendants.     :

COPY

-----
TUESDAY, SEPTEMBER 11, 2018
-----

Oral deposition of ROBERT SCHUTTE held at the
Law Offices of Dechert, LLP, Cira Centre, 2929 Arch
Street, Philadelphia, Pennsylvania, commencing at
2:26 p.m., by and before Jo-Anne M. Bosler,
Professional Shorthand Reporter and Notary Public.

------
THE MCS GROUP, INC.
1601 Market Street - Suite 800
Philadelphia, Pennsylvania 19103
(215) 405-8178

---

A P P E A R A N C E S:

DECHERT. LLP
BY: JOHN P. MCCLAM, ESQUIRE
Cira Centre, 21st Floor
2929 Arch Street
Philadelphia, Pennsylvania 19104
(215) 963-3300
Attorneys for the Plaintiff Kenya Shujaa

MORGAN, LEWIS & BOCKIUS, LLP
BY: ALEXANDRA M. LASTOWSKI, ESQUIRE
     MICHAELA YOUNG, ESQUIRE
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-5608
Attorneys for the Plaintiff Darus Hunter

CITY OF PHILADELPHIA LAW DEPARTMENT
BY: TARA FUNG, ESQUIRE
Assistant City Solicitor
Civil Rights Unit
1515 Arch Street
Philadelphia, Pennsylvania 19102
(215) 686-1776
Attorneys for the Defendants

ALSO APPEARING:

Darus Hunter

---

I N D E X

WITNESS                  PAGE

ROBERT SCHUTTE

By MR. MCCLAM         4

By MS. LASTOWSKI    110

By MS. FUNG          137

E X H I B I T S

NUMBER     DESCRIPTION        PAGE

Schutte-1  Dispatcher/Radio     41
           Transmission
Schutte-2  Internal Affairs    53
           Statement 10/19/15
Schutte-3  Internal Affairs    62
           Statement 11/5/15
Schutte-4  75-48 Report        94
Schutte-5  MDT Message Log Report  99
Schutte-6  Custody Dispute Memo   102
Schutte-7  Directive 12.18     119
Schutte-8  Training Materials   128

---

1          (By agreement of counsel,

2      the signing, sealing, certification

3      and filing are waived; and all

4      objections, except as to the form

5      of the question, are reserved until

6      the time of trial.)

7          - - -

8       ROBERT SCHUTTE, having been

9     duly sworn, was examined and testified

10    as follows:

11          - - -

12         EXAMINATION

13          - - -

14  BY MR. MCCLAM:

15    **Q. Would you please state your name**

16  **for the record?**

17    A. Robert Schutte.

18    **Q. How do you spell your last name?**

19    A. S-c-h-u-t-t-e.

20    **Q. Have you ever been deposed before?**

21    A. No.

22    **Q. I'm going to go over a few**

23  **preliminary instructions before we get**

24  **started.**

**Page 5**

```
1         I'm going to ask that you please
2    answer all of my questions orally.  The
3    court reporter to my right is going to be
4    recording every word that we say.  So if I
5    ask you a yes or no question, please
6    answer yes or no instead of nodding your
7    head.
8         Do you understand?
9    A.  Yes, sir.
10   Q.  Second, because the court reporter
11   is writing down every word I ask that you
12   give me a chance to finish my question
13   before you answer just to make sure we
14   have a clean record.
15        Do you understand?
16   A.  Yes.
17   Q.  If you do not understand a question
18   let me know and I'll do my best to
19   rephrase.  If you do not ask for a
20   clarification I'll assume that you
21   understand.
22        Do you understand that?
23   A.  Yes.
24   Q.  Any time you need a break just let
```

THE MCS GROUP, INC.

**Page 6**

```
1    me know and we can take one.  I just ask
2    that if there's a question outstanding
3    that you answer the question first before
4    taking the break.
5         Do you understand?
6    A.  Yeah.
7    Q.  Your attorney may object during the
8    deposition, but unless she instructs you
9    not to answer you're required to answer my
10   question.
11        Do you understand?
12   A.  Yes.
13   Q.  Are you feeling well enough to
14   testify here today?
15   A.  Yes.
16   Q.  Are you on any medications that
17   might impair your memory or your ability
18   to testify today?
19   A.  No.
20   Q.  Is there anything else that could
21   keep you from testifying truthfully or
22   accurately today?
23   A.  No.
24   Q.  What have you done to prepare for
```

THE MCS GROUP, INC.

**Page 7**

```
1    testifying today?
2    A.  I met with my attorney.  Just went
3    over the paperwork and the former
4    questions that --
5              MS. FUNG:  Sorry.  You
6         don't speak about what we -- you
7         can talk about the documents that
8         we reviewed, but anything other
9         than that, no.  Sorry.
10   BY MR. MCCLAM:
11   Q.  Did you do anything besides meeting
12   with your attorney to prepare for the
13   deposition today?
14   A.  No.
15   Q.  Did you talk with Officer Navedo to
16   prepare for the deposition today?
17   A.  No.
18   Q.  When did you meet with your
19   attorney to prepare for this deposition?
20   A.  Yesterday.
21   Q.  For about how long?
22   A.  For an hour.  About an hour or so.
23   Q.  Did you review documents with your
24   attorney?
```

THE MCS GROUP, INC.

**Page 8**

```
1    A.  Yes.
2    Q.  Have you talked to Officer Navedo
3    since September of 2015 about the incident
4    that's the subject of this litigation?
5    A.  Yes.
6    Q.  When did you speak with him?
7    A.  It hasn't been a while.  I haven't
8    worked with him for over a year, so it's
9    probably about a year.
10   Q.  The incident we're going to talk
11   about today, you understand, has to do
12   with an interaction you and Officer Navedo
13   had with the plaintiffs in this case on
14   September 14th, 2015; is that correct?
15   A.  Yes.
16   Q.  And you stated that you discussed
17   that incident with Mr. Navedo since
18   September of 2015; is that right?
19   A.  Yes.
20   Q.  Do you recall when that was?
21   A.  I do not.
22   Q.  Was it in 2015?
23   A.  Yes.  Initially, when it happened
24   I'm sure we have talked about it, but I
```

THE MCS GROUP, INC.

9

```
 1   don't remember the specifics of it.
 2       Q.  Did you have a -- let me start
 3   over.  Was there an Internal Affairs
 4   investigation into this incident?
 5       A.  I believe there was.
 6       Q.  Did you speak with Officer Navedo
 7   before giving a statement in connection
 8   with the Internal Affairs investigation?
 9       A.  No.
10       Q.  Was your conversation with Officer
11   Navedo about the incident after the
12   Internal Affairs investigation?
13       A.  I don't recall.
14       Q.  Have you read the complaint in this
15   matter?
16       A.  Yes.
17       Q.  What do you understand to be the
18   allegations in the complaint?
19       A.  It was stated that we were
20   aggressive and entered the home illegally
21   and injured one of the parties.
22           That's my understanding of what the
23   complaint is.
24       Q.  So you'll understand that when I
```

THE MCS GROUP, INC.

10

```
 1   speak of the incident today that I'm
 2   referring to your interaction with the
 3   plaintiffs on September 14th, 2015?
 4       A.  Yes.
 5       Q.  And you understand that the
 6   plaintiffs in this case are Darus Hunter
 7   and Kenya Shujaa?
 8       A.  Yes.
 9       Q.  Have you ever testified in a court
10   proceeding other than a deposition?
11       A.  Yes.
12       Q.  How many times?
13       A.  Too numerous to count over the
14   years.
15       Q.  Do you understand that you're under
16   oath today to the same extent that you
17   would be if you were testifying in a court
18   before a judge?
19       A.  Yes.
20       Q.  Have you ever been sued before?
21       A.  No.
22       Q.  Is this your first time being a
23   defendant in a civil lawsuit?
24       A.  Yes.
```

THE MCS GROUP, INC.

11

```
 1       Q.  Can you describe your educational
 2   background?
 3       A.  High school.
 4       Q.  Where did you go to high school?
 5       A.  Upper Darby.
 6       Q.  When did you graduate from Upper
 7   Darby?
 8       A.  2003.
 9       Q.  What did you do after you graduated
10   from Upper Darby in 2003?
11       A.  Worked odd jobs.
12       Q.  When did you become employed as a
13   Philadelphia Police Department officer?
14       A.  2014.
15       Q.  What did you do before you became
16   an officer with the Philadelphia police
17   officer?
18       A.  I was a Temple University police
19   officer for two years.
20       Q.  Did you have to go through any
21   training to become a Temple University
22   police officer?
23       A.  Yes.  We trained at the
24   Philadelphia Police Academy.
```

THE MCS GROUP, INC.

12

```
 1       Q.  Did you have to receive any
 2   additional training before you went to
 3   work at the Philadelphia Police Department
 4   after being at Temple University?
 5       A.  Only a month of updates on
 6   directives and doing things their way, so
 7   to speak, to keep up vehicle course.
 8           Pretty much it was a lateral
 9   program.  I was only there for a month
10   because I had already graduated before
11   prior.
12       Q.  So was the academy that you went to
13   before being a police officer for Temple
14   Police Department the same academy that an
15   officer just starting at the Philadelphia
16   Police Department would attend?
17       A.  Yes.
18       Q.  How long were you at the Temple
19   Police Department?
20       A.  Two years.
21       Q.  What did you do before you were at
22   the Temple Police Department?
23       A.  Security officer in a company in
24   Havertown.
```

THE MCS GROUP, INC.

13

```
1      Q.  What was the name of that company?
2      A.  Alpha -- Security.
3              THE COURT REPORTER:  I'm
4      sorry, what was that?
5              THE WITNESS:  Alpha
6      Centurion.
7   BY MR. MCCLAM:
8      Q.  How long were you at Alpha
9   Centurion?
10     A.  A year.
11     Q.  What did you do before Alpha
12  Centurion Security?
13     A.  I was a musician in Los Angeles.
14     Q.  What instrument did you play?
15     A.  Drums.
16     Q.  Why did you leave the Temple Police
17  Department to move to the Philadelphia
18  Police Department?
19     A.  My goal was to be a Philadelphia
20  police officer, but at the time they
21  required college and, like I said, I only
22  finished high school.  But Temple didn't
23  require college.  So if you have two years
24  of police experience somewhere else
```

THE MCS GROUP, INC.

14

```
1   Philadelphia will take that instead of
2   college.  So I did my two-year contract so
3   I can get into Philly.
4      Q.  So when you started at Temple
5   University the plan was to work there for
6   two years and then move to the
7   Philadelphia Police Department; is that
8   right?
9      A.  Yes.
10     Q.  Do you remember what date you
11  started at the Philadelphia Police
12  Department?
13     A.  I just know the hire year was 2014.
14  I'm not sure the month and day.
15     Q.  And what was your title when you
16  started at Philadelphia Police Department?
17     A.  During the training or when I came
18  out of training?
19     Q.  So you had a month of training when
20  you moved over?
21     A.  Yeah.  I was considered a lateral
22  recruit.
23     Q.  And you were a lateral recruit for
24  one month?
```

THE MCS GROUP, INC.

15

```
1      A.  Yes.
2      Q.  Then what was your title after you
3   were a lateral recruit?
4      A.  Police officer.
5      Q.  At any time when you were at the
6   academy or when you were training as a
7   lateral recruit did you ever fail any of
8   the courses that were offered?
9      A.  No.
10     Q.  Are you still a police officer for
11  the Philadelphia Police Department?
12     A.  Yes.
13     Q.  What's your title today?
14     A.  Police officer.
15     Q.  Has it changed since you started?
16     A.  No.
17     Q.  Who's your supervisor today?
18     A.  Sergeant Skasiac.
19     Q.  Who was your supervisor in
20  September of 2015?
21     A.  Sergeant Davis.
22     Q.  Do you have a partner today?
23     A.  No.
24     Q.  Did you have a partner in September
```

THE MCS GROUP, INC.

16

```
1   of 2015?
2      A.  Yes.
3      Q.  Who was your partner?
4      A.  Officer Navedo.
5      Q.  For what period of time was Officer
6   Navedo your partner?
7      A.  Three years.
8      Q.  Was he your first partner when you
9   started?
10     A.  No.  I was with someone for, I
11  think, a couple of months.
12     Q.  When did Officer Navedo become your
13  partner?
14     A.  I don't know the exact date, but I
15  know it was, maybe, three or four months
16  after I got to my district after I got out
17  of my lateral training.
18     Q.  And you got to your district was it
19  in -- was it January or February of 2015?
20     A.  I think it was February of 2014, I
21  think.  Maybe it was '15.  I don't recall.
22     Q.  So you were -- so you had a few
23  different partners and then a couple
24  months later Officer Navedo became your
```

THE MCS GROUP, INC.

Robert Schutte
September 11, 2018

17

```
 1   partner?
 2       A.  Yes.
 3       Q.  Was Officer Navedo more senior than
 4   you at that time?
 5       A.  Yeah.
 6       Q.  Did that change your roles together
 7   as partners?
 8       A.  No.  Pretty much since I was still
 9   considered new whoever I was with I just
10   knew they were there before me so I just
11   listened and followed kind of what they
12   did and tried to learn as I go along.
13       Q.  Did Officer Navedo help teach you
14   how to be a Philadelphia Police Department
15   officer?
16       A.  In certain ways.  Like, he taught
17   me how he does things and how people in
18   our district usually do things.  So I kind
19   of went off that before I can kind of,
20   like, find my own way of doing things that
21   were comfortable with me.
22       Q.  Do you recall who your supervisor
23   was in September of 2015?
24       A.  It was Sergeant Davis.
```

THE MCS GROUP, INC.

Robert Schutte
September 11, 2018

18

```
 1       Q.  If Sergeant Davis wasn't -- I'm
 2   sorry.  Did Sergeant Davis work all the
 3   shifts when you were working?
 4       A.  During my whole time?
 5       Q.  In September of 2015?
 6       A.  No.  There's time he'd have days
 7   off.
 8       Q.  And was there always a supervisor
 9   on duty when you had a shift as an
10   officer?
11       A.  Yes.
12       Q.  Do you recall who your supervisor
13   was on September 14th, 2015?
14       A.  It would have to be Sergeant Melvin
15   at the time.
16            THE COURT REPORTER:
17       Sergeant who?
18            THE WITNESS:  Melvin.
19            THE COURT REPORTER:
20       Melvin?
21            THE WITNESS:  Yes.
22   BY MR. MCCLAM:
23       Q.  Would Lieutenant Disanto have been
24   a supervisor?
```

THE MCS GROUP, INC.

Robert Schutte
September 11, 2018

19

```
 1       A.  Technically, I guess he could be
 2   considered one.  He wouldn't be a direct
 3   supervisor.  I wouldn't report to him
 4   first.  I would go to one of the sergeants
 5   first.
 6       Q.  Lieutenant Disanto would be a
 7   supervisor; correct?
 8       A.  Yes.
 9       Q.  Have you ever been subject to
10   disciplinary action at the Philadelphia
11   Police Department?
12       A.  Once, yes.
13       Q.  Can you describe that incident?
14       A.  Called out sick too many times
15   without a note.  That was the only time I
16   was disciplined.
17       Q.  When was that?
18       A.  That would be eight months ago.
19       Q.  How were you disciplined?
20       A.  I got a couple of days off.
21       Q.  Kind of ironic, isn't it?
22       Have you ever been the subject of
23   an Internal Affairs investigation?
24       A.  As the target of the investigation?
```

THE MCS GROUP, INC.

Robert Schutte
September 11, 2018

20

```
 1       Q.  Let's do both.  Let's start with
 2   the target.
 3       Have you ever been the target of an
 4   Internal Affairs investigation?
 5       A.  No.
 6       Q.  Have you ever participated in an
 7   Internal Affairs investigation?
 8       A.  Yes.
 9       Q.  How?
10       A.  There was a supervisor -- I don't
11   know the whole story.  I just knew that
12   since I was in his squad I had to go to
13   internal affairs and answer the questions
14   about what he does and how he works.
15       Q.  Was that the only time you've been
16   involved in an Internal Affairs
17   investigation?
18       A.  As far as I can remember.  Yes.
19       Q.  Has anyone ever filed a citizen's
20   complaint against you?
21       A.  No.
22       Q.  Have you ever been subject to any
23   other kind of informal discipline?
24       A.  No.
```

THE MCS GROUP, INC.

```
1      Q.  Have you ever been arrested before?
2      A.  No.
3      Q.  Have you ever been convicted of a
4   crime?
5      A.  No.
6      Q.  What is your relationship with
7   Officer Navedo?
8      A.  Partners -- or we were partners,
9   mostly.  I guess we'd consider each other
10  friends.  I don't really see him outside
11  of work often.
12     Q.  Were you guys close friends in
13  September of 2015?
14     A.  I wouldn't say close friends; I
15  guess close partners.  Like I said, we
16  weren't any outside of work.  At work I
17  guess that's where the friendship would be
18  at the time.
19     Q.  Did you have -- were all of your
20  shifts together as partners, in September
21  of 2015?
22     A.  No.  Not all of them.
23     Q.  In what circumstances wouldn't you
24  work with him?
```

THE MCS GROUP, INC.

```
1      A.  Lack of manpower.  They'd have to,
2   like, make us each in a separate car solo
3   so we can cover more territory.
4      Q.  As of September 2015, you had only
5   been on the force for less than a year; is
6   that right?
7      A.  Yeah.
8      Q.  What's the role of a supervisor on
9   patrol?
10     A.  Supervise the squad.  Help out
11  officers in any way that we need.  Field
12  complaints, if a complaint were to come of
13  an officer.  That sort of thing.  If
14  you're inside operations reviewed
15  paperwork and payroll and everything like
16  that and do the assignment sheets.
17     Q.  Are there certain radio calls that
18  a supervisor alone is responsible for?
19     A.  There's supervisory calls, but they
20  usually don't go out to them alone for
21  safety reasons.
22     Q.  What do you mean they usually don't
23  go out to them alone?
24     A.  Well, usually if there's a call
```

THE MCS GROUP, INC.

```
1   there's an always an officer to back
2   someone up, supervisor or not, because
3   that's how it's done.
4      Q.  If there's a call for a supervisor
5   only, what does that mean?
6      A.  Usually that just means someone
7   wants to speak to a supervisor and you
8   would still go just to back the supervisor
9   up because you don't really know what
10  you're getting into.  So it's just what
11  the squad does to make sure no one gets
12  hurt.
13     Q.  What circumstances are supervisors
14  normally called for over the radio?
15     A.  Usually if an officer needs help
16  with somebody, like questions answered.
17  Sometimes, like -- you know, we don't know
18  everything.  Supervisor has more time, he
19  might be able to help a situation.  Or if
20  a citizen wants to make a complaint
21  against an officer they would call for a
22  supervisor.
23     Q.  Would the radio always call for a
24  supervisor if there was a complaint
```

THE MCS GROUP, INC.

```
1   against an officer?
2      A.  Yeah.  You can't make a complaint
3   to another officer; it has to be to a
4   supervisor.
5      Q.  You can't make a complaint to
6   another officer?
7      A.  A citizen can't make a complaint to
8   a police officer.  They have to make it to
9   a corporal or above.
10     Q.  So if a citizen has a complaint an
11  officer can't go and receive that
12  complaint; is --
13     A.  No.
14     Q.  -- that right?
15         What do you do when you hear a
16  radio call for a supervisor?
17     A.  Me, personally?  If someone's
18  already backing him I'll just take patrol.
19  If no one's available, I'll do my best and
20  go -- I won't interact.  I'll just hang
21  back and make sure everything is safe for
22  that supervisor.
23     Q.  Would you ever go and try to handle
24  whatever it was the supervisor was being
```

THE MCS GROUP, INC.

25

```
 1    called to do?
 2       A.  No.
 3       Q.  Have you ever received any training
 4    on how to respond to a child custody
 5    dispute?
 6       A.  At one point, yes.  It was a while
 7    ago at the academy.
 8       Q.  Have you received any training
 9    since being in the academy about how to
10    respond to a child custody dispute?
11       A.  There was directives that came down
12    and they showed videos every once in a
13    while, like training procedures.
14           But it's been a while since I've
15    seen anything in training.
16       Q.  Do you recall any specific
17    instances of seeing something related to
18    child custody dispute training?
19       A.  Not recently.  It's been a while.
20       Q.  Since the academy?
21       A.  It's been a while since the
22    academy.  Yeah.
23       Q.  Are there certain procedures that
24    officers must follow when responding to a
```

THE MCS GROUP, INC.

26

```
 1    child custody dispute?
 2       A.  Yes.
 3       Q.  Can you describe those procedures?
 4       A.  You request any paperwork that the
 5    Courts may have given out and you go read
 6    it and just confirm to see what the
 7    situation is and what the guidelines that
 8    the judge set up for them, and then you go
 9    off of that.
10       Q.  Do the officers have the power to
11    enforce the custody order?
12       A.  Yes.
13       Q.  So if an officer determined that
14    the child was in the custody of the wrong
15    parent, could the officer order the child
16    be returned to the rightful parent?
17       A.  Yes.
18       Q.  Are you required to contact the
19    supervisor in order to respond to a
20    custody dispute?
21       A.  No.
22       Q.  Are you familiar with what's called
23    a 7548 report?
24       A.  Yes.
```

THE MCS GROUP, INC.

27

```
 1       Q.  What is a 7548 report?
 2       A.  Basically, like an incident report.
 3    You write -- after you deal with the job,
 4    you write down basically what happened and
 5    the type of job it was.  That's pretty
 6    much it.
 7       Q.  When is the 7548 report used?
 8       A.  You can use it in court as evidence
 9    for something to go off the initial job.
10    It's pretty much has a narrative of what
11    happened.
12       Q.  Does the 7548 specifically get
13    filled out for certain kinds of incidents?
14       A.  Most incidents, yeah.  There's
15    different forms for several different
16    things, but 48 is pretty much the standard
17    for most jobs.
18       Q.  What kind of information do you
19    include in a 7548 form?
20       A.  Name, date of birth, address of the
21    complainant, as well as the offender, if
22    there's an offender.  The narrative.  And
23    the officer's information at the bottom.
24    Then the date, time of the incident and
```

THE MCS GROUP, INC.

28

```
 1    the date, time the report was taken.
 2       Q.  What kind of information do you
 3    include in the narrative section of the
 4    7548?
 5       A.  Whatever the job was; whatever it
 6    was stated by the complainant.
 7       Q.  Did you say whatever was stated by
 8    the complainant?
 9       A.  Yes.
10       Q.  So would you record all of your
11    interactions with the complainant or
12    citizen that you came into contact with?
13       A.  It's pretty much just a paragraph,
14    like the bulk of what happened.  You don't
15    have to put everything little detail in
16    it.  It's just like a paragraph of what
17    goes off of everything and If more needs
18    to be said you can attach a second 48 to
19    it, but usually it's not required.
20       Q.  Would you typically list every
21    interaction you had with the complainants
22    or individuals that were involved in the
23    incident?
24       A.  Not typically, no.
```

THE MCS GROUP, INC.

Robert Schutte
September 11, 2018

29

```
 1      Q.  Is there any kind of guidelines on
 2   what to include or what not to include?
 3      A.  Just in a paragraph as much
 4   pertinent information as necessary just to
 5   get the bulk of what happened so you can
 6   go off on that.  It's mainly the important
 7   stuff.
 8      Q.  Are you supposed to thorough in
 9   your 7548 report?
10      A.  As thorough as the incident, what
11   you did in the incident and the outcome of
12   the incident.  That's really it.  Not
13   every little nuance isn't necessary, just
14   the important stuff.
15      Q.  But you would describe your major
16   actions?
17      A.  Yes.
18      Q.  How do you decide between you and
19   your partner -- when you're working with a
20   partner -- who completes the form?
21      A.  Usually -- how we do it anyway, if
22   you drive, the passenger does the 48 and
23   vice versa.
24      Q.  When you were working with Officer
```

THE MCS GROUP, INC.

---

Robert Schutte
September 11, 2018

30

```
 1   Navedo who did most of the driving?
 2      A.  He did most of the driving.  I
 3   would drive every once in a while.
 4      Q.  So did you fill out most of the
 5   7548 reports?
 6      A.  Yes.
 7      Q.  Philadelphia Police Department
 8   patrol cars didn't have any kind of audio
 9   or video devices in September of 2015, did
10   they?
11      A.  No.
12      Q.  In the 12th District -- you're in
13   the 12th District; correct?
14      A.  Yes, sir.
15      Q.  Did any of the police officers in
16   the 12th District have body cameras or
17   audio recording devices, in September of
18   2015?
19      A.  No.
20      Q.  Were you on duty during the early
21   morning of September 14th, 2015?
22      A.  Yes.
23      Q.  What was your shift?
24      A.  It was 12 a.m. to 8:15 a.m.
```

THE MCS GROUP, INC.

---

Robert Schutte
September 11, 2018

31

```
 1      Q.  12 a.m. to 8:15 a.m.?
 2      A.  Yes.
 3      Q.  Do you recall what you were doing
 4   before your shift that day?
 5      A.  Probably sleeping.
 6      Q.  How many shifts did you work per
 7   week, in September of 2015?
 8      A.  All together, I couldn't tell you.
 9      Q.  Per week?
10      A.  Per week, we do four on two off and
11   then five on two off.  And it goes like
12   that every week.
13      Q.  Did you have a partner during your
14   September 14th shift?
15      A.  Yes.
16      Q.  Was it Officer Navedo?
17      A.  Yes.
18      Q.  Where did you report on the evening
19   of September 13th before your shift on the
20   14th?
21      A.  You mean for work?
22      Q.  Correct.
23      A.  12th District.
24      Q.  Where is the 12th District?
```

THE MCS GROUP, INC.

