# EXHIBIT G

| | |
|---|---|
| STATEMENT OF: | Police Officer Robert Schutte<br>Badge #5965<br><br>12th District 3C Platoon |
| APPOINTMENT DATE:<br>ASSIGNMENT DATE: | 12/22/14<br>2/2/15 |
| DATE AND TIME: | 10/19/15 @ 11:45 PM |
| PLACE: | Internal Affairs Division<br>7790 Dungan Road Phila. Pa. 19111 |
| CONCERNING: | PAC # 15-025 IAD # 15-0568 |
| INTERVIEWED BY: | Lieutenant Joseph McGarrey #451, IAD |
| RECORDED BY: | Same |
| IN PRESENCE OF: | William Davis Esquire |
| IN PRESENCE OF: | William Michael |

I am Lt. Joseph McGarrey #451, Internal Affairs Division. I will be asking you questions in reference to a Complaint Against Police and I will be taking your statement directly onto the computer.

    Q. Are you represented by counsel?
    A. Yes.

    Q. Have you had the opportunity to consult with your attorney?
    A. Yes

    Q. Do you need to consult with your attorney before we continue?
    A. No.

You are reminded that failure to cooperate in a Departmental administrative investigation is punishable by 10 days suspension to dismissal under Article 1-§ 008-10 of the Disciplinary Code.

You are also reminded that lying or attempting to deceive regarding a material fact during the course of any Departmental investigation is punishable 10 days suspension to dismissal under Article 1-§ 009-10 of the Disciplinary Code.

    Q. Do you understand this?
    A. Yes.

P/O Schutte _____

1

Q. Are you willing to cooperate?
A. Yes.

Officer, at the conclusion of my initial questioning, a representative of the Police Advisory Commission may then ask you questions, pursuant to Executive Order 8-93, a Court Order signed by Judge Joseph O'Keefe on April 13, 1995 and general computer message NO. 1253, dated 8-1895 and Judge Russell Nigro's order, dated 10-26-95.

Q. P/O Schutte, I am showing a copy of Patrol Activity Log for the date of 9/14/15. After reviewing that document can you tell me if you were working on that date and if so, what was your assignment?
A. Yes, I was working the 12am to 8:15 am tour of duty in the 12th District and I was the EPW 1201 and I was working with my partner, P/O Mike Navedo.

Q. P/O Schutte, during your tour of duty, do you recall handling an assignment at the location of 1242 S 51st Street.
A. Yes.

Q. P/O Schutte, in your own words can you tell me what you recall about that assignment?
A. We got a call for a custody dispute for a child. The mother was concerned because the father had not brought back the child yet. We made contact with the father and he said that Monday was a holiday and per the contract they had, holidays count as part of the weekend, they extend the stay. They showed us the actual contract, the signed order, and she said that she had not seen that. When we read it over, she had made a mistake and after that everything was fine. We didn't even leave the scene yet. We were sitting in the wagon, updating the log, and we got another call for that same address. The call came out as a disturbance so we went and knocked back up at the residence. Se, we heard yelling after were knocking, I shined my light to see if they were ok, and then I realized they were saying, leave us alone, stop banging on their door. They opened the door a little bit; I shined my light because I could not see what they may have in there. They told us to leave them alone and they slammed the door on us. So, we went to leave again, and another call went out for a supervisor at that location. Our Lieutenant showed up and he knocked on the door and there was no answer. He knocked one more time and no one answered so he instructed us to make the job and investigate premise.

Q. P/O Schutte, did you prepare any paperwork in reference to the assignment?
A. Yes, I prepared a 75-48.
A.

Q. P/O Schutte, do you recall the name of the mother of the child who was concerned that the child had not been returned home?
A. No, I do not.

Q. P/O Schutte, where did you first meet the mother of the child?
A. She actually came to the district and that is where we first spoke to her.

P/O Schutte

2

Q. P/O Schutte, did the mother of the child accompany you to the residence where the child was staying with the father?
A. They met us there, they drove in a separate vehicle.

Q. P/O Schutte, when you say they, who are the referring to?
A. It was the mother of the child a guy who she said was her boyfriend.

Q. P/O Schutte, what was the demeanor of the individuals you met at the residence on 51st Street when arrived?
A. When we first talked to them they were pleasant and kind. During the second encounter their demeanor changed and they yelled at us and cursed at us.

Q. P/O Schutte, did you enter the residence during the second time you responded?
A. No.

Q. P/O Schutte, who allowed you entry into the residence the first time you responded?
A. We didn't go into the residence, we talked to the female and the male on the porch. The second time around he was actually the one that was being vulgar.

Q. P/O Schutte, did you forcibly push open the door the second time you arrived at the residence in order to gain entry, knocking the female back with the door?
A. No.

Q. P/O Schutte, did P/O Navedo forcibly push open the door the second time you arrived at the residence in order to gain entry, knocking the female back with the door?
A. No.

Q. What was the Lieutenants name who was working that evening?
A. Lt. Disanto.

Q. William Michael, Question, did you or your partner go back to the residence with the supervisor?
A. We never left the location but when the Lieutenant arrived we went to the door with him.

Q. William Michael, Question, do you know why the 75-48 doesn't indicate a second visit to the home before the supervisor arrived?
A. No, I didn't write the 75-48, my partner wrote the 75-48.

Q. William Michael, Question, did you or partner ever ask any member of the house hold if they had a complaint against police during the second knock at the door?
A. No, we just asked if everything was alright because there was a second call and they told us to stop bother them and they told us to leave them the fuck alone.

Q. William Michael, Question, at what point did you realize that there was a complaint against police?
A. I believe that when the call came out for a supervisor, we assumed that there was a complaint.

P/O Schutte _____

3



Q. William Michael, Question, if you thought that there was a complaint, why did you go back to the door a third time?
A. Because it was an unknown residence, because I did know what there demeanor was towards myself and my partner, we went with the Lieutenant to back him up.

Q. William Michael, Question, did you ever see the child in question?
A. No. I saw children sleeping on the floor but I did not see the child in question. I never entered the residence.

Q. Was the second call you responded to for a disturbance or was it for a supervisor to take the location in which you were still out in front?
A. The second call was for a disturbance.

This is an on-going investigation being conducted by Internal Affairs. By orders of the Commanding Officer of Internal Affairs you are instructed not to disclose any information discussed here to anyone other than your attorney and FOP representative.

STATEMENT CONCLUDED: 12:30 a.m.

I HAVE READ THE FOREGOING STATEMENT CONSISTING OF (3) PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

I MUST REMIND YOU THAT THIS INVESTIGATION IS STILL IN PROGRESS AND THAT THE INFORMATION IN THIS STATEMENT IS CONFIDENTIAL AND THAT YOU ARE NOT TO REVEAL ANY OF THIS INFORMATION TO ANYONE EXCEPT MYSELF OR YOUR ATTORNEY UNTIL THE INVESTIGATION IS CONCLUDED. A FAILURE TO COMPLY WITH THIS REQUEST WILL BE CONSIDERED A LACK OF COOPERATION IN THIS INVESTIGATION.

NAME: _Robert Schutte_

DISTRICT /UNIT: _12th Dist_

DATE AND TIME: _10-20-15   12:35 AM_

WITNESSES: _____

P/O Schutte _[signature]_