---

Robert Schutte
September 11, 2018

32

```
 1      A.  6448 Woodland Avenue.  That's
 2   Southwest Philly.
 3      Q.  What did you do when you reported
 4   to the 12th District prior to your shift?
 5      A.  You got dressed, lined up for roll
 6   call.  Then got our assignments and went
 7   out on patrol.
 8      Q.  Do you recall what your first
 9   assignment was on the morning of September
10   14th, 2015?
11      A.  No.
12      Q.  Was it a complaint about a child
13   custody dispute from a Mrs. Sinquenna
14   Mohammed?
15      A.  That might have been the first one.
16   It probably was, if I recall.
17      Q.  Do you recall how you first learned
18   about the child custody issue?
19      A.  The woman came to the district --
20   to the district window and stated that
21   there was an issue with her child custody
22   and she had the paperwork.  And we went
23   over the paperwork with her.
24      Q.  Were you the first one to speak
```

THE MCS GROUP, INC.

33

```
 1   with her that evening?
 2       A.  I don't remember.
 3       Q.  Do you recall what time -- had she
 4   been there for a while before your shift
 5   started?
 6       A.  I don't know if she was.
 7       Q.  Was Officer Navedo with you at that
 8   time?
 9       A.  I believe he was.
10       Q.  What did you discuss with
11   Ms. Mohammed?
12       A.  We went over the paperwork.  And
13   the issue was that she, I think, was
14   supposed to have the child during the week
15   and he had it on the weekends and the
16   weekend was over, but it was a holiday, I
17   think, that Monday so he stated that that
18   counts as a weekend.  And she didn't know
19   that.  So that was the issue and we tried
20   to resolve it that way.
21       Q.  What papers did you review with
22   Ms. Mohammed?
23       A.  They were Court order papers about
24   that custody.
```

THE MCS GROUP, INC.

34

```
 1       Q.  Did you make any determination
 2   after looking at the court order papers?
 3       A.  If I recall, we determined that he
 4   still had the child for that Monday and
 5   the child had to be returned by Tuesday.
 6       Q.  I mean when you were speaking with
 7   Ms. Mohammed did you think that she had
 8   rightful custody at that time?
 9       A.  At that time I didn't know what
10   kind of opinion to make until I went over
11   the paperwork.  But from what I was
12   reading it seemed that she had mistaken
13   and she wasn't supposed to have custody
14   until Tuesday.
15       Q.  Was that your understanding based
16   on your initial actions with Ms. Mohammed?
17       A.  Before or after I read the
18   paperwork?
19       Q.  Well, when did you read the
20   paperwork?
21       A.  Well, pretty much as soon as she
22   came up and told us the situation she gave
23   me the paperwork and we told her what the
24   situation was.
```

THE MCS GROUP, INC.

35

```
 1       Q.  So you told her that it looked like
 2   Mr. Hunter was supposed to have custody of
 3   the child for the weekend including the
 4   Monday if the Monday was a holiday?
 5       A.  Yes.
 6       Q.  What did she say to that?
 7       A.  I don't remember.
 8       Q.  What did you do after telling her
 9   that Mr. Hunter should have been the
10   person to have custody of the child?
11       A.  I don't remember exactly what we
12   did at that point.
13       Q.  Did you go to Mr. Hunter's
14   residence to talk to him?
15       A.  Yeah.  I think we did eventually go
16   to talk to him to make sure both parties
17   were satisfied.
18       Q.  So why would you go to speak with
19   Mr. Hunter if you were convinced or
20   believed that he was in rightful custody
21   of his child?
22       A.  I'm not even sure it was my call to
23   do it.  But I guess to make sure both
24   parties understood.  I really don't
```

THE MCS GROUP, INC.

36

```
 1   remember.
 2       Q.  Isn't 12:30 in the morning pretty
 3   late to go and have a discussion with
 4   Mr. Hunter if you believe that he had
 5   rightful custody of the child?
 6           MS. FUNG:  Objection to
 7       form, but you can answer the
 8       question.
 9           THE WITNESS:  I don't
10       remember why.  Like I said, I
11       don't think it was my call to go.
12       I agree with you right now that
13       it's too late.  But for the
14       meaning back then, I don't know
15       why.
16   BY MR. MCCLAM:
17       Q.  Whose call was it to go to Mr.
18   Hunter's residence?
19       A.  It would have been my partner's,
20   but I can't be sure.
21       Q.  So either your partner or somebody
22   else told you that you had to go speak to
23   Mr. Hunter; is that right?
24       A.  I think that seems reasonable.
```

THE MCS GROUP, INC.

```
 1   Yeah.
 2      Q.  Did Ms. Mohammed ever say that she
 3   thought the child might be in danger?
 4      A.  I don't recall.
 5      Q.  Did she ever express any concern
 6   about the well-being of the child?
 7      A.  I don't recall.
 8      Q.  Did Ms. Mohammed ever say that
 9   Mr. Hunter or Ms. Shujaa were abusive
10   toward her daughter?
11      A.  I don't recall.
12      Q.  So what did you do after speaking
13   with M. Mohammed?
14      A.  I don't recall.  I know at one
15   point we went to the house, but I don't
16   know if it was right after or what the
17   situation was leading up to that point.
18   It was too long ago.
19      Q.  What did you hope to accomplish at
20   Mr. Hunter and Ms. Shujaa's residence?
21      A.  Make sure the job was taken care of
22   and both parties were happy.
23      Q.  What do you mean the job taken care
24   of?
```

THE MCS GROUP, INC.

```
 1      A.  Like, closed out.  Like, do a 48
 2   and say we spoke to her and this is what
 3   the outcome was and close it out and go on
 4   to the next job.
 5      Q.  Did you want to go speak to
 6   Mr. Hunter after you saw the paperwork
 7   from Ms. Mohammed?
 8      A.  Me, personally?  No.  No.  I like
 9   to take care of the job and go on to the
10   next one.  I don't like to drag it out.
11   So no.
12      Q.  Did you ever tell Officer Navedo
13   that you didn't think he needed to go to
14   Mr. Hunter's residence?
15      A.  I don't believe I did.  No.
16      Q.  Did you speak with anybody besides
17   Ms. Mohammed and Officer Navedo before
18   going to the plaintiffs' residence?
19      A.  No.
20      Q.  Did you speak with the supervisor?
21      A.  I don't think I did.  No.  I don't
22   recall if I did.
23      Q.  Did you ever try calling Mr. Hunter
24   on the phone?
```

THE MCS GROUP, INC.

```
 1      A.  Me personally, no.
 2      Q.  Are you aware of anyone else trying
 3   to call Mr. Hunter?
 4      A.  I'm not aware.
 5      Q.  Did you ask Ms. Mohammed if she had
 6   spoken to Mr. Hunter that evening?
 7      A.  I believe I did to make sure that
 8   she knew what was going on and he knew
 9   what was going on because there was
10   obviously a lack of communication.  So I'm
11   pretty sure I did ask her just to get to
12   the bottom of the situation.
13      Q.  How did she respond?
14      A.  I don't think she made contact with
15   him before then.  But I can't remember.
16      Q.  Did you tell Ms. Mohammed that you
17   would return the child to her?
18      A.  I didn't personally.  No.
19      Q.  Did Mr. Hunter?
20      A.  No.
21      Q.  Did Ms. Mohammed go with you at the
22   plaintiffs' residence?
23      A.  I believe she waited at the
24   district.
```

THE MCS GROUP, INC.

```
 1      Q.  Did you ever see her again?
 2      A.  I don't remember.
 3      Q.  Did you ever see her that
 4   evening?
 5      A.  I think -- I honestly don't
 6   remember even what she looks like.
 7      Q.  So to your knowledge you don't
 8   recall ever speaking with her again after
 9   being in the district?
10      A.  To my knowledge, no.
11      Q.  Do you recall how you got from the
12   district to the plaintiffs' residence?
13      A.  We drove there.
14      Q.  Did Officer Navedo drive?
15      A.  I drove.
16      Q.  Any particular reason or you just
17   felt like driving that night?
18      A.  I think he didn't feel like
19   driving.
20      Q.  Do you why not?
21      A.  Sometimes, you know, he just
22   doesn't feel like it and we switch off.
23      Q.  Did Officer Navedo say anything
24   generally about how he was feeling that
```

THE MCS GROUP, INC.

```
 1   evening?
 2      A.  Not that I recall.
 3      Q.  He didn't seem to be in bad humor
 4   that night?
 5      A.  No.
 6      Q.  Do you recall what time you arrived
 7   at -- on location at plaintiffs'
 8   residence?
 9      A.  It had to be after midnight, but
10   I'm not sure what time.  Maybe 12:30, 1
11   o'clock.
12      Q.  I'm going to hand you what I'm
13   going to ask the court reporter to mark as
14   Exhibit-1 or Schutte-1.
15              (Whereupon the document
16          was marked, for identification
17          purposes, as Exhibit Schutte-1.)
18   BY MR. MCCLAM:
19      Q.  Schutte-1 is a transcript of a
20   series of dispatcher and radio
21   transmissions.
22          I'm going to start right now just
23   by asking you about the top transmission
24   that starts with Monday, 9/14/2015,
```

```
 1   00:14:20.
 2          Do you see that?
 3      A.  Yes.
 4      Q.  Do you understand that transmission
 5   transcripts to be a recording of the
 6   communication between 1201 and the radio
 7   on the evening of September 14th, 2015 at
 8   12:14 a.m.?
 9      A.  Yes.
10      Q.  Does this refresh your recollection
11   as to what time you responded to the
12   complaint at the -- let me start over.
13   Does this refresh your recollection as to
14   what time you went to the plaintiffs'
15   residence for the first time?
16      A.  Yes.
17      Q.  What time did you go to plaintiffs'
18   residence?
19      A.  12:14 a.m.
20      Q.  Is this call recording
21   memorializing you or Officer Naveda's call
22   into the radio saying that you were going
23   to investigate the premise at plaintiff
24   residence?
```

```
 1      A.  Yes.
 2      Q.  Do you know if you made the call or
 3   if Officer Navedo did?
 4      A.  I don't remember that.
 5      Q.  If you're driving would you expect
 6   Officer Navedo to make the call?
 7      A.  Not always.  It's really not set in
 8   stone.
 9      Q.  What does investigate premise mean?
10      A.  It means you pretty much check out
11   the location and if everything seems
12   normal, you investigated it and you close
13   it out as an investigated premises or an
14   invest prem.
15      Q.  Invest prem -- that's short for
16   investigated premise?
17      A.  Yes.
18      Q.  As police officers you guys have a
19   lot of shorthands; is that right?
20      A.  Yeah.  Pretty much.
21      Q.  What happened when you got to the
22   plaintiffs' residence at or around 12:15
23   a.m., on September 14th, 2015?
24      A.  I believe we went up and knocked on
```

```
 1   the door.  Made contact with, I believe --
 2   I'm sorry, I forget his name -- the
 3   gentleman.
 4      Q.  Mr. Hunter?
 5      A.  Yes.  Mr. Hunter.
 6          We were trying to talk to him about
 7   the situation and I'm not really sure what
 8   exactly was said.  I don't remember.  But
 9   I know we made contact with him at his
10   door.
11      Q.  Was Mr. Hunter the first person
12   that you saw at the residence?
13      A.  I don't remember.
14      Q.  Do you remember if one of his
15   children opened the door?
16      A.  I don't remember that.
17      Q.  Did you see inside the residence?
18      A.  Barely.  I remember, because it was
19   dark, and for safety reasons I had to
20   shine a light in the dark to see if
21   anybody was hiding behind windows or
22   anything like that.  I didn't really see
23   much.  I saw several children lying on the
24   floor.  That's pretty much all I could see
```

```
1    from that point.
2       Q.  What was your vantage point when
3    you saw several children lying on the
4    floor?
5       A.  I was on the porch.  There was a
6    double window, and the glass part was
7    open, the screen was down and there was no
8    lights on inside.
9       Q.  So you shined your light into the
10   house through the window and you could see
11   the sleeping children in there?
12      A.  Yes.
13      Q.  Did you ever look through the front
14   door when it was opened?
15      A.  I think when he opened the door it
16   was he kind of opened like a crack.  So I
17   didn't really see anything in there.  So I
18   didn't even try.
19      Q.  Did you ever go inside the
20   residence?
21      A.  No.
22      Q.  How many children did you see?
23      A.  I don't recall the exact number.  I
24   know there was, like, a few, from what I
```

```
1    could understand and make out in the dark.
2       Q.  So more than two?
3       A.  I think it was more than two.
4    Maybe three or four, but I can't really be
5    sure, though.
6       Q.  Were the children sleeping?
7       A.  I believe they were.
8       Q.  Did you try to be quiet because --
9    be quieter because there were sleeping
10   children inside?
11      A.  Yeah.  I mean we spoke normal.
12   Kept our voices down for the sake of the
13   neighborhood basically and for the people
14   in the residence.
15      Q.  Did you see the child that was the
16   subject of the custody dispute?
17      A.  I don't recall.
18      Q.  Would you have requested to see her
19   in the process of investigating a custody
20   dispute?
21             MS. FUNG:  Objection to
22         form.  You can answer the
23         question.
24             THE WITNESS:  If I felt
```

```
1            the child was in danger we
2            probably would request to see to
3            see if the child was okay.  But at
4            that point, I didn't think the
5            child was in danger.  So I didn't
6            request to see the child.
7    BY MR. MCCLAM:
8       Q.  This wasn't a check on the
9    well-being of a child?
10      A.  Unn-nn.  No.
11      Q.  Did you see anybody besides
12   Mr. Hunter at the residence?
13      A.  I believe there was another woman
14   there.  I don't remember her face or
15   anything.  But I know there was another
16   woman there.
17      Q.  Was that Ms. Shujaa?
18      A.  I would assume it was, but I don't
19   remember now.
20      Q.  Can you describe your interactions
21   with Mr. Hunter and the female?
22      A.  I know we were trying to talk to
23   them.  And they petty much went off on us
24   and yelled at us for knocking on the door
```

```
1    so later, which I can understand.  But
2    they were being very uncooperative and
3    vulgar and we pretty much couldn't get
4    anything accomplished.  Yeah.
5       Q.  Mr. Hunter and Ms. Shujaa yelled at
6    you on the first time you went to their
7    residence to investigate the custody
8    dispute?
9       A.  I don't think it was -- not the
10   first time, I don't think.  They were calm
11   the first time.  The second time around
12   they were just -- they went off on us.
13      Q.  Did Mr. Hunter or Ms. Shujaa ever
14   express frustration that you were coming
15   to investigate the custody dispute?
16      A.  I would assume they were frustrated
17   because they were yelling at us and
18   cursing at us.  Yes.
19      Q.  Did they express their frustration
20   during the first interaction when they
21   were explaining to you the custody order?
22      A.  I don't believe so.  I think once
23   we told them why we were there they were
24   being calm.  I don't remember exactly what
```

49

```
1   was said.  But they weren't as hot headed
2   the first time around.
3       Q.  Could you tell that Ms. Shujaa was
4   pregnant at the time?
5       A.  I don't recall.  No.
6       Q.  Did you know that she was four and
7   a half months pregnant on that date?
8       A.  No.
9       Q.  Did she -- Did Ms. Shujaa ever come
10  outside?
11      A.  I don't think she did.  I don't
12  recall.
13      Q.  How long did the first encounter
14  with the plaintiffs last?
15      A.  Maybe five, ten minutes.
16      Q.  How was it resolved?
17      A.  I think we stated -- I honestly
18  don't remember.  There's been so many
19  other jobs since then, I don't really
20  think about them so I couldn't tell you.
21      Q.  Did Mr. Hunter and Ms. Shujaa show
22  you documentation that said that the child
23  was supposed to stay with them that
24  evening?
```

THE MCS GROUP, INC.

50

```
1       A.  I think.  I think Mr. Hunter may
2   have had a copy of it.  He may have showed
3   us, but I can't be completely sure.
4       Q.  Did you review the paperwork that
5   he had?
6       A.  I believe my partner did.
7       Q.  Where did your partner review the
8   paperwork?
9       A.  Right there on the porch.
10      Q.  What were you doing while your
11  partner was reviewing the paperwork?
12      A.  Standing by.
13      Q.  Standing by on the porch?
14      A.  Yeah.  Next to him.
15      Q.  What did you do next?
16      A.  Once he was done with the paperwork
17  I just followed him out back to the wagon.
18      Q.  Was Officer Navedo convinced that
19  Mr. Hunter was, in fact, in proper custody
20  of the child?
21      A.  I believe he was, but I can't speak
22  for him.
23      Q.  Do you know what time you left
24  Mr. Hunter and Ms. Shujaa's residence
```

THE MCS GROUP, INC.

51

```
1   after the first encounter?
2       A.  Probably about, maybe, 12:30 or so.
3   It didn't last that long.
4       Q.  Had you ever met Mr. Hunter and
5   Ms. Shujaa before this incident?
6       A.  No.
7       Q.  What happened after you left
8   Mr. Hunter and Ms. Shujaa's residence
9   after the first encounter?
10      A.  We were sitting in the wagon about
11  to start the 48 for the job and we saw on
12  the computer that a request for a
13  supervisor for that location had come out.
14      Q.  So you saw on the computer that
15  there was a request for a supervisor?
16      A.  Yes.
17      Q.  Did you hear a call over the radio
18  for a request for a supervisor?
19      A.  I don't recall.
20      Q.  Let's look back at Exhibit-1.  Look
21  down to the second page where it says
22  9/14/15, 00:48:58.
23          Do you see that?
24      A.  Yes.
```

THE MCS GROUP, INC.

52

```
1       Q.  Can you take a second to review
2   that transcript portion.
3       A.  Okay.
4       Q.  Does this refresh your recollection
5   as to whether or not there was a call for
6   a supervisor?
7       A.  Yes, it does.
8       Q.  Was that call for a supervisor only
9   at 1242 South 51st Street?
10      A.  Yes.
11      Q.  What is a supervisor only request
12  mean?
13      A.  That could mean a number of things.
14  That means that a supervisor is requested.
15  Usually, from experience, if someone wants
16  to make a complaint against an officer is
17  pretty much the main reason a citizen
18  would want a supervisor.
19      Q.  So you understood, at this time,
20  when the radio call was made that there
21  had been a request for a supervisor at
22  1242 South 51st Street; correct?
23      A.  Yes.
24      Q.  And 1242 South 51st Street is
```

THE MCS GROUP, INC.

53

```
1   Mr. Hunter -- or was Mr. Hunter and Ms.
2   Shujaa's residence; correct?
3       A.  Yes.
4       Q.  What did you do after you heard
5   that call?
6       A.  We waited in the wagon until the
7   supervisor showed up.
8       Q.  How long did you wait?
9       A.  I'm not sure.  A few minutes.
10  Five, ten minutes.
11      Q.  You didn't respond before the
12  supervisor got there?
13      A.  No.
14      Q.  Why not?
15      A.  We weren't called to respond.
16      Q.  So the call is for a supervisor you
17  wait for the supervisor to show up; right?
18      A.  Yeah.
19              MR. MCCLAM:  I'm going to
20          ask the court reporter to mark
21          this document Schutte Exhibit-2.
22              (Whereupon the document
23          was marked, for identification
24          purposes, as Exhibit Schutte-2.)
```

THE MCS GROUP, INC.

54

```
1   BY MR. MCCLAM:
2       Q.  Please take a minute to review
3   Exhibit-2.
4       A.  Okay.
5       Q.  Do you recognize Exhibit-2?
6       A.  Yes.
7       Q.  Are you familiar with it?
8       A.  Yes.
9       Q.  What is Exhibit-2?
10      A.  It's the initial, I guess,
11  interview with myself.
12      Q.  What kind of interview is it?
13      A.  Going over the nature of the call
14  and what took place.
15      Q.  Was this in response to a complaint
16  that was made based on your interactions
17  with the plaintiffs in this case?
18      A.  Yes.
19      Q.  Was your statement recorded on
20  October 19th, 2015?
21      A.  Yes.
22      Q.  While we've got it out, it says
23  appointment 12/22/2014.
24          Is that the date you were first
```

THE MCS GROUP, INC.

55

```
1   appointed or hired by the Philadelphia
2   Police Department?
3       A.  Yes.
4       Q.  Is your assignment date the first
5   day of work at the Philadelphia Police
6   Department?
7       A.  Yes.
8       Q.  Do you see at the bottom where it
9   says, in the presence of?
10      A.  Yes.
11      Q.  Who is William Davis, Esquire?
12      A.  I don't remember who that is.
13      Q.  Do you know who William Michael
14  was?
15      A.  No.  I don't remember.
16      Q.  Okay.  I want to go down, if you
17  turn the page to Page 2, which has what we
18  call the Bates number in the bottom
19  right-hand corner, D054.
20          Do you see that?
21      A.  Yes.
22      Q.  I want to point your attention to
23  large black paragraph in the middle.
24          Do you see the sentence beginning
```

THE MCS GROUP, INC.

56

```
1   with, we were sitting in the wagon
2   updating the log?
3       A.  I'm sorry, where was it?
4       Q.  Right in the middle.
5       A.  Yes.  I see it.
6       Q.  Your statement says, we didn't even
7   leave the scene yet.  We were sitting in
8   the wagon updating the log and we got
9   another call for that same address.  The
10  call came out as a disturbance.  So we
11  went and knocked back up at the residence.
12  So we heard yelling after we're knocking.
13  I shined my light to if they were okay and
14  then I realized they were saying, leave us
15  alone, stop banging on the door.  They
16  opened the door a little bit.  I shined my
17  light because I could not see what they
18  may have in there.  They told us to leave
19  them alone and they slammed the door on
20  us.  So we went to leave again and another
21  call wet out for a supervisor at that
22  location.  Our lieutenant showed up and he
23  knocked on the door and there was no
24  answer.
```

THE MCS GROUP, INC.

Robert Schutte
September 11, 2018

57

```
 1        Do you see that?
 2     A.  Yes.
 3     Q.  Does that refresh your recollection
 4  as to whether or not you waited for the
 5  supervisor to show up on the scene before
 6  you went back to the plaintiffs' residence
 7  on that evening?
 8     A.  Yes.  I believe I might have been a
 9  mistake at that time with my memory.  I
10  remember waiting in the wagon at one point
11  waiting for the lieutenant.  I'm not sure
12  if it was the -- at the time -- I wasn't
13  sure it was the second or third time that
14  the call went out.
15     Q.  Do you recall going back to the
16  residence a second time without Lieutenant
17  Disanto?
18     A.  I believe we might have.
19     Q.  Lieutenant Disanto was the
20  supervisor that eventually showed up; is
21  that right?
22     A.  Yes, it is.
23     Q.  So after you heard a call over the
24  radio for a supervisor only, you went back
```

THE MCS GROUP, INC.

---

Robert Schutte
September 11, 2018

58

```
 1  to the plaintiffs' residence before the
 2  supervisor arrived; correct?
 3     A.  I don't think we did.  I think we
 4  went back to the wagon once the supervisor
 5  call came out to wait for him so we
 6  wouldn't cause any more trouble.
 7     Q.  Can you speak a little bit slower.
 8     A.  Sorry.  I think at the point when
 9  they were calling for a supervisor, we
10  went back to wait so we didn't cause more
11  trouble because, obviously, there was some
12  kind of issue if the supervisor was coming
13  out.  I think we waited for him the next
14  time around.  And then when the supervisor
15  we met with him.
16     Q.  So are you that there were -- how
17  many times did you go back to Mr. Hunter
18  and Ms. Shujaa's residence?
19     A.  I believe just -- I believe once
20  before the supervisor got there and then,
21  again, when the supervisor got there.
22     Q.  So is your position here today that
23  what your statement from October 19th,
24  2015, in Exhibit-2, is incorrect?
```

THE MCS GROUP, INC.

---

Robert Schutte
September 11, 2018

59

```
 1     A.  I think it might have been from my
 2  memory.  I think I made a mistake.  I
 3  can't really recall, to be honest.
 4     Q.  After the custody dispute issue was
 5  resolved, what do you recall about your
 6  interactions with the plaintiffs at their
 7  residence?
 8     A.  Just that they were yelling at us
 9  and cursing at us.
10     Q.  Did you leave after they were
11  yelling and cursing at you?
12     A.  I guess we must have.  I don't
13  remember.  Usually if something like that
14  happens and they don't want assistance
15  there's not much we can do for them so we
16  would leave.
17        So I'm assuming we left.  But I
18  can't remember if we left exactly after
19  that.  But I think we went back to the
20  wagon.  We didn't leave the street.  We
21  were still parked out front.  We were in
22  the wagon.
23     Q.  Do you recall the door having been
24  opened on your second interaction with the
```

THE MCS GROUP, INC.

---

Robert Schutte
September 11, 2018

60

```
 1  plaintiffs?
 2     A.  I don't think it was.  I think they
 3  were yelling through the window.  I don't
 4  remember.
 5     Q.  It says in your statement here,
 6  they opened the door a little bit.  I
 7  shined my light?
 8             MS. FUNG:  Can you tell me
 9        where --
10             MR. MCCLAM:  Sure.  In the
11        block paragraph there.
12  BY MR. MCCLAM:
13     Q.  In the block paragraph it says,
14  they opened the door a little bit.  I
15  shined my light because I could not see
16  what they may have in there.
17        Does this refresh your recollection
18  as to whether or not somebody at the
19  residence opened the door?
20     A.  It does, actually.  Yeah.  I think,
21  yeah.  They opened it and I can't tell how
22  long -- I think it was two seconds they
23  opened it and yelled something and then
24  slammed it.  That's pretty much it.  I
```

THE MCS GROUP, INC.

61

```
 1    couldn't see anyone at the door.
 2    Actually, it was opened a little bit and
 3    then they slammed it.
 4       Q.  Do you know who was on the other
 5    side of the door?
 6       A.  I assume both of them, because I
 7    can hear both of them yelling.
 8       Q.  Did you shine your light inside the
 9    house?
10       A.  I shine the light at the door when
11    they opened it, but I didn't see anything.
12    No.  It was too quick.
13       Q.  How close were you to the door at
14    the time?
15       A.  The door is, like, right here.  And
16    I'm standing on the porch and shining the
17    light like that.  Because once it opened I
18    backed up, you know, out of habit for
19    safety, because I don't want to get shot
20    or anything.  So force of habit, someone
21    opened up real quick and slammed it.  I
22    kind of backed up, put my light up and
23    didn't notice anything in the doorway.
24       Q.  You motioned for how far away you
```

THE MCS GROUP, INC.

62

```
 1    were from the door.  We don't have a video
 2    camera here.  Was it, like, 15 inches?
 3       A.  I didn't jump back.  I just kind of
 4    went back like that.
 5       Q.  You leaned backwards?
 6       A.  Yeah.  Yeah.  Kind of like a shock
 7    thing.
 8       Q.  Before they opened it were you up
 9    against the door?
10       A.  No.  We usually stand to the side
11    of the doorways on any jobs, because it's
12    also a habit that we form for safety.
13             MR. MCCLAM:  I'm going to
14        ask the court reporter to mark
15        this document as Schutte
16        Exhibit-3.
17             (Whereupon the document
18        was marked, for identification
19        purposes, as Exhibit Schutte-3.)
20    BY MR. MCCLAM:
21       Q.  Please take a minute to review
22    Exhibit-3.
23             Have you had a chance to review
24    Exhibit-3?
```

THE MCS GROUP, INC.

63

```
 1       A.  Yes.
 2       Q.  What is Exhibit-3?
 3       A.  I see a second interview regarding
 4    the incident.
 5       Q.  Do you recall the circumstances
 6    around why you were called to give a
 7    second interview regarding this incident?
 8       A.  I believe it had something to do
 9    with discrepancies with my recalling the
10    incident at the time.
11       Q.  Do you know which discrepancies was
12    at issue?
13       A.  The number of times when the
14    supervisor was called and who did the 48.
15    They stated I did it, but it was actually
16    my partner.
17       Q.  Does Exhibit-3 refresh your
18    recollection as to how many times you went
19    to the plaintiffs' residence?
20       A.  Yes, it does.
21       Q.  And how many times did you go to
22    plaintiffs' residence?
23       A.  Twice, I believe.
24       Q.  Do you see on the page that has
```

THE MCS GROUP, INC.

64

```
 1    D058 on the bottom?
 2       A.  Yes.
 3       Q.  It says -- I guess the fourth
 4    question/answer down -- P/O Schutte,
 5    during that first interview do you recall
 6    being asked if the second radio call you
 7    responded to was for a disturbance or was
 8    it for a supervisor to take the location
 9    in which you were still out front.  And
10    said, yes.
11             Do you see that?
12       A.  Yes.
13       Q.  It says, do you recall answering
14    that it was for a disturbance?  Answer:
15    Yes, I did recall that it was for a
16    disturbance.
17             The next question is, after
18    reviewing the transcription to refresh
19    your memory, can you tell me what the
20    second radio call was?  And you answered,
21    it was a call for a supervisor.
22             The question after that is:  P/O
23    Schutte, if it was a call for a
24    supervisor, why did you and your partner
```

THE MCS GROUP, INC.

1  return to the residence?
2      Do you see that?
3   A.  Yes.
4   Q.  Does -- your supervisor wasn't
5  there at the time you returned to the
6  residence when there was a call out for a
7  supervisor initially; correct?
8   A.  No, he wasn't.  He was on his way,
9  from what I understand.
10   Q.  So the second time you went to the
11  residence it was just you and Officer
12  Navedo; correct?
13   A.  Yes.
14   Q.  So if it was a call for a
15  supervisor, why did you and Officer Navedo
16  return to the residence without a
17  supervisor?
18   A.  I don't remember why at the time.
19  At the time since I was still kind of new,
20  I kind of just followed what my partner
21  did for on calls, because I know he had
22  more time in than me.  I was not one to
23  argue with people who had more time on.
24  So I was kind of just there as his

THE MCS GROUP, INC.

1  partner.
2   Q.  Was it Officer Navedo's decision to
3  return to the residence after the
4  supervisor only call came out?
5   A.  I believe it was.  I don't think I
6  would have.
7   Q.  Did you tell him that you didn't
8  think you should go back to respond to a
9  call for a supervisor only?
10   A.  I don't remember if I actually told
11  him.  But given our partnership, I
12  probably did say something along those
13  lines, but I don't recall what was sat
14  about that.
15   Q.  Do you know how long you had been
16  away from the residence after resolving
17  the custody dispute before you heard the
18  call over the radio for a supervisor only?
19   A.  I don't think it was too long.  I
20  don't know exactly.  But I don't think it
21  was too long.
22   Q.  Did you and Officer Navedo go
23  immediately back to the residence?
24   A.  I don't remember.

THE MCS GROUP, INC.

1   Q.  Did you or Officer Navedo
2  communicate with Lieutenant Disanto about
3  your decision to return to the resident --
4  let me start over.  Did you or Officer
5  Navedo communicate with Lieutenant Disanto
6  that you would be going back to the
7  residence in response to the supervisor
8  only call?
9   A.  Only just as a backup and he
10  agreed.  He doesn't like doing thing
11  alone.  That's why we said we would stay
12  there to back him up and he agreed.
13   Q.  I'm going to point your attention
14  back to Exhibit-1, on Page D74.  I'm at
15  the entry that begins Monday, 9/14/15,
16  00:48:58.
17      Do you see that?
18   A.  Yes.
19   Q.  Do you any communication from you
20  or Officer Navedo about backing up the
21  lieutenant?
22   A.  No.  We told him verbally in person
23  when he arrived that we would stay there
24  to back him up.  Not over the radio.

THE MCS GROUP, INC.

1   Q.  So that was after you had already
2  responded to the supervisor only call;
3  correct?
4   A.  Yes.
5   Q.  But before Lieutenant Navedo
6  arrived on the scene, you didn't have any
7  communications with him about this
8  incident; correct?
9   A.  You mean Lieutenant Disanto?
10   Q.  Yes.
11   A.  No, no communication over the
12  radio.  We don't communicate between each
13  other over the radio, it's only through
14  dispatch so we wouldn't have contacted
15  him.
16   Q.  Is there a way you could have
17  communicated with Lieutenant?
18   A.  Cell phone, but we didn't.
19   Q.  I'm still in Exhibit-1.  Turn over
20  to D76.  The entry that starts with
21  Monday, 9/14/15, 1:06:08.
22      Do you see that?
23   A.  Yes.
24   Q.  Can you take a second to review

THE MCS GROUP, INC.

69

```
1   this call transcript.
2      A.  Okay.
3      Q.  Can you describe what the call at
4   the bottom of D76 is about?
5      A.  This would leave me to believe that
6   we assumed the situation was handled or
7   done so either myself or my partner
8   resumed supervisor.  I don't remember who.
9   And that's when they told us they called
10  back again.  So we still decided to show
11  up and wait.  That was it.
12     Q.  So after you and Officer Navedo
13  responded to the supervisor only, you made
14  a call over the radio that the plaintiffs
15  no longer needed a supervisor; is that
16  right?
17     A.  Yes.
18     Q.  Do you know if you made that call
19  or if Officer Navedo did?
20     A.  I don't think I did.  Yeah, for me
21  over the radio, I wouldn't have asked, are
22  you sure about that.  I just take the
23  command or the call.
24     Q.  I think that's radio to 1201.  So
```

THE MCS GROUP, INC.

70

```
1   that would have been from radio to you.
2      A.  Oh, okay.
3      Q.  Then 12 DC to radio, is that
4   Lieutenant Disanto's response?
5      A.  Yes.
6      Q.  So he's saying he's on the way
7   anyway; he's going to come?
8      A.  Yes.
9      Q.  Do you recall how long you were up
10  on the porch at the residence from after
11  the call for this supervisor only came out
12  to when you left the porch?
13     A.  For after this call.
14     Q.  No.  Before --
15     A.  The initial one?
16     Q.  Yeah.
17     A.  I'll go over this again.  He said
18  he was coming from Wawa and that was
19  really far from the location we were at.
20  So at least 15 minutes.
21     Q.  I'm trying to connect the dots for
22  how long you were interacting with the
23  plaintiffs on the second interaction after
24  you left the custody dispute.
```

THE MCS GROUP, INC.

71

```
1        So if you look back at D74, do you
2   see that?  That's the radio request for a
3   supervisor only that went out at around
4   12:48 a.m., on September 14th; right?
5      A.  Yes.
6      Q.  Then, if you look on D76, there's a
7   call at 1:06 a.m. saying they no longer
8   need a supervisor.
9      A.  Hmm-mm.
10     Q.  So there's a span of time of 18
11  minutes, plus or minus a few seconds,
12  between when the call for a supervisor
13  came out --
14     A.  Yes.
15     Q.  -- and your call or Officer
16  Navedo's call saying that a supervisor is
17  no longer needed; is that correct?
18     A.  Yes.
19     Q.  So adding time from walking to and
20  from the police vehicle, how much time
21  were you interacting with the plaintiffs
22  on their front steps -- or front porch?
23     A.  Interacting with them or being on
24  location?
```

THE MCS GROUP, INC.

72

```
1      Q.  On location, on their front porch.
2      A.  Well, afterwards, we got off the
3   porch; we were just on the sidewalk out
4   front of the house, because we weren't
5   talking to them anymore.  So we didn't
6   feel comfortable standing on the porch
7   like that.  So I think we were at the
8   steps -- on the steps of the sidewalk when
9   we were waiting for the lieutenant.  So
10  probably, like, 20 minutes on scene, give
11  or take.  Maybe a half hour.
12     Q.  Well, during that 20 minutes you
13  went -- you knocked on the plaintiff's
14  door; right?
15     A.  I believe -- yeah.  I believe we
16  did.
17     Q.  When you were done interacting with
18  the plaintiffs you went back and called in
19  that a supervisor was no longer needed;
20  right?
21     A.  Yes.
22     Q.  How long were you on the front
23  porch, either knocking on the door or
24  talking to the plaintiffs?
```

THE MCS GROUP, INC.

1    A.  Well, talking to them on the porch
2  wasn't -- I don't think it was that long.
3  I don't really know the exact amount of
4  time, but we were mostly waiting for the
5  supervisor at that point because they
6  slammed the door.  We weren't getting
7  anywhere with them and they were arguing.
8    Q.  Do you recall where you were when
9  the call came out for a supervisor only,
10  initially?
11   A.  I'm not really sure.  I thought we
12  were in the wagon, but we might not have
13  been in the wagon.  We might have been out
14  front still.  I'm not really sure.
15   Q.  So you don't know if you had to
16  actually drive back to the scene?
17   A.  I don't think we drove back.  I
18  think we were parked across the street.  I
19  think we were just still there when the
20  call came out.  I'm not exactly sure.
21   Q.  Well, if you were going to call in
22  that a supervisor was no longer needed,
23  you would wait for the supervisor first to
24  make that call; right?

THE MCS GROUP, INC.

1         MS. FUNG:  Objection.
2       Objection to form.  It's calling
3       for speculation.  He can answer if
4       he has an answer.
5         THE WITNESS:  I don't.  I
6       don't have an answer.
7  BY MR. MCCLAM:
8    Q.  You don't know?
9       Did you leave immediately when it
10  was clear that the plaintiffs didn't want
11  to speak with you or Officer Navedo?
12   A.  I don't think we did.  Because
13  usually after a job we'll just sit in the
14  vehicle and start up the log and the
15  paperwork so we won't forget as the night
16  goes on, and usually pull away.
17   Q.  Did you go back -- or did you go
18  back and did you or Officer Navedo make
19  the call that a supervisor was no longer
20  needed immediately after the plaintiffs
21  made it clear they didn't want to speak to
22  you?
23   A.  I'm not sure how long soon
24  afterwards.  I believe it was my partner

THE MCS GROUP, INC.

1  who made that call, as I think about it.
2  I'm not sure if we were in the wagon yet
3  or not.  I'm not sure how soon after the
4  call was made.
5    Q.  Is it -- in your experience is it
6  customary for officers that are the
7  subject of complaints to go back and
8  confront the complaining civilians?
9    A.  Unn-nn.
10   Q.  Have you ever done that before?
11   A.  No, no.  I don't think I had a
12  complaint against me until now, to be
13  honest.
14   Q.  But you're aware that after you
15  came to deal with the custody dispute that
16  Mr. Hunter and/or Ms. Shujaa called in a
17  complaint about you and Officer Navedo?
18   A.  Yes.
19   Q.  And you did return back to the
20  scene where the complainants, Mr. Hunter
21  and Ms. Shujaa were; correct?
22   A.  Yes.
23   Q.  And you confronted them on their
24  front porch; is that right?

THE MCS GROUP, INC.

1         MS. FUNG:  Objection.  Can
2       you define confronting?
3         THE WITNESS:  Yeah.  It
4       sounds aggressive.
5  BY MR. MCCLAM:
6    Q.  What does confront mean to you?
7    A.  Like going up to someone and being
8  aggressive.  That's not how I operate.
9  That's not how my partner operates.
10  Confronting is sort of an ugly word.
11   Q.  How would you describe the second
12  interaction after Mr. Hunter and
13  Ms. Shujaa had filed a complaint -- or
14  called in a complaint about yourself and
15  Officer Navedo?
16   A.  Well, we approached the house
17  again.  And they went off on us.  We
18  didn't really go up like stereotypical
19  cops, you know, seeing what was going on.
20  I was just following my partner, because
21  that's one of my jobs to be there for my
22  partner.
23   Q.  Do you think they have a right to
24  be upset because the officers they were

THE MCS GROUP, INC.

77

```
 1   complaining about came back in response
 2   immediately after they made a complaint
 3   about those officers?
 4            MS. FUNG:  Objection to
 5        form.  Again, calls for
 6        speculation.  He can answer if he
 7        has an answer.
 8            THE WITNESS:  I don't have
 9        an answer.
10   BY MR. MCCLAM:
11      Q.  Do you agree that it was
12   inappropriate for you and Officer Navedo
13   to respond to a supervisor only call after
14   a complaint was filed against you by
15   Mr. and Mr. Shujaa -- sorry.  Let me start
16   over.
17        Do you agree that it was
18   inappropriate for you and Officer Navedo
19   to respond to the complaint by Mr. Hunter
20   and Ms. Shujaa without the presence of a
21   supervisor?
22      A.  At the time I guess I didn't.  But
23   I mean -- I mean at the time, I don't
24   really know what I was thinking at the
```

THE MCS GROUP, INC.

78

```
 1   time.  I thought we were doing the right
 2   thing, I guess.  I was following my
 3   partner.  I don't know.  If I was solo
 4   maybe it would have been different.  I
 5   don't know.
 6      Q.  Standing here today, was it
 7   inappropriate?
 8      A.  I guess now it is, yes.  I guess it
 9   was not the best thing to do.
10      Q.  You said, now, it is.  Is there a
11   change of policy that made it okay --
12      A.  No.  I just got more time on.  I
13   slowed down, doing like -- going from call
14   to call, being like -- like I have even
15   worked the streets for over a year now.
16   I'm in the office now.  So I really don't
17   know.
18      Q.  So you're no longer on patrol?
19      A.  No.  I'm in the office right now.
20      Q.  Are you -- is there a reason why
21   you're no longer on patrol?
22      A.  I'm on limited duty.
23      Q.  What is limited duty?
24      A.  Not in uniform.  I don't do patrol
```

THE MCS GROUP, INC.

79

```
 1   and I pretty much just do paperwork in the
 2   office.
 3      Q.  Why are you on limited duty?
 4            MS. FUNG:  I'm going to
 5        object and order him not to
 6        answer.
 7            We can go off the record.
 8            MR. MCCLAM:  I think we
 9        can do this on the record.  This
10        is the kind of thing that's
11        supposed to be on the record.  You
12        can explain your objection and
13        then we'll have a record of it.
14        Okay?
15            MS. FUNG:  That's fine.
16        I'm not going to get into any
17        details, but yeah, sure.  That's
18        fine.
19            MR. MCCLAM:  For the
20        record, I think this is the kind
21        of discussion that should be on
22        the record.  So go ahead.
23            Ms. Fung, did you want to
24        make an objection?
```

THE MCS GROUP, INC.

80

```
 1            MS. FUNG:  Yes.  I have an
 2        objection to the question.  I'm
 3        instructing my client not to
 4        answer the question.  He is
 5        currently on desk duty.  There is
 6        an open investigation.  And he's
 7        not permitted to discuss the
 8        contents of an open investigation.
 9   BY MR. MCCLAM:
10      Q.  Is the investigation -- without
11   getting into any details -- about some
12   action you took while you were on the job?
13      A.  Yes.
14      Q.  When did that action take place?
15   Can you give me a month and year?
16      A.  May of 2017.
17      Q.  And since May of 2017 have you been
18   on desk duty?
19      A.  Yes.
20      Q.  Is that why you're wearing that
21   very nice looking sports coat today?
22      A.  Yes.  And thank you.
23      Q.  So what happened after you and
24   Officer Navedo responded to the supervisor
```

THE MCS GROUP, INC.

1    only call without a supervisor?

2        A.  I think that's when they yelled at

3    us, if I recall.  Yeah.  That's when they

4    yelled at us.  They opened the door,

5    slammed it and they cursed at us.

6        Q.  That was when the supervisor was

7    not there; right, that they did the

8    yelling and cursing; is that correct?

9        A.  Yes.

10       Q.  What happened after that?

11       A.  We waited for the supervisor.  The

12   supervisor eventually showed up, knocked

13   on the door and nobody answered.  So he

14   told us to make an invest prem.  That was

15   it.

16       Q.  Did you investigate the premise

17   when nobody answered the door?

18       A.  No.  That's just what you call it.

19   No statement at that point so you just

20   call it invest prem.  We didn't

21   investigate anything.

22       Q.  Nobody went in the back yard or

23   anything?

24       A.  No.  It's pretty much a generic

1    report to close it out.

2        Q.  When you returned to the residence

3    after the supervisor only call and you

4    were without a supervisor, did Mr. Hunter

5    or Ms. Shujaa ever ask you why you were

6    there?

7        A.  I don't remember exactly what they

8    said at that point.

9        Q.  Did you ever tell Mr. Hunter and

10   Ms. Shujaa why you were there?

11       A.  The second time?

12       Q.  Yes.

13       A.  I don't remember if we told them a

14   second time.  I know, initially we told

15   them why we were there, obviously, so they

16   know what's going on.  But I don't recall

17   if we said anything the second time.

18       Q.  Did you say anything to them the

19   second time you were there?

20       A.  I'm sure we did.  I don't just

21   remember what we said.

22       Q.  Did you tell them that you were

23   there responding to their complaint?

24       A.  No.

1        Q.  Did Officer Navedo tell them that

2    he was there responding to the complaint?

3        A.  No.  I don't think he would have

4    done that.

5        Q.  The only reason you were there was

6    in response to their complaint; is that

7    right?

8        A.  Yeah.  I mean I don't remember why

9    we went back up so I couldn't really tell

10   at you.

11       Q.  Were Mr. Hunter and Ms. Shujaa

12   upset about the fact that you returned in

13   response to their complaint about you and

14   Officer Navedo?

15       A.  I assume they were since they were

16   agitated and yelling.

17       Q.  Do you recall what Mr. Hunter or

18   Ms. Shujaa said to you all in the second

19   visit?

20       A.  Basically, they told us to leave

21   them the "f" alone and stuff like that

22   repetitive.  And yelling.  And pretty much

23   I kind of just tuned it out at that point.

24   It was a bunch of cursing.

1        Q.  How did you respond to the cursing?

2        A.  I didn't say anything.  I don't

3    usually curse on the job.

4        Q.  How did Officer Navedo respond?

5        A.  Same way.  He's got more time in

6    than me.  It doesn't usually bother him.

7        Q.  Did you all turn around and leave

8    as soon as you heard from the plaintiffs

9    on the second visit?

10       A.  At that point I think we did

11   because there's no point just sitting

12   there listening to it.

13       Q.  Did plaintiffs ever tell you that

14   they were no longer going to assert a

15   complaint against you and Officer Navedo?

16       A.  To my knowledge, no.

17       Q.  Was the plaintiffs' complaint

18   resolved at that time?

19       A.  I don't know if it was resolved,

20   because they didn't answer when the

21   lieutenant came up.  So nothing was really

22   decided at that point.  So I don't know if

23   that resolved it or not.  I assume because

24   he didn't give the complaint form to them,

85

```
 1   because they didn't answer the door when
 2   he knocked up so I guess it wasn't
 3   resolved.
 4       Q.  You said, complaint form.  How are
 5   complaints -- what's a complaint form for?
 6       A.  It's pretty much like a sheet.
 7   Supervisor -- when there's a complaint
 8   that's supposed to be against an officer a
 9   supervisor will speak to them -- the
10   person making the complaint -- and give a
11   piece of paper to them for them to fill
12   out.  Make sure the complaint has the
13   officer's name, badge number and all that
14   stuff and they drop it off to the district
15   and it's filed and sent up to the chain of
16   command.
17       Q.  Do officers carry complaint forms?
18       A.  No.  Because only supervisors can
19   give them out.
20       Q.  So did you or Officer Navedo have a
21   complaint form on you on the evening of
22   September 14th, 2010?
23       A.  No.  We don't carry them.
24       Q.  Sorry, I said 2010.  I meant on the
```

86

```
 1   night of the incident.
 2       A.  No.  We don't carry them.  They're
 3   kept at the office.  And officers aren't
 4   the ones that give them out.
 5       Q.  So can you think of any purpose
 6   that could be accomplished by you and/or
 7   Officer Navedo responding to Mr. Hunter
 8   and Ms. Shujaa's complaint about yourself
 9   and Officer Navedo?
10           MS. FUNG:  Objection to
11       form.  But you can answer.
12           THE WITNESS:  I don't have
13       an answer.
14   BY MR. MCCLAM:
15       Q.  So the answer is, no?
16       A.  Yeah, me personally, no.
17       Q.  You didn't have a complaint form so
18   they couldn't have given their complaint
19   to you; correct?
20       A.  Correct.
21       Q.  And they couldn't have given their
22   complaint to Officer Navedo; right?
23       A.  Correct.
24       Q.  They would have had to give the
```

87

```
 1   complaint to Lieutenant Disanto; correct?
 2       A.  Yes.
 3       Q.  And Lieutenant Disanto wasn't there
 4   the second time; correct?
 5       A.  Correct.
 6       Q.  Going back to the radio call, which
 7   is in Exhibit-1, on D76.  1201 to radio
 8   says, they no longer need a supervisor.
 9           Do you see that?
10       A.  Yes.
11       Q.  So why would they no longer need a
12   supervisor if when Officer Navedo couldn't
13   have facilitated their issuing of a
14   complaint or resolving their complaint?
15           MS. FUNG:  Objection to
16       form, but you can answer.
17           THE WITNESS:  I don't have
18       an answer.
19   BY MR. MCCLAM:
20       Q.  Do you know why the call went out
21   from 1201 stating that they no longer need
22   a supervisor?
23       A.  I don't recall why we -- why it
24   would have been said.
```

88

```
 1           I don't remember why it led up to
 2   that conclusion.
 3       Q.  You don't recall what led to the --
 4       A.  No.  No, I don't.
 5       Q.  Did you discuss the incident with
 6   Lieutenant Disanto when he arrived?
 7       A.  Yes.
 8       Q.  What did you describe to him?
 9       A.  We told him what the initial call
10   was for.  And then we told him that when
11   we went up again they were yelling at us
12   and cursing at us and everything.  And
13   then that's when he tried to go up, I
14   guess, talk to them about the complaint or
15   calm them down, but like I said, they
16   didn't answer when we got there.
17       Q.  Did you tell Lieutenant Disanto
18   that you had already returned to the
19   residence after the supervisor only call
20   went out?
21           MS. FUNG:  Objection.
22       This has been asked and answered.
23       I'm instructing him not to answer
24       it again.  It' been asked and
```

89

```
1        answered.
2              MR. MCCLAM:  I'm asking
3        about what he told Lieutenant
4        Disanto.
5              MS. FUNG:  Yeah.  You did
6        ask that already, John.
7              MR. MCCLAM:  You may
8        answer the question.
9              THE WITNESS:  Ask it
10       again.
11   BY MR. MCCLAM:
12       Q.  Did you tell Lieutenant Disanto,
13   when he arrived, that you and Officer
14   Navedo had already been back to the
15   residence after the call for a supervisor
16   only went out?
17       A.  I don't recall.  But I'm assuming
18   we told him we went up again, because why
19   wouldn't we tell him everything that
20   happened.
21       Q.  How did -- do you recall how
22   Lieutenant Disanto responded to that?
23       A.  Indifferent.
24       Q.  Indifferent?
```

90

```
1        Did Lieutenant Disanto ask you why
2    you responded to the supervisor only call?
3        A.  He did.  We stated to back him up
4    and he said, thank you.  That was pretty
5    much it.
6        Q.  But you didn't -- you weren't
7    backing him up when you and Navedo went
8    without him; right?
9        A.  Not at the time, no.  But the
10   reason he was there while we were there,
11   from what I recall, was to be there for
12   him to back him up.  That's from my memory
13   is why he stayed because he was still on
14   his way.
15       Q.  Do you know where Lieutenant
16   Disanto was coming from at the time?
17       A.  He stated the Wawa.
18       Q.  At the time the supervisor only
19   call came out did you know where
20   Lieutenant Disanto was?
21       A.  No.
22       Q.  Do you know how long it would take
23   him to get to the residence?
24       A.  No.
```

91

```
1        Q.  I believe you stated earlier that
2    Officer Navedo wrote the 7548 report; is
3    that right?
4        A.  Yes.
5        Q.  Do you remember what he wrote in
6    the description box?
7        A.  Not word for word.  I did read it a
8    couple of times.  I don't remember what he
9    wrote.  I think just the basis of the
10   invest prem, the custody dispute.  I'm not
11   really sure, to be honest with you, word
12   for word.
13       Q.  Did you review it after he wrote
14   it?
15       A.  Probably not.  I don't think I did.
16   I usually don't go over his paperwork.
17       Q.  Filling out 7548 forms something
18   you do regularly?
19       A.  Yes.
20       Q.  If you were filling -- if you had
21   been filling out the description box on
22   the 7548, what information would you have
23   included?
24       A.  Since it was an invest prem, I
```

92

```
1    would have put that we initially came out
2    for the custody dispute.  Went to the
3    residence.  Police no longer needed.
4    Invest prem.  RTF.
5        Q.  Would you describe your interaction
6    with the plaintiff after you responded to
7    the supervisor only?
8        A.  Yeah, yeah.  Probably.  I probably
9    would have put that in there.
10       Q.  So you said you would have
11   described the first interaction, which was
12   regarding the custody dispute?
13       A.  Yes.
14       Q.  And you would have described the
15   second interaction, which was when you and
16   Officer Navedo returned to the residence
17   without Lieutenant Disanto; correct?
18       A.  Yes.
19       Q.  And then you would have described
20   that third visit when Lieutenant Disanto
21   went up to the residence and you and
22   Officer Navedo were backing him up; is
23   that right?
24       A.  Yes, yes.
```

Robert Schutte
September 11, 2018

93

```
 1      Q.  So you would have included all
 2   three of those?
 3      A.  Yes.  Not in depth.  About
 4   everything they said, about pretty much as
 5   being uncooperative, swearing and left it
 6   at that.
 7      Q.  In general, is that the level of
 8   detail that's required in these 7548
 9   reports?
10      A.  Usually for invest premise.  Yeah.
11   It's just a basic narrative.
12      Q.  Including the significant
13   interactions?
14      A.  Yes.
15      Q.  Would you expect that Navedo's 7548
16   would have included a description of each
17   one of -- each of those three
18   interactions?
19           MS. FUNG:  Objection to
20       form.  Calls for speculation.  You
21       can answer.
22           THE WITNESS:  Not really.
23       He writes it how he writes it.  I
24       write it how I write it.  I don't
```

THE MCS GROUP, INC.

Robert Schutte
September 11, 2018

94

```
 1           question how he does it his
 2           paperwork.
 3           MR. MCCLAM:  I'll ask the
 4       court reporter to mark this
 5       document as Schutte-4.
 6           (Whereupon the document
 7       was marked, for identification
 8       purposes, as Exhibit Schutte-4.)
 9   BY MR. MCCLAM:
10      Q.  Take a minute to review Exhibit-4.
11      Is Exhibit-4 the 7548 incident
12   report form that Officer Navedo completed
13   in connection with the incident we've been
14   talking about here today?
15      A.  Yes.
16           MS. FUNG:  I'm going to
17       object to this line of questioning
18       and instruct him not to answer
19       since he did not fill out this
20       report.  This was filled out by
21       Officer Navedo.
22           MR. MCCLAM:  He can talk
23       about -- this is a document --
24           MS. FUNG:  I'm aware.  He
```

THE MCS GROUP, INC.

Robert Schutte
September 11, 2018

95

```
 1           did not fill out this form.
 2           MR. MCCLAM:  That's an
 3       improper objection to tell the
 4       witness not to answer just because
 5       he didn't write about it.
 6           MS. FUNG:  I'm telling you
 7       that he did not prepare this form.
 8           MR. MCCLAM:  Are you
 9       asserting a privilege?
10           MS. LASTOWSKI:  For the
11       record, on the bottom left of the
12       report it says Report Prepared By
13       Navedo/Schutte.  So at the time
14       perhaps it was prepared by both.
15           THE WITNESS:  It's a
16       partnership.  They always put
17       both.
18           MS. FUNG:  They always put
19       both.
20           THE WITNESS:  Only one
21       person writes it.
22           MR. MCCLAM:  You can
23       object, but this is a line of
24       questions he is allowed to answer.
```

THE MCS GROUP, INC.

Robert Schutte
September 11, 2018

96

```
 1           You can have your
 2       foundation objection and those
 3       will be noted on the record, but
 4       this is a subject matter that is
 5       well within his ability to
 6       testify.
 7           MS. FUNG:  Okay.
 8   BY MR. MCCLAM:
 9      Q.  Is this the 7548 complaint -- or
10   incident report form that Officer Navedo
11   completed in related to the incident?
12      A.  Yes.
13      Q.  Do you see the first sentence in
14   the description field says, police
15   responded to above location on check of
16   well-being on the juvenile due to
17   visitation rights.
18      Do you see that?
19      A.  Yes.
20      Q.  Did you conduct a check on the
21   well-being of the juvenile?
22      A.  I don't recall.  I mean we didn't
23   ask about where the kid was; we didn't
24   look for the kid or anything like that.
```

THE MCS GROUP, INC.

97

```
1    So I guess showing up is what he means.  I
2    can't really tell from his prerogative,
3    but I guess showing up to the location is
4    his idea to check on the well-being.
5         I probably wouldn't have wrote
6    that.
7    Q.  Do you see anywhere in the
8    description of the incident a description
9    of your second interaction with the
10   plaintiff?
11   A.  You mean like the swearing and the
12   yelling?
13   Q.  Correct.
14   A.  No, I do not.
15   Q.  It says at the bottom of the
16   report, prepared by Navedo/Schutte.
17   A.  Yes.
18   Q.  Why are both of your names listed
19   there, do you know?
20   A.  It's a two-man unit so you
21   automatically put both officers names on
22   every piece of paperwork.  That's just how
23   it's taught to us.
24   Q.  Do you know whose signature that is
```

THE MCS GROUP, INC.

98

```
1    down at the bottom?
2    A.  I know it's the sergeants.  But I
3    don't know what sergeant.  I can't make
4    out the last name.
5    Q.  Do you know why Officer Navedo
6    omitted the part about your second return
7    to the residence without Lieutenant
8    Disanto present?
9         MS. FUNG:  Objection to
10        the form.
11        THE WITNESS:  I couldn't
12        tell you.  It's how he wrote it.
13        It's in his mind.  This is how he
14        writes his paperwork, I guess.  I
15        don't have an answer.  I don't
16        know.
17   BY MR. MCCLAM:
18   Q.  Do you recall -- let me start over.
19   Have you ever seen this document before?
20   A.  Yes.
21   Q.  When did you see it?
22   A.  During the first observation of the
23   paperwork I received for this case.
24        MR. MCCLAM:  Let's take a
```

THE MCS GROUP, INC.

99

```
1         quick break.
2              (Whereupon, a brief recess
3              was taken.)
4    BY MR. MCCLAM:
5    Q.  Officer Schutte, I'm handing you a
6    document that I'm asking the court
7    reporter to mark as Schutte Exhibit-5.
8              (Whereupon the document
9              was marked, for identification
10             purposes, as Exhibit Schutte-5.)
11   BY MR. MCCLAM:
12   Q.  Take a minute to review Exhibit-5.
13       I'm only going to be asking you
14   about the first three pages.
15       Due recognize Exhibit-5?
16   A.  Yes.
17   Q.  Are you familiar with it?
18   A.  Yes.
19   Q.  What is it?
20   A.  It's a printout of the MDT
21   terminal.
22   Q.  What is the MDT terminal?
23   A.  -- or the mobile terminal screen.
24   It's the in car computer.
```

THE MCS GROUP, INC.

100

```
1    Q.  Is this a printout from what you
2    and Officer Navedo can see on your
3    computer screen on the morning of
4    September 14th, 2015?
5    A.  Yes.
6    Q.  Look over the second page.  Is
7    what's reflected here, which you would
8    have -- well, what is reflected on the
9    second page?
10   A.  It's a type of job invest prem with
11   the address, the location of dispute, time
12   and date that's entered in and myself and
13   my partner's name.  It's pretty much
14   standard MDT screen.
15   Q.  Let's turn over to the next page,
16   Bates Number D069.
17   A.  Yes.
18   Q.  Can you describe what's on this
19   page?
20   A.  It's a job for a complaint against
21   police with narrative, stating -- like we
22   responded for the custody dispute and the
23   male was requesting a supervisor and the
24   female unhappy with the police being at
```

THE MCS GROUP, INC.

1    their door.
2      Q.  So would you have seen the entries
3    listed under remarks prior to responding
4    to the supervisor only call and returning
5    to the residence without Lieutenant
6    Disanto?
7      A.  Yes.  You can see every officers'
8    and supervisors' current on the screen job
9    with a narrative.
10     Q.  So you would have seen male
11   compl -- which I assume means complainant?
12     A.  Yes.
13     Q.  You would have seen in the remarks
14   section male complainant in reference to
15   officers responding for a custody dispute.
16   Male requesting a supervisor?
17     A.  Yes.
18     Q.  Do you recall seeing that come
19   across the screen on September 14th, 2015?
20     A.  I mean I don't recall it recall it.
21   I know I must have seen it on the screen,
22   because we check the screen periodically
23   to see what's going on.  I do recall that
24   being there.

THE MCS GROUP, INC.

1            MR. MCCLAM:  I'll ask the
2      court reporter to mark this
3      document as Schutte-6.
4            (Whereupon the document
5      was marked, for identification
6      purposes, as Exhibit Schutte-6.)
7    BY MR. MCCLAM:
8      Q.  Please take a minute to review
9    Exhibit-6, which is Philadelphia Police
10   Department Memorandum, dated July 31st,
11   20101.  Subject:  Custody Disputes
12   Involving Minor Children.
13         I'll state for the record that this
14   is a three-page exhibit, that in the order
15   it was produced, but it looks like Page 3
16   was produced before Page 2.
17         I'm going to point to -- do you
18   recognize this document?
19     A.  Yes.
20     Q.  Are you familiar with it?
21     A.  I mean not the whole thing.  It's
22   been a while since I went over directives,
23   but I have seen it before.
24     Q.  Have you ever been -- I believe you

THE MCS GROUP, INC.

1    testified earlier that you've been trained
2    on how to respond to a custody dispute
3    involving minors?
4      A.  Yeah.  I went over the directives
5    during my training.  We usually don't
6    study directives on our free time or down
7    time at work.  So pretty much when you get
8    trained you have it in your file, but no
9    one really looks at the directives unless
10   you have to report on something.
11     Q.  I want to point your attention down
12   to the bottom of the first page of
13   Schutte-6, at the definition, "At Risk".
14         Do you see that?
15     A.  Yes.
16     Q.  It defines "at risk" as when facts
17   and circumstances exist whereby the
18   officer reasonably believes that the
19   immediate health, safety, and/or welfare
20   of a minor child is threatened or in
21   jeopardy.
22         Do you see that?
23     A.  Yes.
24     Q.  Was the child described by

THE MCS GROUP, INC.

1    Ms. Mohammed, on September 14th, 2015,
2    considered "at risk"?
3      A.  I don't recall.
4      Q.  Do you recall any statements about
5    the child's well-being?
6      A.  I don't.
7      Q.  If your turn over to the Page D306
8    at the bottom.  Under Patrol Officer,
9    Number 1, it states, that after the
10   verification of a founded custody dispute,
11   request the presence of a supervisor, if
12   not already dispatched.  The officer and
13   supervisor will investigate to insure the
14   child is not "at risk" or in a missing
15   person status.
16         Did you ever contact a supervisor
17   in relation to your investigation of the
18   custody dispute on September 14th, 2015?
19     A.  I didn't personally.
20     Q.  Did Officer Navedo?
21     A.  I think he spoke to Sergeant Melvin
22   at one point, but I don't know if he did
23   and I don't know what was said.
24     Q.  Under this directive would you or

THE MCS GROUP, INC.

```
 1   Officer Navedo been required to speak with
 2   a supervisor before responding to a
 3   custody dispute?
 4       A.  Well, the supervisor was --
 5   Sergeant Melvin was at the headquarters
 6   when she came up initially with the
 7   paperwork.  And I don't know -- I don't
 8   remember what he said or what was said to
 9   him, but I know he was present when she
10   came up.  And he told us to take care of
11   the whatever paperwork she had.
12       Q.  Then, under Patrol Supervisor, on
13   D305, it says, patrol supervisor will
14   respond to all founded custody disputes.
15           Should the patrol supervisor have
16   responded to the custody dispute at
17   Mr. Hunter and Ms. Shujaa's residence?
18       A.  According to this he should.  But I
19   don't tell the sergeants what to do or
20   where to go or what their prerogative is
21   and whether they go to things.  I can't
22   say anything about that because they out
23   rank me.  But according to this he should
24   have, but he didn't.
```

```
 1       Q.  Officer Schutte, I'm going to play
 2   an audio recording for you of one of the
 3   radio calls.  And my primary question is
 4   going to be to identify whose voices they
 5   are.
 6           PLAYBACK OF AUDIO RECORDING:
 7           Monday, September 14, 2015, 0:14
 8   and 20 seconds.
 9           Male voice:  1201?
10           Female voice:  1201.
11           Male voice:  Make us available
12   using the same, hold us out to 1242 South
13   51st Street, invest prem.
14           Female voice:  Received.
15   BY MR. MCCLAM:
16       Q.  Is that Officer Navedo on track?
17       A.  Yes.
18       Q.  Is he the one saying 1201?
19       A.  Yes.
20       Q.  Is it normal police practice to
21   call in on the radio and announce that
22   you're going to an incident scene?
23       A.  Absolutely.
24       Q.  Is that what Officer Navedo was
```

```
 1   doing on that recording?
 2       A.  Yes.
 3       Q.  Would you expect there to be a call
 4   from yourself or Officer Navedo announcing
 5   on the radio that you were going back to
 6   the residence after the supervisor only
 7   call before Lieutenant Disanto got there?
 8       A.  It depends on the situation.  I
 9   mean it's happened before.  You know, it
10   depends on the situation.
11       Q.  How does it depend on the
12   situation?
13       A.  Pretty much the officer's decision
14   to go back.  I've done it on a couple of
15   jobs.  Other officers have done it.
16       Q.  By go back you mean go back without
17   making a radio call?
18       A.  Oh, go back without making a radio
19   call?
20       Q.  Yeah.
21       A.  Oh, no, no.  I wouldn't do that.
22   Most officers wouldn't do that.  It's a
23   safety issue.  They have to know where
24   you're at all times just in case
```

```
 1   something happens.  And your last known
 2   location is where you would go to first
 3   if, say, you got shot or something like
 4   that.  So you've always got to tell them
 5   where you're going to be at?
 6       Q.  So after the custody dispute was
 7   resolved, you or Officer Navedo should
 8   have called the radio line to say you were
 9   returning to the residence?
10       A.  Ideally, yes.
11       Q.  Are you aware whether or not you or
12   Officer Navedo made that call?
13       A.  I don't remember if either of us
14   did.
15       Q.  I'm going to play another radio
16   call.
17           PLAYBACK OF AUDIO RECORDING:
18           Monday, September 14, 2015, 01:06
19   and 08 seconds?
20           Male voice 1:  1201.
21           Male voice 2:  That last unit?
22           Male voice 1:  1201.
23           Male voice 2:  1201.
24           Male voice 1:  You can RTF us and
```

109

```
 1   you can resume Command.  They no longer
 2   need a supervisor.
 3           Male voice 2:  They just called
 4   back again for another one.  Are you sure
 5   about that?
 6           Male voice 3:  12 Command.  Let
 7   them know that I am almost there.  I was
 8   coming from the Wawa.  I'll be right
 9   there.
10           Male voice 2:  Okay.
11   BY MR. MCCLAM:
12       Q.  Who was the first voice in that
13   recording announcing 1201?
14       A.  Officer Navedo.
15       Q.  And who was the last voice saying,
16   I was at the Wawa?
17       A.  Lieutenant Disanto.
18       Q.  For our wrap up, are there any
19   answers to my questions that I had today
20   that you wish to change before I conclude
21   my questions?
22       A.  No.
23       Q.  Anything you would like to clarify
24   for the record?
```

THE MCS GROUP, INC.

110

```
 1       A.  Not at this time.
 2           MR. MCCLAM:  I will pass
 3   the witness.
 4   BY MS. LASTOWSKI:
 5       Q.  Good afternoon, Officer Schutte.  I
 6   introduced myself in the beginning of the
 7   deposition.  My name is Alex Lastowski.
 8   And I'm here with my colleague Michaela
 9   Young.  We represent the plaintiff Darus
10   Hunter in this matter.  I'm going to have
11   a few follow-up questions from my
12   co-counsel's questions and the questions
13   exploring some new areas and then your
14   counsel will have an opportunity to ask
15   you some questions as well.
16           So that's what left for you the
17   rest of the day.
18       A.  Okay.
19       Q.  I'll just remind you that the
20   deposition rules that Mr. McClam shared
21   with you in the beginning of the
22   deposition apply while we're talking now.
23           Again, if you don't understand a
24   question I'm asking, just let me know.  If
```

THE MCS GROUP, INC.

111

```
 1   your counsel objects, unless she instructs
 2   you not to answer, you have to answer my
 3   question.  Again, if you need any break --
 4   I know we've been going for a while and
 5   you've had a long day -- just let me know.
 6           Following up on some things you
 7   talked about with Mr. McClam.  Going back
 8   to the beginning, can you describe to me
 9   how assignments are doled out when you
10   show up for your shift at 12 a.m.?  How do
11   you know where you're going?  Who decides
12   that and how do you learn that
13   information?
14       A.  During roll call the supervisors
15   have a sign-in sheet ready to go.  And
16   prior to roll call they have a sheet set
17   up and dictates what zones each car gets.
18   That's pretty much how it's done,
19   depending on manpower.
20       Q.  So a roll call supervisor decides
21   before you show up for your shift where
22   you'll be patrolling for your shift; is
23   that right?
24       A.  90 percent of the time.  Yeah.
```

THE MCS GROUP, INC.

112

```
 1       Q.  What about the other 10 percent?
 2       A.  It could be made up right five
 3   minutes before roll call.  People call out
 4   sick last minute, that kind of thing and
 5   things got to be moved around.
 6       Q.  I understand.
 7           In the circumstance we talked about
 8   here where someone showed up -- a
 9   complainant showed up to the district to
10   raise this custody dispute, was that a
11   situation where your assignment changed
12   from what you had originally been
13   assigned?  How do you deal with kind of
14   impromptu complaints like that?
15       A.  We were the ones standing there
16   next to the sergeant at the time so we
17   were the ones that got the job.
18       Q.  Got it.  So your original
19   assignment was shifted when this impromptu
20   complainant came in?
21       A.  Yes.
22       Q.  And you said the roll call -- so
23   was it the roll call supervisor who told
24   you that you'd be dealing with the custody
```

THE MCS GROUP, INC.

113

```
1   dispute or a sergeant?
2       A.  It was a sergeant.  It was the roll
3   call sergeant.  I believe the one that did
4   roll call that night was Sergeant Melvin.
5   That's why he was still in the building.
6       Q.  So it was Sergeant Melvin who told
7   you, can you handle this custody issue?
8       A.  Yeah.
9       Q.  How is it recorded in the district
10  where each officer on duty is patrolling
11  for their shift?
12      A.  It's printed on an assignment
13  sheet.  Several copies are made.  It's on
14  a computer.  That's where it's initially
15  done.  One goes to the desk sergeant or
16  corporal and three copies go to the
17  captain's mail.
18      Q.  What about for a situation like we
19  just discussed where we have an impromptu
20  change to your assignment, would that be
21  recorded on the assignment sheet?
22      A.  Usually.  But we were in the wagon
23  anyway.  And the wagon is a -- the wagon
24  has its own per se, as of the whole
```

THE MCS GROUP, INC.

114

```
1   district.  But we were just given that
2   assignment as the wagon.
3       Q.  Okay.  So some officers are
4   assigned to patrol certain areas?
5       A.  Zones, yes.
6       Q.  Zones?
7       A.  Yes.
8       Q.  And if you're assigned to the wagon
9   that means you're assigned to the 12th
10  District as a whole?
11      A.  Yes.
12      Q.  Is it the case -- I'm just
13  wondering -- if you're assigned to the
14  wagon that you're kind of in charge of
15  these impromptu things that come up during
16  the shift?
17      A.  Pretty much, yes.
18      Q.  That's how it ends up happening?
19      A.  Yeah.  We're usually not the wagon.
20  It was kind of a rarity.  They usually
21  give that to new guys.  But I don't
22  remember --
23      Q.  But for whatever reason that night
24  you were assigned to it?
```

THE MCS GROUP, INC.

115

```
1       A.  Yeah.  I don't know why they gave
2   it to us.
3       Q.  Would Sergeant Mel -- so Sergeant
4   Melvin was the one who told you and
5   Officer Navedo to head out and deal with
6   the custody dispute.  So I assume -- and
7   correct me if I'm wrong -- it goes without
8   saying, that Sergeant Melvin knew where
9   you and Officer Navedo were going during
10  your shift?
11      A.  Yes.
12      Q.  Would he have had the address of
13  where you and Officer Navedo were
14  reporting to follow up on the custody
15  dispute?
16      A.  Yeah.  It's on the paperwork we
17  reviewed.
18      Q.  Would the address of where you were
19  reporting to follow up on the custody
20  dispute had been recorded in some police
21  computer system?
22      A.  Over the radio when we tell them
23  that we have this assignment.  We're going
24  to go to this location and we'll give the
```

THE MCS GROUP, INC.

116

```
1   location over the radio.
2       Q.  Who has access to the radio?
3       A.  The --
4       Q.  Meaning who can hear what comes in
5   over the radio?  Is it broadcast over the
6   station?  Is it just to the sergeant?
7       A.  Our division -- our division covers
8   12th and 18th.  So anyone in the 12th and
9   18th with a police radio can hear it.
10      Q.  So anyone in the 12th and 18th who
11  are on police radio can hear it?
12      A.  Yes.
13      Q.  Who is on the police radio?
14      A.  Officers, night command, sergeants.
15  Pretty much anyone in a uniform.
16      Q.  So I know that you have discussed
17  earlier that when the woman came in to
18  discuss the custody dispute with her that
19  she had brought a custody order; correct?
20      A.  Yes.
21      Q.  And you and Officer Navedo took a
22  look at that custody order?
23      A.  Yes.
24      Q.  Then when you visited Mr. Hunter's
```

THE MCS GROUP, INC.

1   home to follow up on the custody dispute,
2   he also showed you a custody order.
3       A.  Yes.
4       Q.  Is that right?
5       A.  I believe so.  Yes.
6       Q.  Were those the same custody order?
7   Did they provide the same details?
8       A.  I don't remember all the details.
9   I'm assuming they'd be the same ones.  It
10  makes sense that they would be, but I
11  can't tell you a hundred percent.
12      Q.  Do you recall when you reviewed the
13  custody order while you were still at the
14  12th district and dealing with the
15  complainant, did you, when you reviewed
16  the custody order, did it say that if
17  there was a holiday that Mr. Hunter is
18  entitled or whichever parent is entitled
19  to keep the child past the weekend?
20      A.  I believe that's what it said.  I
21  mean I glossed over it and gave it to my
22  partner so he could read it more through.
23  I believe he stated that.  That's the
24  understanding that I came to with him.

THE MCS GROUP, INC.

1       Q.  I have another technical question.
2   We reviewed the MDT log, the mobile --
3       A.  Mobile data terminal.
4       Q.  Mobile data terminal?
5           So who has access to the
6   information in the mobile data terminal?
7       A.  Any police officer with a sign on
8   and pass code.
9       Q.  So if I'm working the 12 a.m. to
10  8:15 a.m. shift in the 12th district, and
11  I, at 12:15 a.m., log in with my police
12  user name and password, can I review
13  anyone's mobile data entries who's working
14  at the time?
15      A.  Yes.
16      Q.  During your interaction with
17  Mr. Hunter and Ms. Shujaa, you witnessed
18  some of their children; correct?
19      A.  I don't know if it was their
20  children.  I just witnessed --
21      Q.  You witnessed children?
22      A.  Yes, yes.
23      Q.  And do you recall how many
24  different children you viewed during

THE MCS GROUP, INC.

1   morning of September 14th, 2015?
2       A.  I stated earlier I believe three or
3   four, but I can't really be sure because
4   it was dark.
5       Q.  Do you remember whether they were
6   male or female children?
7       A.  I don't know.
8       Q.  Officer Schutte, are you aware that
9   there's a directive outlining the
10  procedures that Philadelphia Police
11  Department personnel should follow when
12  accepting a citizen's complaint?
13      A.  Yes.
14          MS. LASTOWSKI:  I'll mark
15      the directive as seven.
16          (Whereupon the document
17      was marked, for identification
18      purposes, as Exhibit Schutte-7.)
19  BY MS. LASTOWSKI:
20      Q.  Officer Schutte, I've handed you a
21  document titled Philadelphia Police
22  Department Directive 12.18.  Subject of
23  the directive is Complaints Against the
24  Philadelphia Police Department.

THE MCS GROUP, INC.

1           Have you seen this document before?
2       A.  I haven't.  I know of it, but I
3   haven't.  They don't show us every
4   directive, only things that pretty much
5   pertain to basic patrol.  This is more of
6   a supervisor thing.  So we really wouldn't
7   need this information.  So I've never
8   actually read this.
9       Q.  Okay.  This is the first time
10  you're that you've seen this directive in
11  writing?
12      A.  Yes.
13      Q.  You see that the directive was
14  issued and effective on August 29th, 2014?
15      A.  Yes.
16      Q.  And that predates the time that you
17  joined the Philadelphia Police Department;
18  right?
19      A.  Yes.
20      Q.  And it was updated on May 15th,
21  2015.
22          Do you see that?
23      A.  Yes.
24      Q.  So the update happened while you

THE MCS GROUP, INC.

```
 1   were employed by the Philadelphia Police
 2   Department?
 3       A.  Hmm-mm.
 4       Q.  And you would agree that this
 5   directive was in effect during your
 6   interactions with the plaintiff in this
 7   case?
 8       A.  Yes.
 9       Q.  So if you would take a look under
10   the heading, Policies.  The second
11   sentence there -- and I'll just read it
12   out loud -- it read, Philadelphia Police
13   Department personnel -- and really
14   quickly, would you agree that you fall
15   under that bucket; you're a member of the
16   Philadelphia Police Department?
17       A.  Yes.
18       Q.  The Philadelphia Police Department
19   personnel shall inform any persons who
20   wishes to make a complaint against a
21   police officer of the existence of the
22   formal complaint procedure and shall refer
23   such persons to those locations listed in
24   Section 2-A of this directive, including
```

THE MCS GROUP, INC.

```
 1   the most convenient locations, where the
 2   Citizen's Complaint Report may be obtained
 3   and filed.
 4           Did I read that correctly?
 5       A.  Yes.
 6       Q.  Would you agree with me that for
 7   this directive personnel -- if a citizen
 8   wants to file a complaint, they should
 9   first inform the person that there's a
10   formal procedure that should be filed; is
11   that right?
12       A.  Yes.
13       Q.  Second, the Philadelphia Police
14   Department personnel shall refer the
15   person to the most convenient location
16   where they can file that complaint.
17       A.  Yes.
18       Q.  So we've discussed today the
19   different interactions that you've had
20   with the plaintiff in this case.
21           And after your first visit to Mr.
22   Hunter's home to follow-up with the
23   custody dispute, you became aware, at some
24   point, that Mr. Hunter wanted to file a
```

THE MCS GROUP, INC.

```
 1   complaint against you and Officer Navedo;
 2   correct?
 3       A.  Yes.
 4       Q.  And in response to learning that
 5   Mr. Hunter wanted to file a complaint, you
 6   and Officer Navedo visited Mr. Hunter's
 7   home for the second time; is that right?
 8       A.  Yes.
 9       Q.  Can you pull Exhibit-3 up for me.
10   That's your interview statement from
11   November 5th, 2015.  Page 2.  Looking back
12   at the block, it's just describing why you
13   and your partner returned to Mr. Hunter's
14   home.  And I'm looking at -- I'll just
15   read the first three sentences.
16           When you were asked why you and
17   your partner returned to the residence you
18   said, we went there to back up the
19   supervisor, but we also went to see if we
20   could resolve any issue that may not need
21   the supervisor to respond.  When we first
22   went to the residence it did not seem that
23   the complaint -- I think it's meant to
24   say, the complainant -- was upset with us
```

THE MCS GROUP, INC.

```
 1   or the service we provided.  So we went to
 2   see what the problem was and to see if it
 3   was something we could resolve.
 4           So would you agree that one of
 5   purposes was to investigate the source of
 6   his complaint; is that right?
 7       A.  It wasn't my purpose.  I just
 8   follow my partner.  But, yes.
 9       Q.  But based on your interaction with
10   Mr. Hunter you couldn't understand why he
11   wanted to file a complaint?
12       A.  That's correct.
13       Q.  You wanted to see -- as you say
14   here in the first sentence -- if there was
15   some way you could resolve the issue
16   without involving the supervisor?
17       A.  I didn't mean me.  I meant "we" as
18   partners.
19       Q.  Sure.  So you as partners with
20   Officer Navedo thought that perhaps if you
21   spoke to Mr. Hunter you could resolve it
22   without involving the supervisor?
23       A.  Yes.
24       Q.  Turning back to Exhibit-7.  I'll
```

THE MCS GROUP, INC.

125

```
1    tell you to flip to the third page of the
2    document -- I'm sorry, Exhibit-7, and Page
3    3, which is Bates stamped on the bottom
4    right D284, and we have under the Heading
5    3, Procedures for Recording and Processing
6    Complaints.
7         Do you see that?
8    A.   Yes.
9    Q.   Feel free to take a look at this
10   page and it continues on to Pages 4 and 5.
11   But there is a procedure outlined here for
12   accepting and investigating citizen
13   complaints.
14        Would you agree that this directive
15   outlines the step by step process by which
16   the Philadelphia Police Department should
17   accept and process citizens' complaints?
18   A.   Yes.
19   Q.   Taking a look at these procedures,
20   based on your understanding, does this
21   directive instruct officers to return to
22   the home of a complainant to follow-up on
23   a citizen's complaint?  Is that provided
24   for here?
```

THE MCS GROUP, INC.

126

```
1    A.   It is not.
2    Q.   Officer Schutte, we discussed --
3    and you discussed with Mr. McClam earlier
4    today about the type of training that you
5    received when you joined the Philadelphia
6    Police Department.  And I understand -- I
7    believe that you said that because you had
8    had the Temple Police training that your
9    training once you joined the Philadelphia
10   Police Department was that only a month
11   long?
12   A.   Yeah.  Because, initially, I went
13   through the actual academy.
14   Q.   Right.  So it was sort of a
15   refresher training --
16   A.   Yes.
17   Q.   -- like an introduction to the
18   Philadelphia Police Department?
19   A.   Yes.
20   Q.   Can you describe the type of
21   training, in general, that you received
22   since joining the police department in
23   December of 2014?
24   A.   A lot of different type of things.
```

THE MCS GROUP, INC.

127

```
1    Crisis intervention training, taser
2    training.  Updates on -- legal updates on
3    law.  Stuff like that.
4    Q.   Do you receive an annual retraining
5    or is it just the type of training that
6    you just describe ad hoc, like, when
7    something new comes down?
8    A.   Well, the legal updates is like
9    when there's updates on new law or case
10   law.  And we have to qualify with our
11   firearms every year.  That's yearly.
12   Q.   And when there's; for example, an
13   update in a case law or a new directive
14   how is that information conveyed to
15   officers in the 12th district?
16   A.   You get sent back to the academy
17   for a few days of training with a class
18   where you're instructed on everything new
19   that was changed or altered.
20   Q.   Is that the case for any update to
21   any existing directive or is that the case
22   for major changes?
23   A.   Usually for major changes.  Updates
24   to directives are usually just handed out
```

THE MCS GROUP, INC.

128

```
1    and printed out throughout the districts.
2    Q.   What training did you receive on
3    the directive, which is Exhibit 7, in
4    front of you?
5    A.   We were basically told that if
6    there is ever a complaint let a supervisor
7    know and then they'll give them the
8    paperwork.  They have to fill it out and
9    return it.  And that was pretty much what
10   I was told in terms of being trained for
11   complaints against police.
12   Q.   Why did you use air quotes when you
13   said --
14   A.   Because it's not like I was -- sat
15   down -- like, it wasn't hammered.  It was
16   just a passing thing, oh, this is what
17   happens when there's a complaint -- get a
18   supervisor.  That was the extent of it.
19        MS. LASTOWSKI:  I'm going
20        to have the court reporter mark
21        this document as Exhibit-8.
22        (Whereupon the document
23        was marked, for identification
24        purposes, as Exhibit Schutte-8.)
```

THE MCS GROUP, INC.

```
 1   BY MS. LASTOWSKI:
 2      Q.  Officer Schutte, I've handed you a
 3   document that's titled, 2015 Training
 4   Material Received/Record.
 5          Do you see that?
 6      A.  Yes.
 7      Q.  Have you ever seen this document
 8   before?
 9      A.  Yes.
10      Q.  What does this document reflect?
11      A.  These are the various training or
12   paperwork we received based on new
13   training and my signature stating that I
14   received that paperwork.
15      Q.  So does this in essence memorialize
16   the different training materials that you
17   received?
18      A.  Yes.
19      Q.  Does the fact that there's an entry
20   here indicate that you received any type
21   of oral or live training on what's
22   described under Item Description?
23          Meaning is it possible for some of
24   these entries that you were simply handed
```

```
 1   a packet of new materials for you to
 2   review on your own time?
 3      A.  Yeah.  We were definitely handed
 4   the paperwork for it.  Yeah.
 5      Q.  But did you also always receive a
 6   live training on the paperwork for each of
 7   these entries that you see here?
 8      A.  Not everything.  No.  Like the sick
 9   leave thing, this is paperwork.  And the
10   body worn cameras, since we don't wear
11   them there's no training on it.  We just
12   got information on it.  Stuff like that.
13      Q.  And correct me if I'm wrong, is ir
14   the case that you received a document like
15   this at the end of the year and filled it
16   out or is it the case that you fill out
17   your signature and have your supervisor
18   sign once you received the training
19   material?
20      A.  Once you have the material you get
21   the packet to sign, along with the stack
22   of the new paper so when they know when
23   you get it.
24      Q.  So here's my question, I guess.  Do
```

```
 1   you have a sign in -- so when you receive
 2   new training material or a new training,
 3   do you sign in to reflect that you
 4   received the training or you received the
 5   training material?
 6      A.  Yeah.  You just sign this sheet.
 7      Q.  So what you're telling me is that
 8   through January of 2015 -- or excuse me
 9   2013, which goes several pages -- this
10   entire document -- every single time you
11   receive an item that's described under
12   here you sign this document
13   contemporaneously when you were handed the
14   materials?  Or is this something that you
15   fill out on an annual baize?
16      A.  It depends.  Because I think this
17   might actually be one like that.  Some
18   just get it separately.  But ones like
19   this that have stuff coming to you, yeah,
20   I probably did sign this all at once.  It
21   looks like I did.
22      Q.  You have a very consistent
23   signature otherwise.
24      A.  Usually it's a separate thing where
```

```
 1   you sign individual.
 2      Q.  So there are circumstances where
 3   you may have a separate sign-in sheet --
 4      A.  Yeah.
 5      Q.  -- that's loose and not necessarily
 6   connected to --
 7      A.  Yes.  Definitely.
 8      Q.  You see here there's a column for
 9   date, and there's a column for item
10   description?
11      A.  Hmm-mm.
12      Q.  Does the date reflect when you
13   received the item or could it reflect when
14   the item described here went into effect?
15      A.  I don't know, to be honest.
16      Q.  Can you turn to the second page,
17   it's Page D383 on the bottom right-hand
18   corner.  And it's the fifth entry down, on
19   May 15th, 2015.  Then it's Directive 127,
20   complaints against the Philadelphia Police
21   Department.
22          Do you see that?
23      A.  Yes.
24      Q.  If you turn back here to the
```

133

```
1   directive itself, as we discussed earlier,
2   the directive was updated on May 15th,
3   2015.
4       A.  Hmm-mm.
5       Q.  So it looks like you either
6   received some type of training or you
7   received that updated directive --
8       A.  Yes.
9       Q.  -- on or around May 15th, 2015; is
10  that right?
11      A.  Yes.
12      Q.  Do you recall when you received the
13  updated directive?  Was it on May 15th,
14  2015 or could it have been after that?
15      A.  I don't remember.  I'm sure it was
16  around the same time.  They usually give
17  it out before at the roll call as we're
18  heading to our cars.
19      Q.  Do you remember whether on or
20  around May 15th, 2015 you received
21  training on the amendment to the directive
22  or whether you were just provided with the
23  updated document itself?
24      A.  I was just handed the document.
```

THE MCS GROUP, INC.

134

```
1   That was the extent of it.
2       Q.  So you do not recall receiving any
3   oral or live training on the directive?
4       A.  Not that one.  No.
5       Q.  Do you have a copy of this
6   directive at your desk?
7       A.  I'm sure it's in the drawer
8   somewhere.  We have everything on file.  I
9   haven't looked at it, obviously.
10      Q.  So you've never referenced it
11  during the course of your work as an
12  officer for the Philadelphia Police
13  Department?
14      A.  No.  Whenever there was a complaint
15  I just do what I was told to give the
16  sergeant the heads up and the sergeant
17  takes care of it -- or corporal.
18      Q.  Do you recall receiving any
19  training since May 15th, 2015 on this
20  directive?
21      A.  No.
22      Q.  Just in general, are you evaluated
23  by your supervisor on an annual or
24  biannual basis?
```

THE MCS GROUP, INC.

135

```
1       A.  Yes.
2       Q.  As part of that evaluation does
3   your supervisor look at your compliance
4   with various Philadelphia Police
5   Department policies?
6       A.  Yes.
7       Q.  Do you know how that's measured?
8   Is it done by observing you in the field?
9   Is it done by giving you quizzes?  How is
10  that done?
11      A.  Observations over the course of a
12  year.
13      Q.  Has a supervisor ever observed you
14  handling a citizen's complaint?
15      A.  You mean being told -- when they
16  complain and telling us?  Yeah.
17      Q.  The evaluations we were just
18  talking about, do you receive like a
19  handwritten copy of the evaluation?
20      A.  Yeah.  You have to sign them.
21      Q.  I'm sorry, I gave you two options
22  when I asked you, is the evaluation
23  annually or is it twice a year or is it
24  more frequently than that?
```

THE MCS GROUP, INC.

136

```
1       A.  Annually, I believe.
2       Q.  Who does the evaluation, is it your
3   direct supervisor, their boss?
4       A.  Yeah.  Direct supervisor.
5       Q.  Who would that be right now?
6       A.  Right now it would be Sergeant
7   Skasiac.
8       Q.  Who would it have been September
9   2015?
10      A.  Sergeant Davis.
11      Q.  Is there like a separate section
12  for compliance?  Like where in the course
13  of the evaluation is compliance to
14  policies reported?
15      A.  Basically it just goes down the
16  line to different things.  There's like a
17  one through five satisfactory, and then a
18  little box for a short narrative to
19  explain why he gave that number.
20      Q.  So there's some -- you know, down
21  the line one of the questions is
22  compliance with Philadelphia Police
23  Department policies.
24          And would you agree that a
```

THE MCS GROUP, INC.

137

```
 1    Philadelphia Police Department directive
 2    is a Philadelphia Police Department
 3    policy?
 4        A.  Yes.
 5                MS. LASTOWSKI:  I don't
 6        have anything else.
 7                MR. MCCLAM:  Any
 8        follow-up?
 9                MS. FUNG:  Yeah.
10    BY MS. FUNG:
11        Q.  Officer Schutte, today you've been
12    up for over 24 hours; is that correct?
13        A.  Yes.
14        Q.  Are you tired?
15        A.  Yes.
16        Q.  All statements you made here were
17    they made to the best of your ability?
18        A.  Yes.
19        Q.  Standing here today, three years
20    later, do you remember every incident
21    clearly?
22        A.  No.
23        Q.  Do you remember as clearly as you
24    would have, say, a month or two after the
```

THE MCS GROUP, INC.

138

```
 1    incident?
 2        A.  No.
 3        Q.  Taking you to the incident
 4    specifically, did you ever enter
 5    Mr. Hunter and Ms. Shujaa's home?
 6        A.  No.
 7        Q.  Did you ever push in the door?
 8        A.  No.
 9        Q.  Did you ever use any type of force?
10        A.  No.
11        Q.  You stated earlier that you're not
12    sure if you stated the reason that you
13    went to Mr. Hunter's home a second time.
14    And I think you said you didn't think you
15    did not give him a reason.
16            Are you positive about that answer?
17                MS. LASTOWSKI:  Objection
18        to form.  Stated to who?
19                MS. FUNG:  What?
20                MS. LASTOWSKI:  Stated to
21        who?
22                MS. FUNG:  To Mr. Hunter
23        and Ms. Shujaa?
24                MR. MCCLAM:  Objection to
```

THE MCS GROUP, INC.

139

```
 1        form.  Misstates testimony.
 2                THE WITNESS.
 3                MS. FUNG:  You can answer.
 4                THE WITNESS:  Oh.  I don't
 5        recall.  I could have stated, but
 6        I really don't recall what I
 7        stated earlier if I did say
 8        anything.
 9    BY MS. FUNG:
10        Q.  From your memory do you remember
11    Mr. Hunter or Ms. Shujaa even allowing you
12    to speak when you were at the home a
13    second time?
14                MR. MCCLAM:  Objection to
15        form.  Leading.
16                THE WITNESS:  The second
17        time they were just yelling and
18        wouldn't listen to reason.  So I
19        stopped talking.
20    BY MS. FUNG:
21        Q.  Were they doing anything else
22    besides yelling?
23        A.  I don't remember if they were
24    yelling from the door or the window.  I
```

THE MCS GROUP, INC.

140

```
 1    just don't remember.  I guess they opened
 2    the door real quick and then slammed it
 3    and you could hear threw the window.  I
 4    think they were just yelling.
 5        Q.  After you left the home the first
 6    time were you still listed as on location
 7    at Mr. Hunter and Ms. Shujaa's residence?
 8                MR. MCCLAM:  Objection to
 9        form.  Foundation.
10                THE WITNESS:  I believe we
11        were.  Yes.
12                MS. FUNG:  That's all I
13        have.
14    BY MR. MCCLAM:
15        Q.  One clarifying question.  If you
16    recall, before we started this deposition
17    today I asked you if there was anything
18    that would keep you from testifying
19    truthfully and accurately today?
20        A.  Yes.
21        Q.  Has your sleep or lack of sleep
22    impacted your ability to testify
23    truthfully and accurately today?
24        A.  I don't think it did.  I mean
```

THE MCS GROUP, INC.

Robert Schutte
September 11, 2018

141

```
 1   certainly early on I was okay.  But as the
 2   day is wearing on I can definitely feel
 3   it.  At the time I thought I was okay.  I
 4   had a coffee on my way over here so.  But
 5   I'm definitely feeling it now.
 6      Q.  To the best of your knowledge and
 7   everything, you testimony today has been
 8   truthful and accurate?
 9      A.  Yes, sir.
10          MR. MCCLAM:  No further
11   questions.
12               -  -  -
13          (Witness excused.)
14               -  -  -
15          (Whereupon, the deposition
16   concluded at 4:56 p.m.)
17               -  -  -
18
19
20
21
22
23
24
```

THE MCS GROUP, INC.

---

C E R T I F I C A T I O N

```
 4          I, JO-ANNE M. BOSLER, a
 5   Professional Court Reporter and Notary
 6   Public, do hereby certify that the
 7   foregoing is a true and accurate
 8   transcript of the stenographic notes
 9   taken by me in the aforesaid matter.
```

DATE:  SEP 2 6 2018

_Jo-Anne M. Bosler_
JO-ANNE M. BOSLER

---

Robert Schutte
September 11, 2018

Page 143

**A**

a.m (13)
30:24,24 31:1,1 42:8 42:19 43:23 71:4,7 111:10 118:9,10,11
ability (4)
6:17 96:5 137:17 140:22
able (1)
23:19
Absolutely (1)
106:23
abusive (1)
37:9
academy (10)
11:24 12:12,14 15:6 25:7,9,20,22 126:13 127:16
accept (1)
125:17
accepting (2)
119:12 125:12
access (2)
116:2 118:5
accomplish (1)
37:19
accomplished (2)
48:4 86:6
accurate (2)
141:8 142:7
accurately (3)
6:22 140:19,23
action (4)
1:2 19:10 80:12,14
actions (2)
29:16 34:16
actual (1)
126:13
ad (1)
127:6
adding (1)
71:19
additional (1)
12:2
address (5)

27:20 56:9 100:11 115:12,18
affairs (10)
3:16,18 9:3,8,12 19:23 20:4,7,13,16
aforesaid (1)
142:8
afternoon (1)
110:5
aggressive (3)
9:20 76:4,8
agitated (1)
83:16
ago (3)
19:18 25:7 37:18
agree (9)
36:12 77:11,17 121:4 121:14 122:6 124:4 125:14 136:24
agreed (2)
67:10,12
agreement (1)
4:1
ahead (1)
128:12
Alex (1)
110:7
ALEXANDRA (1)
2:7
allegations (1)
141:8
allowed (1)
95:24
allowing (1)
139:11
Alpha (4)
13:2,5,8,11
altered (1)
127:19
amendment (1)
133:21
amount (1)
73:3

and/or (3)
75:16 86:6 103:19
Angeles (1)
76:16
Arch (3)
1:15 2:4,13
announce (1)
106:21
announcing (2)
107:4 109:13
annual (3)
127:4 131:15 134:23
annually (2)
135:23 136:1
answer (38)
5:2,6,13 63:9,9
20:13 36:7 46:22
56:24 64:14 74:3,4
74:6 77:6,7,9 79:6
80:4 84:20 85:1
86:11,13,15 87:16
87:18 88:16,23 89:8
93:21 94:18 95:4,24
98:15 111:2,2
138:16 139:3
answered (6)
79:22
air (1)
78:22
answering (1)
64:13
answers (1)
109:19
anybody (3)
38:16 44:21 47:11
anymore (1)
72:5
anyone's (1)
118:13
anyway (3)
29:21 70:7 113:23
APPEARING (1)
2:12
apply (1)
110:22
appointed (1)
55:1
appointment (1)

54:23
approached (1)
9:18
backed (2)
13:13
areas (2)
110:13 114:4
argue (1)
65:23
arguing (1)
73:7
arrested (1)
21:1
arrived (6)
41:6 58:2 67:23 68:6
88:6 89:13
asked (7)
64:6 69:21 88:22,24
123:16 135:22
140:17
asking (5)
41:23 89:2 99:6,13
110:24
assignments (2)
32:6 111:9
assistance (1)
2:12
Assistant (1)
2:8
assume (8)
5:20 47:18 48:16
88:2 89:14 90:3,12
107:5,14,16,16,18

THE MCS GROUP, INC.

---

Robert Schutte
September 11, 2018

Page 144

assumed (1)
69:6
assuming (3)
59:17 89:17 117:9
attach (1)
28:18
attend (1)
12:16
attention (3)
55:22 67:13 103:11
attorney (5)
6:7 7:2,12,19,24
Attorneys (3)
2:5,10,15
audio (5)
30:8,17 106:2,6
108:17
August (1)
120:14
automatically (1)
97:21
available (2)
24:19 106:11
Avenue (1)
32:1
aware (7)
39:2,4 75:14 94:24
108:11 119:8
122:23

**B**

B (1)
3:9
back (50)
23:1,8 24:21 36:14
50:17 51:20 56:11
57:6,15,24 58:4,10
58:17 59:19 62:3,4
66:8,23 67:6,12,14
67:24 69:10 71:1
72:18 73:16,17
74:17,18 75:7,19
77:1 81:22 83:9
87:6 89:14 90:3,12
107:5,14,16,16,18

109:4 111:7 123:11
123:18 124:24
127:16 132:24
attach (1)
61:18,22
background (1)
11:2
backing (4)
24:18 67:20 90:7
92:22
backup (1)
67:9
backwards (1)
62:5
bad (1)
41:3
badge (1)
85:13
baize (1)
131:15
banging (1)
56:15
Barely (1)
44:18
based (5)
34:15 54:16 124:9
125:20 129:12
basic (2)
93:11 120:5
basically (6)
27:2,4 46:13 83:20
128:5 136:15
basis (2)
91:9 134:24
Bates (3)
55:18 100:16 125:3
beginning (4)
55:24 110:6,21 111:8
begins (1)
67:15
believe (34)
9:5 33:9 36:4 38:15
39:7,23 43:24 44:1
46:7 47:13 48:22
50:6,21 57:8,18

58:19,19 63:8,23
66:5 69:5 72:15,15
74:24 91:1 102:24
113:3 117:5,20,23
119:2 126:7 136:1
140:10
believed (1)
35:20
believes (1)
103:18
best (5)
5:18 24:19 78:9
137:17 141:6
biannual (1)
134:24
birth (1)
27:20
bit (5)
56:16 58:7 60:6,14
61:2
black (1)
55:23
block (3)
60:11,13 123:12
BOCKIUS (1)
2:6
body (2)
30:16 130:10
Bosler (3)
1:16 142:4,16
boss (1)
136:3
bother (1)
84:6
bottom (13)
27:23 39:12 55:8,18
64:1 69:4 95:11
97:15 98:1 103:12
104:8 125:3 132:17
box (3)
91:6,21 136:18
break (4)
5:24 6:4 99:1 111:3
brief (1)
99:2

broadcast (1)
116:5
brought (1)
116:19
bucket (1)
121:15
building (1)
113:5
bulk (2)
28:14 29:5
bunch (1)
83:24

**C**

C (3)
2:1 142:1,1
call (89)
22:24 23:4,21,23
24:16 32:6 35:22
36:11,17 39:3 42:20
42:21 43:2,6 51:17
52:5,8,20 53:5,16
54:13 55:18 56:9,10
56:21 57:14,23 58:5
64:6,20,21,23 65:6
67:8 68:2 69:1,3,14
69:18,23 70:11,13
71:7,12,15,16 73:9
73:20,21,24 74:19
75:1,4 77:13 78:13
80:19 89:15 90:2,19
101:4 106:21 107:3
107:7,17,19 108:2
108:16 111:4,16
111:20 112:3,3,22
112:23 113:3,4
called (13)
19:14 23:14 25:1
26:22 53:15 63:6,14
69:9 72:18 75:16
76:14 108:8 109:3

THE MCS GROUP, INC.

calling (3) 38:23 58:9 74:2
calls (6) 22:17,19 65:21 77:5 93:20 106:3
calm (3) 48:10,24 88:15
camera (1) 62:2
cameras (2) 30:16 130:10
captain's (1) 113:17
car (3) 22:2 99:24 111:17
care (5) 37:21,23 38:9 105:10 134:17
carry (3) 85:17,23 86:2
cars (2) 30:8 133:18
case (14) 8:13 10:6 54:17 98:23 107:24 114:12 121:7 122:20 127:9,13,20 127:21 130:14,16
cause (2) 58:6,10
Cell (1) 68:18
Centre (2) 1:15 2:3
Centurion (3) 13:6,9,12
certain (5) 17:16 22:17 25:23 27:13 114:4
certainly (1) 141:1
certification (1) 4:2
certify (1) 142:6

chain (4) 85:15
chance (2) 5:12 62:23
change (4) 17:6 78:11 109:20 113:20
changed (3) 15:15 112:11 127:19
changes (2) 127:22,23
charge (1) 114:14
check (6) 43:10 47:8 96:15,20 97:4 101:22
child (31) 25:4,10,18 26:1,14 26:15 32:12,18,21 33:14 34:4,5 35:3 35:10,21 36:5 37:3 37:6 39:17 46:15 47:1,3,5,6,9 49:22 50:20 103:20,24 104:14 117:19
child's (1) 104:5
children (13) 44:15,23 45:3,11,22 46:10 104:6,12 118:18,20,21,24 119:6
Cira (2) 1:15 2:3
circumstance (1) 112:7
circumstances (5) 21:23 23:13 63:5 103:17 132:2
citizen (7) 23:20 24:7,10 28:12 52:17 122:7 125:12
citizen's (5) 20:19 119:12 122:2 125:23 135:14

citizens' (1) 125:17
City (3) 1:7 2:11,12
civil (3) 1:2 2:13 10:23
civilians (1) 75:8
clarification (1) 5:20
clarify (1) 109:23
clarifying (1) 140:15
class (1) 127:17
clean (1) 34:17
clear (2) 74:10,21
clearly (2) 137:21,23
client (1) 80:3
close (7) 21:12,14,15 38:3 43:12 61:13 82:1
closed (1) 38:1
co-counsel's (1) 110:12
coat (1) 80:21
code (1) 118:8
coffee (1) 141:4
colleague (1) 110:8
college (3) 13:21,23 14:2
column (2) 132:8,9

70:7 101:18 114:15
comes (1) 114:12 127:7
comfortable (2) 17:21 72:6
coming (6) 48:14 58:12 70:18 90:16 109:8 131:19
command (5) 69:23 85:16 109:1,6 116:14
commencing (1) 1:16
communicated (3) 116:14
communicated (1) 68:17
communication (2) 39:10 42:6 67:19 68:11
communications (1) 68:7
company (2) 12:23 13:1
complain (1) 101:1
complainant (11) 27:21 28:6,8,11 101:11,14 112:9,20 117:15 123:24 142:5
complaints (2) 28:21 75:20
complaint (63) 9:14,18,23 20:20 22:12 23:20,24 24:2 24:5,7,10,12 32:12 24:5,7,10,12 32:12 54:15 75:12,17 76:13,14 77:2,14,19 82:23 83:2,6,13 84:15,17

84:24 85:4,5,7,10 85:12,17,21 86:8,17 86:18,22 87:1,14,14 88:14 96:9 100:20 119:12 121:20,22 122:2,8,16 123:1,5 123:23 124:6,11 125:23 128:6,17 134:14 135:14
complaints (10) 22:12 75:7 85:5 112:14 119:23 125:6,13,17 128:11 132:20
completed (2) 94:12 96:11
completely (1) 50:3
completes (1) 29:20
compliance (4) 118:3 136:2,13,22
computer (6) 51:12,14 99:24 100:3 113:14 115:21
concern (1) 37:5
conclude (1) 109:20
concluded (1) 141:16
conclusion (1) 88:2
conduct (1) 96:20
confirm (1) 26:6
confront (2) 75:8 76:6
confronted (1) 75:23
confronting (2) 76:2,10
connect (1) 70:21

connected (1) 132:6
connection (2) 9:7 94:13
consider (1) 21:9
considered (4) 14:21 17:9 19:2 104:2
consistent (1) 131:22
contact (6) 26:18 28:12 39:14 44:1,9 104:16
contacted (1) 68:14
contemporaneousl... 131:13
contents (1) 80:8
continues (1) 107:14
contract (1) 14:2
convenient (2) 122:1,15
conversation (1) 9:10
conveyed (1) 127:14
convicted (1) 21:3
convinced (2) 35:19 50:18
copies (2) 113:13,16
cover (1) 22:3
covers (1) 116:7
crack (1) 45:16
corner (2) 55:19 132:18
corporal (1) 24:9 113:16 134:17
correct (29)

8:14 19:7 30:13 31:22 52:22 53:2 58:2 65:7,12 68:3,8 71:17 75:21 81:8 86:19,20,23 87:1,4 87:5 92:17 97:13 115:7 116:19 118:18 123:2 124:12 130:13 137:12
correctly (1) 113:2
counsel (3) 4:1 110:14 111:1
count (1) 10:13
counts (1) 33:18
couple (5) 16:11,23 19:20 91:8 107:14
course (4) 12:7 134:11 135:11 136:12
courses (1) 15:8
court (19) 1:1 5:3,10 19:7 13:3 18:16,19 27:8 33:23 34:2 41:13 53:20 62:14 94:4 99:6 102:2 128:20 142:5
Courts (1) 26:5
cover (1) 22:3
covers (1) 116:7
crack (1) 45:16
crime (1) 21:4
Crisis (1) 127:1

current (1) 101:8
currently (1) 80:5
curse (1) 84:3
cursed (1) 81:5
cursing (7) 80:18 83:18 59:9,11 81:8 83:24 84:1 88:12
custody (56) 3:22 25:4,10,18 26:1 26:1,14,20 32:13 32:18,21 33:24 34:8 34:13 35:2,10,20 36:5 46:16,19 48:7 49:22 50:20 60:6,11,24 99:4 66:17 70:24 75:15 91:10 92:2,12 100:22 101:15 102:11 103:2 104:1,8 105:3,4 105:16 108:6 112:10,24 113:7 115:6,14,19 116:18 116:19,22 117:1,2,6 117:13,16 122:23
customary (1) 25:5

**D**

D (1) 3:1
D054 (1) 35:19
D058 (1) 64:1
D069 (1) 106:16
D284 (1) 125:4
D305 (1) 105:13
D306 (1)

104:7
D383 (1) 132:17
D74 (2) 67:14 71:1
D76 (4) 68:20 69:4 71:6 87:7
danger (3) 37:3 47:1,5
Darby (3) 11:5,7,10
dark (4) 44:19,20 46:1 119:4
Darus (5) 1:3 2:10,24 10:6 110:9
data (4) 118:3,4,6,13
date (12) 14:10 16:14 27:20,24 28:1 49:7 54:24 55:4 100:12 132:9 132:12 142:13
dated (1) 102:10
daughter (1) 37:10
Davis (6) 15:21 17:24 18:1,2 55:11 136:10
day (6) 14:14 31:4 55:5 107:9 111:5 141:2
days (3) 18:6 19:20 127:17
DC (1) 70:3
deal (4) 27:3 75:15 112:13 134:4
dealing (2) 112:24 117:14
December (1) 126:23
Dechert (2)

1:15 2:2
decide (1) 29:18
decided (2) 69:10 84:22
decides (2) 111:11,20
decision (3) 66:2 67:3 107:13
defendant (1) 10:23
Defendants (2) 1:9 2:15
define (1) 76:2
defines (1) 103:16
definitely (4) 130:3 132:7 141:2,5
department (39) 2:11 11:13 12:3,14 12:16,19,22 13:17 13:18 14:7,12,16 15:11 17:14 19:11 30:7 55:2,6 102:10 119:11,22,24 126:9 126:6,10,18 126:22 132:21 134:13 135:5 136:23 137:1,2
depend (1) 107:11
depending (1) 111:19
depends (3) 107:8,10 131:16
deposed (1) 4:20
deposition (11) 1:15 68:7,13,18 10:10 110:7,20,22

140:16 141:15
depth (1) 93:3
describe (13) 11:1 19:13 26:3 29:15 47:20 69:3 76:11 88:8 92:5 100:18 111:8 126:20 127:6
described (7) 92:11,14,19 103:24 67:2,5 68:9 87:1,3 88:6,17 89:4,12,22 90:1,16,20 92:17,20 132:4
describing (1) 123:12
description (9) 3:11 91:6,21 93:16 96:14 97:8,8 129:22 132:10
desk (4) 80:5,18 113:15 134:6
detail (2) 28:15 93:8
details (4) 79:17 80:11 117:7,8 34:1
determined (2) 26:3 34:3
devices (2) 30:9,17
dictates (1) 111:17
different (9) 16:23 27:15,15 78:4 103:24 123:20 126:24 129:16 136:16
direct (3) 19:2 136:3,4
directive (27) 3:23 104:24 119:9,15 119:22,23 120:4,10 120:13 121:5,24 122:7 125:14,21

127:13,21 128:3 132:19 133:1,2,7,13 133:21 134:6,6,20 137:1
directives (7) 12:6 25:11 102:22 104:3 119:24 127:24
Disanto (23) 18:23 19:6 57:17,19 67:2,5 68:9 87:1,3 88:6,17 89:4,12,22 90:1,16,20 92:17,20 130:14 131:10,12 133:23,24
Disanto's (1) 70:4
disciplinary (1) 19:10
discipline (1) 20:23
disciplined (2) 19:16,19
discrepancies (2) 63:9,11
discuss (4) 33:10 80:7 88:5 116:18
discussed (7) 8:16 113:19 116:16 121:18 126:2,3 136:3
discussion (2) 126:2
dispatch (1) 68:14
dispatched (1) 104:12
dispatcher (1) 41:20
Dispatcher/Radio (... 3:14
dispute (35) 3:22 25:5,10,18 26:1 26:20 32:13 48:16 46:20 48:8,15 19

66:17 70:24 75:15 91:10 92:2,12 101:22 100:1 101:15 103:2 104:10,18 105:3,16 108:6 112:10 113:1 115:6 115:15,20 116:18 117:1 122:23
disputes (2) 102:11 105:14
district (24) 1:1,1 16:16,18 17:18 30:12,13,16 31:23 31:24 32:4,19,20 39:24 40:9,12 83:14 112:9 113:9 114:1 114:10 117:14 118:10 127:15
districts (1) 128:1
disturbance (4) 38:6 44:7,14,16
division (2) 116:7,7
document (28) 41:15 53:21,22 62:15 62:17 94:5,6,23 98:19 99:6,8 102:3 102:4,18 119:16,21 128:22 129:3,7,10 130:14 131:10,12 133:23,24
documentation (1) 49:22
documents (2) 7:7,23
doing (9) 12:6 17:20 31:3 50:10 67:10 78:1,13 107:1 139:21
doled (1) 111:9
door (32) 44:1,10,15 45:14,15

47:24 56:15,16,19 56:23 59:23 60:6,14 60:19 61:1,5,10,13 61:15 62:1,9 72:14 72:23 73:6 81:4,13 81:17 85:1 101:1 138:7 139:24 140:2
doorway (1) 61:23
doorways (1) 62:11
dots (1) 70:21
double (1) 45:6
drag (1) 38:10
drawer (1) 134:7
dressed (1) 32:5
drive (4) 29:22 30:3 40:14 73:16
driving (5) 30:1,2 40:17,19 43:5
drop (1) 83:4
drove (3) 40:13,15 73:17
Drums (1) 131:10
due (2) 96:16 99:15
duly (1) 4:9
duty (8) 18:9 30:20 78:22,23 79:3 80:5,18 113:10

**E**

E (5) 2:1,1 3:1,9 142:1
earlier (8) 9:1 103:1 116:17
119:2 126:3 133:1 138:11 139:7
early (2) 60:19 61:1,5,10,13
EASTERN (1) 1:1
educational (1) 11:1
effect (2) 121:5 132:14
effective (1) 120:14
eight (1) 19:18
either (5) 36:21 69:7 72:23 108:13 133:5
employed (2) 11:12 121:1
encounter (3) 49:13 51:1,9
ends (1) 114:18
enforce (1) 26:11
enter (1) 138:4
entered (2) 9:20 100:12
entire (1) 131:10
entitled (2) 117:18,18
entries (4) 101:2 118:13 129:24 130:7
entry (4) 67:15 68:20 129:19
Esquire (5) 2:3,7,8,12 55:11
essence (1) 129:15
evaluated (1) 134:22

evaluation (5) 135:2,19,22 136:2,13
evaluations (1) 135:17
evening (9) 60:13 81:3 39:6 40:4 41:1 42:7 49:24 57:7 85:21
eventually (3) 35:15 57:20 81:12
evidence (1) 27:8
exact (3) 15:14 45:3 73:3
exactly (7) 35:11 44:8 48:24 59:18 66:20 73:20 82:7
EXAMINATION (... 4:12
examined (1) 4:9
example (1) 127:12
excuse (1) 131:8
exhibit (10) 41:17 53:24 62:19 94:8 99:10 102:6,14 119:18 128:3,24
Exhibit-1 (5) 41:14 51:20 57:14 68:19 87:7
Exhibit-2 (3) 53:21 54:3,5 9:58:24
Exhibit-4 (2) 94:10,11
Exhibit-5 (3) 99:7,12,15
Exhibit-6 (1)

102:9
**Exhibit-7 (2)**
124:24 125:2
**Exhibit-8 (1)**
128:21
**exist (1)**
103:17
**existence (1)**
121:21
**existing (1)**
127:21
**expect (3)**
43:5 93:15 107:3
**experience (3)**
13:24 52:15 75:7
**explain (2)**
79:12 136:19
**explaining (1)**
48:21
**exploring (1)**
110:13
**express (3)**
37:5 48:14,19
**extent (3)**
10:16 128:18 134:1

**F**

**f (2)**
83:21 142:1
**face (1)**
47:14
**facilitated (1)**
87:13
**fact (3)**
50:19 83:12 129:19
**facts (1)**
103:16
**fail (1)**
15:7
**fall (1)**
121:14
**familiar (4)**
26:22 54:7 99:17
102:20
**far (3)**
20:18 64:20 70:19
**February (2)**
16:19 20:20
**feel (5)**
40:18,22 72:6 125:9
141:2
**feeling (3)**
6:13 40:24 141:5
**felt (2)**
40:17 46:24
**female (5)**
47:21 100:24 106:10
106:14 119:6
**field (3)**
22:11 96:14 135:8
**fifth (1)**
132:18
**file (7)**
103:8 122:8,16,24
123:5 124:11 134:8
**filed (6)**
20:19 76:13 77:14
125:23 125:5 132:10
**filing (1)**
4:3
**fill (7)**
30:4 85:11 94:19
95:1 128:8 130:16
131:15
**filled (3)**
27:13 94:20 130:15
**filling (3)**
91:17,20,21
**find (1)**
17:20
**fine (2)**
79:15,18
**finish (1)**
5:12
**finished (1)**
13:22
**firearms (1)**
127:11
**first (37)**
6:3 10:22 16:8 19:4,5
**former (1)**
7:3
**forms (3)**
27:15 85:17 91:17
**foundation (2)**
96:2 140:9
**founded (2)**
104:10 105:14
**four (5)**
16:15 31:10 46:4
49:6 119:3
**fourth (1)**
64:3
**free (2)**
103:6 125:9
**frequently (1)**
135:24
**friends (3)**
21:10,12,14
**friendship (1)**
21:17
**front (1)**
45:13 59:21 64:9
71:22,22 72:1,4,22
73:14 75:24 128:4
**frustrated (1)**
48:16
**frustration (2)**
48:18 49:22
**Fung (22)**
2:12 3:7 7:5 36:6
46:21 60:8 74:1
76:1 77:4 79:4,15
79:23 80:1 86:10
87:15 88:21 89:5
93:19 94:6 96:1
95:16 96:7 98:9
137:9,10 138:19,22
139:3,9,20 140:12
**further (1)**
141:10

**G**

**general (3)**
93:7 126:21 134:22

---

**generally (1)**
40:24
**generic (1)**
81:24
**gentleman (1)**
44:3
**getting (3)**
23:10 73:6 80:11
**give (15)**
5:12 63:6 72:10
80:15 84:24 85:10
85:19 86:4,24
114:21 115:24
128:7 133:16
134:15 138:15
**given (5)**
26:5 66:11 86:18,21
137:6
**giving (2)**
9:7 135:9
**glass (1)**
45:9
**glossed (1)**
117:21
**go (54)**
19:4 20:12 22:20,23
23:8 24:11,20,23
26:5,8 27:9 29:6
35:13,15,18 36:3,11
36:17,22 38:3,5,9
38:13 39:21 42:17
45:19 55:16 58:17
63:21 66:8,22 70:17
74:17,17 75:7 76:18
105:20,21 107:14
107:16,16,18 108:2
111:15 113:16
115:24
**goal (1)**
13:19
**goes (7)**
28:17 31:11 74:16
113:15 115:7 131:9
136:15
**going (44)**
4:22 5:1,3 8:10 38:18
39:8,9 41:12,13,22
42:22 53:19 54:13
57:15 62:13 67:6,13
70:7 73:21 76:7,19
78:13 79:4,16 82:16
84:14 87:6 94:16
99:13 101:23
102:17 106:1,4,22
107:5 108:5,15
110:10 111:4,7,11
115:9,23 128:19
**Good (1)**
110:5
**graduate (1)**
11:6
**graduated (2)**
11:9 12:10
**GROUP (1)**
1:21
**guess (19)**
19:1 21:9,15,17
35:23 54:10 59:2
64:3 77:22 78:2,8
85:22 88:14 97:1,3
98:14 130:24 140:1
**guidelines (2)**
26:7 29:1
**guys (3)**
21:12 43:18 114:21

**H**

**H (1)**
3:9
**habit (3)**
61:18,20 62:12
**half (2)**
122:19,21
**hammered (1)**
1:21
**hand (1)**
41:12
**handed (7)**
**handle (2)**
24:23 113:7
**handled (1)**
135:14
**handling (1)**
135:4
**handwritten (1)**
135:19
**hang (1)**
37:19
**happened (12)**
8:23 27:4,11 28:14
29:5 43:21 51:7
80:23 81:10 89:20
107:9 120:24
**happening (1)**
114:18
**happens (3)**
59:14 108:1 128:17
**happy (1)**
64:3
**Havertown (1)**
12:24
**head (2)**
5:7 115:5
**heading (3)**
49:1
**headquarters (1)**
105:5
**heads (1)**
134:16
**health (1)**
36:19
**hear (7)**
24:15 51:17 61:7
116:4,9,11 140:3
**heard (5)**
53:4 56:12 57:23
66:17 84:8
**held (1)**
1:15
**help (4)**
17:13 22:10 23:15,19
**hiding (1)**
4:3
**high (3)**
11:3,4 13:22
**hire (1)**
14:13
**hired (1)**
55:1
**Hmm-mm (4)**
71:9 121:3 132:11
133:4
**hoc (1)**
21:6
**hold (1)**
116:2
**holiday (3)**
33:16 35:4 117:17
**home (10)**
20:1 107:1 122:22
123:7,14 125:22
138:5,13 139:12
140:5
**honest (3)**
33:16 35:3 91:11
132:15
**honestly (2)**
40:5 49:17
**hope (1)**
37:19
**hot (1)**
37:19
**hour (3)**
7:22,22 72:11
**hours (1)**
21:8
**house (1)**
37:15 45:10 61:9
72:4 76:16
**humor (1)**
41:3

---

**hundred (1)**
117:11
**Hunter (53)**
1:3 2:10,24 10:6 35:2
35:9,19 36:4,23
37:9,20 38:6,23
39:3,6,19 44:4,5,11
47:12,21 48:5,13
49:21 50:1,19,24
51:4,8 53:1,1 58:7,17
75:16,20 76:12
77:19 82:4,9 83:17
83:17 86:7 105:17
110:10 117:17
118:17 122:24
123:5 124:10,21
138:5,22 139:11
**Hunter's (8)**
35:13 36:18 38:14
116:24 122:22
123:6,13 138:13
**hurt (1)**
23:12

**I**

**idea (1)**
97:4
**Ideally (1)**
108:10
**identification (8)**
11:16 43:23 62:18
94:7 99:9 102:5
119:17 128:23
**identify (1)**
106:4
**illegally (1)**
9:20
**immediate (1)**
103:19
**immediately (4)**
66:23 74:9,20 77:2
**impacted (1)**
140:22
**impair (1)**
6:17
**important (2)**
29:6,14
**impromptu (1)**
112:14,19 113:19
114:15
**improper (1)**
95:3
**inappropriate (1)**
103:2
**inches (1)**
62:2
**incident (29)**
8:3,10,17 9:4,11
19:13 27:2,24 28:23
29:10,11,12 51:5
63:4,7,10 68:8 86:1
88:5 94:11,13 96:10
96:11 97:8 106:22
137:20 138:1,3
**incidents (2)**
27:13,14
**include (4)**
27:19 28:3 29:2,2
**included (1)**
91:23 93:1,16
**including (3)**
35:3 93:12 121:24
**incorrect (1)**
58:24
**indicate (1)**
129:20
**Indifferent (2)**
89:23,24
**individual (1)**
28:22
**individuals (2)**
121:19 122:9
**inform (2)**
121:19 122:9
**informal (1)**
20:23
**information (10)**
27:18,23 28:3 29:22
91:22 111:13 118:6
120:7 127:14
130:12
**initial (5)**
27:9 34:16 54:10
70:15 88:9
**initially (8)**
8:23 65:7 73:10
82:14 92:1 105:6
113:14 126:12
**injured (1)**
110:6
**inject (10)**
43:14,15 81:14,20
91:10,24 92:4 93:10
100:10,20 101:8
112:17
**instances (1)**
25:17
**instruct (2)**
127:18
**instructed (1)**
43:12,13,16
**instructing (2)**
46:19 125:12
**instrument (1)**
13:14
**insult (1)**
104:13
**interact (1)**
24:20
**interaction (13)**
70:22 71:21,23 72:17
58:12 59:4 63:12
**interactions (8)**
28:11 47:20 54:16
59:6 93:13,18 121:6
130:10
**it' (1)**
**inside (6)**
22:14 44:17 45:8,19
45:24 103:21
**instances (1)**
25:17
**intervention (1)**
19:23 20:4,7,13,16
**interview (6)**
54:11,12 63:3,7 64:5
123:10
**introduced (1)**
110:6
**introduction (1)**
113:14
**invect (1)**
121:24
**invest (10)**
43:14,15 81:14,20
91:10,24 92:4 93:10
100:10,20 101:8
112:17
**investigate (5)**
42:23 43:9 48:7,15
81:16,21 104:13
124:5
**investigated (2)**
43:12,13,16
**investigating (2)**
46:19 125:12
**investigation (12)**
9:4,8,12 19:23,24
20:4,7 80:6,8,10
104:17
**involved (2)**
20:16 28:22
**involving (4)**
102:12 103:3 124:16
124:22
**ir (1)**
13:0
**ironic (1)**
44:1
**issue (11)**
32:18,21 33:13,19
58:12 59:4 63:12
107:23 113:7
123:20 124:15
**issued (1)**
124:14
**issuing (1)**
87:13
**it' (1)**

---

88:24
**item (1)**
96:9

**J**

**January (2)**
16:19 131:8
**jeopardy (1)**
103:2
**Jo-Anne (3)**
1:16 142:4,16
**job (16)**
27:3,5,9 28:5 37:21
37:23 38:4,9 51:11
74:13 80:12 84:3
100:10,20 101:8
112:17
**jobs (6)**
11:11 27:17 49:19
62:11 76:21 107:15
**John (2)**
2:3 89:6
**joined (3)**
12:10 17 126:5,9
**joining (1)**
126:22
**judge (2)**
10:18 26:8
**July (1)**
102:10
**jump (1)**
62:3
**juvenile (2)**
96:16,21

**K**

**keep (4)**
6:21 12:7 117:19
140:18
**Kenya (1)**
1:3 2:5 10:7
**kept (2)**
46:12 86:3
**kid (2)**
96:23,24
**kind (26)**
17:11,18,19 19:21
20:23 27:18 28:2
29:1 30:8 34:10
45:16 54:12 58:12
61:22 62:3,6 65:19
65:20,24 79:10,20
83:23 112:4,13
114:14,20
**kinds (1)**
27:13
**knew (5)**
20:11 30:13 39:8,8
115:8
**knocked (6)**
43:24 56:11,23 72:13
81:12 85:2
**knocking (3)**
47:24 56:12 72:3
**know (75)**
5:18 6:1 14:13 16:14
16:15 20:11 23:9,17
23:17 33:6,18 34:9
36:4 37:11,14 39:14
40:21 43:2 44:9
45:24 47:15,22 49:6
50:23 55:13 61:4,18
63:11 65:21 66:15
66:20 69:18 73:3,15
74:8 76:19 77:24
78:3,5,17 82:14,16
84:19,22 87:20
90:15,19,22 97:19
97:24 98:2,3,5,16
113:16
**knowledge (6)**
1:15 2:11 127:3,9,10
127:13
**known (1)**
108:1

**L**

**lack (3)**
22:1 39:10 140:21
**large (1)**
55:23
**Lastowski (12)**
2:7 3:6 95:10 110:4,7
119:14,19 128:19
129:1 137:5 138:17
138:20
**late (2)**
36:3,13
**lateral (6)**
12:8 14:21,23 15:3,7
16:17
**law (6)**
1:15 2:11 127:3,9,10
127:13
**lawsuit (1)**
10:23
**leading (2)**
37:17 129:15
**leaned (1)**
62:5
**learn (2)**
17:12 111:12
**learned (1)**
32:17
**learning (1)**
123:4
**leave (13)**
11:13 56:7,14,18,20
59:10,16,20 69:5
74:9 83:20 84:7
130:9
**led (2)**
88:1,3
**left (10)**
50:23 51:7 59:17,18
70:12,24 93:5 95:11
135:7 136:20
127:2,8
**Let's (5)**
20:1,1 51:20 98:24
100:15
**level (1)**
1:15
**LEWIS (1)**
2:7
**lieutenant (3)**
18:23 19:6 56:22
57:11,16,19 67:2,5
67:21 68:5,9,17
70:4 72:9 84:21
73:2 88:6,17 89:3
89:12,22 90:1,15,20
92:17,20 98:7 101:5
107:7 109:17
**life (10)**
44:20 45:9 56:13,17
60:7,15 61:6,8,10,17
61:22
**lights (1)**
45:8
**limited (3)**
78:22,23 79:3
**line (5)**
94:17 95:23 108:8
136:16,21
**linked (1)**
32:5
**lines (1)**
66:13
**list (1)**
28:20
**listed (4)**
97:18 101:3 121:23
**listen (1)**
139:18
**listening (1)**
17:11
**litigation (1)**
8:4

little (8)
28:15 29:13 56:16
58:7 60:6,14 61:2
136:18
live (3)
129:21 130:5 134:3
LLP (3)
1:15 2:2,7
location (16)
41:7 43:11 51:13
56:22 64:8 70:19
71:24 72:1 96:15
97:3 100:11 108:2
115:24 116:1
122:15 140:6
locations (2)
121:23 122:1
log (6)
3:21 56:2,8 74:14
118:2,11
long (19)
7:21 12:18 13:8
37:18 49:13 51:3
53:8 60:22 66:15,19
66:21 70:9,22 72:22
73:2 74:23 90:22
111:5 126:11
longer (14)
69:15 71:7,17 72:19
73:22 74:19 78:18
78:21 84:14 87:8,11
87:21 92:3 109:1
look (12)
45:13 51:20,20 71:1
71:6 96:24 100:6
105:2 109:15 129:5
125:19 135:3
looked (2)
35:1 134:9
looking (4)
34:2 80:21 123:11,16
looks (5)
40:6 102:15 103:9
131:21 133:5
loose (1)

132:5
Los (1)
13:13
lot (2)
43:19 126:24
loud (1)
121:12
lying (2)
44:23 45:3

**M**

M (5)
1:16 2:7 37:13 142:4
142:16
mail (1)
113:17
main (1)
113:17
major (3)
29:15 127:22,23
making (3)
85:10 107:17,18
male (15)
100:23 101:10,14,16
106:9,11 108:20,21
108:22,23,24 109:3
109:6,10 119:6
manpower (2)
22:11 119
mark (8)
41:13 53:20 62:14
94:4 99:7 102:2
119:14 128:20
marked (8)
41:16 53:23 62:18
94:7 99:9 102:5
119:17 128:23
Market (2)
1:22 2:8
material (5)
129:4 130:19,20
131:2,5
materials (2)
3:24 130:1
131:14

matter (1)
9:15 96:4 110:10
142:8
McClain (1)
2:3 3:5 4:14 7:10
13:7 18:22 36:16
41:18 47:7 53:19
54:1 60:10,12 62:13
62:20 74:7 76:5
77:10 79:8,19 80:9
86:14 87:19 89:2,7
89:11 94:3,9,22
95:2,8,22 96:8
98:17,24 99:4,12
102:1,7 106:15
109:11 110:2,20
111:7 126:3 137:7
138:24 139:14
140:8,14 141:10
MCS (1)
1:21
MDT (5)
3:21 99:20,22 100:14
142:3
mean (24)
22:22 23:5 31:21
34:6 37:23 43:9
46:11 52:12,13 68:9
76:6 77:23,23 83:8
96:22 97:11 101:20
102:21 107:9,16
117:21 124:17
135:15 140:24
meaning (3)
36:14 116:4 129:23
means (6)
23:6 43:10 52:14
97:1 101:11 114:9
meant (3)
85:24 123:23 124:17
measured (1)
6:16
medications (1)
131:14
meet (1)

7:18
meeting (1)
142:8
Mel (1)
115:3
Melvin (10)
1:8 18:14,18,20
104:21 105:5 113:4
113:6 115:4,8
member (1)
121:15
Memo (1)
3:22
Memorandum (1)
102:10
memorialize (1)
121:5
memorializing (1)
129:15
memory (6)
61:7 57:9 59:2 64:19
90:12 139:10
Message (1)
3:21
met (3)
7:2 51:4 58:15
Michael (3)
1:7 2:13 5:1
Michaela (2)
2:8 110:8
middle (2)
55:23 56:4
might (1)
41:9
mind (1)
98:13
minor (2)
102:12 103:20
minors (1)
103:3
minus (1)
71:11
minute (6)
54:22 62:21 94:10
59:12 102:8 112:4

minutes (8)
49:15 53:9,10 70:20
71:11 72:10,12
112:3
missing (1)
104:14
Mistakes (1)
139:1
mistake (2)
57:9 59:2
mistaken (1)
34:12
mobile (6)
99:23 118:2,3,4,6,13
Mohammed (14)
32:14 33:11,22 34:7
34:16 37:2,8,13
38:7,17 39:5,16,21
104:1
Monday (9)
33:17 34:4 35:4,4
41:24 67:15 68:21
106:7 108:18
month (8)
12:5,9 14:11,19,24
80:15 126:10
137:24
months (5)
16:11,15,24 19:18
49:7
MORGAN (1)
2:7
morning (5)
30:21 32:9 36:2
100:3 119:1
motioned (1)
61:24
move (2)
13:17 14:6
moved (2)
14:20 112:5
musician (1)
13:13

**N**

N (3)
2:1 3:1 142:1
name (10)
4:15,18 13:1 27:20
44:2 85:13 98:4
100:13 110:7
118:12
names (2)
97:18,21
narrative (7)
27:10,22,28 3 93:11
100:21 101:9
136:18
nature (1)
54:13
Naveda's (1)
42:21
Navedo (74)
1:8 7:15,19 11:10,13
14:4,7,17,19,21
44:10,15 45:3,20,22
50:18 65:12,15
68:5 69:12,19 74:11
74:18 75:17 76:15
77:12,18 80:4 83:11
84:4,15 86:7,22
89:14 90:7 91:2
92:16,22 94:12,21
96:10 98:5 100:2
104:20 107:4,14
108:7,12,24 109:14
113:15,17 116:2
123:1,6 124:20
Navedo's (3)
95:13 97:16
Navedo-Schutte (2)
95:13 97:16
necessarily (1)
73:13
necessary (2)

29:4,13
need (10)
5:24 22:11 71:8 87:8
87:11,21 109:2
111:3 120:7 123:20
needed (7)
38:13 69:15 71:17
72:19 73:22 74:20
93:15
needs (2)
23:15 28:17
neighborhood (1)
46:13
never (2)
120:7 134:10
new (13)
17:9 65:19 110:13
114:21 127:7,9,11
127:18 129:12
130:1,22 131:2,2
nice (1)
80:21
night (7)
40:17 41:4 74:15
86:1 113:4 114:23
116:14
nodding (1)
5:6
normal (3)
44:13 44:15 106:20
normally (1)
23:14
Notary (2)
1:17 142:5
note (1)
19:15
noted (1)
96:3
notes (1)
142:8
notice (1)
41:3
November (1)
1:13
nuance (1)

29:13
number (9)
3:11 45:23 52:13
55:18 63:13 85:13
100:16 104:9
136:19
numerous (1)
10:13

**O**

O (1)
142:1
o'clock (1)
41:11
oath (1)
10:16
object (4)
6:7 79:5 94:17 95:20
objection (20)
36:9 46:21 74:1,2
76:1 77:4 79:12,24
88:21 93:19 95:3
94:2 98:2 138:17,24
139:1 140:8
objections (1)
140:8
objects (1)
4:4
observation (1)
98:22
Observations (1)
135:13
observing (1)
135:8
obtained (1)
122:2
obviously (1)
39:10 58:11 82:15
134:9
October (2)
54:20 58:23
odd (1)

11:11
offender (2)
27:21,22
offered (1)
15:8
office (4)
77:2 79:2 86:3
officer (115)
7:15 8:2,12 9:6,10
11:13,16,17,19,22
12:13,15,23 13:20
15:4,10,14 16:4,5
16:12,24 17:3,13,15
18:10 21:7 22:13
23:1,15,21 24:1,3,6
24:8,11 26:13,15
29:24 31:16 33:7
38:12,17 40:14,23
42:21 43:3,6 50:18
52:16 65:11,15 66:2
66:22 67:1,4,20
69:12,19 71:15
74:11,18 75:17
76:15 77:12,18
80:2 83:11 84:4
84:15 85:8,20 86:7
86:9,22 87:12 89:13
91:2 92:16,22 94:12
94:17,20 97:5,7,13
99:5 100:2 103:18
104:8,12,20 105:1
106:1,16,24 107:4
108:7,12 109:14
110:5 113:15 114:15
115:9,13 116:21
118:7 119:8,20
121:21 123:1,6
124:20 126:2 129:2
134:12 137:11
officer's (3)
27:23 85:13 107:13
officers (18)
22:11 25:24 26:10
76:6 77:3 85:17

86:3 97:21 101:15
107:15,22 114:3
116:14 125:21
127:15
officers' (1)
101:7
Offices (1)
1:15
oh (5)
70:2 107:18,21
128:16 139:4
okay (56)
4:3 5:2 53:2 54:4 55:16
56:13 69:2 70:2
78:11 79:14 96:7
109:10 110:18
114:3 120:9 141:1,3
omitted (1)
98:6
once (12)
19:12 25:12 30:3
48:22 50:16 58:4,19
61:17 126:19 130:18
130:20 131:20
one's (1)
141:2
ones (5)
86:4 112:15,17 117:9
131:18
open (3)
45:7 80:6,8
opened (18)
44:15 45:14,15,16
56:16 59:24 60:6,14
60:19,21 23 61:2,11
61:17,21 62:8 81:4
140:1
operate (1)
76:8
operates (1)
76:9
operation (1)
22:14
opinion (1)
34:10

opportunity (1)
110:14
options (1)
135:21
oral (3)
1:15 129:21 134:3
orally (1)
5:2
order (14)
26:11,15,19 33:23
34:2 48:21 79:5
102:14 116:19,22
117:2,6,13,16
original (1)
112:18
originally (1)
112:12
outcome (2)
29:11 38:3
outlined (1)
125:1
outlines (1)
125:1
outlining (1)
119:9
outside (3)
21:10,16 49:10
outstanding (1)
6:2

**P**

P (3)
2:1,1,3
p.m (2)
1:16 141:16
P/O (2)
64:4,22
packet (2)
130:1,21
page (21)
3:3,11 51:21 55:17
54:8 75:23 67:14
100:6,9,15,19
102:15,16 103:12
104:7 123:11 125:1

125:2,10 132:16,17
pages (3)
110:14
paper (2)
85:11 130:22
paperwork (31)
7:3 22:15 26:4 32:23
32:23 33:12 34:11
34:18,20,23 38:6
50:4,8,11,16 74:15
79:1 91:16 94:2
97:22 98:14,23
105:7,11 115:16
128:8 129:12,14
130:4,6,9
paragraph (6)
28:13,16 29:3 55:23
60:11,13
parked (2)
26:15,16 117:18
part (6)
59:21 73:18
part (6)
45:6 98:6 135:2
participated (1)
20:6
particular (1)
41:6
parties (4)
3:21 35:16,24 37:22
partner (3)
6:19 100:13
partners (8)
16:23 17:7 21:8,8,15

21:20 124:18,19
partnership (2)
66:11 95:16
pass (2)
110:2 118:8
passenger (1)
29:2
passing (1)
128:16
password (1)
118:12
patrol (23)
22:9 24:18 30:8 32:7
119:10 119:21,24
45:1,2 57:10 58:8
105:12,13,15 114:4
120:5
patrolling (2)
111:22 113:10
payroll (1)
22:15
Pennsylvania (6)
66:11 95:16
12:3,13,14,16,19,22
13:16,18,20,24 14:7
14:11,16 15:4,16,17
137:2
people (4)
17:17 46:13 65:23
20:2
percent (3)
111:24 112:1 117:11
period (1)
16:9
periodically (1)
101:22
permitted (1)
80:7
person (8)
35:10 44:11 67:22
129:2 132:15 140:15
122:9,15
personally (6)
24:17 38:8 39:1,18
86:16 104:19
personnel (5)
119:11 121:13,19
122:7,14
persons (2)
121:19,23

pertain (1)
120:5
pertinent (1)
29:4
petty (1)
47:23
Philadelphia (44)
1:7,16,23 2:4,9,11,14
11:13,16,24 12:3,15
13:17,19 14:1,7,11
14:16 15:11 17:14
19:10 30:7 55:1,5
90:22 119:10,21,24
45:1,2 47:4 55:22
57:10 58:8 67:13
73:5 81:19 82:8
83:23 84:10,11,12
93:10
Philly (2)
14:3 32:2
phone (2)
38:24 68:18
piece (2)
85:11 97:22
place (3)
54:14 80:14
plaintiff (8)
2:5,10 42:23 92:6
97:10 110:9 121:6
118:7,11
plaintiff's (1)
121:1,12,16,18,21
plaintiffs (17)
1:5 8:13 10:3,6 49:14
54:17 59:6 60:1
69:14 70:23 71:21
72:18,24 74:10,20
84:8,13
plaintiffs' (12)
38:18 39:22 40:12
41:7 42:14,17 43:22
57:6 58:1 63:19,22
78:11 137:3
plan (1)

14:5
play (3)
13:14 106:1 108:15
PLAYBACK (2)
106:6 108:17
please (6)
4:15 5:1,5 54:2 62:21
102:8
plus (1)
71:11
point (22)
25:6 35:12 37:15,17
45:1,2 47:4 55:22
57:10 58:8 67:13
73:5 81:19 82:8
83:23 84:10,11,12
102:17 103:11
119:24 120:17
police (66)
11:13,16,18,22,24
12:3,13,14,16,19,22
13:16,18,20,24 14:7
14:11,16 15:4,16,17
15:14 17:14 19:11
24:8 30:7,15 43:18
55:2,5,8,14,17 56:5
60:24 79:1 81:24
policies (4)
83:9 84:8 137:3
policy (2)
78:11 137:3
porch (13)
44:21 45:1 46:2
47:1 42:14,17 43:22
57:6 58:1 63:19,22
70:10,12 71:22 72:1
78:14,18 81:24

72:3,6,23 73:1
portion (1)
52:2
position (1)
58:22
positive (1)
138:16
possible (1)
129:2
power (1)
26:10
practice (1)
116:20
predates (1)
120:16
pregnant (2)
40:4,7
preliminary (1)
4:23
prem (9)
95:12,14 97:16
91:10,24 92:4
100:10 106:13
premises (1)
43:13
prepare (5)
6:24 7:12,16,19 95:7
prepared (2)
95:12,14 97:16
prerogative (2)
97:2 105:20
presence (2)
55:9 77:20 104:11
present (2)
98:8 105:9
pretty (29)
12:8 17:8 27:5,10,16
28:13 34:21 36:2
39:11 43:10,20
44:24 49:3 57:
60:24 79:1 81:24

Robert Schutte
September 11, 2018

83:22 85:6 90:4
93:4 100:13 103:7
107:13 111:18
114:17 116:15
120:4 128:9
**primary (1)**
106:3
**printed (2)**
113:12 128:1
**printout (2)**
99:20 100:1
**prior (4)**
12:11 32:4 101:3
111:16
**privilege (1)**
95:9
**probably (12)**
8:9 31:5 32:16 47:2
51:6 62:12 72:10
91:15 92:8,8 97:5
131:20
**problem (1)**
124:2
**procedure (3)**
121:22 122:10
125:11
**procedures (6)**
25:13,23 26:3 119:10
125:5,19
**proceeding (1)**
10:10
**process (3)**
46:19 125:15,17
**Processing (1)**
125:5
**produced (2)**
102:15,16
**Professional (2)**
1:17 142:4
**program (1)**
12:9
**proper (1)**
50:19
**provide (1)**
117:7

**provided (4)**
124:1 125:23 133:22
**Public (2)**
1:17 142:5
**pull (2)**
74:16 123:9
**purpose (2)**
86:5 124:7
**purposes (9)**
41:17 53:24 62:19
94:8 99:10 102:6
119:18 124:5
128:24
**push (1)**
138:7
**put (7)**
28:15 61:22 92:1,9
95:16,18 97:21

**Q**
**qualify (1)**
127:10
**question (21)**
4:5 5:5,12,17 6:2,3
6:10 36:8 46:23
64:17,22 80:2,4
89:8 94:1 106:3
110:24 111:3 118:1
130:24 140:15
**question/answer (1)**
64:4
**questioning (1)**
94:17
**questions (13)**
5:2 7:4 20:13 23:16
95:24 109:19,21
110:11,12,12,15
136:21 141:11
**quick (4)**
61:12,21 99:1 140:2
**quickly (1)**
121:14
**quiet (1)**
46:8
**quieter (1)**

46:9
**quizzes (1)**
135:9
**quotes (1)**
128:12

**R**
**R (2)**
2:1 142:1
**radio (38)**
22:17 23:11,23 24:16
24:20 42:6,22 51:17
52:20 57:24 64:6,20
66:8 67:24 68:6,12
70:1,3 71:2 87:6,7
106:21 107:5,17
107:18 108:8,15
115:22 116:1,2,5,9
116:11,13
**raise (1)**
112:10
**rank (1)**
105:23
**rarity (1)**
114:20
**read (11)**
9:14 26:5 34:17,19
91:7 117:22 120:8
121:11,12 122:4
123:15
**reading (1)**
34:12
**ready (1)**
111:15
**real (2)**
61:21 140:2
**realized (1)**
56:14
**really (28)**
21:10 23:9 29:12
35:24 43:7 44:7,22
45:17 46:4 49:19
59:3 70:19 73:3,11
73:14 76:18 77:24

78:16 83:9 84:21
91:11 93:22 97:2
101:9 115:3 120:6
123:1,13 139:6
**reason (9)**
40:16 52:17 78:20
83:5 90:10 114:23
138:12,15 139:18
**reasonable (1)**
36:24
**reasonably (1)**
103:18
**reasons (2)**
22:21 44:19
**recall (61)**
8:20 9:13 16:21
17:22 18:12 25:16
31:3 32:8,16,17
33:5 34:3 37:4,7,11
37:14 38:22 40:8,11
41:2,6 45:23 46:17
49:5,12 51:19 57:15
59:3,5,23 63:5 64:5
64:13,15 66:13 70:9
72:3 80:13 82:16
83:1 87:22 88:4
108:13 114:22
117:8 119:5 133:15
133:19 137:20,23
139:10,23 140:1
141:6 141:12
142:1 142:5
143:13 143:18
**recalling (1)**
63:9
**receive (8)**
12:1 24:11 127:4
128:2 130:5 131:1
131:11 135:18
**received (19)**
55:3,8 98:23 106:14
126:5,21 129:12,14
129:17,20 130:14
130:18 131:4,4
132:13 133:6,7,12

THE MCS GROUP, INC.

---

Robert Schutte
September 11, 2018

133:20
**Received/Record (1)**
129:4
**receiving (2)**
134:2,18
**recess (1)**
99:2
**recognize (3)**
54:5 99:15 102:18
**recollection (6)**
42:10,13 52:4 57:3
60:17 63:18
**record (13)**
4:16 5:14 28:10 79:7
79:9,11,13,20,22
95:11 96:3 102:13
109:24
**recorded (4)**
54:19 113:9,21
115:20
**recording (14)**
54:10,17 42:5,20
106:2,6 107:1
108:17 109:13
125:5
**recruit (2)**
14:22,23 15:3,7
**refer (2)**
121:22 122:14
**reference (1)**
101:14
**referenced (1)**
103:14
**referring (1)**
10:2
**reflect (4)**
29:10 131:3 132:12
132:13
**reflected (2)**
100:7,8
**refresh (7)**
42:10,13 52:4 57:3
60:17 63:17 64:18
**refresher (1)**
126:15

**regarding (3)**
63:3,7 92:12
**regularly (1)**
91:18
**related (2)**
25:17 96:11
**relation (1)**
104:17
**relationship (1)**
36:24
**remarks (2)**
101:3,13
**remember (50)**
9:1 14:10 20:18 33:2
35:7,11 36:1,10
39:15 40:2,6 43:4
44:8,13,14,16,18
47:14,19 48:24
49:18 55:12,15
57:10 59:13,18 60:4
65:18 66:10,24 69:8
82:7,13,21 83:8
88:1 91:5,8 105:8
108:13 114:22
118:19 133:15
133:19 137:20,23
139:10,23 140:1
**remind (1)**
110:19
**repetitive (1)**
83:22
**rephrase (1)**
5:19
**report (20)**
3:20,21 19:3 26:23
27:1,2,7 28:1 29:9
31:18 82:1 91:2
94:12,20 95:12,12
96:10 97:16 103:10
122:2
**reported (2)**
32:3 136:14
**resident (1)**
67:3
**resolve (5)**
33:20 123:20 124:3

124:15,21
**resolved (7)**
49:16 59:5 84:18,19
84:23 85:3 108:7
**resolving (1)**
66:16 87:14
**record (14)**
25:4,10 26:19 39:13
53:11,15 66:8 77:13
77:19 84:1,4 103:2
105:14 123:21
**responded (11)**
42:11 64:7 68:2
82:10 83:24 89:22
90:2 92:6 96:15
100:22 105:16
**responding (7)**
42:1 64:8 68:13
93:1,2 95:6 105:2
86:7 101:3,15 105:2
**response (7)**
54:15 67:7 70:4 77:1
83:6,13 123:4
**responsible (1)**
22:18
**rest (1)**
110:17
**resume (1)**
109:1
**resumed (1)**
69:8
**retraining (1)**
127:4
**return (9)**
39:17 65:1,16 66:3
67:3 75:19 98:6
125:21 128:9
**returned (9)**
26:16 34:5 45:5 82:2
83:12 88:18 92:16
113:17,1
**returning (2)**
101:4 108:9
**review (15)**
7:23 33:21 50:4,7
52:1 54:2 62:21,23

THE MCS GROUP, INC.

---

Robert Schutte
September 11, 2018

68:24 91:13 94:10
99:12 102:8 118:12
136:22
**reviewed (6)**
7:8 22:14 115:17
117:12,15 118:2
**reviewing (2)**
50:11 64:18
**right (43)**
5:3 8:18 14:8 22:6
24:14 36:12,23
37:16 41:22 43:19
50:9 53:17 56:4
57:21 61:15 69:16
71:4 72:14,20 73:24
75:24 76:23 78:1,19
81:7 83:7 86:22
90:8 91:3 92:23
117:4 120:18
122:11 123:7 124:6
125:4 126:14
133:10 136:5,6
**right-hand (1)**
55:19 132:17
**rightful (4)**
26:16 34:8 35:20
36:5
**rights (2)**
2:13 96:17
**risk (4)**
103:13,16 104:2,14
**Robert (5)**
1:7,15 3:4 4:8,17
**role (1)**
22:8
**roles (1)**
17:6
**roll (10)**
32:5 111:14,16,20
112:3,22,23 113:2,4
133:17
**RTF (2)**
92:4 108:24
**rules (1)**

110:20

**S**
**S (2)**
2:1 3:9
**S-e-h-u-t-t-e (1)**
4:19
**safe (1)**
24:21
**safety (6)**
22:21 44:19 61:19
62:12 103:19
107:23
**sake (1)**
46:12
**sat (2)**
66:13 128:14
**satisfactory (1)**
136:17
**satisfied (1)**
136:17
**saw (6)**
38:6 44:12,23 45:3
51:11,14
**saying (8)**
42:22 56:14 70:6
71:7,16 106:18
109:15 115:8
**says (13)**
51:21 54:22 55:9
56:6 60:5,13 64:3
64:13 87:8 95:12
96:14 97:15 105:13
**scene (7)**
56:7 57:5 68:6 72:10
73:16 75:20 106:22
**school (3)**
11:3,4 13:22
**Schutte (18)**
1:7,15 3:4 4:8,17
53:21 62:15 64:4,23
99:5,7 106:1 110:5
119:8,20 126:2
129:2 137:11 142:7

3:14 41:14,17,19
3:16 53:24
**Schutte-2 (2)**
3:18 62:19
**Schutte-3 (4)**
3:20 94:5,8
3:21 99:10
**Schutte-6 (4)**
3:22 102:3,6 103:13
**Schutte-7 (2)**
3:23 119:18
**Schutte-8 (2)**
3:24 128:24
**screen (8)**
45:7 99:23 100:3,14
101:8,19,21,22
**se (1)**
113:24
**sealing (1)**
4:2
**second (35)**
5:10 28:18 48:11
59:24 63:3,7 64:6
64:20 65:10 68:24
70:23 76:11 82:11
82:14,17,19 83:18
84:9 87:4 92:15
97:9 98:6 100:6,9
121:10 122:13
138:13 139:13,16
**seconds (4)**
60:22 71:11 106:8
108:19
**section (4)**
28:3 101:14 121:14
136:11
**Security (3)**
131:1,14,22
**see (56)**
21:10 26:6 40:1,3
42:24 44:17,20,22,24

45:10,17,22 46:15
46:17 47:2,3,6,11
51:23 55:8,20,24
56:5,17 57:1 60:5
61:1,11 63:3,24
64:11 65:2 67:17
66:19 69:8 71:23
100:2 101:7,23
120:22 123:19
125:9 130:7 132:8
133:3
**seeing (3)**
25:17 76:19 101:18
**seen (10)**
26:15 98:19 101:2,10
100:13,21 102:23
120:1,10 129:7
**senior (1)**
17:3
**sense (1)**
117:10
**sent (2)**
85:11 127:16
**sentence (4)**
55:24 96:13 121:11
121:14
**sentences (1)**
123:15
**separate (4)**
46:9 118:23 132:3
136:11
**separately (1)**
118:24
**September (33)**
1:12 8:3,14,18 10:3
15:20,24 17:23 18:5
18:13 21:13,20 22:4
30:9,17 21:33 73:7,14
31:19 32:9 47:2
43:23 71:4 85:22
100:4 101:19 104:1
104:18 106:7

THE MCS GROUP, INC.

---

Robert Schutte
September 11, 2018

108:18 119:1 136:8
142:13
**sergeant (25)**
15:18,21 17:24 18:1
18:2,14,17 98:3
104:21 105:5
112:16 113:1,2,3,4
113:6,15 115:3,3,8
116:6 134:16,16
136:6,10
**sergeants (4)**
19:4 98:2 105:19
116:14
**series (1)**
41:20
**service (1)**
124:1
**set (3)**
26:8 43:7 111:16
**seven (1)**
119:15
**shared (1)**
110:20
**sheet (7)**
83:6 111:15,16
113:13,21 131:16
132:3
**sheets (1)**
62:16
**shift (14)**
18:9 30:23 31:4,8
31:19 32:4 33:4
111:10,21,22
113:11 114:16
115:10 118:10
**shifted (1)**
113:24
**shifts (3)**
18:3 21:20 31:6
**shine (3)**
44:20 61:8,10
**shined (5)**
45:9 56:13,16 60:7
60:15
**shining (1)**

61:16
**shock (1)**
44:8
**short (2)**
43:15 136:18
**Shorthand (1)**
1:17
**shorthands (1)**
43:19
**shot (2)**
61:19 108:3
**show (7)**
49:21 53:17 57:5
69:10 111:10,21
120:3
**showed (9)**
25:12 50:2 53:7
56:22 57:20 81:12
112:8,9 117:2
**showing (2)**
97:1,3
**Shujaa (23)**
1:4 2:5 10:7 37:9
47:17 48:5,13 49:3
49:9,21 51:5 75:16
75:21 76:13 77:1,5
77:20 82:5,10 83:11
83:18 118:17
138:23 139:11
**Shujaa's (9)**
37:20 50:24 51:8
53:2 58:18 86:8
105:17 138:5 140:7
**sick (3)**
19:14 112:4 130:8
**side (2)**
61:5 62:10
**sidewalk (2)**
72:3,8
**sign (10)**
118:7 130:18,21
131:12,14,20
132:1 135:20
**sign-in (2)**
111:15 132:3

**signature (4)**
97:24 129:13 130:17
131:23
**signaling (1)**
93:12
**signing (1)**
4:2
**simply (1)**
129:24
**single (1)**
131:10
**Sinquenna (1)**
32:13
**sir (3)**
5:9 30:14 141:9
**sit (1)**
74:13
**sitting (4)**
51:10 56:1,7 84:11
**situation (13)**
23:19 26:7 34:22,24
37:17 39:12 44:7
69:6 107:8,10,12
112:11 113:18
**Skasiac (2)**
15:18 136:7
**slammed (7)**
56:19 60:24 61:3,21
73:6 81:5 140:2
**sleep (2)**
140:21,21
**sleeping (1)**
31:5 45:11 46:6,9
**slowed (1)**
78:13
**slower (1)**
78:7
**Solicitor (1)**
2:12
**solo (2)**
22:2 78:3
**somebody (3)**
23:16 36:21 60:18
**someone's (1)**
24:17

**soon (4)**
34:21 74:23 75:3
84:8
**sorry (11)**
7:5,9 13:4 18:2 44:2
56:3 58:8 77:15
98:5 122:2 135:21
**sort (3)**
22:13 76:10 126:14
**sounds (1)**
76:4
**source (1)**
124:5
**South (4)**
52:9,22,24 106:12
**Southwest (1)**
32:2
**span (1)**
71:10
**speak (19)**
7:6 8:6 9:6 10:1 12:7
23:7 32:24 35:18
36:22 38:5,16,20
50:21 58:7 74:11,21
95:5 108:1 139:12
**speaking (3)**
34:6 37:12 40:8
**specific (1)**
76:1
**specifically (2)**
27:12 138:4
**specifies (1)**
93:4
**speculation (3)**
74:3 77:6 93:20
**spell (1)**
64:4
**spoke (4)**
38:2 46:11 104:21
116:2
**spoken (1)**
39:6
**sports (1)**
23:2
**squad (3)**

THE MCS GROUP, INC.

## Page 161

20:12 22:10 23:11
**stack (1)**
130:21
**stamped (1)**
125:3
**stand (1)**
62:10
**standard (2)**
27:16 100:14
**standing (7)**
50:12,13 61:16 72:6
78:6 112:15 137:19
**start (9)**
9:2 20:1 41:22 42:12
51:11 67:4 74:14
77:15 98:18
**started (8)**
4:24 14:4,11,16
15:15 16:9 33:15
140:16
**starting (1)**
12:15
**starts (2)**
41:24 68:20
**state (2)**
4:15 102:13
**stated (19)**
8:16 9:19 28:6,7
32:20 33:17 49:17
63:15 90:3,17 91:1
117:23 119:2
138:11,12,18,20
139:5,7
**statement (9)**
3:17,19 9:7 54:19
56:6 58:23 60:5
81:19 123:10
**statements (2)**
104:4 137:16
**states (2)**
1:1 104:9
**stating (3)**
87:21 100:21 129:13
**station (1)**
116:6
**status (1)**
104:15
**stay (3)**
49:23 67:11,23
**stayed (1)**
90:13
**stenographic (1)**
142:7
**step (2)**
125:15,15
**steps (3)**
71:22 72:8,8
**stereotypical (1)**
76:18
**stone (1)**
43:8
**stop (1)**
56:15
**stopped (1)**
139:19
**story (1)**
101:16 104:11,13
**street (11)**
1:16,22 2:4,8,13 52:9
52:22,24 59:20
73:18 106:13
**streets (1)**
78:15
**study (1)**
103:6
**stuff (7)**
29:7,14 83:21 85:14
127:3 130:12
131:19
**subject (9)**
8:4 19:9,22 20:22
46:16 75:7 96:4
102:11 119:22
**sued (1)**
10:20
**Suite (1)**
1:22
**Supervise (1)**
22:10
**supervisor (122)**
15:17,19 17:22 18:8
18:12,24 19:3,7
20:10 22:8,18 23:2
23:4,7,8,18,22,24
24:4,16,22,24 26:19
38:20 51:13,15,18
52:6,8,11,14,18,21
53:7,12,16,17 56:21
57:5,20,24 58:2,4,9
58:12,14,20,21
63:14 64:8,21,24
65:4,7,15,17 66:4,9
66:18 67:7 68:2
69:8,13,15 70:11
71:3,8,12,16 72:19
73:5,9,22,23 74:19
77:13,21 80:24 81:1
81:6,11,12 82:3,4
85:7,9 87:8,12,22
88:19 89:15 90:2,18
92:7 100:23 101:4
101:16 104:11,13
104:16 105:2,4,12
105:13,15 107:6
106:21 110:12,16
112:23 120:6
123:19,21 124:16
124:22 128:6,18
130:17 134:23
135:3,13 136:3,4
**supervisors (3)**
23:13 85:18 111:14
**supervisors' (1)**
101:8
**supervisory (1)**
22:19
**supposed (7)**
29:8 33:14 34:13
35:2 49:23 79:11
85:8
**sure (37)**
5:13 8:24 14:14
23:11 24:21 35:16
35:22,23 36:20
37:21 39:7,11 41:10

**T**

**T (3)**
3:9 142:1,1
**take (20)**
6:1 14:1 24:18 38:9
52:1 54:2 62:21
64:8 68:24 69:22
72:11 80:14 90:22
94:10 98:24 99:12
102:8 105:10 121:9
**taken (4)**
28:1 37:21,23 99:3
142:8
**takes (1)**
134:17
**talk (9)**
7:7,15 8:10 35:14,16
44:6 47:22 88:14
94:22
**talked (4)**
8:2,24 111:7 112:7
**talking (2)**
72:5,24 73:1 94:14
110:22 135:18
139:19
**TARA (1)**
2:12

## Page 162

**target (3)**
19:24 20:2,3
**taser (1)**
127:1
**taught (2)**
17:16 97:23
**teach (1)**
17:13
**technical (1)**
11:13
**Technically (1)**
19:1
**tell (25)**
31:8 38:12 39:16
49:3,20 60:8,21
64:19 66:7 82:9,22
83:1,9 84:13 88:17
89:12,19 95:3 97:2
98:12 105:19 108:4
115:22 117:1
125:1
**telling (4)**
35:8 95:6 131:7
135:16
**Temple (10)**
11:18,21 12:4,13,18
12:22 13:16,22 14:4
126:8
**ten (2)**
45:7 53:10
**terminal (6)**
99:21,22,23 118:3,4
128:3
**terms (1)**
128:10
**territory (1)**
22:3
**testified (3)**
4:9 10:9 103:1
**testify (4)**
6:14,18 96:6 140:22
**testifying (4)**
6:21 7:1 10:17
140:18
**testimony (1)**
139:1 141:7
**thank (2)**
80:22 90:4
**they'd (2)**
22:1 117:9
**thing (12)**
22:13 62:7 67:10
78:2,9 79:10 102:21
112:4 120:6 128:16
131:3 134:7
**things (13)**
12:6 17:17,18,20
27:16 52:13 105:21
116:6 112:5 114:15
120:4 126:24
136:16
**think (66)**
16:11,20,21 33:13,17
34:7 35:15 36:11,24
38:13,21 39:14 40:5
40:18 45:15 46:3
47:4 48:9,10,22
49:11,17,20 50:1,1
58:3,3,8,13 59:1,2
59:19 60:2,2,20,22
66:5,8,19,20 69:20
69:24 72:7 73:2,17
73:18,19 74:12 75:1
75:11 76:23 79:8,20
81:2 83:3 84:10
86:5 91:9,15 104:21
104:23 116:10
131:1,3
**thinking (1)**
77:24
**thorough (3)**
37:3 73:11 78:1
**thought (3)**
29:8,10 117:2
**threatened (1)**
103:20
**three (10)**
6:14,18,22 7:1,13,16
8:11 10:1,16 15:13
15:17,22 58:22 78:6
**times (8)**
10:12 19:14 58:17
63:13,18,21 91:8
107:24
**tired (1)**
137:14
**title (3)**
14:15 15:2,13
**titled (2)**
119:21 129:3
**today (25)**
6:14,18,22 7:1,13,16
8:11 10:1,16 15:13
15:17,22 58:22 78:6
80:21 94:14 109:19
122:18 126:4
134:21 141:9 140:17
**told (25)**
34:22,23 35:1 36:22
48:23 56:18 66:10
67:22 69:9 81:14
82:13,14 83:20 88:9
88:10 89:3,18
90:15,21 100:11,23
112:6 115:4 128:5
128:10 134:15
**top (1)**
41:23
**track (1)**
105:11
**trained (4)**
11:23 103:1,8 128:10
**training (24)**
11:24 12:1 12:12
14:17,18,19 15:6
16:17 25:3,8,13,15
25:18 33:8 126:4,8
126:9,15,21 127:1,2
127:5,17 128:2
**transcript (4)**
129:3,11,13,16,21
130:6,11,18 131:2,2
131:4,5 133:6,21
**transcription (1)**
64:18
**transcripts (1)**
42:5
**transmission (3)**
3:15 41:23 42:4
**transmissions (1)**
42:1
**trial (1)**
4:6
**tried (3)**

## Page 163

17:12 33:19 88:13
**trouble (2)**
58:6,11
**true (1)**
142:6
**truthful (1)**
141:8
**truthfully (3)**
6:21 140:19,23
**try (4)**
24:23 38:23 45:18
46:8
**trying (4)**
4:22 44:15 117:24
70:21
**Tuesday (3)**
1:12 34:5,14
**tuned (1)**
83:23
**turn (7)**
27:5 100:10 126:4,20
126:24 127:5
129:20 133:6 138:9
**Turning (1)**
124:24
**twice (2)**
63:23 135:23
**two (11)**
11:19 12:20 13:23
14:6 31:10,11 46:2
46:3 60:22 135:21
137:24
**two-man (1)**
97:20
**two-year (1)**
14:2
**type (9)**
27:5 100:10 126:4,20
126:24 127:5
129:20 133:6 138:9
**typically (2)**
28:20,24

**U**

**ugly (1)**

76:10
**uncooperative (2)**
48:2 93:5
**understand (20)**
5:8,15,17,21,22 6:5
6:11 8:11 9:17,24
10:5,15 42:4 46:1
48:1 65:9 110:23
112:6 124:10 126:6
**understanding (4)**
9:22 34:15 117:24
125:20
**understood (2)**
35:24 52:19
**unhappy (1)**
100:24
**uniform (2)**
78:24 116:15
**unit (3)**
2:13 97:20 108:21
**UNITED (1)**
1:1
**University (1)**
11:18,21 12:4 14:5
**Unn-nn (2)**
47:10 75:9
**update (3)**
120:24 127:13,20
**updated (2)**
120:20 133:2,7,13,23
**updates (6)**
12:5 127:2,2,8,9,23
**updating (2)**
56:2,8
**Upper (3)**
11:5,6,10
**upset (3)**
76:24 83:12 123:24
**use (3)**
27:8 128:12 138:9
**user (1)**
118:12
**usually (25)**
17:18 22:20,22,24
23:6,15 28:19 29:21

**V**

**vantage (1)**
45:2
**various (2)**
129:11 135:4
**vehicle (3)**
12:7 71:20 74:14
**verbally (1)**
67:22
**verification (1)**
104:10
**versa (1)**
29:23
**vice (1)**
29:23
**video (2)**
30:9 62:1
**videos (1)**
25:12
**viewed (1)**
118:24
**visit (4)**
83:19 84:9 92:20
122:21
**visitation (1)**
96:17
**visited (2)**
116:24 123:6
**voice (14)**
106:9,10,11,14
108:20,21,23,24
109:3,6,10,12,15
**voices (2)**
46:12 106:4
**vs (1)**
1:6
**vulgar (1)**
48:3

**W**

**wagon (19)**
74:13,16 84:3,6
91:16 93:10 103:5
56:18 57:10 58:4
59:20,22 73:12,13
75:2 113:22 123,23
124:4,8,14,19
133:16
**wait (6)**
53:8,17 58:5,10
69:11 73:23
**waited (5)**
39:23 53:6 57:4
58:13 81:11
**waiting (4)**
51:13 71:19 72:9
73:4
**waived (1)**
4:3
**walking (1)**
71:19
**want (10)**
38:5 52:18 55:16,22
56:14 59:19 74:10
74:21 79:23 103:11
**wanted (4)**
122:24 123:5 124:11
124:13
**wants (4)**
23:7,20 52:15 122:8
**wasn't (11)**
18:1 34:13 47:8 85:2
85:2 87:3 124:7
**Wawa (4)**
70:18 90:17 109:8,16
**way (11)**
18:3 29:19,24 118:8
118:13
**we'll (3)**
116:2,12,13
136:1,9 130:3,4
**works (1)**
21:14
**worn (1)**
130:10
**we'll (3)**
17:16
**we're (6)**

## Page 164

8:10 56:12 110:22
114:19 115:23
122:18
**we've (4)**
54:22 94:13 111:4
122:18
**wear (1)**
130:10
**wearing (2)**
80:20 141:2
**week (5)**
31:7,9,10,12 33:14
**weekend (4)**
33:16,18 35:5 117:19
**weekends (1)**
33:15
**welfare (1)**
103:19
**well-being (6)**
37:6 47:9 96:16,21
97:4 104:5
**went (48)**
32:19 47:13,16
116:17
**weren't (6)**
21:16 49:1 53:15
72:4 73:6 90:6
**wet (1)**
56:21
**whichever (1)**
117:18
**William (2)**
55:11,13
**window (6)**
32:20 45:6,10 60:3
139:24 140:3
**windows (1)**
44:21
**wish (1)**
109:20
**wishes (1)**
121:20
**witness (33)**
3:13 15:18,21
36:9 46:24 74:5
76:3 77:8 86:12
87:17 89:9 93:22
95:4,15,20 98:14
103:1 139:2,4,16
140:10 141:13
**witnessed (3)**
118:17,20,21
**woman (4)**
32:19 47:13,16
116:17
**wondering (1)**
114:13
**Woodland (1)**
32:1
**word (7)**
5:4,11 76:10 91:7
91:11,12
**work (12)**
12:3 14:5 18:2 21:11
21:16,16,24 31:16,23
55:5 69:20 70:16
72:15 76:3 79:17
81:3 83:8 86:16
89:5 92:8,9 93:10
103:4 107:20
111:24 113:8
114:19 115:1,16
116:2 120:3,4
126:12 130:4 133:3
135:12,23
**worked (3)**
8:8 11:11 78:15
**working (5)**
18:3 29:19,24 118:8
118:13
**works (1)**
21:14
**worn (1)**
130:10
**wouldn't (13)**
19:2,3 21:14,23 58:6
68:14 69:21 89:19
135:12,23
9:5 107:21,22
120:6 139:18
**yearly (1)**
127:11
**years (7)**
10:14 11:19 12:20
13:23 14:6 16:7
137:19
**yelled (4)**
47:24 48:5 60:23
81:2,4
**yelling (15)**
47:24 48:5 60:23
81:3 83:16,22 88:11
89:5,9,16,18,22
104:14
**Yesterday (1)**
7:20
**Young (2)**
2:18 110:9

**X**
3:1,9

**Y**
**yard (1)**
81:22
**yeah (47)**
6:6 14:21 17:5 22:7
24:24 29:8 32:17 34:4
35:15 37:1 43:20
46:11 48:4 50:14
47:23 48:6,12,16
56:20 57:6,14,24
58:4,10 59:20,24
62:4 66:20 70:16
72:15 76:3 79:17
81:3 83:8 86:16
89:5 92:8,9 93:10
103:4 107:20
111:24 113:8
114:19 115:1,16
116:2 120:3,4
126:12 130:4 133:3
135:12,23
**year (11)**
8:8,9 13:10 14:13
22:5 78:11 85:10,15
127:11 130:15
135:12,23

**Z**
**zones (3)**
111:17 114:5,6

**0**
**0:14 (1)**
106:7
**00:24:10 (1)**
42:1
**00:48:58 (2)**
51:22 67:16
**01:06 (1)**
108:18
**08 (1)**
108:18

**1**
**1 (5)**
41:10 104:9 108:20
108:22,24
**1:06 (1)**
71:1
**1:06:08 (1)**
108:18
**10 (1)**
112:1

**10/19/15 (1)**
3:17
**102 (1)**
3:22
**11 (2)**
1:12 142:13
**11/5/15 (1)**
3:19
**110 (1)**
3:6
**119 (1)**
3:23
**12 (6)**
30:24 31:1 70:3
109:6 111:10 118:9
**12.18 (2)**
3:23 119:22
**12/22/2014 (1)**
54:23
**12:14 (2)**
42:8,19
**12:15 (2)**
43:22 118:11
**12:30 (3)**
36:2 41:10 51:2
**12:48 (1)**
71:4
**1201 (11)**
42:6 69:24 87:7,21
106:9,10,18 108:20
108:22,23 109:13
**1242 (4)**
52:9,22,24 106:12
**127 (1)**
132:19
**128 (1)**
3:24
**12th (13)**
30:12,13,16 31:23,24
32:4 114:9 116:8,8
116:10 117:14
118:10 127:15
**137 (1)**
3:7
**13th (1)**

31:19
**14 (2)**
106:7 108:18
**14th (16)**
8:14 10:3 18:13
30:21 31:14,20
32:10 42:7 43:23
71:4 85:22 100:4
101:19 104:1,18
119:1
**15 (3)**
16:21 62:2 70:20
**1515 (1)**
2:13
**15th (7)**
120:20 132:19 133:2
133:9,13,20 134:19
**1601 (1)**
1:22
**17-0889 (1)**
1:2
**1701 (1)**
2:8
**18 (1)**
3:10
**18th (3)**
116:8,9,10
**19102 (1)**
2:14
**19103 (2)**
1:23 2:9
**19104 (1)**
2:4
**19th (2)**
54:20 58:23

— 2 —
**2 (7)**
55:17 102:16 108:21
108:23 109:3,10
123:11
**2-A (1)**
121:24
**2:26 (1)**
1:16

**20 (3)**
72:10,12 106:8
**2003 (2)**
11:8,10
**2010 (2)**
85:22,24
**20101 (1)**
102:11
**2013 (1)**
131:9
**2014 (5)**
11:14 14:13 16:20
120:14 126:23
**2015 (44)**
8:3,14,18,22 10:3
15:20 16:1,19 17:23
18:5,13 21:13,21
22:4 30:9,18,21
31:7 32:10 42:7
43:23 54:20 58:24
100:4 101:19 104:1
104:18 106:7
108:18 119:1
120:21 123:11
129:3 131:8 132:19
133:3,9,14,20
134:19 136:9
**2017 (2)**
80:16,17
**2018 (2)**
1:12 142:13
**215 (4)**
1:24 2:5,9,14
**21st (1)**
2:3
**24 (1)**
137:12
**2929 (2)**
1:15 2:4
**29th (1)**
120:14

— 3 —
**3 (4)**
102:15 109:6 125:3,5

**31st (1)**
102:10

— 4 —
**4 (2)**
3:5 125:10
**4:56 (1)**
141:16
**405-8178 (1)**
1:24
**41 (1)**
3:14
**48 (6)**
27:16 28:18 29:22
38:1 51:11 63:14

— 5 —
**5 (1)**
125:10
**51st (4)**
52:9,22,24 106:13
**53 (1)**
3:16
**5th (1)**
123:11

— 6 —
**62 (1)**
3:18
**6448 (1)**
2:14
**686-1776 (1)**
2:14

— 7 —
**7 (1)**
128:3
**75-48 (1)**
3:20
**7548 (15)**
26:23 27:1,7,12,19
28:4 29:9 30:5 91:2
91:17,22 93:8,15
94:11 96:9

— 8 —

THE MCS GROUP, INC.

**8:15 (3)**
30:24 31:1 118:10
**800 (1)**
1:22

— 9 —
**9/14/15 (3)**
51:22 67:15 68:21
**9/14/2015 (1)**
41:24
**90 (1)**
111:24
**94 (1)**
3:20
**963-3300 (1)**
2:5
**963-5608 (1)**
2:9
**99 (1)**
3:21

THE MCS GROUP, INC.