# EXHIBIT I

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION NO. 17-0889

DARUS HUNTER and KENYA :
SHUJAA
                             :

        Plaintiffs,
                             :

    vs.
                             :

CITY OF PHILADELPHIA,
ROBERT SCHUTTE, MICHAEL:
NAVEDO and MICHAEL
MELVIN,
                             :

        Defendants.      :


                -----

        TUESDAY, SEPTEMBER 11, 2018
                -----


        Oral deposition of MICHAEL NAVEDO held at the
Law Offices of Dechert, LLP, Cira Centre, 2929 Arch
Street, Philadelphia, Pennsylvania, commencing at
9:54 a.m., by and before Jo-Anne M. Bosler,
Professional Shorthand Reporter and Notary Public.


                ------
        THE MCS GROUP, INC.
        1601 Market Street - Suite 800
        Philadelphia, Pennsylvania 19103
            (215) 405-8178

**Michael Navedo**
**September 11, 2018**

2

A P P E A R A N C E S:

DECHERT. LLP
BY:  JOHN P. MCCLAM, ESQUIRE
Cira Centre, 21st Floor
2929 Arch Street
Philadelphia, Pennsylvania 19104
(215) 963-3300
Attorneys for the Plaintiff Kenya Shujaa

MORGAN, LEWIS & BOCKIUS, LLP
BY:  ALEXANDRA M. LASTOWSKI, ESQUIRE
     MICHAELA YOUNG, ESQUIRE
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-5608
Attorneys for the Plaintiff Darus Hunter

CITY OF PHILADELPHIA LAW DEPARTMENT
BY:  TARA FUNG, ESQUIRE
Assistant City Solicitor
Civil Rights Unit
1515 Arch Street
Philadelphia, Pennsylvania 19102
(215) 686-1776
Attorneys for the Defendants

ALSO APPEARING:

Darus Hunter

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

3

```
              I  N  D  E  X

WITNESS                        PAGE

MICHAEL NAVEDO

By MR. MCCLAM                  5

By MS. LASTOWSKI               140

By MS. FUNG                    175



              E X H I B I T S


NUMBER          DESCRIPTION           PAGE
```

```
 Navedo-1   Photograph               66
 Navedo-2   Dispatcher/Radio         75
            Transmissions
 Navedo-3   75-48 Report             107
 Navedo-4   Internal Affairs         112
            Interview 11/5/15
 Navedo-5   MDT Message Log Report   121
 Navedo-6   Patrol Activity Log      126
 Navedo-7   Custody Dispute Memo     132
 Navedo-8   Directive 12.18          143
 Navedo-9   Interrogatories          156
 Navedo-10  Interrogatory Answers    157
 Navedo-11  Training Materials       161
 Navedo-12  Complaint Against PO     178
            Navedo
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

4

```
 1              (By agreement of counsel,

 2       the signing, sealing, certification

 3       and filing are waived; and all

 4       objections, except as to the form

 5       of the question, are reserved until

 6       the time of trial.)

 7                 -   -   -

 8              MICHAEL NAVEDO, having been

 9       duly sworn, was examined and testified

10       as follows:

11                 -   -   -

12              EXAMINATION

13                 -   -   -

14              MR. MCCLAM:  Do you want

15       us to introduce ourselves?

16              THE COURT REPORTER:  If

17       you'd like.

18              MR. MCCLAM:  John McClam

19       on behalf of plaintiff Kenya

20       Shujaa.

21              MS. LASTOWSKI:  Alexandra

22       Lastowski on behalf of plaintiff

23       Darus Hunter.

24              MS. YOUNG:  Michaela Young
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

5

1          on behalf of plaintiff.

2                MS. LASTOWSKI:  And our

3          client is here.

4                MR. HUNTER:  Darus Hunter,

5          plaintiff, being represented by

6          these two today.

7                MS. FUNG:  Tara Fung on

8          behalf of Officer Navedo.

9                MR. NAVEDO:  Officer

10         Navedo.

11   BY MR. MCCLAM:

12      Q.  **Good morning, Officer Navedo.  My**

13   **name is John McClam.  I'm going to be**

14   **taking your deposition today.**

15         **Can you please state your full name**

16   **for the record?**

17      A.  Michael Navedo.

18      Q.  **Have you ever been deposed before?**

19      A.  Nope.

20      Q.  **Before we start I'm going to go**

21   **over a couple of preliminary instructions.**

22   **I'm going to be asking you questions and**

23   **you'll need to answer those questions**

24   **orally.  The court reporter here is going**

Michael Navedo
September 11, 2018

1  to be writing down every word we say.  So

2  if I ask a yes and no question you'll need

3  to answer yes or no because the court

4  reporter can't register head nods or

5  shakes of the head.

6       Do you understand?

7    A.  Understand.

8    Q.  If you don't understand a question

9  you're welcome to ask for a clarification

10  and I'll do my best to clarify.  If you

11  don't ask for a clarification I'll assume

12  that you understood the question.

13       Do you understand?

14    A.  Yes, sir.

15    Q.  Anytime you need a break just let

16  me know and we can take one.  However, I

17  ask that if a question is outstanding that

18  you answer the question first.

19       Do you understand?

20    A.  Yes.

21    Q.  Your attorney may object during the

22  deposition; however, unless your attorney

23  instructs you not to answer you must

24  answer the question.

Michael Navedo
September 11, 2018

7

```
1              Do you understand?
2       A.  Yes.
3       Q.  Do you understand these
4  instructions that I just read to you?
5       A.  Yes.
6       Q.  Are you feeling well enough to
7  testify today?
8       A.  Yes.
9       Q.  Were you working last night?
10      A.  Yes.
11      Q.  So how long have you been awake
12  for?
13      A.  Since 2 o'clock yesterday.
14      Q.  2 o'clock yesterday afternoon?
15      A.  Yes.
16      Q.  Do you anticipate that will have
17  any impact on your ability to testify
18  truthfully and accurately today?
19      A.  No.  It's fine.  I want to --
20              THE COURT REPORTER:  I'm
21      sorry.  What was that?
22              THE WITNESS:  I just would
23      like to get this over with.
24
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

8

1    BY MR. MCCLAM:

2       Q.  So we're clear so that she can hear

3    you and create an accurate records I'll

4    ask that you speak a little bit louder

5    than you might otherwise, and to

6    articulate as clearly as possible.  Okay?

7       A.  Yes.

8       Q.  Are you taking any medications that

9    might impair your memory or ability to

10   testify today?

11      A.  No.

12      Q.  Is there any other reason why you

13   might not be able to testify truthfully

14   and accurately today?

15      A.  No.

16      Q.  Have you done anything to prepare

17   for testifying today?

18      A.  Other than reviewing notes with my

19   attorney.

20      Q.  When did you meet with your

21   attorney?

22      A.  Yesterday.

23      Q.  For how long?

24               MS. FUNG:  What's the

**Michael Navedo**
**September 11, 2018**

9

```
 1              relevance to that?

 2                    MR. MCCLAM:  Do you have

 3              an objection?

 4                    MS. FUNG:  Yes.

 5              Objection.  What is the relevance

 6              of the question?

 7                    MR. MCCLAM:  I don't have

 8              to answer your question.

 9    BY MR. MCCLAM:

10        Q.   How long did you meet with your

11    attorney?

12                    MS. FUNG:  You don't have

13              to answer that.

14                    MR. MCCLAM:  Is it your

15              position that that's privileged?

16                    MS. FUNG:  Yeah.  I mean

17              what is your basis for that?  My

18              objection is relevance.  He's not

19              answering the question.

20                    MR. MCCLAM:  Relevance is

21              not a valid objection for not

22              answering a question.  If you

23              have --

24                    MS. FUNG:  I'm asking you
```

**Michael Navedo**
**September 11, 2018**

```
 1          what is your basis for the
 2          question?
 3                MR. MCCLAM:  How long --
 4          are you taking your attorney's
 5          advice not to answer the question?
 6                MS. FUNG:  Go ahead.
 7          Answer it.
 8                THE WITNESS:  Answer the
 9          question?
10                MS. FUNG:  Yeah.  Answer
11          the question.
12                THE WITNESS:  Probably,
13          like, a half hour.
14   BY MR. MCCLAM:
15      Q.  Did you review documents while you
16   were meeting with your attorney?
17      A.  A few.
18      Q.  Did you review any documents in
19   preparation for your deposition today when
20   you were not with your attorney?
21      A.  No.
22      Q.  Did you talk with anyone besides
23   your attorney in preparing for your
24   deposition today?
```

Michael Navedo
September 11, 2018

1      A.   No.

2      Q.   Have you talked with Officer

3   Schutte since the incident -- since in

4   September -- let me start over.

5         You recognize that we're here today

6   to talk about an incident that occurred on

7   September 14th, 2015; correct?

8      A.   Yes.

9      Q.   Have you talked to Officer Schutte

10  since that time about the incident?

11     A.   No.

12     Q.   Have you talked to anybody besides

13  Officer Schutte and your attorney about

14  the incident?

15     A.   No.

16     Q.   I'm not trying to trick you up; you

17  did give a statement to Internal Affairs?

18     A.   Oh, well, yeah.   Yeah.   Regarding

19  that, yes.

20     Q.   Anything outside of Internal

21  Affairs?

22     A.   No.

23     Q.   Have you read the complaint in this

24  matter?

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

12

```
 1     A.   Some of it.  I didn't read the

 2   entirety of the document.  I just skimmed

 3   through it.

 4     Q.   What do you understand this

 5   litigation to be about?

 6     A.   Apparently the female that was with

 7   him that night was pregnant, and

 8   apparently what he's saying is that we

 9   made forced entry into the home and the

10   door was forcefully pushed in, knocking

11   her down and causing a miscarriage.  And I

12   believe we also, apparently -- from what

13   he's saying -- we searched the home

14   illegally.

15     Q.   Okay.

16     A.   If that's accurate.

17     Q.   So you understand when I'm

18   referring to the incident that I'm

19   referring to your interactions with

20   plaintiffs on the early morning of

21   September 14th, 2015?

22     A.   Correct.

23     Q.   And you understand that plaintiffs

24   in this case are Darus Hunter and Kenya
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

13

```
1    Shujaa?

2        A.   Yes.

3        Q.   Have you ever testified in any

4    proceeding other than a deposition?

5        A.   Are you talking about a court

6    proceeding or, like, internal affairs

7    stuff?

8        Q.   Like court proceeding, any time

9    where you would be under oath?

10       A.   Yes.

11       Q.   How many times?

12       A.   I can't give you an exact number.

13   It could very well be in the thousands

14   now.

15       Q.   You understand that you're under

16   oath today just as if you were in one of

17   those court proceedings?

18       A.   Excuse me.

19       Q.   You understand that you're under

20   oath --

21       A.   Yes.

22       Q.   -- for your testimony today just as

23   if you were in front of a judge and in a

24   courtroom?
```

THE MCS GROUP, INC.

Michael Navedo
September 11, 2018

14

```
 1      A.   Yes.

 2      Q.   Just so we're clear, so that we can

 3  have a clear record, please wait until I'm

 4  finished with my question before you

 5  answer?

 6      A.   Okay.   Sorry.

 7      Q.   No worries.

 8               THE COURT REPORTER:   Also,

 9          keep your voice up.   You're

10          fading.

11               THE WITNESS:   Okay.

12  BY MR. MCCLAM:

13      Q.   Have you ever been sued before?

14      A.   Yeah.

15      Q.   In what context?

16      A.   Personal.

17      Q.   Related to your work as a police

18  officer?

19      A.   No.

20      Q.   What was the suit related to?

21      A.   That's irrelevant.

22      Q.   Can you -- when was the lawsuit?

23      A.   A couple of years ago.

24      Q.   Was it before 2015?
```

**Michael Navedo**
**September 11, 2018**

15

```
1      A.   Don't know.   I don't recall.
2      Q.   Can you give me the broad strokes
3    without getting into the details about the
4    context?
5      A.   That's my personal business.   That
6    I will not share with you.
7      Q.   What's your educational background?
8      A.   Some college.
9      Q.   Where did you attend college?
10     A.   Berkeley.
11     Q.   What years about?
12     A.   Between 2007, I believe it is.
13   Yeah, about seven -- between seven and
14   nine.
15     Q.   How many years were you enrolled at
16   Berkeley?
17     A.   That was one year.   And then I did
18   a little bit at Middlesex County College.
19     Q.   Middlesex?
20     A.   Yeah.
21     Q.   From what years were you at
22   Middlesex?
23     A.   Probably around 2005.   Right after
24   high school.
```

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

1      **Q.   Is that before you went to**

2   **Berkeley?**

3      A.   Yes.   Berkeley was after.

4      **Q.   What did you study at Middlesex?**

5      A.   Middlesex -- at that time it was

6   for mechanical engineering.   At Berkeley I

7   became a business management.

8      **Q.   Did you graduate from Berkeley?**

9      A.   No.

10      **Q.   What did you do after you left**

11   **Berkeley?**

12      A.   Why is this relevant?

13      **Q.   Just background information.**

14      A.   I understand that, but that's

15   personal.   I really don't understand why

16   my personal life has anything to do with

17   this.

18            MS. FUNG:   He can ask you

19         some basic background questions.

20         He's not going to get super in

21         depth, but your educational

22         history and things like that he's

23         allowed to ask you.   If there's

24         something you want to discuss with

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

17

```
 1          me and something you don't feel
 2          comfortable sharing that's another
 3          thing.  But --
 4                  THE WITNESS:  I don't feel
 5          comfortable sharing anything in my
 6          life.
 7                  MS. FUNG:  He's just going
 8          to ask you basic background
 9          questions.  It's not going to get
10          too in depth.  If you feel it's
11          too in depth you can let me know.
12                  THE WITNESS:  I feel it's
13          too in depth.
14                  MS. FUNG:  What's the
15          question pending?
16                  MR. MCCLAM:  I think it's
17          what he did after he left
18          Berkeley.
19                  MS. FUNG:  Can you clarify
20          your question?
21  BY MR. MCCLAM:
22      Q.  In terms of employment did you get
23  a job after you left Berkeley?
24      A.  Yes.  I work all throughout.  Yeah.
```

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

18

```
 1      Q.   What was your first job after you
 2   left Berkeley?
 3      A.   I know I was working at Shop Rite.
 4   And I worked for the ---- Municipal Court.
 5                  THE COURT REPORTER:   For
 6          what municipal court?
 7                  THE WITNESS:   ----
 8          Municipal Court.
 9                  THE COURT REPORTER:
10          Millbridge?
11                  THE WITNESS:   Woodbridge.
12                  THE COURT REPORTER:
13          Woodbridge, okay.
14   BY MR. MCCLAM:
15      Q.   From what years did you work at
16   Shop Rite?
17      A.   What --
18                  MS. FUNG:   Can we go off
19          the record for a second, please?
20                  MR. MCCLAM:   Sure.
21                  (Discussion was held off
22          the record.)
23   BY MR. MCCLAM:
24      Q.   Do you recall approximately what
```

Michael Navedo
September 11, 2018

19

```
 1   years you worked at Shop Rite?
 2       A.  Not really.  I mean I worked there
 3   for three years, I think it was.
 4       Q.  What did you do at Shop Rite?
 5       A.  Basically a clerk, because I worked
 6   in all departments; grocery, cashier,
 7   seafood, meat.
 8       Q.  What did you do after you worked at
 9   Shop Rite?
10       A.  Worked at Woodbridge Municipal
11   Court.
12       Q.  What did you do at Woodbridge?
13       A.  My title was a desk clerk typist.
14       Q.  What did you do -- when did you
15   stop working at Woodbridge Municipal
16   Court?
17       A.  It was only for, like, nine months.
18       Q.  What did you do after you worked at
19   Woodbridge Municipal Court?
20       A.  I worked at TSA.
21       Q.  Do you recall for what period of
22   time you worked for TSA?
23       A.  I'm sorry, TSA was three years.
24   And Shop Rite, I believe, that was, like,
```

THE MCS GROUP, INC.

Michael Navedo
September 11, 2018

20

```
 1    four or five.
 2         Q.   For what years did you work at TSA?
 3         A.   I don't recall what years.  That
 4    was just before this job.
 5         Q.   Okay.  So when did you start at the
 6    Philadelphia Police Department?
 7         A.   So I guess '07 to '10.
 8         Q.   So '07 to '10 as TSA agent?
 9         A.   Yeah.
10         Q.   Were you a TSA agent?
11         A.   Yes.
12         Q.   What does a TSA agent do?
13         A.   Screen bags for any contrabands,
14    explosives, anything like that.
15         Q.   What did you do after you were a
16    TSA agent?
17         A.   Also checked -- as well.
18              THE COURT REPORTER:  Also
19         checked bags, you said?
20              THE WITNESS:  Passengers.
21              THE COURT REPORTER:
22         Passengers.  Okay.
23    BY MR. MCCLAM:
24         Q.   What did you do after you were a
```

**Michael Navedo**
**September 11, 2018**

21

```
 1    TSA agent?
 2        A.   I came here to Philadelphia.
 3        Q.   To the Philadelphia police
 4    Department?
 5        A.   Yes.
 6        Q.   Do you recall what your start date
 7    was at the Philadelphia Police Department?
 8        A.   February 22nd, 2010.
 9        Q.   What was your title when you first
10    started at the Philadelphia Police
11    Department?
12        A.   Officer.
13        Q.   Do you have the same title today?
14        A.   Yes.
15        Q.   Before you started as an officer at
16    the Philadelphia Police Department, in
17    February of 2010, did you have to go
18    through any special training?
19        A.   Before?
20        Q.   Before, yes.
21        A.   Are you talking about the academy?
22        Q.   Any training?
23        A.   Yeah.  We have to -- once you get
24    up in -- you enter the academy you would
```

**Michael Navedo**
**September 11, 2018**

22

```
 1    have been there for, like, eight months.

 2        Q.  So did your time at the academy

 3    start on February 22nd, 2010?

 4        A.  Yes.

 5        Q.  And you were at the academy for

 6    eight months?

 7        A.  Yes.

 8        Q.  What kind of training did you have

 9    at the academy?

10        A.  We receive -- basically, you study

11    the law; motor vehicle laws, criminal law.

12    Well, hand-to-hand combat, physical

13    training.  That's pretty much it.  Oh, and

14    driver's ed -- so basically aggressive

15    driving.

16        Q.  Did you have courses that you had

17    to take while you were at the academy?

18        A.  What do you mean courses?

19        Q.  Well, did you have to take any

20    tests?

21        A.  Yes.  There were tests.

22        Q.  Did you ever fail any tests while

23    you were at the academy?

24        A.  No.
```

Michael Navedo
September 11, 2018

1      Q.   You said you're an officer today;

2   is that right?

3      A.   Yes.

4      Q.   Do you have a partner?

5      A.   No.

6      Q.   How long have you not had a

7   partner?

8      A.   A few months.  Three months.

9      Q.   Three months?

10      A.   No, about four months.

11      Q.   Before three or four months ago did

12   you always have a partner?

13      A.   I had a steady partner for about

14   six months.

15      Q.   Who was that?

16      A.   Officer Chestnut.

17      Q.   Who's your supervisor today?

18      A.   Sergeant Skasiac.

19                THE COURT REPORTER:

20         Sergeant who?

21                THE WITNESS:  Skasiac.

22                THE COURT REPORTER:  Do

23         you have a spelling for that?

24                THE WITNESS:

Michael Navedo
September 11, 2018

24

```
 1          S-k-a-s-a-i-k -- no, a-c, I'm
 2          sorry, i-a-c.
 3   BY MR. MCCLAM:
 4      Q.   In September of 2015 did you have a
 5   partner?
 6      A.   Yes.
 7      Q.   Who was that?
 8      A.   Officer Schutte.
 9      Q.   For how long was Schutte your
10   partner for?
11      A.   I'll say about three years.
12      Q.   Three years?
13      A.   About three years.  Yeah.
14      Q.   For what period of time -- let me
15   start over.
16           When did he start as your partner?
17      A.   I don't know the timeframe.
18   It's -- you're asking me timeframes --
19      Q.   Sure.
20      A.   -- I can't recall that.
21      Q.   Do you know when Officer Schutte
22   started on the force?
23      A.   No.
24      Q.   Was it early 2015?
```

Michael Navedo
September 11, 2018

25

```
 1      A.   Probably around there.  Yeah.
 2    That's about right.
 3      Q.   Do you know if he had a different
 4    partner before he started working with
 5    you?
 6      A.   He worked with a few other people
 7    and eventually we became steady partners.
 8      Q.   Became steady partners?
 9      A.   Steady partners.
10      Q.   Do you know how long you had been
11    partners before September 2015?
12      A.   No.
13      Q.   Who was your supervisor in
14    September of 2015?
15      A.   I believe it's Sergeant Davis.
16      Q.   Who is Sergeant Davis?
17      A.   He's been a sergeant of mine for
18    years.  So it's safe to say he was my
19    sergeant at the time.
20      Q.   What shifts do you normally work
21    now?
22      A.   Right now?
23      Q.   Hmm-mm.
24      A.   10:45 to seven.  10:45 p.m. to 7
```

Michael Navedo
September 11, 2018

26

```
 1   a.m.
 2        Q.   Sorry.  Could you say that again?
 3        A.   10:45 p.m. to seven in the morning.
 4        Q.   Did you work the same shift in
 5   September of 2015?
 6        A.   No.
 7        Q.   What shift did you work?
 8        A.   It was 11:45 to eight.  I'm sorry.
 9   It was 11:45 till eight in the morning.
10        Q.   Thank you.
11             Have you always worked nights since
12   you started at Philadelphia Police
13   Department?
14        A.   Not always.
15        Q.   In September of 2015, were you
16   primarily working nights?
17        A.   Yes.
18        Q.   Do you recall who your supervisor
19   was on the early morning of September
20   14th, 2015?
21        A.   The only thing I recall is that the
22   lieutenant was there.  So I'm not sure if
23   my sergeant was there for that night.
24        Q.   Who is the lieutenant?
```

Michael Navedo
September 11, 2018

```
1      A.  Disanto.
2      Q.  So if the sergeant wasn't there
3   would Lieutenant Disanto be your
4   supervisor?
5      A.  Yes.
6      Q.  If they're both there are they both
7   your supervisor?
8      A.  Yes.  But we answer to the
9   sergeant.  It goes by rank.
10     Q.  Sure.  Can you give me a brief
11  tutorial of the rank from, I guess,
12  officer after sergeant?
13     A.  Officer, corporal -- which would be
14  the inside, they wouldn't be in the
15  street; so they would be in charge of the
16  operations room -- then it goes to
17  sergeant and lieutenant and captain.
18     Q.  Was Officer Schutte your partner on
19  September 14th, 2015?
20     A.  Yes.
21     Q.  Have you ever been subject to any
22  disciplinary actions at the Philadelphia
23  Police Department?
24     A.  Yes.
```

THE MCS GROUP, INC.

**Michael Navedo**
**September 11, 2018**

```
 1     Q.  Can you describe those disciplinary

 2  actions?

 3     A.  Well, I can't describe them because

 4  I don't know what the exact disciplines

 5  were.

 6     Q.  So there have been disciplinary

 7  actions taken against you; correct?

 8     A.  Yes.

 9     Q.  Do you recall when?

10     A.  Excuse me.

11     Q.  How many?

12     A.  Two or three.

13     Q.  When was the first one?

14     A.  I guess that would be when I was

15  foot beat when I first started.

16     Q.  What did your superior say that you

17  had done wrong?

18     A.  Well, I didn't do anything wrong.

19  What happened in that matter that's

20  something that took place with other

21  officers and I got charged with the fall

22  because I was the new guy.

23     Q.  You got charged with the fall?  I'm

24  not sure I understand.
```

**Michael Navedo**
**September 11, 2018**

29

```
 1      A.   Apparently, it was some sort of a
 2   noise complaint.  We went there -- me and
 3   a veteran officer went to that location
 4   and told them to put it down.  Apparently,
 5   another set of officers went there after
 6   us and between there they got physical.
 7   So they said because I was the one with
 8   the least seniority that I was the one
 9   getting the counselling memo for that
10   situation, because it involved all of us.
11      Q.   What is a counseling memo?
12      A.   It's like an in-district slap on
13   the hand.  It usually doesn't go anywhere.
14      Q.   Who decided that you were going to
15   get the counseling memo?
16      A.   The -- I'm not sure if it was
17   the -- I guess it would be the sergeant
18   that gave it to me.  But from what I
19   recall, I was in the captain's office --
20   no, no, no, I'm sorry -- the lieutenant's
21   office that gave me the form and I had to
22   sign it.
23      Q.   You mentioned there was one other
24   disciplinary action.
```

**Michael Navedo**
**September 11, 2018**

```
 1          What was the other incident?

 2     A.   It was involving an accidental

 3   discharge.

 4               THE COURT REPORTER:   An

 5          accidental discharge?

 6               THE WITNESS:   Yes.

 7   BY MR. MCCLAM:

 8     Q.   Can you describe that incident?

 9     A.   It was basically they were

10   conducting a car stop.  A car -- I mean do

11   I have to say the whole thing?

12     Q.   Just briefly.

13     A.   Basically, the way that we were

14   conducting this car stop, like once we got

15   out the car started moving forward.  It

16   popped the curb, came down and the guy

17   dove down to the passenger's seat.  We

18   came out the car with the weapon drawn,

19   because -- not at the car but on our

20   side -- because we thought he was looking

21   for a weapon.  So as we went up to the car

22   I was on top of the sidewalk.  There was

23   an upgrade on the sidewalk -- basically a

24   lip -- I tripped over it and I fired
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

31

```
 1    accidentally as my finger slipped down on

 2    the trigger and it struck the vehicle in

 3    the rear quarter panel.  Nobody was hurt.

 4       Q.  Got it.

 5           Are those the only two disciplinary

 6    actions since you've been in the

 7    Philadelphia Police Department?

 8       A.  There's one more, but that's an

 9    open case.

10       Q.  Can you describe that incident?

11       A.  No.  I'm not allowed to, because

12    it's an open matter.

13       Q.  When did that -- when was the

14    incident?

15       A.  About a little over a year ago.

16       Q.  So the incident involving a

17    shooting of somebody -- of a civilian?

18       A.  Yeah.

19       Q.  Have you ever been the subject of

20    an Internal Affairs investigation?

21       A.  Yeah.

22       Q.  How many times?

23       A.  Don't know.

24       Q.  More than two?
```

**Michael Navedo**
**September 11, 2018**

```
 1    A.  I don't recall.  I get sent notices

 2   all the time so.  Whether I'd be a target

 3   or not, I don't recall.

 4    Q.  Can you recall the subject matter

 5   of the investigations?

 6    A.  No.

 7    Q.  Are they alleged that you've done

 8   something wrong?

 9    A.  I don't recall any of the

10   situations.

11    Q.  Has anyone ever filed a citizen's

12   complaint against you?

13    A.  Yes.

14    Q.  How many times?

15    A.  Don't know.

16    Q.  More than two?

17    A.  No, I don't know.

18    Q.  You don't know if there's --

19    A.  I don't know because it's the same

20   thing, you just go to Internal Affairs and

21   you talk to them.  So I don't know.

22         Every year we go up there

23   periodically.  You're in the 12th so it

24   happens pretty often.
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

33

1       Q.   **Would you say there's been more**

2    **than five?**

3       A.   Five what?

4       Q.   **Citizen's complaints?**

5       A.   I don't know.

6       Q.   **How is a citizen's complaint**

7    **reported to you?**

8       A.   It's not reported.

9            What do you mean, reported to me?

10      Q.   **How do you become aware of a**

11   **citizen's complaint?**

12      A.   On the board, the radio board that

13   we have on the computer, it will be out

14   there as a complaint on police and the

15   supervisor would have to go out there.

16      Q.   **The supervisor would go and talk to**

17   **the --**

18      A.   Complainant.

19      Q.   **Is that any time there's a**

20   **complaint against a police officer?**

21      A.   Not necessarily.  They can also go

22   to the district and file a complaint.

23      Q.   **But it's a supervisor that takes**

24   **care of it -- a complaint against a --**

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

34

```
 1      A.  Yeah.

 2      Q.  -- police officer?

 3      A.  Yes.

 4      Q.  And, sir, just so we have a clear

 5   record, let me finish my question before

 6   you answer.  Okay?

 7      A.  I'm sorry.  I'm sorry.

 8      Q.  Yeah.  I talk kind of slow so when

 9   you see an opening it can be hard not to

10   jump in.

11              MR. MCCLAM:  Could you

12         read the last question back.

13              (Whereupon, the reporter

14         read back the last question.)

15   BY MR. MCCLAM:

16      Q.  Have you ever been arrested before?

17      A.  No.

18      Q.  Have you ever been convicted of a

19   crime?

20      A.  Why is this relevant?

21      Q.  Just background.

22      A.  Should I answer that?

23              MS. FUNG:  Let's go off

24         the record a second.
```

Michael Navedo
September 11, 2018

```
 1                    MR. MCCLAM:  Well, history
 2          is clearly relevant.
 3                    MS. FUNG:  Yeah.  I just
 4          need a second.
 5                    MR. MCCLAM:  Do you want
 6          to step outside?
 7                    MS. FUNG:  Yeah, please.
 8                    (Discussion was held off
 9          the record.)
10     BY MR. MCCLAM:
11          Q.  Have you ever been convicted of a
12     crime as an adult?
13          A.  No.
14          Q.  Have you ever been arrested as an
15     adult?
16          A.  No.
17          Q.  And as an adult -- let me start
18     over.  As an adult I mean as of the age of
19     18 or older; correct?
20          A.  Right.
21          Q.  And your answer wouldn't change
22     based on that understanding of an adult;
23     correct?
24          A.  Correct.
```

Michael Navedo
September 11, 2018

36

```
1        Q.   What is your relationship with
2   Officer Schutte?
3        A.   I have a question, if I may ask?
4        Q.   Sure.
5                   MS. FUNG:  Is this off the
6             record or on the record?
7                   THE WITNESS:  Off the
8             record.
9                   MR. MCCLAM:  Off the
10            record.
11                  (Discussion was held off
12            the record.)
13  BY MR. MCCLAM:
14       Q.   What is your relationship with
15  Officer Schutte?
16       A.   He's a colleague.
17       Q.   Is he your partner today?
18       A.   No.
19       Q.   You testified earlier that he was
20  your partner for about three years; is
21  that right?
22       A.   Yes.
23       Q.   Were you guys friends outside of
24  work?
```

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

37

```
 1      A.  Yes.

 2      Q.  How would you describe your

 3   friendship as of September 2015?

 4      A.  As of September?

 5      Q.  As of September 2015?

 6      A.  Like a brother.

 7                  THE COURT REPORTER:  He's

 8          what?

 9                  THE WITNESS:  He's like a

10          brother.

11   BY MR. MCCLAM:

12      Q.  What do you mean when you say, like

13   a brother?

14      A.  He wasn't born through my mom or

15   dad, but I consider him as such.

16      Q.  Did you know Officer Schutte before

17   you started working together?

18      A.  No.

19      Q.  Did you think of yourself as a

20   mentor to Officer Schutte?

21      A.  Yes.

22      Q.  Did you help train Officer Schutte?

23      A.  Yes.

24      Q.  In what way?
```

**Michael Navedo**
**September 11, 2018**

38

```
 1      A.   They pair up new guys with veteran

 2   officers and, you know, try to teach them

 3   the ropes, how to handle jobs and things

 4   like that on the streets.

 5      Q.   So were you responsible for

 6   teaching Officer Schutte how to handle

 7   jobs?

 8      A.   I wasn't responsible for it.  I was

 9   just -- he can either take it or leave it.

10   It's totally up to him.  The police

11   academy trains you to do what you need to

12   do.

13      Q.   As your partner did you and Officer

14   Schutte have the same shifts?

15      A.   Yes.

16      Q.   Was he your -- was he your partner

17   on every single shift as long as both of

18   you were healthy and didn't call out sick?

19      A.   For the most part.  I mean there's

20   days if we were short of manpower we would

21   be solo.

22      Q.   How did you become partners with

23   Officer Schutte?

24      A.   They just paired me up and liked
```

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

1   how we worked together, and the chemistry,

2   and we just kept as partners.

3       **Q.  Do you know if Officer Schutte had**

4   **any other partners before you and him were**

5   **paired up?**

6       A.  Yeah.  He was partnered up with a

7   few other guys, but I don't know who they

8   were.

9       **Q.  Do you know how long he was**

10  **partnered up with other guys?**

11      A.  No.

12      **Q.  Would you say Officer Schutte was**

13  **inexperienced as of September of 2015?**

14              MS. FUNG:  Objection.

15          Calls for -- or objection to form.

16          You can answer the question.

17              THE WITNESS:  I'm sorry.

18              MS. FUNG:  I objected, but

19          you can still answer the question.

20              THE WITNESS:  And what was

21          your question?

22              MR. MCCLAM:  Do you want

23          me to repeat it?  This is one of

24          the weird things about depositions

Michael Navedo
September 11, 2018

40

```
 1          where she will make objections but
 2          you're allowed to answer the
 3          question unless she objects.  It
 4          takes a little awhile to get used
 5          to.
 6              I'll ask the question
 7          again.
 8   BY MR. MCCLAM:
 9      Q.  Was Officer Schutte, in your
10   opinion, inexperienced as of September of
11   2015?
12      A.  No.
13      Q.  As of September '15, Officer
14   Schutte had only been on the force for
15   less than a year; correct?
16      A.  In Philadelphia, yes.
17      Q.  Did Officer Schutte work at a
18   different precinct beforehand?
19      A.  Yes, he did.
20      Q.  Do you know for how long?
21      A.  I think -- don't -- it's general --
22   I think it was two years at Temple Police.
23      Q.  At Temple?
24      A.  For Temple Police.
```

**Michael Navedo**
**September 11, 2018**

41

1      Q.   At Temple University?

2      A.   Yes.

3      Q.   What's your relationship with

4    Lieutenant Disanto?

5      A.   He was my superior.

6      Q.   Were you friends with Lieutenant

7    Disanto outside of work?

8      A.   No.

9      Q.   What's the role of a supervisor on

10   patrol?

11     A.   To ensure that any type of decision

12   we need to make on certain jobs they have

13   to basically make for us; whether it be

14   how to handle a job a certain way, or

15   delegate who is taking a job -- like how

16   you divide it up, whether who's

17   transporting somebody or taking a

18   complainant somewhere or a prisoner

19   somewhere.

20     Q.   What kind of scenarios would the

21   supervisor have to decide how to handle a

22   job?

23     A.   An active shooter or, I guess, like

24   maybe a questionable one, like a job

**Michael Navedo**
**September 11, 2018**

42

```
 1    that's complicated that has to be, like, a
 2    special victim's job.  Or any type of
 3    officer that's involved in an accident or
 4    shooting or something like that, they have
 5    to make decisions and delegate what goes
 6    on there.
 7          If there's any type of fire or
 8    major event, they have to delegate and set
 9    up a staging area and all that other
10    stuff.
11    Q.  Do calls ever come over the radio
12    specifically requesting a supervisor?
13    A.  Yes.
14                MS. FUNG:  I'm sorry.  Can
15          we go off.
16                (Discussion was held off
17          the record.)
18    BY MR. MCCLAM:
19    Q.  I'm going to start over.  Do calls
20    ever come over the radio specifically
21    requesting a supervisor?
22    A.  Yes.
23    Q.  Under what circumstances?
24    A.  Requesting a supervisor, you said?
```

**Michael Navedo**
**September 11, 2018**

43

```
 1      Q.   Yes.
 2      A.   For complaints requesting a
 3   supervisor, it would be for a complaint.
 4      Q.   What kind of complaint?
 5      A.   Complaint on police, whether it be
 6   conduct or taking too long to go to a job.
 7      Q.   Would a radio call for a supervisor
 8   only be for anything besides a complaint?
 9      A.   I'm sorry, what?
10      Q.   Can you think of any circumstance,
11   other than a complaint about police
12   officers, that a radio call would be for a
13   supervisor?
14      A.   Well, like I said, if the
15   complainant hadn't received police
16   assistance in a timely manner they would
17   probably ask for a supervisor.
18      Q.   What do you do when you hear a
19   radio call for a supervisor?
20      A.   It depends on what the job was
21   before.  If I'm paying attention to the
22   board, and if I was there I would show up
23   so I can inform the supervisor.
24           If it's my job I would inform the
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

44

```
 1    supervisor, like, what the situation is.
 2        Q.   Would you wait on the supervisor
 3    before taking any action if you heard a
 4    radio call for a supervisor?
 5        A.   What do you mean?
 6        Q.   Well, you said you would wait for a
 7    supervisor if it was your job; right?
 8        A.   Right.
 9        Q.   So would you take any action
10    besides waiting if there was a call over
11    the radio for a supervisor?
12        A.   If it's my job?
13        Q.   Yes.
14        A.   If it's my job it would normally be
15    me on location already so I'm just waiting
16    for him.
17        Q.   Okay.  And you said something about
18    paying attention to the board.
19             What do you mean by board?
20        A.   I'm talking about the computer.
21    It's a list of all of our jobs.
22        Q.   And that's the computer that's in
23    the car; is that correct?
24        A.   Yes.
```

Michael Navedo
September 11, 2018

```
 1      Q.   What information does the computer

 2   provide?

 3      A.   It provides a description of the

 4   job.  It can get into more in depth if you

 5   type in the job's number.  It tells you

 6   what time they called, what time it was

 7   dispatched, if they called again.  It will

 8   tell you what time the officer is en route

 9   and it will tell you when the job is

10   finished.

11      Q.   Who inputs the information into the

12   computer?

13      A.   Radio dispatch.

14      Q.   Do the officers input information?

15      A.   No.

16      Q.   Have you received any training on

17   how to respond to child custody dispute?

18      A.   It's in the academy that we receive

19   all the training we need that's on the job

20   to handle all your situations.

21      Q.   At the academy did you receive

22   training on how to handle a child custody

23   dispute?

24      A.   I'm going to say, yes, because we
```

**THE MCS GROUP, INC.**

1   we reviewed all the directives and it kind

2   of gives you a guideline as to what you

3   would do.

4        **Q.  Does one of the directives cover**

5   **child custody disputes?**

6        A.  Directly?  I don't think it does

7   directly.  Like I said, I just think that

8   there's little guidelines.

9        **Q.  Would those be recorded -- are**

10   **those recorded somewhere?**

11        A.  Yeah.  It's got to be in the

12   directives -- if not the directives, the

13   commissioner's memorandum.

14        **Q.  Have you received any training on**

15   **child custody disputes since you were at**

16   **the academy?**

17        A.  I'm sure I received some kind of

18   update.  Or whenever we go to MPO every

19   year there's always updates that are

20   given.

21        **Q.  What's NPO -- is that N or M?**

22        A.  M.  Municipal Police Officer.  It's

23   like -- it's like a recert training.  So

24   rather than taking your eight months of

**Michael Navedo**
**September 11, 2018**

1   academy, they cut it short and they give

2   you the updates.

3      Q.  **How often do you receive the**

4   **updates?**

5      A.  It's -- well, the actual class to

6   get recertified every year.  Then,

7   throughout the year you get training

8   updates at roll call.

9      Q.  **Do you have to take an exam every**

10  **year to be recertified?**

11     A.  Yes.  Yeah.  There are tests you

12  have to take.

13     Q.  **Do you remember any child custody**

14  **disputes -- sorry.  Do you remember any**

15  **child custody dispute training that you've**

16  **attended or received since you were at the**

17  **academy?**

18     A.  Directly, no.

19     Q.  **Are there certain procedures**

20  **officers must follow when responding to a**

21  **child custody dispute?**

22     A.  Yeah.

23     Q.  **What are those procedures?**

24     A.  You have to, first, ascertain

Michael Navedo
September 11, 2018

```
 1    whether there's custody orders, any type
 2    of visitation orders that are in effect.
 3    Our main job would basically be to enforce
 4    the judge's or the magistrate's orders.
 5        Q.   What do you mean enforce the order?
 6        A.   Whatever it says, that's what we
 7    have to abide by.  So if it says the kid
 8    is only supposed to be there every weekend
 9    and they're there during the week and the
10    mom wants it back or vice versa, then we
11    have to go have the kid returned to the
12    mom.
13        Q.   So you, as the officer, would be --
14    let me start over.  Would you, as the
15    officer, you're responsible for
16    transferring the custody of the child from
17    one parent to the other?
18        A.   I'd be the middle guy, yeah.
19        Q.   What do you mean the middle guy?
20        A.   Well, you have parents, the
21    parties.  So I'm the guy that's delegating
22    what's going on.  So I have to tell them,
23    this is what the paper says; the judge
24    says you can't have them at this time.  If
```

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

```
 1    the mother wants them you have to give

 2    them back.

 3        Q.  So you would order one parent to

 4    hand over custody of the child to the

 5    other parent?

 6        A.  Right.

 7        Q.  Are you required to contact a

 8    supervisor at any time -- let me start

 9    over.  Are you required to contact a

10    supervisor when enforcing a child custody

11    order?

12        A.  Only if one party is creating an

13    issue.  If you can't handle it yourself

14    then you would call a supervisor so they

15    can come and explain something to them so

16    they'd have a better understanding of

17    what's going on.  It's not from my mouth.

18        Q.  So there's no basic requirement

19    that before you handle a child custody

20    dispute that you speak with a supervisor;

21    is that right?

22        A.  Right.

23        Q.  Do you, as an officer, sometimes

24    have to fill out a report after certain
```

Michael Navedo
September 11, 2018

1  **incidents?**

2      A.   You always have to.  Yes.

3      **Q.   What is a 7548 report?**

4      A.   7548?

5      **Q.   Yes.**

6      A.   It's a general report taken for

7  many jobs.  It's the best way to describe

8  that.

9      **Q.   Can you give me an example?**

10     A.   Any type of burglary, robbery,

11 shooting, lost property, recovered auto,

12 made complaint jobs -- that's what you

13 write on a 48.

14     **Q.   What kind of information do you**

15 **include on a 7548 form?**

16     A.   The address of the occurrence, the

17 time of occurrence, district control

18 number, date, time, year, my name, if I

19 asked a partner, payroll, the detail of

20 the job, what type of whatever job it is.

21 And, also, it could be either a

22 complainant's name.  So it could either us

23 or anybody on the street.

24     **Q.   By details of the job, what do you**

**Michael Navedo**
**September 11, 2018**

51

1    **mean by that?**

2       A.   Whatever happened on the job.   If

3    there's a burglary you state whatever the

4    complainant -- if they witnessed it, you

5    state what they witnessed and you also

6    state what they observed, with whatever

7    items were taken, how entry was made, who

8    you contacted as for notifications -- the

9    detective or sergeant.

10      **Q.   Do you describe your interactions**

11   **with the witnesses?**

12      A.   Yes.

13      **Q.   Do you describe your interactions**

14   **with whatever other civilians are present?**

15      A.   Yes.   If there's witnesses and

16   stuff like that, too, you know, you put

17   them on there.

18      **Q.   How much detail are you supposed to**

19   **include on these witness forms?**

20      A.   Well, if it's -- it depends.   If

21   it's just a regular job without an arrest

22   you have as much detail as you can.   If

23   there's an arrest included then you can

24   kind of write it vaguely, but understand

Michael Navedo
September 11, 2018

52

```
 1    you have an arrest memo to do on parts on

 2    certain jobs that you would put your

 3    details on.

 4        Q.  And if the description doesn't fit

 5    in the little box on the 7548 form can you

 6    go over to the next page?

 7        A.  You write another 48.  Not the next

 8    page, another 48 and you mark it as two of

 9    two or one of two.

10        Q.  When you're working with a partner

11    how do you decide whether you and your

12    partner completes a 7548?

13        A.  Sorry.

14        Q.  Well, sometimes you work with a

15    partner; right?

16        A.  Right.

17        Q.  Do you and your partner fill out

18    your own 7548 forms?

19        A.  Typically what happens is, when one

20    guy is driving one guy's recording.  So

21    the guy in the passenger would be the guy

22    writing the job --

23                THE COURT REPORTER:  The

24        job what?
```

Michael Navedo
September 11, 2018

```
 1                    THE WITNESS:  The officer
 2            in the passenger seat would be
 3            most likely writing all reports
 4            for the night, unless you would be
 5            nice and help out.
 6    BY MR. MCCLAM:
 7        Q.   When you were working with Officer
 8    Schutte as your partner, were you the
 9    primary driver of the vehicle?
10        A.   I wouldn't say the primary driver.
11    It's just he never liked to drive so I
12    drove.
13        Q.   Did you drive exclusively?
14        A.   If he ever wanted to drive he can
15    drive.  I don't care.  But I mostly drove.
16        Q.   And that includes in September of
17    2015?
18        A.   I believe, yeah, I drove.
19        Q.   Did Philadelphia Police Department
20    patrol cars have audio/visual recording
21    systems in 2015?
22        A.   Did the department have it?
23        Q.   Yes.
24        A.   I don't know whatever pilot
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

54

```
1    programs they have out there at that time.

2    I mean I know some districts have a body

3    camera, but not us.  We don't have that

4    stuff.

5        Q.  Since you've been an officer at the

6    Philadelphia Police Department your car

7    has never had --

8        A.  I'm only going to talk for what

9    district I'm working in.  So in my 12th

10   District we don't have that equipment.

11       Q.  By that equipment that also

12   includes body cameras?

13       A.  Yes.

14       Q.  What about body recording devices

15   for audio?

16       A.  Any type of audio/visual recording

17   devices we don't have any of them in the

18   12th.

19                MR. MCCLAM:  We've been

20           going about an hour, we'll take a

21           quick break.

22                MS. FUNG:  It's up to you

23           if you need a break.

24                MR. MCCLAM:  Yeah.  Off
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

55

```
 1          the record.
 2                   (Whereupon, a brief recess
 3          was taken.)
 4    BY MR. MCCLAM:
 5       Q.  Officer Navedo, we're back on the
 6    record after a brief break.
 7              You understand that you're still
 8    under oath; correct?
 9       A.  Yes.
10       Q.  Were you on duty during the early
11    morning of September 14th, 2015?
12       A.  Yes.
13       Q.  What was your shift that day.
14       A.  It was -- I believe it was 11:45
15    p.m. till eight in the morning.
16       Q.  Was 11:45 p.m. till 8 a.m. your
17    normal shift in September of 2015?
18       A.  Yes.
19       Q.  Do you recall what you were doing
20    before your shift that day?
21       A.  What?
22       Q.  Do you recall what you were doing
23    before your shift on September 2015?
24       A.  No.
```

Michael Navedo
September 11, 2018

56

```
 1       Q.  Did you have a partner during your

 2   September 14th, 2015 shift?

 3       A.  I'm sorry.

 4       Q.  Was Officer --

 5       A.  I'm still thinking back to why you

 6   would ask me that -- the previous

 7   question, but go ahead.

 8       Q.  Was Officer Schutte your partner on

 9   your shift on September 14th, 2015?

10       A.  Yes.

11       Q.  Where did you report before your

12   shift started on September 14th, 2015?

13       A.  Where did I report?

14       Q.  Yes.

15       A.  Do you mean where's my

16   headquarters?

17       Q.  How did your shift start?

18       A.  Went to work at 68 -- Woodland

19   Avenue.

20                    THE COURT REPORTER:  68 --

21                    THE WITNESS:  6448 --

22                    THE COURT REPORTER:  6448.

23                    THE WITNESS:  -- Woodland

24           Avenue.
```

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

57

```
1    BY MR. MCCLAM:

2         Q.  Did you report at 11:45 p.m.?

3         A.  Yes.

4         Q.  What did you do after you reported

5    for duty that day?

6         A.  Get my equipment, get my radio, get

7    my car.  And sign in the computer and

8    start patrol.

9         Q.  Did you respond to a complaint

10   about a custody dispute on September 14th,

11   2015?

12        A.  Yes.

13        Q.  How did you become aware of the

14   custody dispute issue?

15        A.  We were given the job.  The female

16   was at the district and we were given a

17   job there was a custody dispute where she

18   wanted -- the female at that location

19   wanted her child, saying that she was due

20   to have her child and she had not received

21   her child yet.

22        Q.  Did you meet with the woman?

23        A.  Yes.

24        Q.  Was her name Sinquenna (sp)
```

Michael Navedo
September 11, 2018

```
 1   Mohammed?

 2      A.  Yes.  I guess.  I don't know.

 3      Q.  Was Officer Schutte with you when

 4   you met with Ms. Mohammed?

 5      A.  Yes.

 6      Q.  How long did you meet with

 7   Ms. Mohammed for?

 8      A.  I don't know, ten, 15 minutes.

 9      Q.  What did Ms. Mohammed describe to

10   you?

11      A.  From what I can remember it was

12   just she was complaining that she had not

13   received the child; that the father had

14   the child for his weekend and she was due

15   to have the child back by a certain time.

16   And I believe she was stating that he

17   wasn't going to give the child back.  I

18   can't remember too much about that.

19      Q.  She said that Mr. Hunter was not

20   going to give the child back?

21      A.  I believe so.

22      Q.  Did you ever try to call Mr. Hunter

23   on that evening?

24      A.  No.  We went to the house.
```

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

```
 1       Q.   Was that the first incident you
 2   responded to after reporting for duty that
 3   day?
 4       A.   I believe so.
 5       Q.   Did Ms. Mohammed say anything
 6   besides -- well, Ms. Mohammed show you any
 7   documentation or --
 8       A.   I believe she did have
 9   documentation, but I'm not -- I can't
10   remember right now.
11       Q.   Do you remember what documentation
12   she might have had?
13       A.   I believe it would be the custody
14   order that she had established in court --
15   or visitation order.
16       Q.   About what time was your meeting
17   with Ms. Mohammed?
18       A.   Don't know.
19       Q.   Some time after midnight?
20       A.   Yeah.
21       Q.   Did Ms. Mohammed say why she waited
22   until after midnight to come to the police
23   department?
24       A.   Don't recall.
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

```
 1      Q.  Did she say anything -- did
 2  Ms. Mohammed express any concerns about
 3  the safety of the child?
 4      A.  I don't recall.
 5      Q.  Did she say she thought the child
 6  might be in danger?
 7      A.  I don't recall.
 8      Q.  Did she say -- did Ms. Mohammed say
 9  that Mr. Hunter and Ms. Shujaa were
10  abusive toward her daughter?
11      A.  I don't recall that.
12      Q.  What did you do after you spoke
13  with Ms. Mohammed?
14      A.  We went to the location on 51st
15  Street to see if we could make contact
16  with the father and see if he had the
17  daughter there.
18      Q.  What was the purpose of your trip
19  to I believe it's 1242 South 51st Street?
20      A.  It was to ask reason why he hasn't
21  returned the child.
22      Q.  Did Ms. Mohammed go with you?
23      A.  No.
24      Q.  Did she stay at the station?
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

61

```
 1     A.  Yes.
 2     Q.  If you found out that the child, in
 3  fact, should have been with Ms. Mohammed
 4  would you have returned the child to the
 5  station and deliver her to Ms. Mohammed?
 6               MS. FUNG:  Objection to
 7          form, but you can answer the
 8          question.
 9               THE WITNESS:  Yeah.
10  BY MR. MCCLAM:
11     Q.  Did you ever actually see the
12  children when you were at the residence in
13  response to the custody dispute?
14     A.  Yes.
15     Q.  Can you describe what you saw?
16     A.  From what I can remember, there's
17  two children right where the door entrance
18  was sleeping.
19     Q.  Did you speak with the supervisor
20  before going to the residence on 51st
21  Street?
22     A.  No.
23     Q.  Did you drive the patrol vehicle
24  from headquarters to 51st Street?
```

Michael Navedo
September 11, 2018

```
 1      A.   Yes.
 2      Q.   Was Officer Schutte in the
 3   passenger's seat?
 4      A.   Yes.
 5      Q.   What time did you arrive?
 6      A.   I don't recall.
 7      Q.   What happened when you arrived at
 8   the residence on 51st Street?
 9      A.   We knocked on the door.  It was
10   dark.  So we shined the light.  The
11   windows were open.  There's a screen.  We
12   shined the light to see if it was dark
13   inside.  We knocked on the door.  A female
14   came to the door.  We were asking if the
15   gentleman was there, we're there in
16   reference to the custody dispute.  He came
17   over and we started explaining what's
18   going on.  He had -- he showed me
19   paperwork that he had stating that he had
20   the right to have visitation -- and I
21   believe it was, like, a holiday or
22   something -- and that he was able to have
23   that extended day if it was a holiday as
24   long as she didn't have school or
```

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

1    something like that.

2           So then we went back to the car.  I

3    believe I called the complainant and told

4    her about the situation and she agreed

5    that it's fine to let him have the child

6    until tomorrow -- or I mean the next day.

7       **Q.   Okay.  Going back to when you were**

8    **standing on the porch at the residence.**

9       A.   Right.

10      **Q.   You said you had your flashlight**

11   **out; is that right?**

12      A.   Yeah.

13      **Q.   Were you shining it the window?**

14      A.   Yeah.  Because it was dark.  We

15   couldn't see anything.

16      **Q.   Could you see anything inside the**

17   **window?**

18      A.   When you shine the light, yeah.

19      **Q.   What did you see?**

20      A.   Children laying in the bed right in

21   front.

22      **Q.   Did you enter the apartment?**

23      A.   No.  It's a house.

24      **Q.   Was the documentation that**

Michael Navedo
September 11, 2018

64

```
 1    Mr. Hunter showed you the same as what

 2    Ms. Mohammed had shown you?

 3       A.  What do you mean?

 4       Q.  I thought you said you thought that

 5    Ms. Mohammed had some kind of

 6    documentation when she made her complaint;

 7    correct?

 8       A.  Right.  That's the reason why I

 9    went there.  I'm not going to go there if

10    there's nothing in place.

11            Other than that I would be, like,

12    you have to go to family court to get

13    something arranged.

14       Q.  You said that Mr. Hunter also

15    showed you some documentation?

16       A.  Yeah.  I do remember that.

17       Q.  Was it the same documentation that

18    Ms. Mohammed had?

19       A.  Yeah.  I believe so.  It has to

20    be -- whatever court order it was it had

21    to be the same because that's what the

22    judge was the judge --

23                    THE COURT REPORTER:

24            That's what the judge what?
```

Michael Navedo
September 11, 2018

65

```
 1                  THE WITNESS:   Was issuing.
 2   BY MR. MCCLAM:
 3      Q.   How long did you knock on the door
 4   before the Ms. Shujaa answered?
 5      A.   I don't recall.
 6      Q.   Did you speak with anybody besides
 7   Mr. Hunter and Ms. Shujaa?
 8      A.   No.
 9      Q.   Did you speak with any of
10   Mr. Hunter's children?
11      A.   I don't believe so.
12      Q.   Did you ever see the child that was
13   complained of by Ms. Mohammed?
14      A.   Yes.
15      Q.   What was your vantage point?
16      A.   You're talking about when did I
17   think of her?
18      Q.   You saw the child at issue;
19   correct?
20      A.   Excuse me.
21      Q.   Did you ever see the child that was
22   the subject of the custody dispute?
23      A.   Yes.
24      Q.   Where were you standing when you
```

THE MCS GROUP, INC.

**Michael Navedo**
**September 11, 2018**

```
 1    saw her?

 2       A.   On the porch.

 3       Q.   Did she come outside?

 4       A.   No.   I could clearly see her

 5    through the door.

 6       Q.   So through the open front door, is

 7    what I'm asking?

 8       A.   Right.

 9                MR. MCCLAM:   I'm going to

10         ask the court reporter to mark

11         this exhibit Navedo-1.

12                (Whereupon the document

13         was marked, for identification

14         purposes, as Exhibit Navedo-1.)

15                MS. FUNG:   I'll note for

16         the record this is the first time

17         we've seen this photo.

18                MR. MCCLAM:   It was taken

19         yesterday.

20    BY MR. MCCLAM:

21       Q.   Officer Navedo, I'll represent to

22    you that this is a photograph taken of

23    1242 51st Street, taken yesterday morning.

24                Does this appear to be the
```

**Michael Navedo**
**September 11, 2018**

67

1   residence that you responded to on the

2   morning of September 14th, 2015?

3       A.  Yes.  If that's 1242, then yeah.

4       Q.  Do you recall where you were

5   standing when you saw the children inside

6   the residence on 51st Street?

7       A.  Yeah.  We saw them through the

8   window, because the window was open.

9   There was just a screen.  And when they

10  opened the door I saw them in the

11  background, I believe.

12      Q.  Were the children sleeping?  Were

13  the children sleeping?

14      A.  When we initially came up, yeah,

15  they were sleeping.  We can see them at

16  the window sleeping.

17      Q.  How did you identify the child that

18  was the subject of the custody dispute?

19      A.  I believe we asked where the child

20  was and they showed -- I believe that's

21  the way it happened.

22      Q.  Can you describe the appearance of

23  Mr. Hunter when he came to the door?

24      A.  No.

Michael Navedo
September 11, 2018

68

```
 1      Q.   What about the appearance of
 2   Ms. Shujaa?
 3      A.   No.
 4      Q.   Can you tell that Ms. Shujaa was
 5   four and a half months pregnant at the
 6   time?
 7      A.   No.
 8      Q.   Did you know that Ms. Shujaa was
 9   pregnant?
10      A.   No.
11      Q.   Did Ms. Shujaa come outside onto
12   the porch?
13      A.   No.  I don't --
14               THE COURT REPORTER:  No,
15        what?
16               THE WITNESS:  No.  I don't
17        remember that.
18   BY MR. MCCLAM:
19      Q.   You don't remember if she came
20   outside or, no, she did not come outside?
21      A.   I don't believe she came outside.
22      Q.   How long did your first encounter
23   with Mr. and Ms. Hunter at their residence
24   on 51st Street last?
```

Michael Navedo
September 11, 2018

69

```
 1      A.  I don't recall.

 2      Q.  Ten to 15 minutes?

 3      A.  Yeah.  That's fine.  That's fair to

 4   say.  I don't recall.

 5      Q.  How was the encounter resolved?

 6      A.  When we first left, we left with

 7   the job resolved.  Both parties were

 8   settled by themselves.

 9      Q.  Did Mr. Hunter show you something

10   that convinced you that he had rightful

11   custody of the child that evening?

12      A.  Yes.

13      Q.  What did show you?

14      A.  He showed a visitation order.

15      Q.  What did the visitation order say?

16      A.  It stated specifically that he

17   had -- I don't know if it's every weekend

18   or -- or whatever weekend he was allowed

19   to have and they said with the exception

20   of, like, the holiday he was allowed to

21   have an extended day.  So that clarified

22   the whole situation.  And I called the mom

23   and I told her that he's allowed to have

24   her.  And she agreed as long as he brings
```

Michael Navedo
September 11, 2018

```
 1   her back tomorrow.
 2       Q.  How would you describe the
 3   neighborhood where Mr. Hunter and
 4   Ms. Shujaa live?
 5       A.  What do you mean?
 6       Q.  Well, is it an affluent
 7   neighborhood?
 8       A.  It's nothing wrong with it.
 9               MS. FUNG:  Objection to
10           the form.  You can answer.
11               THE WITNESS:  Restate your
12           question.
13   BY MR. MCCLAM:
14       Q.  Is 51st Street, the 1200 block, is
15   that known as a high crime area?
16       A.  The entire city of Philadelphia is
17   a high crime area.
18       Q.  What precinct are you in?
19       A.  12th.
20       Q.  Is the 12th District known as a
21   especially high crime area?
22       A.  Absolutely.
23       Q.  Had you ever met Mr. Hunter and
24   Ms. Shujaa before this incident?
```

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

```
 1     A.  No.  Not that I remember.

 2     Q.  What happened after you left

 3  Mr. Hunter and Ms. Shujaa's residence the

 4  first time?

 5     A.  Nothing.  I thought everything was

 6  resolved.

 7     Q.  Where did you go after the first

 8  encounter?

 9     A.  We drove away.

10     Q.  What happened after that?

11     A.  I believe at some point there was a

12  complaint on the board.

13     Q.  What do you mean a complaint on the

14  board?

15     A.  A complaint on police on the board.

16  They were requesting a supervisor.

17     Q.  So you saw something physically on

18  your computer --

19     A.  Yes.

20     Q.  -- in your car?

21     A.  Yes.

22     Q.  Do you recall what it said?

23     A.  No.

24     Q.  You recall it was requesting a
```

```
 1    supervisor?

 2       A.  Yes.

 3       Q.  Was there a call over the radio for

 4    a supervisor?

 5       A.  Yes.  It was over the radio.

 6    That's how I figured it out.  It was,

 7    like, it went over the air with the

 8    address requesting a supervisor.  I

 9    remember I didn't understand.  I was,

10    like, wait a minute, we just came from

11    there.  So we went back.

12       Q.  After you heard the request for a

13    supervisor over the radio did you look at

14    your computer afterwards?

15       A.  Yes.

16       Q.  On the computer it said that there

17    was a request for a supervisor?

18       A.  I don't remember what it said on

19    the computer, but I know what that means.

20       Q.  What did you do when you heard the

21    call over the radio for a supervisor?

22       A.  We went over to that location to

23    figure out what just happened, because we

24    didn't understand why they needed a
```

Michael Navedo
September 11, 2018

```
 1   supervisor when --
 2       Q.  Was the -- go ahead.  I didn't mean
 3   to cut you off.
 4       A.  -- when we thought we satisfied the
 5   matter.
 6       Q.  Was Lieutenant Disanto the
 7   supervisor on September 14th, 2015?
 8       A.  I believe so, because he responded.
 9       Q.  Did you call him before you went
10   back to the residence?
11       A.  No.
12       Q.  No?
13       A.  No.
14       Q.  Did you have any communication with
15   Lieutenant Disanto before you went back to
16   the residence?
17       A.  You said before we went back?
18       Q.  Right.
19       A.  No.
20       Q.  Did you know where Lieutenant
21   Disanto was at that time?
22       A.  No.
23       Q.  Why didn't you wait for Lieutenant
24   Disanto to return after receiving a call
```

**Michael Navedo**
**September 11, 2018**

74

1    for a supervisor only?

2       A.   Because I didn't see why there was

3    a supervisor needed.   There was nothing

4    wrong.   We thought we left with everything

5    copacetic or civil.   There was no -- no

6    type of issue or anything like that.

7       Q.   Did you call anyone at the precinct

8    to try to clarify why a supervisor was

9    being called?

10      A.   No.

11      Q.   Had you ever responded to a call

12   for a supervisor only before?

13      A.   Yes.

14      Q.   Did you respond without the

15   supervisor there?

16      A.   I wait for the supervisor.

17      Q.   Are you or Officer Schutte --

18   excuse me.   Did your supervisor,

19   Lieutenant Disanto, respond over the radio

20   for the call for a supervisor only?

21      A.   You're asking me if my lieutenant

22   responded to that call?

23      Q.   Yes.

24      A.   Yes.

Michael Navedo
September 11, 2018

1     **Q.   What did he say?**

2     A.   What do you mean what did he say?

3     **Q.   You said he responded to the call.**

4  **Do you recall what he said?**

5     A.   He came to the job.  We described

6  what was going on, because I know the

7  second time we knocked on the door, first,

8  to see what's going on I remember that he

9  was irate.  At that time he was irate.  We

10  didn't understand why.

11        Then the supervisor came.  He

12  knocked on the door.  He didn't want to

13  answer.

14             MR. MCCLAM:  I'm going to

15        ask the court reporter to mark

16        this document as Navedo-2.

17             (Whereupon the document

18        was marked, for identification

19        purposes, as Exhibit Navedo-2.)

20             MS. FUNG:  Can we go off

21        the record a second?

22             (Discussion was held off

23        the record.)

24

**Michael Navedo**
**September 11, 2018**

1    BY MR. MCCLAM:

2       **Q.  Do you recognize Exhibit-2?**

3       A.  Two, yeah.

4       **Q.  Are you familiar with it?**

5       A.  I mean, no.  I'm not used to seeing

6    it this way.  No.

7       **Q.  What is Exhibit-2?**

8       A.  It's dispatcher and radio

9    transmissions.  Basically, whatever we say

10   over the radio.

11      **Q.  Looking at the first entry at the**

12   **top of the first page --**

13      A.  Hmm-mm.

14      **Q.  -- do you see where it says,**

15   **Monday, 9/14/2015?**

16      A.  Yeah.

17      **Q.  Does 14, colon, 20 mean that that**

18   **radio call went out at -- or began at**

19   **12:14 a.m. on September 14th, 2015?**

20      A.  Right.  Correct.

21      **Q.  And 1201 to radio, is that a call**

22   **from your police car to the radio?**

23      A.  Hmm?  Oh, okay.  Yes.  That's a

24   call from -- they're talking to dispatch.

Michael Navedo
September 11, 2018

```
 1    The call center -- that's Darus Hunter is

 2    talking to --

 3       Q.  No, sir.  I'm at the first one.

 4    It's only about six lines at the top left

 5    corner.

 6       A.  Are you talking about this?

 7       Q.  Yes.

 8       A.  Yeah.

 9       Q.  Can you describe this first radio

10    transmission?

11       A.  We're making available -- making

12    ourselves available using 1201 wagon.  And

13    it says to hold us out at 1242 South 51

14    for invest prem.

15                  THE COURT REPORTER:  For

16          what?

17                  THE WITNESS:  Investigate

18          premise.

19    BY MR. MCCLAM:

20       Q.  What is investigate premise?

21       A.  Well, it's a custody visitation

22    issue so we went -- basically, initially,

23    we went over there to see if the child was

24    there.  If we would knock and nobody
```

**Michael Navedo**
**September 11, 2018**

78

```
1    answer we would just write it as an invest

2    prem, investigate premise, which means we

3    knocked with negative results and we would

4    just be on our way.

5        Q.  Is it standard procedure to call

6    into the radio before you show up on the

7    scene at a residence?

8        A.  Yes.  Well, normally, like I said,

9    we usually get the radio calls.  But if

10   you have to show yourself on location or

11   something then you would just go over as

12   that.

13       Q.  I'm not sure I understand the

14   distinction.

15       A.  Normally, when you're on patrol

16   radio would drop you a job on the

17   computer.  And you go over there.  Radio

18   would be like, 1201, can you handle this

19   domestic at 1242 South 51, and then she'll

20   drop it on the MPT, the computer.  And

21   we'll go there.  And when we get there

22   usually, on location or whatever, the

23   disposition is of the situation.

24           But since she came to the district
```

Michael Navedo
September 11, 2018

```
 1    where showing us available -- meaning we

 2    just got on -- but it shows us en route,

 3    or holding us out at that location.  So

 4    it's a little different.

 5       Q.  Understood.  So does this refresh

 6    your recollection that your first

 7    encounter with the plaintiffs began

 8    sometime around 12:15 a.m., on September

 9    14th?

10       A.  Correct.

11       Q.  I want to go over to the second

12    page, which has the number down at the

13    bottom of the right-hand corner as D074.

14          If you halfway down the page, where

15    it says Monday, 9/14/15, 48:58.

16          Do you see that?

17       A.  I'm sorry.  Where?

18       Q.  Look halfway down.

19       A.  Yeah.

20       Q.  It's about -- can you take a minute

21    to review that entry.

22       A.  Yeah.

23       Q.  The first radio request stated, do

24    I have a 12th District supervisor on the
```

THE MCS GROUP, INC.

Michael Navedo
September 11, 2018

1    air; correct?

2      A.   Right.

3      Q.   Then 12 DC to radio response is, 12

4    command.

5           What do you understand that entry

6    to mean?

7      A.   That's the lieutenant receiving the

8    call and he's answering up saying that I'm

9    here, I'm available.

10     Q.   Then the next entry says, radio to

11   12 DC.

12     A.   Hmm-mm.

13     Q.   Is that a radio call directed at

14   the lieutenant?

15     A.   Yes.   That's the radio talking --

16   telling the lieutenant what's going on.

17     Q.   It says, sir, be advised we have a

18   supervisor only at 1242 South 51st Street.

19   We have 1201 on location there.   It's a

20   domestic custody dispute.

21     A.   Right.

22     Q.   Do you see that?

23     A.   Yes.

24     Q.   What is a supervisor only?

Michael Navedo
September 11, 2018

1    A.   That's where whatever the

2   complainant is needing further assistance

3   on the job by a higher command.

4    Q.   **By a supervisor?**

5    A.   Yes.

6    Q.   **It says -- 12 DC to radio says, 12**

7   **command, can you drop it down.**

8        **Do you see that?**

9    A.   Yeah.

10   Q.   **What does it mean to "drop it**

11  **down"?**

12   A.   Just send it to my computer so he

13  knows the address to where he's going.

14   Q.   **Did Lieutenant Disanto call for**

15  **backup after receiving the call?**

16   A.   No, no.

17   Q.   **Did he say where he was at the**

18  **time?**

19   A.   No.

20   Q.   **Did you have any communication with**

21  **Lieutenant Disanto before you went back to**

22  **the residence after the call for a**

23  **supervisor only?**

24   A.   I'm sorry.  Say that again.

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

82

```
 1      Q.  Did you have any -- after -- let me
 2  start over.  After the entry that begins
 3  at 12:48 a.m., did you hear that exchange
 4  over the radio?
 5      A.  Yeah.
 6      Q.  After you heard the call for a
 7  supervisor only, did you have any
 8  communication with Lieutenant Disanto
 9  before he arrived on scene?
10      A.  I don't believe so.  No.
11      Q.  Was it your decision to respond to
12  the supervisor only call by returning to
13  the residence?
14      A.  Yes.
15      Q.  Why did you decide to return after
16  the supervisor only call?
17      A.  Because technically, in the
18  situation we would have still been there,
19  but we left before we RTF'd it, which is
20  Report To Follow, which means we're done
21  with the job.
22      Q.  When you say you left, did you --
23  had you driven away?
24      A.  We drove away.  Yes.
```

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

83

```
 1        Q.   How far away were you?

 2        A.   I don't know, a couple of blocks.

 3        Q.   So it had only been -- you had only

 4   been driving for a few minutes?

 5        A.   Yeah.

 6        Q.   Did you tell Lieutenant Disanto

 7   over the radio that you intended to

 8   respond to the supervisor only call?

 9        A.   No.   Because radio had us still on

10   location still.

11        Q.   Did you radio it in that you were

12   going back to the residence?

13        A.   I'm not sure.   I'm not sure how

14   that went.

15        Q.   You're not sure if --

16        A.   I'm not sure if I said we'll go

17   back over there or what.   I don't know.

18        Q.   Would it have been normal procedure

19   to call it in if you were going back over

20   to the residence?

21        A.   If we're already on location, maybe

22   or maybe not I'd go over or not.   If I

23   wasn't there I'd say I'll turn myself back

24   around.   But if I'm already on location on
```

**Michael Navedo**
**September 11, 2018**

```
 1    the computer then there's no need for me

 2    to say it.  So I may or may not have said

 3    it.  Don't know.

 4        Q.   When did you -- I want to

 5    understand a little bit more about the

 6    Report To Follow.

 7            When do you -- is that something

 8    you say over the radio?

 9        A.   Yes.  We don't really say, Report

10    To Follow; it's RTF.  It's like an

11    acronym.  Just basically to end the job,

12    to close the job out.

13        Q.   When you heard the job for a

14    supervisor only, you hadn't called in RTF

15    at that time; correct?

16        A.   I believe we were still on scene

17    over there.

18        Q.   On scene, but you had driven away?

19        A.   Right.

20        Q.   Did you assume when you heard the

21    supervisor only call over the radio that

22    the residents had made a complaint against

23    you and Officer Schutte?

24        A.   Yeah.  Because we just left there.
```

**Michael Navedo**
**September 11, 2018**

85

```
1    We didn't understand what was going on.

2    So we wanted to see if there was something

3    we could do before a supervisor came.

4           As I said, when we left we thought

5    everything was civilized and settled

6    between both parties.  We didn't

7    understand what was going on.

8       Q.  Are there any -- let me start over.

9    Have you received any training on how to

10   respond to citizen complaints about

11   officer conduct?

12      A.  No.  That's a supervisory position.

13      Q.  So is this the first time you had

14   ever gone to confront somebody who had

15   made a complaint about officer conduct?

16               MS. FUNG:  Objection to

17          form, but you can answer the

18          question.

19               THE WITNESS:  I'll stay

20          with the objection.

21               MR. MCCLAM:  This is one

22          of the objections --

23               MS. FUNG:  You can still

24          answer the question.
```

Michael Navedo
September 11, 2018

86

```
 1                    THE WITNESS:  All right.
 2           My thing was I didn't think there
 3           was anything wrong.  I didn't
 4           understand why there would be a
 5           complaint.  So that's the only
 6           reason why I went back.  Not just
 7           that to -- well, I went back to
 8           knock on the door; I didn't
 9           understand what was going on.
10                    So for any other complaint
11           I would just wait there for a
12           supervisor to inform him what went
13           on in the situation.  But the only
14           reason why we knocked on the door
15           is because we didn't understand
16           why there was a complaint coming
17           out when we thought we handled the
18           job right.
19   BY MR. MCCLAM:
20      Q.  And complaints -- let me start
21   over.  Citizen complaints are the
22   responsibility of the supervisor; correct?
23      A.  Yeah.  They're responsible for
24   handling the complaint and taking down the
```

Michael Navedo
September 11, 2018

```
 1   complaint.
 2      Q.  Would you agree the proper
 3   procedure under these circumstances would
 4   have been for you and Officer Schutte to
 5   wait for Lieutenant Disanto to arrive on
 6   scene?
 7               MS. FUNG:  I object to
 8          form again, but you can answer.
 9               THE WITNESS:  No.  Because
10          we didn't -- there was no conflict
11          at that time.  So we contacted the
12          mother.  We made contact with him.
13          We saw the child and we contacted
14          with the mother and both parties
15          agreed on whatever they were going
16          to do.  And there was no -- there
17          was no -- you know, nothing bad
18          was exchanged.  It wasn't no -- it
19          wasn't, at that point, a hostile
20          environment or anything like that
21          so we didn't understand what was
22          going on.  That's the reason why
23          we knocked on the door.
24
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

88

```
 1    BY MR. MCCLAM:

 2        Q.  Are you, as an officer, authorized

 3    to respond to citizen complaints?

 4        A.  We can back the supervisor up.

 5    Yes.

 6        Q.  Are you, as an officer, allowed to

 7    respond to citizen complaints without the

 8    presence of a supervisor?

 9        A.  See, the problem is that -- can I

10    explain something?

11        Q.  Sure.

12        A.  When a citizen complaint happens,

13    generally, we're still on location and the

14    complainant is usually irate.  So

15    therefore, we just fall back and wait for

16    the supervisor to get there.

17            This situation was a different

18    circumstance because we didn't know that

19    there was anything wrong, because there

20    was nothing ill exchanged or anything like

21    that.  So we didn't understand.  We were

22    basically scratching our head with what

23    happened.

24        Q.  I understand that.  But my question
```

Michael Navedo
September 11, 2018

89

1  stands.  Are you authorized as an officer

2  to respond to a citizen complaint without

3  the presence of a supervisor?

4      A.  I don't see why not.

5      Q.  Have you ever responded to a

6  citizen complaint --

7      A.  I mean --

8      Q.  -- before or after this incident

9  without a supervisor present?

10     A.  I'm going to say, yes, because

11  there are times that we can de-escalate

12  and the complaint can get resolved before

13  they saw a supervisor and we can resume

14  supervisory.

15     Q.  What do you mean, "resume

16  supervisory"?

17     A.  So let's say if somebody is making

18  a complaint on the phone -- they don't

19  like the service, whatever.  We can doctor

20  it up, so to speak, talk the complainant

21  down and resolve the issue before the

22  supervisor gets there and we can resume

23  supervisory if they no longer want a

24  supervisor.

Michael Navedo
September 11, 2018

90

```
 1      Q.  So why would the call be for a
 2   supervisor only if the officer can go and
 3   take care of the complaint?
 4      A.  Because the supervisor is the only
 5   one that can actually write the report.
 6   We can sit there and talk to them and talk
 7   them down, whatever.  But when it comes to
 8   actually filling out the complaint report,
 9   the official report, the supervisor has to
10   do it.  That's the reason why.
11      Q.  So the supervisor has to be present
12   on scene in order to complete a report
13   for --
14      A.  Correct.  We cannot write that
15   report.
16      Q.  Did you immediately go back to the
17   residence after you heard the supervisor
18   only call?
19      A.  Yes.
20      Q.  How long did it take you?
21      A.  I don't know.
22      Q.  A couple of minutes?
23      A.  Yeah.  It was right after we heard
24   that we went back.
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

91

1      Q.   So less than five?

2      A.   Yeah.

3      Q.   What did you do when you returned

4    to the residence on the second occasion?

5      A.   Knocked on the door and tried to

6    see what was going on.

7      Q.   And how long were you knocking on

8    the door before you heard a response by

9    one of the residents?

10     A.   I don't know.

11     Q.   Were you knocking for a long time?

12     A.   It couldn't have been that long.

13   No.

14     Q.   So looking back at Exhibit-2 and

15   the request for supervisor only call, do

16   you know about what time you returned to

17   the residence after the supervisor only

18   call?

19     A.   I'm sorry.  What was that.

20     Q.   About what time did you return to

21   the residence after the supervisor only

22   call?

23     A.   I don't know.  Once we heard the

24   call we returned back.

Michael Navedo
September 11, 2018

92

```
1       Q.   After you knocked on the door what
2    did you hear inside?
3       A.   What, for the second time?
4       Q.   Yes.
5       A.   I don't recall what I heard.  All I
6    know is whatever point they got mad
7    because we were knocking again and they
8    became irate.
9       Q.   Were you flashing the -- did you
10   have your flashlights on the second time?
11      A.   No.  I don't think so.
12      Q.   Were both you and Officer Schutte
13   standing on the porch of the residence?
14      A.   Yes.
15      Q.   Do you recall if you were doing the
16   knocking or if Officer Schutte was?
17      A.   I don't recall.
18      Q.   Did you announce yourself?
19      A.   Yes.
20      Q.   What did you say?
21      A.   Police.
22      Q.   Anything else?
23      A.   I don't remember.
24           Obviously, at whatever point we
```

THE MCS GROUP, INC.

Michael Navedo
September 11, 2018

93

```
 1    came in contact with them we asked them

 2    what was the problem.

 3        Q.  How did you come in contact with

 4    them?

 5        A.  I don't know if it was through the

 6    window -- even though I think it's through

 7    the window.  I don't think they opened the

 8    door up the second time.

 9        Q.  You don't think they ever opened

10    the door up the second time?

11        A.  I don't believe.  I don't recall if

12    they did or not.  I believe -- that's what

13    I believe.  I believe there was talk

14    through the window.

15        Q.  Do you recall what Mr. Hunter or

16    Ms. Shujaa said while you were standing on

17    the porch the second time?

18        A.  No.  I don't recall.  I just

19    remember it was -- they got irate because

20    we were knocking the second time.

21        Q.  Did they sound frightened?

22        A.  No.  They were irate.  They were

23    mad.

24        Q.  Did you ever see Mr. Hunter or Ms.
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

1    Shujaa the second time?

2       A.  The second -- what do you mean?

3       Q.  I'm using second time to talk about

4    you and Officer Schutte's return after the

5    supervisor only call.

6           Do you understand that?

7       A.  Right.

8       Q.  Did you ever see visually

9    Mr. Hunter or Ms. Shujaa the second time?

10      A.  I believe -- like I said, I believe

11   it was through the window, the screen

12   window.  I believe it was through there.

13      Q.  Did they have the lights on?

14      A.  I don't recall.

15      Q.  Did you stop knocking on the door

16   after you heard them inside?

17      A.  Yeah.

18      Q.  Did you ever push on the front

19   door?

20      A.  Nope.

21      Q.  Did Officer Schutte?

22      A.  No.

23      Q.  Was it hard to hear Mr. Hunter and

24   Ms. Shujaa inside their house?

THE MCS GROUP, INC.

**Michael Navedo**
**September 11, 2018**

```
 1     A.   No.

 2     Q.   Was the window open?

 3     A.   Yes.

 4     Q.   How long did the interaction after

 5   the supervisor only last?

 6     A.   Not long at all.

 7     Q.   What do you mean by not long?

 8     A.   Once we saw they were irate we left

 9   the steps and waited on the corner for the

10   supervisor.

11     Q.   When did you realize that

12   Mr. Hunter and Ms. Shujaa didn't want to

13   talk to you or Officer Schutte a second

14   time?

15     A.   Once they became irate.  Yelling

16   and cursing.

17     Q.   So after the supervisor only call

18   came in you and Officer Schutte returned

19   in your vehicle to the residence, you

20   walked up to the front door on the porch.

21   You and/or Officer Schutte knocked on the

22   front door, and then heard from the

23   residents and then you left?

24     A.   Right.
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

1      Q.   About how long did all that take?

2      A.   Not long at all.

3      Q.   Did Mr. Hunter and Ms. Shujaa ask

4   why you were there?

5      A.   When?

6      Q.   On the second interaction.

7      A.   Yeah.  We were asking -- honestly,

8   I don't remember what was said so I

9   can't -- I'm not going to say anything.

10      Q.   Did you ever tell Mr. Hunter or Ms.

11   Shujaa why you were there?

12      A.   Yeah, yeah.  Because we returned.

13   So I'm pretty sure we related why we came

14   back -- finding out what was wrong.

15      Q.   What did you tell them?

16      A.   Don't know.

17      Q.   Did you tell them that you heard

18   they filed a complaint?

19      A.   No.  I don't remember how that was

20   relayed.  All I remember is -- obviously,

21   if I'm there I'm asking them -- telling

22   them why I'm there.  That was it,

23   basically.

24      Q.   You were there because -- you were

THE MCS GROUP, INC.

Michael Navedo
September 11, 2018

97

```
 1    there during the second interaction
 2    because Mr. Hunter or Ms. Shujaa filed a
 3    complaint against you and Office Schutte;
 4    correct?
 5        A.   Right.
 6        Q.   Did you tell Mr. Hunter and
 7    Ms. Shujaa that?
 8        A.   I mean we were asking what's wrong,
 9    because we didn't understand what was
10    going on.  We thought we handled their
11    situation the way they wanted.
12        Q.   Did you tell Mr. Hunter or Ms.
13    Shujaa that you and Officer Schutte had
14    been called back to the residence?
15        A.   What do you mean?
16        Q.   Did you tell the resident -- the
17    plaintiffs that you were at their
18    residence because you had been requested
19    to be there?
20        A.   Not that we were requested to be
21    there.  No.
22        Q.   Did you tell them that you were
23    there because a supervisor had been
24    requested to be there?
```

**Michael Navedo**
**September 11, 2018**

```
 1     A.   Probably.  Because that's the

 2   reason why we were there.

 3     Q.   So you think that you told Officer

 4   Shujaa -- sorry.  So you think you told

 5   Mr. Hunter and Ms. Shujaa that you were

 6   there because there was a call in for a

 7   supervisor?

 8     A.   Most likely that's probably what

 9   happened.  I mean that's the reason why we

10   came back.

11     Q.   Why did you leave after the second

12   interaction?

13     A.   Because they were irate; yelling

14   and cursing get off the porch.  So we

15   left.

16     Q.   Did you feel that plaintiffs'

17   complaint had been resolved at that time?

18     A.   I didn't know what the complaint

19   was about so we just left because he was

20   irate.  There was no need for anything

21   else.

22     Q.   Did the plaintiffs tell you that

23   they were no longer going to make a

24   complaint against you and Officer Schutte
```

Michael Navedo
September 11, 2018

99

1    before you left the second time?

2       A.   No.

3       Q.   What did you do when you left

4    plaintiffs' home after responding to the

5    supervisor only call?

6       A.   We waited until the supervisor

7    showed up.  Explained to him what happened

8    and he knocked on the door.

9       Q.   Did you call it in when you left?

10      A.   What, the second time?

11      Q.   Right, the second time.

12      A.   No.  The supervisor is on his way.

13      Q.   I'm going to point you to

14   Exhibit-2.  If you look halfway down the

15   page, on the page that has D076 on the

16   bottom right-hand corner.

17      A.   Okay.

18      Q.   Do you see the entry that begins

19   Monday, 9/14/15, 1:06:08?

20      A.   Yeah.

21      Q.   Take a second to review that entry.

22      A.   Okay.

23      Q.   Did you make the call at the bottom

24   of D076?

Michael Navedo
September 11, 2018

100

```
 1     A.   I'm sorry, what was that?

 2     Q.   Does this reflect a communication

 3   between your vehicle and the radio

 4   operator?

 5     A.   Yeah.

 6     Q.   And also a communication from

 7   Lieutenant Disanto?

 8     A.   Yes.

 9     Q.   Did you make this radio call?

10     A.   Yes -- no.  I'm not sure if it was

11   me exactly, but that's us in general as a

12   unit.

13     Q.   Do you see where it says 1201 to

14   radio, you can Report To Follow and you

15   can resume Command.  They no longer need a

16   supervisor?

17     A.   Yeah.  So I guess we did talk about

18   that and they did say that they didn't

19   need one.

20     Q.   Did you -- did you or Officer

21   Schutte make this call as soon as you got

22   back to your police car after leaving the

23   residence after the second interaction?

24     A.   Yeah.
```

Michael Navedo
September 11, 2018

1    Q.  Yes?

2    A.  It had to be them.  Yes.

3    Q.  What was the purpose of your

4  message, "you can Report To Follow us and

5  you can resume Command; they no longer

6  need a supervisor?

7    A.  That's basically saying that

8  they -- whatever conversation that was

9  exchanged that they didn't need, I guess,

10  the situation was found and they didn't

11  want a supervisor anymore for whatever the

12  complaint they wanted or were trying to

13  make.

14    Q.  So in this communication were you

15  trying to tell Lieutenant Disanto that he

16  no longer needed to show up on scene?

17    A.  Correct.

18    Q.  So what did you do when you left

19  plaintiffs' home after the second

20  interaction?

21    A.  Well, if radio says that they just

22  called back for another one, then that

23  means we just stayed there and waited at

24  that point.

Michael Navedo
September 11, 2018

102

1      Q.   So did you leave the residence

2    porch and go back to your car, make the

3    call listed on D76 and then wait for

4    Lieutenant Disanto?

5      A.   I do remember he came out -- we met

6    him on Kingsessing, on the corner.  So,

7    yeah.  We waited at the car, at least.

8      Q.   So did you drive off after the

9    second interaction?

10     A.   No.  We stayed there.

11     Q.   But your car was parked on

12   Kingsessing?

13     A.   Yeah.

14     Q.   And Lieutenant Disanto met you

15   where your car was parked?

16     A.   Right.

17     Q.   Did you discuss the incident with

18   Lieutenant Disanto?

19     A.   Yes.

20     Q.   What did you discuss?

21     A.   The details of what happened,

22   basically.

23     Q.   Did you describe both interactions

24   with plaintiffs?

THE MCS GROUP, INC.

Michael Navedo
September 11, 2018

```
1      A.   Yeah.

2      Q.   Did you tell Lieutenant Disanto

3    that you went back to the residence after

4    the supervisor only call?

5      A.   Yeah.

6      Q.   What happened next?

7      A.   He went up to the porch to knock

8    and nobody answered the door there.

9      Q.   Did you or Officer Schutte -- did

10   you or Officer Schutte go with Lieutenant

11   Disanto back to the door?

12     A.   Yeah.  We both did.  But we stayed

13   back down the sidewalk.

14     Q.   Did Lieutenant Disanto knock on the

15   door?

16     A.   Yes.

17     Q.   There was no answer inside?

18     A.   No.

19     Q.   How long did Lieutenant Disanto

20   wait for an answer after knocking on the

21   door?

22     A.   I don't know how long he waited.

23   He knocked.  I mean, like, you know he's

24   there.  He knocks loud.  Very loud.
```

THE MCS GROUP, INC.

Michael Navedo
September 11, 2018

1      **Q.  Did he knock louder than you**
2   **knocked?**
3      A.  I would say, yeah.  He's a loud
4   guy.
5      **Q.  Did Lieutenant Disanto announce his**
6   **presence when he got there?**
7      A.  Yeah.  He's -- yeah.
8      **Q.  What did he announce?**
9      A.  I'm pretty sure he announced,
10   police.
11      **Q.  Is it common practice when you're**
12   **announcing your presence to give your**
13   **names?**
14      A.  Our names?  No.  It's just, police.
15   You would say, police.
16      **Q.  Did Lieutenant Disanto ever ask you**
17   **why you responded to the supervisor only**
18   **call?**
19      A.  No.  Because we told him the whole
20   situation when he came.
21      **Q.  Did you hear anything inside when**
22   **Lieutenant Disanto knocked on the door?**
23      A.  No.  I, generally, just -- I was by
24   the sidewalk.  So I'm just looking at the

THE MCS GROUP, INC.

**Michael Navedo**
**September 11, 2018**

1    lieutenant.  That's all.  I wasn't really

2    paying attention.

3        Q.  **What happened after no one answered**

4    **when Lieutenant Disanto showed up?**

5        A.  I believe he wrote invest prem.

6        Q.  **Excuse me.**

7        A.  He wrote investigate premise, I

8    believe.

9        Q.  **What is investigate premise?**

10       A.  Stating that he knocked, responding

11   for a complaint on police, and negative

12   results on making contact.

13           Not in those words but, yeah.

14       Q.  **Is there some form that investigate**

15   **premise goes on?**

16       A.  48.

17       Q.  **7548?**

18       A.  7548.

19       Q.  **And is that something that he**

20   **filled out?**

21       A.  Yeah.  He should have.

22       Q.  **He should have?**

23       A.  He should have, yeah.

24       Q.  **Did you fill out a 7548 in**

Michael Navedo
September 11, 2018

106

```
 1   connection with this incident?

 2      A.  I did, yeah.

 3      Q.  So both of you should have filled

 4   out your own 7548?

 5      A.  Right.

 6      Q.  Would Officer Schutte have to fill

 7   out his own 7548, also?

 8      A.  No, because we're partners.

 9      Q.  Do you remember what you wrote in

10   the 7548?

11      A.  Probably that the matter was

12   settled between both parties and no

13   assistance was needed on our part.

14      Q.  Did you describe the second

15   interaction with plaintiffs in the 7548?

16      A.  No.  I don't think so.

17      Q.  Why not?

18      A.  Because I didn't -- I just thought

19   of it as one job.  I didn't think it was

20   relevant.

21      Q.  Why wouldn't that have been

22   relevant?

23      A.  Because it was -- there was nothing

24   that was done wrong.  So I just did what
```

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

```
 1   the main job was about, basically, the

 2   custody issue itself.

 3       Q.   So you --

 4              MR. MCCLAM:   I'm going to

 5         ask the court reporter to mark

 6         this document as Navedo-3.

 7              (Whereupon the document

 8         was marked, for identification

 9         purposes, as Exhibit Navedo-3.)

10   BY MR. MCCLAM:

11       Q.   Take a minute to review Exhibit-3.

12       A.   Okay.

13       Q.   Do you recognize Exhibit-3?

14       A.   Yeah.

15       Q.   Are you familiar with it?

16       A.   Yes.

17       Q.   What is Exhibit-3?

18       A.   It's a 7548 that was written in

19   regards to the job.

20       Q.   Did you complete 7548 forms like

21   this in the ordinary course of your

22   business?

23       A.   Yeah.

24       Q.   If you look down at the bottom
```

Michael Navedo
September 11, 2018

108

```
 1   where it says, report prepared by.

 2      A.  Yeah.

 3      Q.  Do you see it says Navedo/Schutte

 4   there?

 5      A.  Hmm-mm.

 6      Q.  You're the one that wrote this

 7   report; correct?

 8      A.  I think so.  Yeah.

 9      Q.  Did Schutte review it before this

10   report was submitted?

11      A.  I don't know.  I don't know if he

12   did.

13      Q.  What happens after you complete a

14   7548 report?

15      A.  Sometimes I show it to him or I'll

16   just read it out loud, whatever.

17      Q.  By him you mean Officer Schutte?

18      A.  Yes.

19      Q.  Then, what happens to the report?

20      A.  We turn it in to the 48 person who

21   enters it into the computer.

22      Q.  The 48 person?

23      A.  Yeah.  In the inside operations

24   room we have a person who's designated to
```

THE MCS GROUP, INC.

**Michael Navedo**
**September 11, 2018**

1    enter 48s into the system.

2        **Q.   Okay.   Could you read the**

3    **description section of the 7548 out loud?**

4        A.   Police responded to above location

5    for a check on well-being on a juvenile

6    due to visitation rights.   Matter was

7    clarified and resolved without police

8    assistance.   Police were called back to

9    above location for a request of a

10   supervisor.   12DC responded and knocked

11   multiple times, but no response at the

12   door.

13       **Q.   Is that an accurate description of**

14   **your interactions with plaintiffs on**

15   **September 14th, 2015?**

16       A.   Yeah, for the most part, minus

17   coming back the second time.   But I mean I

18   didn't -- that's it, yeah.

19       **Q.   Why didn't you include the part**

20   **about you and Officer Schutte responding**

21   **to the supervisor only call in your 7548**

22   **report?**

23       A.   Well, it is included technically.

24   It says police were called back to above

**Michael Navedo**
**September 11, 2018**

110

```
1    location for a request for a supervisor.

2    So it's still saying we went back.  And in

3    the computer it's saying that we're on

4    location already.

5        Q.  The supervisor was called back for

6    the request of a supervisor; correct?

7        A.  Right.

8        Q.  You and Officer Schutte were not

9    called back?

10       A.  No.  But our job -- what I'm saying

11   is that we're on location on the computer

12   so we're there.  So that's why we went

13   back, because we were supposed to be

14   there.

15       Q.  Do you typically omit interactions

16   with complainants when you fill out 7548

17   forms?

18       A.  No.  It's not something I did

19   purposely.  It's just I thought I put the

20   general information that I needed down.

21       Q.  Generally, do you include every

22   interaction that you have with witnesses

23   when you fill out these forms?

24       A.  Yeah.
```

Michael Navedo
September 11, 2018

111

```
 1     Q.  But this time you omitted one of
 2   those interactions; right?
 3     A.  I didn't see it as omitting
 4   anything.  It's just -- I mean we were
 5   there.  It's not something that I'm trying
 6   not to put on paper.  But, obviously, we
 7   went over the air saying that as well.
 8     Q.  Prior to this incident had anybody
 9   ever call in a complaint about you before?
10     A.  Yeah.  Probably.
11     Q.  Is it a frequent event?
12     A.  It happens all the time.  I mean
13   that's for every officer that's out there.
14   It's not something that's uncommon.
15              MR. MCCLAM:  We've been
16         going for about an hour.  Let's go
17         off the record for another quick
18         break.
19              (Whereupon, a brief recess
20         was taken.)
21   BY MR. MCCLAM:
22     Q.  Officer Navedo, I'm going hand you
23   an exhibit that I'm going to ask the court
24   reporter to mark as Navedo-4.
```

THE MCS GROUP, INC.

Michael Navedo
September 11, 2018

112

```
 1                    (Whereupon the document

 2              was marked, for identification

 3              purposes, as Exhibit Navedo-4.)

 4    BY MR. MCCLAM:

 5        Q.  Please take a minute to review

 6    Exhibit-4.

 7        A.  Okay.

 8        Q.  Have you had a chance to review

 9    Exhibit-4?

10        A.  Yeah.

11        Q.  Do you recognize Exhibit-4?

12        A.  Yes.

13        Q.  Are you familiar with it?

14        A.  Yes.

15        Q.  What is Exhibit-4?

16        A.  Internal Affairs interview, it's

17    the questions and answers of what happened

18    in that particular situation.

19        Q.  By that particular situation you

20    mean the incident that we're talking aobut

21    today?

22        A.  Yes.

23        Q.  Did you do your best to be truthful

24    and accurate in the statement you gave in
```

Michael Navedo
September 11, 2018

1    Exhibit-4?

2      A.  Yes.

3      Q.  Was this statement made on November

4    5th, 2015 -- looking at the date and time

5    line?

6      A.  Oh, yes.

7      Q.  And November 5th, 2015 would have

8    been almost two months after the incident;

9    is that correct?

10     A.  Correct.

11     Q.  Do you see that the statement took

12   place at a 11:45 p.m.

13        Was that before your shift that

14   evening?

15     A.  I'm sorry.  Say that again.

16     Q.  The statement took place at 11:45

17   p.m.; is that right?

18     A.  Yes.

19     Q.  Is that before you had a shift that

20   evening?

21     A.  No.  That's when your shift starts.

22   You're not paid overtime for internal

23   affairs interviews.

24     Q.  So you gave this statement and then

**Michael Navedo**
**September 11, 2018**

1   you went on your shift; is that right, or

2   is it during your shift?

3       A.  It's during the shift.  There's no

4   overtime paid.  So that why it says 11:45

5   p.m., because have to punch in at internal

6   affairs saying that we were there and we

7   wait for them there to come interview us.

8   And then when we're done go back to the

9   district.

10      Q.  Do you know what's meant by the

11  heading, Appointment Date?

12      A.  Yes.

13      Q.  What is Appointment Date?

14      A.  That's the date I started -- I was

15  appointed to the job -- I started working.

16  I was put in the acad -- it was my first

17  day at the academy.

18      Q.  The appointment date is the first

19  day of your academy?

20      A.  Yes.

21      Q.  And your appointment date was

22  February 22nd, 2010; is that right?

23      A.  Yes.

24      Q.  And what is the assignment?

Michael Navedo
September 11, 2018

1      A.   The assignment date is 10/31/11 --

2    oh, that's when I was -- I graduated the

3    academy and was put in the 25th District.

4      **Q.   So is the assignment date your**

5    **first date on the job as a police officer**

6    **after completing the academy?**

7      A.   Yeah.

8      **Q.   Interviewed by, it says, Lieutenant**

9    **Joseph McGarrey; is that right?**

10     A.   Yes.

11     **Q.   Who is Joseph McGarrey?**

12     A.   A lieutenant in Internal Affairs

13    that conducts interviews.

14     **Q.   It says, record by same.**

15         **What does that mean?**

16     A.   He's the one that type what I'm

17    saying in the computer.

18     **Q.   Lieutenant McGarrey typed down your**

19    **responses?**

20     A.   Yes.

21     **Q.   Did he -- was this interview**

22    **recorded by a tape recorder?**

23     A.   No.

24     **Q.   So you gave a statement orally and**

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

1   he wrote it down?

2      A.   Correct.

3      Q.   **Who is Danielle Nitti?**

4      A.   That would be my attorney.  So I

5   guess my FOP representative -- FOP lawyer.

6      Q.   **What do you mean FOP?**

7      A.   Fraternal Order of Police.  They

8   provide our services where we can hire

9   lawyers that are from the department.

10     Q.   **Did you meet with Danielle Nitti**

11  **before giving this statement?**

12     A.   I did meet with her but it's not --

13  you mean to case prep or, like, hey?

14     Q.   **Did you meet with her at all?**

15     A.   When I came in she was there in the

16  waiting area.  And she said I'll be

17  representing you.  So she just sat down

18  with me.  We didn't review anything.

19     Q.   **Did you discuss the incident with**

20  **Officer Schutte before giving this**

21  **statement?**

22     A.   No.

23     Q.   **I want to point your attention to**

24  **the page with the number at the bottom**

**Michael Navedo**
**September 11, 2018**

```
 1    right-hand corner that we call Bates

 2    numbers, Bates number D061, the second

 3    page of this exhibit.

 4        A.  Yes.

 5        Q.  In the middle large paragraph, I'm

 6    going to read the third to the last

 7    sentence states, This time, the male was

 8    very hostile towards us and told us to get

 9    the fuck off the porch and then he slammed

10    the door.

11            Did I read that correctly?

12        A.  Where we at?  Oh, yeah, yeah.  Yes.

13        Q.  Does this refresh your recollection

14    as to whether on the second interaction

15    with the plaintiffs the door was ever

16    opened?

17        A.  Yeah.  I guess the door was open.

18        Q.  Do you recall seeing anything

19    through the door?

20        A.  Seeing anything through the door?

21        Q.  Correct.

22        A.  No, I don't recall, honestly.

23    It's, like, three years ago.

24        Q.  So you don't -- do you recall now
```

**Michael Navedo**
**September 11, 2018**

118

1    after reading this that the door was

2    opened and then slammed?

3        A.  I do remember the yelling.  But,

4    yeah.  Yes.  I would say, yes.

5        Q.  Yes, you remember the door being

6    opened?

7        A.  Yes.

8        Q.  Who opened the door?

9        A.  I don't know.  I don't remember if

10   it was her or him.

11       Q.  You don't recall any of the

12   circumstances around the door being opened

13   in this second interaction with the

14   plaintiffs; is that right?

15       A.  As I'm reading this I can remember

16   the door being opened.  I can't remember

17   who responded to the door first.  But --

18   and I remember there was yelling.

19       Q.  I want to point your attention to

20   the page with Bates number ending in 62.

21       A.  Yes.

22       Q.  The third page of Exhibit-4.

23           Your second to last answer says,

24   we're going back up the lieutenant, but

**Michael Navedo**
**September 11, 2018**

119

```
1    also the first time we were there

2    everything was fine.  And we attempted to

3    see if there something that we could

4    resolved to assist the complainant.  The

5    lieutenant was coming a distance and we

6    didn't want the complainant to have to

7    wait if it was something we could handle.

8         Do you see that?

9    A.  Yeah.

10   Q.  Did I read that accurately?

11   A.  Yeah.

12   Q.  You stated that the lieutenant was

13   coming a distance.

14        How did you know where the

15   lieutenant was at the time?

16   A.  Well, according to the radio

17   transmissions he said that he was coming

18   from Wawa.

19             THE COURT REPORTER:

20        Coming from where?

21             THE WITNESS:  Wawa.

22   BY MR. MCCLAM:

23   Q.  Okay.  Let's look back at

24   Exhibit-2.  Now if you look on Bates
```

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

1    Number D74, do you see that?

2       A.   Yeah.

3       Q.   It says, sir, be advised we have a

4    supervisor only.

5       A.   Right.

6       Q.   He doesn't say in this call he was

7    at the Wawa; correct?

8       A.   No.  It's further in.

9       Q.   It's after you and Officer Schutte

10   responded to the supervisor only call to

11   say that they no longer needed a

12   supervisor that he stated that he was at

13   Wawa; is that right?

14      A.   Right.

15           Hold on.  Say that again.  I'm

16   sorry.

17      Q.   The call on D76.

18           Do you see that?

19      A.   Yeah.

20      Q.   That was after the second

21   interaction where you and Officer Schutte

22   responded to the supervisor only call;

23   correct?

24      A.   Right.

Michael Navedo
September 11, 2018

```
 1      Q.   So at the time you decided to
 2   respond to the supervisor only call, you
 3   didn't know where the lieutenant was;
 4   correct?
 5      A.   No.   Prior to him stating where he
 6   was I didn't know where he was.
 7      Q.   You didn't know that the lieutenant
 8   was coming from a distance when you
 9   decided to respond to the supervisor only
10   call?
11      A.   Correct.
12      Q.   During this interview did
13   Lieutenant Joseph McGarrey write down
14   every word that was said?
15      A.   What do you mean, the questions
16   he's asking me?
17      Q.   Right.
18      A.   Yes.
19      Q.   I'm going to hand you a document
20   and ask the court reporter to mark
21   Navedo-5?
22                  (Whereupon the document
23          was marked, for identification
24          purposes, as Exhibit Navedo-5.)
```

Michael Navedo
September 11, 2018

122

```
 1   BY MR. MCCLAM:

 2       Q.   Take a minute to review Exhibit-5.

 3       A.   Okay.

 4       Q.   Do you recognize Exhibit-5?

 5       A.   Yes.

 6       Q.   What is it?

 7       A.   It says, MDT Message Log Report.

 8       Q.   What is it?

 9       A.   Basically, what our computer is

10   saying everything that we're getting

11   transmitted on a computer.

12       Q.   So this is a transcription of what

13   you would have seen during the incident --

14       A.   Yeah.

15       Q.   -- on September 14th, 2015?

16       A.   Right.

17       Q.   Will you turn to the second page,

18   D68.

19            Is this what you would have seen on

20   September 14th, at 12:14 a.m.?

21       A.   Yes.

22       Q.   It says, Type:  IVPRM, parenthesis,

23   investigate premises; is that right?

24       A.   Yes.
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

123

```
1        Q.   And Priority:   5?
2        A.   Right.
3        Q.   What does Priority 5 mean?
4        A.   It's basically one of the lowest
5    priorities, because it's not a job that
6    was called in by 911.  It's like a
7    pedestrian site job.  So if we're just
8    seeing a location, invest prem, whatever,
9    that's how they would drop it.  It's the
10   lowest priority.
11       Q.   How many priority levels are there?
12       A.   One to five.
13       Q.   One being the highest priority?
14       A.   Yes.
15       Q.   Five being the lowest priority?
16       A.   Correct.
17       Q.   If you turn over to the next page.
18   Now, is this what you would have seen --
19   is Page D69 what you would have seen on
20   your computer screen at 12:48 a.m., on
21   September 14th, 2015?
22       A.   Yeah.
23       Q.   Where it says, Entered, by C21, do
24   you know what that means?
```

Michael Navedo
September 11, 2018

124

```
 1      A.   That would be -- that's the
 2   dispatcher's call sign.  So the 911 call
 3   taker, that's her call sign.
 4      Q.   Okay.  It says, Dispatched by BO 5.
 5           Do you know what BO 5 is?
 6      A.   Yeah.  That's the radio.  That
 7   would be the people that are actually
 8   talking to the police over the air.  B is
 9   for backup.  So there's two people on each
10   station.  The primary would be PO 5.
11      Q.   Then it says, Type:  CPOL,
12   parenthesis, complaint against police; is
13   that correct?
14      A.   Yeah.
15      Q.   So at 12:48 a.m., you and Officer
16   Schutte would have seen on your computer
17   screen that there was a complaint against
18   police?
19      A.   Well, yeah.  I mean when I heard it
20   over the air that's when I probably looked
21   it up.
22      Q.   And when you looked it up, this is
23   what would have shown up on your computer
24   screen?
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

125

```
 1     A.   Right.

 2     Q.   What does routed 12 mean?

 3     A.   Routed 12?

 4     Q.   Next to District/Sector --

 5                THE COURT REPORTER:  Can I

 6          get a cough drop?

 7                MR. MCCLAM:   Sure.

 8    BY MR. MCCLAM:

 9     Q.   Looking at on D69, it says,

10    District/Sector:  124.  And then it says,

11    Routed:  12.

12          Do you know what Routed:  12 means?

13     A.   Yes.  12th District.

14     Q.   And below that it says, male

15    complaints, in ref to officer responding

16    for a custody dispute, male requesting a

17    supervisor.

18          Do you see that?

19     A.   Yes.

20     Q.   Did you see this on your computer

21    screen before responding to the supervisor

22    only call?

23     A.   I'm sorry.  What?

24     Q.   Did you see the male requesting a
```

Michael Navedo
September 11, 2018

126

```
1    supervisor note on your computer screen in

2    your police car before you and Officer

3    Schutte responded to the supervisor only

4    call?

5         A.   Right.   Yes.

6                   MR. MCCLAM:   I'm going to

7              ask the court reporter to mark

8              this document Navedo Exhibit 6.

9                   (Whereupon the document

10             was marked, for identification

11             purposes, as Exhibit Navedo-6.)

12   BY MR. MCCLAM:

13        Q.   Take a minute to review Exhibit-6,

14   sir.

15        A.   Hmm-mm.   Okay.

16        Q.   Do you recognize Exhibit-6?

17        A.   Yes.

18        Q.   Are you familiar with it?

19        A.   Yes.

20        Q.   What is Exhibit-6?

21        A.   It's a police patrol activity log.

22        Q.   Did you fill out Exhibit-6?

23        A.   Yeah.   I think so.

24        Q.   Did you fill out all the entries or
```

Michael Navedo
September 11, 2018

127

```
1    did Officer Schutte fill out some of them?

2         A.   No, I believe I did.

3         Q.   In the -- what is the purpose of

4    Exhibit-6, sir?

5         A.   It basically record and track what

6    we do for the shift.

7         Q.   If you look in the equipment check

8    box --

9         A.   Huh-huh.   You said equipment check

10   box?

11        Q.   Yes.

12        A.   Yeah.

13        Q.   Do you see that?

14        A.   Yeah.

15        Q.   Do you see where it says MDT

16   Working?

17        A.   Yes.

18        Q.   The yes box is checked; correct?

19        A.   Correct.

20        Q.   Your MDT system was working on

21   September 14th, 2015; correct?

22        A.   Correct.

23        Q.   And then go two lines down its

24   says, location 1242 South 51st Street.
```

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

1              Do you see that?

2      A.   Yeah.

3      Q.   This is the recording of the -- or

4  a recording of the incident on 1242 South

5  51st Street; is that right?

6      A.   Right.

7      Q.   If you turn to the next page, did

8  you also complete the information on

9  Exhibit-6, Page D133?

10      A.   Yes.

11      Q.   It says at the top, 1242 South 51st

12  Street; is that right?

13      A.   Right.

14      Q.   What is the purpose of this page?

15      A.   It's a continuation of the front.

16  But the top part what it's saying is

17  Lieutenant Disanto signed this at 1242

18  South 51 at 1:14 in the morning.

19      Q.   Why did Lieutenant Disanto sign

20  this?

21      A.   He's required to sign all patrol

22  logs.

23              Whoever the supervisor is that

24  night they're required to sign the

**Michael Navedo**
**September 11, 2018**

129

```
1    officer's log for the night.
2        Q.  At the end of the night?
3        A.  During the shift and at the end.
4        Q.  Okay.  Location down at the bottom
5    says, R/C and there's some kind of chart
6    there.
7            What is that chart?
8        A.  This is dividing -- whenever you
9    have activity -- car stops, radio call,
10   arrest, whatever, you mark down the
11   activity so they can counted for you at
12   the end of the day, the week, the month,
13   and the year.
14       Q.  So is it saying you each responded
15   to three incidents or he responded to
16   three and you responded to three?
17       A.  Right.  Yes.
18       Q.  Which ones -- that was a bad
19   question.
20           What does the three and three?
21       A.  It's just three radio calls.  We
22   responded to three radio calls each.
23       Q.  So together you responded to six
24   radio calls?
```

**Michael Navedo**
**September 11, 2018**

```
 1      A.   No, no, no.   Individually.   I got

 2   three radio calls.   Let's say if we have

 3   car stops, we don't share car stops, but

 4   we share radio calls as partners.   But

 5   when it comes to a car stop one has to

 6   take one.   If we get two car stops a

 7   night, he'll get one, I'll get one and

 8   then you count that up together as two.

 9   But when it comes to a radio call you're

10   individually mark with that.

11      Q.   So for a car stop, one of you went

12   to the car and the other one would stay in

13   your patrol vehicle?

14      A.   No, no, no.   It's kind of -- it's a

15   little weird, but you don't split car

16   stops.   And for example, an arrest you

17   would split to get partial credit for an

18   arrest.   So it would be point 5 and point

19   5.   Any type of ped stop or car stop you

20   don't split.   Any type of TVR tickets,

21   moving violations or parking violations or

22   CVNs you don't split.   The only ones you

23   can split are arrests.   Radio calls across

24   the board, you respond, you go, you get
```

Michael Navedo
September 11, 2018

131

```
1    credit for the entirety of the job.

2        Q.  Even if you go together?

3        A.  Right.  So he got three and I got

4    three for the night.

5        Q.  So did one of you get credit for

6    the radio call to plaintiffs' residents?

7        A.  We both did.  When it comes to

8    radio calls we both get credit for it.

9        Q.  Down on the bottom left, on D133,

10   it says, operator's name, and it says,

11   Navedo.

12          What does it mean by operator?

13       A.  I'm the one that drove that night.

14   I operated the patrol vehicle.  And the

15   recorder is passenger, basically.  So most

16   of the paperwork, but apparently not this

17   night.

18       Q.  So usually if you're driving

19   Officer Schutte would record this kind of

20   paperwork that we see here in Exhibit-6?

21       A.  Right.  But if I'm driving 90

22   percent of the time, I'm not going to,

23   obviously, let him do all the paperwork.

24   So I'm going to help him out.
```

**Michael Navedo**
**September 11, 2018**

```
 1                    MR. MCCLAM:  I'm going to

 2            ask the court reporter to mark

 3            this document as Navedo-7.

 4                    (Whereupon the document

 5            was marked, for identification

 6            purposes, as Exhibit Navedo-7.)

 7   BY MR. MCCLAM:

 8      Q.  Take a minute to review Exhibit-7,

 9   which is titled, Philadelphia Police

10   Department Memorandum (01-09); Subject,

11   Custody Disputes Involving Minor Children.

12            I'll note for the record that this

13   is the order of pages that we received

14   this document in.  But if you look above

15   the D304 number you'll see individual page

16   numbers and it goes one, three, two.   --

17   just when your reviewing this, I'll note

18   that.

19      A.  Okay.  Go ahead.

20      Q.  Do you recognize Exhibit-7?

21      A.  Yes.

22      Q.  Did I describe it accurately?

23      A.  Yes.  It's the commissioner's

24   memorandum that specifically targets the
```

Michael Navedo
September 11, 2018

133

```
 1    subject of custody disputes involving

 2    minors.

 3        Q.  Have you ever seen this memorandum

 4    before?

 5        A.  Yeah.

 6        Q.  Have you ever been trained on it?

 7        A.  Yes.

 8        Q.  Do you recall when the last time

 9    you were trained on this memorandum was?

10        A.  No.

11        Q.  If you look in the Definitions

12    section.  Do you see "At Risk"?

13        A.  Hmm-mm.

14        Q.  It says, "At Risk" - when facts and

15    circumstances exist whereby the officer

16    believes that the immediate health, safety

17    and/or welfare of a minor child is

18    threatened or in jeopardy.

19            Do you see that?

20        A.  Right.

21        Q.  Did you consider the child

22    described by Ms. Mohammed, on September

23    14th, 2015 to be at risk?

24        A.  No.
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

134

```
1        Q.   Let's go over to D306?

2        A.   06?

3        Q.   Yes.   Page 2 of the memo.   In the

4    Patrol Officer, Paragraph 1, it says,

5    After the verification of a founded

6    custody dispute, request the presence of a

7    supervisor, if not already dispatched.

8             Do you see that?

9        A.   Where?

10       Q.   At the top?

11       A.   Oh, at the top; right.

12       Q.   Right.   Top paragraph.

13            Does this paragraph mean that after

14   you find a founded custody dispute you're

15   required to contact a supervisor?

16       A.   Yeah.

17       Q.   Did you -- what is founded custody

18   dispute mean?

19       A.   Basically we made contact with the

20   father and child on location.

21       Q.   Was it a founded custody dispute

22   after Ms Mohammed showed you her

23   paperwork?

24       A.   Yes.
```

THE MCS GROUP, INC.

Michael Navedo
September 11, 2018

1    Q.   So at that point should you have

2    contacted your supervisor?

3    A.   Yeah.

4    Q.   Let's go down to Paragraph 3.   It

5    says, if the child is not at risk and a

6    custody order exists; correct?

7    A.   Yeah.

8    Q.   In this scenario, when Ms. Mohammed

9    came in and reported the custody dispute,

10   you knew the child was not at risk;

11   correct?

12   A.   Sorry.   Say that again.

13   Q.   When you stated earlier that after

14   speaking with Ms. Mohammed you did not

15   believe the child at issue was at risk; is

16   that right?

17   A.   Right.

18   Q.   I think you also stated earlier

19   that Ms. Mohammed showed you a custody

20   order; is that right?

21   A.   Right.

22   Q.   Then, if you look at 3B, it says,

23   regardless of any written custody order,

24   the officer should not disturb physical

Michael Navedo
September 11, 2018

136

```
 1   custody of the child.  The officer will

 2   not personally, nor at the complainant's

 3   direction have the child delivered to the

 4   complaining or another party.

 5        Did I read that accurately?

 6   A.  Yeah, I guess.

 7   Q.  Does this refresh your recollection

 8   as to whether or not a police officer can

 9   order a paret to provide custody to

10   another individual of a child?

11   A.  Right.

12   Q.  Right; that's correct?

13   A.  That's correct.

14   Q.  Did you ever receive training

15   informing you of this?

16   A.  Yes.

17   Q.  So if you had found out that Ms.

18   Mohammed was, in fact, entitled to custody

19   of the child, would you have been able to

20   take the child from Mr. Hunter and provide

21   her to Ms. Mohammed?

22   A.  I wouldn't do that without --

23             MS. FUNG:  Objection to

24        the form of the question, but you
```

THE MCS GROUP, INC.

Michael Navedo
September 11, 2018

137

```
1          can answer.
2                   THE WITNESS:  I wouldn't
3          do that without a supervisor
4          there.  I mean I'm going to ask
5          and if they don't want to I'm
6          going to call the supervisor.
7     BY MR. MCCLAM:
8       Q.  I'm going to play a couple of audio
9     recordings from -- that were produced to
10    us in this case.  And if you need me to
11    play it multiple times let me know.  One
12    of the questions I'm going to be asking is
13    who the voices are.
14                  PLAYBACK OF AUDIO RECORDING:
15                  Monday, September 14, 2015, 0:14
16    and 20 seconds.
17                  Male voice:  1201.
18                  Female voice:  1201.
19                  Male voice:  Make us available
20    using the same, hold us out to 1242 South
21    51st Street, invest prem.
22                  Female voice:  Received.
23    BY MR. MCCLAM:
24      Q.  Did listening to that recording
```

THE MCS GROUP, INC.

Michael Navedo
September 11, 2018

138

```
 1     your recollection as to who called in, you

 2     and Officer Schutte's arrival at the

 3     residence, in the first instance, on

 4     September 14th?

 5        A.   Yeah.   It doesn't really sound like

 6     me, but I don't think so.

 7        Q.   Was it you?

 8        A.   It must be a tired version of me

 9     but, yeah, I guess so.   I don't know.

10        Q.   Was it Officer Schutte?

11        A.   I don't know.   I'm not sure.

12        Q.   You're not sure.

13             We'll play it one more time and the

14     if you're still not sure let me know.

15             PLAYBACK OF AUDIO RECORDING:

16             Monday, September 14th, 2015,

17     0:14 and 20 seconds.

18                Male voice:   1201.

19                Female voice:   1201.

20             Male voice:   Make us available

21     using the same, hold us out to 1242 South

22     51st Street, Invest prem.

23             Male voice:   Received.

24                   THE WITNESS:   I guess that
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

```
 1          was me.
 2    BY MR. MCCLAM:
 3        Q.   You think that was you?
 4        A.   Yeah.
 5        Q.   Now, I'm going to play a call from
 6    1:06 a.m.
 7              PLAYBACK OF AUDIO RECORDING:
 8              Monday, September 14, 2015, 01:06
 9    and 08 seconds.
10              Male voice 1:  1201.
11              Male voice 2:  That last unit?
12              Male voice 1:  1201.
13              Male voice 2:  1201.
14              Male voice 1:  You can RTF us and
15    you can resume Command.  They no longer
16    need a supervisor.
17              Male voice 2:  They just called
18    back again for another one.  Are you sure
19    about that?
20              Male voice 3:  12 Command.  Let
21    them know that I am almost there.  I was
22    coming from the Wawa.  I'll be right
23    there.
24              Male voice 2:  Okay.
```

THE MCS GROUP, INC.

Michael Navedo
September 11, 2018

140

```
1   BY MR. MCCLAM:
2       Q.  Do you know whether that call at
3   1:06 a.m. was made by you?
4       A.  The transmission at 1201?  Yeah,
5   that's mine.  That's me.
6       Q.  That's you?  Okay.
7           Are there any questions -- let me
8   start over.  Are there any answers to my
9   questions that I've asked so far today
10  that you wish to change before I finish my
11  turn at this deposition?
12      A.  No.  Nothing that I can think of.
13                  MR. MCCLAM:  Okay.  I will
14          pass the witness.
15                  We'll go off the record.
16                  (Discussion was held off
17          the record.)
18                  MS. LASTOWSKI:  Just give
19          me a minute.
20                  MS. FUNG:  Sure.
21  BY MS. LASTOWSKI:
22      Q.  Officer Navedo, I introduced myself
23  in the beginning of the deposition, but my
24  name is Alex Lastowski.  I represent the
```

Michael Navedo
September 11, 2018

141

```
 1   plaintiff, Darus Hunter in this matter.
 2   I'll just remind you that the deposition
 3   rules and pointers that my co-counsel
 4   shared apply right now while we're
 5   talking.
 6       A.  Okay.
 7       Q.  So verbal answers.  We won't speak
 8   over one another.  But I'm sure we'll
 9   remind each other if we're forgetting any
10   of those rules.
11            And just so you know how the rest
12   of your afternoon is going to go, I'll ask
13   you some questions about some training you
14   received and then your counsel will have
15   an opportunity to ask you questions if she
16   decides to do so.
17       A.  Okay.
18       Q.  I just wanted to follow up on one
19   question that Mr. McClam had asked you
20   earlier about, the children who you saw
21   during your visit on September 14th, 2015
22   to Mr. Hunter's home.
23            You mentioned that you saw the
24   child who was the subject of the custody
```

THE MCS GROUP, INC.

Michael Navedo
September 11, 2018

142

1    dispute; correct?

2       A.   Correct.

3       Q.   And can you tell me or describe for

4    me any other children who you came in

5    contact with or who you viewed during your

6    different visits to Mr. Hunter's home?

7       A.   There was a male and female

8    that's -- I don't know what else you want

9    me to say.

10      Q.   Sure.   So there was the child who

11   was the subject of the custody dispute;

12   correct?

13      A.   Hmm-mm.

14      Q.   That's yes?

15      A.   Yes, I'm sorry.

16      Q.   That's okay.

17           Then there was a male child?

18      A.   Yes.

19      Q.   Was there another female child?

20      A.   I only remember two children there.

21      Q.   Officer Navedo, do you know whether

22   the Philadelphia Police Department has a

23   directive outlining how the police

24   department is supposed to accept and

**Michael Navedo**
**September 11, 2018**

143

```
 1    process citizen's complaints?
 2        A.  Yes.
 3        Q.  So you are aware that the
 4    department has a directive on that?
 5        A.  Yes.
 6                    MS. LASTOWSKI:  I'll mark
 7            this exhibit as Exhibit-8.
 8                    (Whereupon the document
 9            was marked, for identification
10            purposes, as Exhibit Navedo-8.)
11    BY MS. LASTOWSKI:
12        Q.  Feel free to take a look at the
13    document.
14            Officer Navedo, I've handed you a
15    document that's Bates stamped D282, and
16    it's Directive 12.18 from the Philadelphia
17    Police Department.  Subject:  Complaints
18    Against the Philadelphia Police
19    Department.
20            Do you see all that?
21        A.  Yes.
22        Q.  Do you recognize this document?
23        A.  Yes.
24        Q.  Have you seen it before?
```

Michael Navedo
September 11, 2018

144

```
 1      A.   Yeah.
 2      Q.   Do you recall the first time that
 3   you saw it?
 4      A.   The first time was in the academy.
 5      Q.   So you recall seeing this directive
 6   during your training in the police
 7   academy?
 8      A.   Yes.
 9      Q.   Have you seen this document since
10   the police academy?
11      A.   Maybe.
12      Q.   So you're not sure whether you've
13   seen this document since the police
14   academy?
15      A.   No.
16      Q.   Let's take a look -- I'm sorry.
17   Well, let's take a look at the issue date,
18   which is at the top of the document.
19           It says it was issued August 29th,
20   2014; correct?
21      A.   Yes.
22      Q.   And the effective date, also,
23   August 29th, 2014; correct?
24      A.   Correct.
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

1       Q.   And the document was updated on May

2   15th, 2015; correct?

3       A.   Correct.

4       Q.   So you agree that this directive

5   was in effect during your interactions

6   with Mr. Hunter on September 14, 2015;

7   correct?

8       A.   Correct.

9       Q.   So taking a look under the heading,

10  Policy here, that first paragraph.  The

11  second sentence reads that -- and I won't

12  read the entire sentence -- the

13  Philadelphia Police Department personnel

14  shall inform any person who wishes to make

15  a complaint against a police officer of

16  the existence of the formal complaint

17  procedure and shall refer such persons to

18  those locations listed in Section 2-A of

19  this directive.

20          Did I read that correctly?

21      A.   Yes.

22      Q.   So would you agree that for this

23  directive, if a citizen calls in to make a

24  complaint that the Philadelphia Police

**Michael Navedo**
**September 11, 2018**

146

```
 1    Department is obligated, first, to inform

 2    that person of a formal police procedure;

 3    correct?

 4        A.   Correct.

 5        Q.   And then refer that person to a

 6    location where they can call file that

 7    complaint --

 8        A.   Correct.

 9        Q.   -- is that right?

10             And if we flip to the second page,

11    under -- excuse me, the third page, which

12    is Bates stamp D284 at the bottom.

13             Do you see that?

14        A.   Yes.

15        Q.   Do you see here under the heading,

16    3, Procedures for Recording and Processing

17    Complaints there's a series of steps that

18    the Philadelphia Police Department is to

19    follow when they are accepting and

20    investigating a citizen's complaint.

21             Would you agree with that?

22        A.   Yes.

23        Q.   Now, we've discussed at length that

24    at some point during the morning of
```

**Michael Navedo**
**September 11, 2018**

1    September 14th, 2015 you became aware that

2    Mr. Hunter had complained about you and

3    Officer Schutte -- had complained about

4    your visit to his home on the morning of

5    September 14, 2015; correct?

6        A.   Yes.

7        Q.   That was a bad question, but you

8    understood it?

9                 MS. FUNG:   Can you read --

10               MS. LASTOWSKI:   I'll

11         re-ask it again.   Sure.

12   BY MS. LASTOWSKI:

13       Q.   You visited Mr. Hunter's home on

14   the morning of September 14th, 2015;

15   correct?

16       A.   Yes.

17       Q.   You became aware after that first

18   visit that Mr. Hunter had called in and

19   complained about you and Officer Schutte;

20   correct?

21       A.   Yes.

22       Q.   And you told us that you returned

23   to Mr. Hunter's home after you learned

24   that he had called to complain about you;

**Michael Navedo**
**September 11, 2018**

148

```
1    correct?

2       A.   Yes.

3       Q.   And I know you returned again with

4    Lieutenant Disanto, but I'm talking about

5    that second visit, so we understand.

6       A.   Yes.   Hmm-mm.

7       Q.   Your purpose in returning to

8    Mr. Hunter's home was to understand and

9    investigate why he had filed a complaint;

10   is that right?

11      A.   Correct.

12      Q.   So taking a look back at Directive

13   12.18, which is right in front of you, we

14   see looking under Heading 3, Procedures

15   for recording and processing complaints.

16          Can you show me, if you're able to

17   find it, where it directs an officer about

18   who a citizen is trying to make a

19   complaint should return to the home of the

20   citizen who is making that complaint?

21          I mean you're welcome to look

22   through the directive, but I'll tell you

23   that that is not the process that's

24   outlined in this directive.
```

**Michael Navedo**
**September 11, 2018**

149

1    A.  I understand that.  But what

2  happened there was the fact that we were

3  supposed to have already be there.  That's

4  the reason why -- the initial reason why

5  we went back.

6    **Q.  Well, you went there to follow up**

7  **on a custody dispute; right?**

8    A.  Yes.

9    **Q.  And you visited Mr. Hunter's home**

10  **to identify whether a custody order**

11  **permitted one of his children to be at his**

12  **home; correct?**

13    A.  Correct.

14    **Q.  And during your first interaction**

15  **with Mr. Hunter you reviewed a custody**

16  **order; correct?**

17    A.  Yes.

18    **Q.  And you were satisfied that**

19  **Mr. Hunter properly had the child at**

20  **issue; correct?**

21    A.  Yes.

22    **Q.  And then you left his home;**

23  **correct?**

24    A.  Yes.

**Michael Navedo**
**September 11, 2018**

1      Q.   So at that time you had completed

2   the purpose for which you had been sent to

3   Mr. Hunter's home; correct?

4      A.   Right.

5      Q.   So what did it matter that you were

6   still on the job?  What does that have to

7   do at all with the fact that he had called

8   to complain about you?

9      A.   Because we were -- on the MDT we

10   are on location -- we're still on

11   location.

12      Q.   I understand that.

13      A.   And we didn't see anything -- any

14   reason why a complaint should come about.

15   So we went back to see if we could do

16   something further.

17      Q.   Does the directive state that if an

18   officer about whom a citizen is trying to

19   make a complaint disagrees with the basis

20   for the complaint they should go and

21   confront the complainant?

22      A.   No.

23               MS. FUNG:   Objection.

24          That's a mischaracterization of

**Michael Navedo**
**September 11, 2018**

```
 1          what's he saying.

 2   BY MS. LASTOWSKI:

 3      Q.  No, it does not say that; correct?

 4          I mean what effect do you think

 5   that has on a citizen who is trying to

 6   make a complaint about their treatment by

 7   a police officer if those very officers

 8   return to his home and confront him about

 9   making a complaint?

10          Do you think that that encourages

11   full and frank disclosure to the police

12   about issues that citizens have about

13   their treatment by the police?

14      A.  No.

15              MS. FUNG:  Objection to

16          the form.

17              MS. LASTOWSKI:  I'm sorry.

18          You're allowed to answer when she

19          objects, and I should give her an

20          opportunity to object.  So should

21          you before you answer.

22   BY MS. LASTOWSKI:

23      Q.  But you would agree that if a

24   citizen is trying to make a complaint
```

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

152

```
 1    about their treatment by police officers

 2    and those officers return to their home,

 3    that's not something you would tend to

 4    think would encourage other citizens to

 5    make complaints about officers.

 6           Would you agree with that?

 7      A.  Well, see my thing was is that

 8    we -- it's not like we left on a bad note.

 9    We didn't have that in our mind as

10    something bad happened.  So there was

11    not -- there shouldn't have been any

12    tension between us.

13      Q.  Why shouldn't there have been any

14    tension, because you did not understand

15    that the interaction went poorly?

16      A.  Because we resolved the matter

17    between both parties.  There was nothing

18    else.

19      Q.  Is it possible that Mr. Hunter and

20    Ms. Shujaa experienced a different

21    understanding of how the interaction went?

22              MS. FUNG:  Objection to

23         form, but you can answer.

24              THE WITNESS:  Say it
```

Michael Navedo
September 11, 2018

153

```
 1          again.
 2                    MS. LASTOWSKI:  That's
 3          fine.  I'll move on.
 4  BY MS. LASTOWSKI:
 5     Q.  I know we discussed earlier -- my
 6  co-counsel and you, Officer Navedo -- the
 7  type of training that you received when
 8  you began the Philadelphia Police
 9  Department.
10          I understand that you attended the
11  police academy; correct?
12     A.  Yes.
13     Q.  And subsequent to that you have an
14  annual recertification; is that right?
15     A.  Correct.
16     Q.  Can you remind me what that is
17  called?
18     A.  Municipal police officer
19  recertification.
20     Q.  And during that annual
21  recertification are you trained on the
22  same type of things that you were trained
23  on in the academy or on a different set of
24  directives or documents?
```

**Michael Navedo**
**September 11, 2018**

154

1     A.   It's retraining and it's also

2     updates.

3     **Q.   So if there had been any updates to**

4     **directives or new directives in the past**

5     **year, is that when you'll receive training**

6     **on it?**

7     A.   Correct.  Well, no, because during

8     the year you also get training as well.

9     It's like the statewide training

10    recertifications.  And then throughout the

11    months you'll have, like, your update

12    memorandums that they tell the sergeants

13    have to train you at roll call or

14    something like that, and then you fill out

15    a form saying you received training.

16    **Q.   Got it.  So the annual training is**

17    **statewide?**

18    A.   Right.

19    **Q.   And do all the officers throughout**

20    **the state receive that same type of**

21    **training?**

22    A.   Correct.

23    **Q.   Then, throughout the year you have**

24    **training at your district?**

Michael Navedo
September 11, 2018

155

```
1     A.   Yes.

2        Q.   So it's district level training?

3     A.   Correct.

4        Q.   And that's conducted -- you used a

5     phrase something called roll call?

6     A.   Roll call.  That's when we line up

7     at 11:45 sharp.

8        Q.   Got it.

9     A.   And we are at attention and the

10    sergeant addresses any type of complaints

11    or issues, concerns citizens have or

12    problem areas, or any type of special

13    orders that we need to be given and

14    assignments.

15       Q.   And during that roll call you may

16    also receive --

17    A.   A training.

18       Q.   -- a training.

19    A.   Whatever updated training that

20    comes down they'll discuss it at roll

21    call, whether it be a paper or video.  And

22    then we'll sign off on receiving that

23    training.

24       Q.   Got it.
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

156

```
 1          Do you recall responding to
 2    interrogatories in this matter?
 3      A.  No.
 4      Q.  I can rephrase it.  Interrogatories
 5    are questions that the parties can ask of
 6    the other parties.
 7          Do you recall receiving certain
 8    questions that you had to answer and then
 9    responding to those questions related to
10    this matter?
11      A.  Are you talking about the
12    interviews?
13      Q.  No.
14              MS. FUNG:  Can we go off
15          the record for a minute?
16              MS. LASTOWSKI:  Sure.
17              (Discussion was held off
18          the record.)
19              MS. LASTOWSKI:  I'll mark
20          these two documents as Exhibit-9
21          and 10.  You can look at them.
22              (Whereupon the document
23          was marked, for identification
24          purposes, as Exhibit Navedo-9.)
```

Michael Navedo
September 11, 2018

1              (Whereupon the document

2          was marked, for identification

3          purposes, as Exhibit Navedo-10.)

4    BY MS. LASTOWSKI:

5        Q.  Officer Navedo, I've handed you

6    Exhibit-9, which are Plaintiffs'

7    Interrogatories directed to you and

8    Officer Navedo -- or excuse me, you and

9    Officer Schutte.  And Exhibit-10 are your

10   responses -- your and Officer Schutte's

11   responses to the interrogatories.

12          There's also some other information

13   in there, but I'll direct you to where you

14   should be looking.

15          So do you recall seeing the

16   interrogatories that plaintiff served on

17   you and Officer Schutte -- Exhibit-9?

18       A.  Yes.

19       Q.  So you've seen this document

20   before?

21       A.  Yes.

22       Q.  We're going to be flipping to

23   Interrogatory Number 10, which is on Page

24   6 of the document of Exhibit-9.

Michael Navedo
September 11, 2018

158

```
 1      A.   Okay.
 2                     MS. FUNG:  Just to be
 3           clear, this doesn't include the
 4           updated answers that I submitted.
 5           I had amended responses.  I think
 6           that was to the second set.
 7                     MS. LASTOWSKI:  Yeah.
 8                     MS. FUNG:  Let me just
 9           double check.  I think you wanted
10           more clarification.  I could be
11           wrong.
12                     MS. LASTOWSKI:  I know
13           that we amended responses --
14                     MS. FUNG:  I don't have it
15           on me, but I thought I -- I might
16           be confusing it with another case.
17                     MS. LASTOWSKI:  You know
18           what, we can just take a look at
19           Exhibit-9, which are the
20           interrogatories that we served and
21           I'll just ask you the question
22           that's here.
23      BY MS. LASTOWSKI:
24      Q.   Taking a look at Page 6,
```

THE MCS GROUP, INC.

Michael Navedo
September 11, 2018

```
 1    Interrogatory Number 10.
 2          Officer Navedo, do you see where I
 3    am?
 4      A.  Yes.
 5      Q.  So we asked you to identify any
 6    training, whether formal or informal,
 7    conducted by Philadelphia Police
 8    Department, on Executive Order Number 711
 9    and Philadelphia Police Directive 12.18.
10          So can you tell me -- in your own
11    words right now, can you describe the type
12    of training, whether formal or informal,
13    that you received on Directive 12.18 that
14    we just looked at?
15                MS. FUNG:  Can we go off
16          the record for a second?
17                MS. LASTOWSKI:  Yeah.
18                (Discussion was held off
19          the record.)
20    BY MS. LASTOWSKI:
21      Q.  Officer Navedo, I'm going to ask
22    you a different question.  So here we
23    asked you to identify any training,
24    whether formal or informal, conducted by
```

THE MCS GROUP, INC.

Michael Navedo
September 11, 2018

160

```
 1    the Philadelphia Police Department, on

 2    this executive order and this Philadelphia

 3    Police directive.

 4          What we were asking about was the

 5    training you received on Exhibit-8,

 6    titled, Philadelphia Police Directive

 7    12.18.

 8          So if that helps to jog your

 9    memory, can you describe for me the type

10    of training, formal or informal that you

11    received on that directive?

12    A.   I know in the academy we reviewed

13    all directives and commissioner

14    memorandums.  So that's when we would have

15    received full training.  But in regards to

16    this, when it comes to any updates or

17    anything like that, I mean they give you

18    the package and it's up to you to read it

19    in depth.  And the sergeant or whoever is

20    in charge will give you a brief

21    description of what's new or changed or

22    what's going on.

23    Q.   So you mentioned that during the

24    police academy you received a packet of
```

THE MCS GROUP, INC.

**Michael Navedo**
**September 11, 2018**

161

```
1    all the directives or commission orders.

2         Is that what you said?

3    A.   Commissioner's memorandum.

4    Q.   Commissioner's memorandum.

5         You were trained at the police

6    academy in 2010; is that right?

7    A.   Yes.

8    Q.   This directive was effective as of

9    August 29th, 2014?

10   A.   Correct.

11   Q.   So you did not receive training on

12   this directive at least as it exist as

13   we're looking at it during your time at

14   the police academy; correct?

15   A.   Yeah, at the police academy, no.

16   So I would have received it at the

17   district.

18              MS. LASTOWSKI:  Final

19         exhibit, which would be

20         Exhibit-11.

21              (Whereupon the document

22         was marked, for identification

23         purposes, as Exhibit Navedo-11.)

24
```

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

162

```
 1    BY MS. LASTOWSKI:

 2        Q.  Officer Navedo, take a look at what

 3    I just handed to you.  I believe it's a

 4    record of training materials you received

 5    at least since 2014.

 6        A.  Yes.

 7        Q.  Is that what this document looks

 8    like to you?

 9        A.  Yes.

10        Q.  Have you seen this document before?

11        A.  Yes.

12        Q.  So just to confirm what I

13    understand this document to reflect, it

14    has your handwritten name at the top

15    right-hand corner; is that right?

16        A.  Correct.

17        Q.  Then we have a date column.

18            Do those dates reflect the days on

19    which you received training I'm?

20        A.  Going to say, yes.

21        Q.  And does the column item

22    description reflect the topic of the

23    training?

24        A.  Yes.
```

Michael Navedo
September 11, 2018

163

1    Q.   Sorry.   I just noticed that it says

2    that training material receipt/record in

3    the top left corner, do you see that --

4    description of the document?

5    A.   Yes.

6    Q.   Tell me, does this reflect the

7    training that you received or does it just

8    reflect material that you received?

9    A.   It's both.   It's training and

10   materials.

11   Q.   And this reflects your receipt of

12   the training material?

13   A.   Yes.   This is like your final

14   receipt at the end of the year for all the

15   training you've had for the year.

16   Q.   So do you sign this

17   contemporaneously, at the same time, when

18   you take the training or do you sign this

19   at the end of the year after when the

20   trainings are all completed?

21   A.   At the end of the year when

22   everything's completed.

23        So after you -- as you're getting

24   the training you have to sign off.

THE MCS GROUP, INC.

**Michael Navedo**
**September 11, 2018**

164

1     Q.  Where do you sign off?

2     A.  There's whatever sheet they have

3  for that day it's a printout and a list of

4  everybody's name.  And when you receive

5  the package and it's explained to you, you

6  have to sign off saying you received the

7  training.

8     Q.  So on the date that you receive the

9  training you receive the package of

10  material; is that right?

11     A.  Yes.

12     Q.  Do you always receive materials of

13  the training?

14     A.  Like I said, it's going to be

15  either paper, video or paper and video.

16     Q.  Okay.  So you typically receive

17  some type of paper with the training?

18     A.  Right.

19     Q.  And you sign some type of sign-in

20  sheet the day that you receive the

21  training; is that right?

22     A.  Yes.

23     Q.  And do you know -- who do you give

24  that sign-in sheet to?

Michael Navedo
September 11, 2018

165

```
 1      A.   The sergeant or corporal, whoever
 2   is doing that.  I don't know who actually
 3   collects that.  But I know either the
 4   sergeant or the corporal has that and
 5   makes sure everybody has their training
 6   and receives it and signs it.
 7      Q.   Do you know if anyone cross
 8   references this 2014 training material or
 9   receipt/record document with the sign-in
10   sheet to make sure that people saying that
11   they received a certain training actually
12   signed in on the day that the training
13   occurred?
14      A.   I don't know.  That's like -- that
15   would be a corporal or --
16                  THE COURT REPORTER:  That
17          would be a what?
18                  THE WITNESS:  That would
19          be a corporal or supervisor.
20   BY MS. LASTOWSKI:
21      Q.   So this is your signature in the
22   signature column?
23      A.   Yes.
24      Q.   Under supervisor's initial, it
```

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

```
 1   looks like it says, MD; is that right?

 2      A.  Yes.

 3      Q.  Who is M.D.?

 4      A.  No idea.

 5      Q.  You don't know who this supervisor

 6   is?

 7      A.  No.

 8      Q.  So did this supervisor watch you as

 9   you signed this document or did you sign

10   it and then turn it over to M.D.?

11      A.  I signed it and turned it over.

12      Q.  If you can turn for me to D374,

13   which is the third page of this document.

14          If you look one, two, three, four,

15   five, six lines from the bottom the date

16   is August 29th, 2014.

17          Do you see that entry?

18      A.  August 29th?

19      Q.  Yeah.

20      A.  Okay.

21      Q.  You've got it?

22      A.  Complaints Against Police?

23      Q.  You've got it, yes.  So we have

24   Directive Number 127 - Complaints Against
```

Michael Navedo
September 11, 2018

167

```
 1    the Philadelphia Police Department.
 2           So if we turn back to Exhibit-8,
 3    which is Directive 12.18 -- if you have
 4    that in front of you.
 5           So we had looked earlier that the
 6    effective date of Directive 12.18 is
 7    August 29th, 2014; is that right?
 8       A.  Yes.
 9       Q.  It was issued on August 29th, 2014
10    and effective as of that date; correct?
11       A.  Correct.
12       Q.  And it looks like if we turn back
13    to Exhibit-11, an entry that we were
14    looking at, you received some type of
15    training on August 29th, 2014 on this
16    directive; is that right?
17       A.  Yes.
18       Q.  And can you -- if you have
19    Directive 12.18, Exhibit-8 in front of
20    you, we had confirmed that that policy was
21    updated on May 15th, 2015; is that right?
22       A.  Yes.
23       Q.  Let's turn to Exhibit-11, the page
24    that's Bates stamped D378 on your training
```

Michael Navedo
September 11, 2018

168

```
 1   record.
 2          Back to your training record.
 3      A.  All right.
 4      Q.  If you could turn to the page that
 5   has D378 in the bottom right-hand corner.
 6      A.  Yeah.
 7      Q.  And the one, two, three, four,
 8   fifth entry from the top, it's an entry on
 9   May 15th, 2015.  Complaints on --
10   Directive 127.
11      A.  Yep.
12      Q.  Directive 127, Complaints against
13   the Philadelphia Police Department.
14          Do you see that?
15      A.  Yes.
16      Q.  It looks like you received training
17   on the date the directive was issued and
18   effective, on August 29th, 2014; correct?
19      A.  Right.
20      Q.  And you received training again on
21   May 15th, 2015, the date on which the
22   directive was updated; is that right?
23      A.  Correct.
24      Q.  Describe in as much detail as you
```

Michael Navedo
September 11, 2018

1  can for me the substance of the training

2  you received on August 29th, 2014 on this

3  directive?

4      A.   What are you talking about the

5  package that I received?

6      Q.  Yeah.  Yes?

7      A.   Normally, what happens is we

8  receive, it's like a package.  It's like

9  every few of these -- like let's say the

10  month of it you'll receive that whole

11  package.

12     Q.  So, for example, while we're

13  looking at the May 15th, 2015 date, it

14  looks like there were a few amendments to

15  different directives; an amendment to

16  directive on complaints against the

17  Philadelphia Police, an amendment on

18  police and suspect photographs.  And it

19  goes on.

20          Would you have received all of

21  these amendments in a packet on May 15th,

22  2015?

23     A.   No.  That be like, basically, at

24  the end of the month they'll usually give

THE MCS GROUP, INC.

**Michael Navedo**
**September 11, 2018**

170

```
 1    you the package and then they'll give you

 2    a list of what you have to sign off.

 3          So it's kind of like this, but it's

 4    a shorter version of what they give you in

 5    the month.  And let's say on that day,

 6    they would have -- the sergeant would

 7    address at roll call.

 8       Q.   Okay.  So even though the date here

 9    reads May 15th, 2015, you may not have

10    received the directive and the training

11    for a couple of weeks after that?

12       A.   Right.

13       Q.   Do you have any independent

14    recollection of the August 2014 or May

15    2015 training on this directive?

16       A.   No.

17       Q.   Can you tell me who ran the

18    training?

19       A.   No.

20       Q.   Can you tell me how long the

21    training lasted?

22       A.   No.

23       Q.   Did you receive any training

24    materials outside of copies of the
```

**Michael Navedo**
**September 11, 2018**

1    **directive?**

2       A.   Outside of copies of the directive?

3    I don't remember.   I mean as I said, when

4    something new comes out at roll call the

5    sergeant addresses it, he talks about it.

6    If it's something super important he'll

7    read it out loud.   Other than that, he'll

8    tell you what it's about and then you come

9    up and you pick up a copy of it and you

10   have to sign off on it.

11      **Q.   So sometimes it's run by the**

12   **sergeant, is that what you said?**

13      A.   Whoever is doing roll call.

14      **Q.   So the person doing roll call will**

15   **sometimes read the directive start to**

16   **finish if it's really important?**

17      A.   Yeah.   It doesn't happen, though.

18      **Q.   Do you recall if the person running**

19   **roll call, in August 2014, read Directive**

20   **12.18 out loud?**

21      A.   I don't recall.

22      **Q.   And same question for the August**

23   **15th, 2015?**

24      A.   I don't recall.   It's too long ago.

**Michael Navedo**
**September 11, 2018**

172

1    Q.   How do you remind yourself of

2    what's required when a citizen calls in

3    with a complaint?  Do you have any

4    checklist?  Do you have a copy of the

5    directive at any work station or anything?

6    A.   I mean every is all on our

7    computer.  So if we really need to go

8    touch up on something that we we're unsure

9    of we can look on the computer.  All of

10   the records are posted there and they're

11   updated.

12        And if anything, we call

13   supervisors to ask for guidance and

14   direction if we need it.

15   Q.   Do you recall the last time you

16   consulted your computer database to look

17   at Directive 12.18?

18   A.   Specifically?

19   Q.   Yeah.

20   A.   I don't know.

21   Q.   Do you know if you've ever looked

22   at Directive 12.18 on your computer?

23   A.   Complaints against police, no.

24   Q.   Do you recall ever receiving any

Michael Navedo
September 11, 2018

173

```
 1    training since May 5th, 2015 on Directive
 2    12.18?
 3       A.  I don't recall.
 4       Q.  Does the police department perform
 5    any compliance audits to see if their
 6    officers are following different
 7    directives and commissioner memorandum?
 8       A.  An audit?  I mean Internal Affairs
 9    is always doing something.
10       Q.  Have you ever personally been
11    observed receiving and responding to a
12    citizen's complaint by a supervisor?
13       A.  I'm sorry.  Say that again.
14       Q.  Has a supervisor ever observed you
15    for purposes of evaluation receiving a
16    citizen's complaint and seeing how you
17    respond to it for compliance with
18    Directive 12.18?
19       A.  No.  Because we don't take
20    complaints.  Supervisors do.  So we're not
21    going to -- you're not going to see us sit
22    there and --
23       Q.  No.  Just really quickly, flip back
24    to Exhibit-8, which is in front of you,
```

THE MCS GROUP, INC.

Michael Navedo
September 11, 2018

```
 1    the Directive.
 2          That second sentence we read
 3    Philadelphia Police Department personnel
 4    shall -- and then we talked about informed
 5    a citizen of the complaint procedure and
 6    then refer them to a complaint location;
 7    correct?
 8       A.   Right.   That's the supervisor's
 9    job.
10       Q.   But this sentence, the Philadelphia
11    Police Department personnel.
12          Do you fall in the category of
13    Philadelphia Police Department personnel?
14       A.   Yes, I do.
15       Q.   I don't have any --
16       A.   I mean --
17       Q.   -- further -- go ahead.   Please
18    finish your answer.
19       A.   For example, if somebody wants to
20    file a complaint on the street.   Sure he
21    can file a complaint.   I'll get a
22    supervisor over here and you can file with
23    him.   If not, you can go to the district
24    and find a supervisor there.   And they'll
```

THE MCS GROUP, INC.

**Michael Navedo**
**September 11, 2018**

1   give you a copy of the paperwork that you

2   have to fill out.

3       Q.   Sir, I think I understand what

4   you're saying.  A citizen couldn't say to

5   you, I want to file a complaint, and

6   you're going to receive that information

7   and process the paperwork.

8       A.   Correct.

9       Q.   There's a formal procedure you have

10   to follow and you are not the start and

11   end point; correct?

12       A.   Right.  I reference people.  That's

13   what I do.  That's all I do.  I don't

14   actually take that.

15       Q.   Okay.  I understand.

16                MS. LASTOWSKI:  I don't

17           have any other questions right

18           now.

19                Tara?

20                MS. FUNG:  I have a couple

21           of questions.  It's going to be,

22           like, three.

23   BY MS. FUNG:

24       Q.   This incident occurred about three

**THE MCS GROUP, INC.**

Michael Navedo
September 11, 2018

176

```
 1    years ago; is that correct?

 2        A.  Yes.

 3        Q.  Standing here today are the events

 4    as fresh in your mind as say a month or

 5    two after the incident?

 6        A.  Absolutely not.

 7        Q.  And since this incident about how

 8    many different custody disputes have you

 9    responded to?

10        A.  Custody disputes?

11        Q.  Any sort of dispute?

12        A.  Hundreds.

13        Q.  And is it uncommon for officers to

14    back up a supervisor when they're called

15    out to a scene?

16        A.  No.

17        Q.  Why is that?

18        A.  Just to -- officer's safety, Number

19    1.  And, also, to clarify anything with

20    the supervisor.

21              MS. FUNG:  I think that is

22        it.

23    BY MS. FUNG:

24        Q.  Oh, you were asked by Attorney
```

**Michael Navedo**
**September 11, 2018**

177

```
 1    McClam about disciplinary actions and you
 2    referenced a noise complaint issue; that
 3    one issue you responded to about a noise
 4    complaint.
 5           Do you remember what the outcome of
 6    that investigation was, meaning were the
 7    findings against you sustained?
 8      A.   I don't recall that.  I just
 9    remember that I got a counseling memo.  It
10    was in district.
11                MS. FUNG:  Off the record
12           a minute.
13                (Discussion was held off
14           the record.)
15    BY MS. FUNG:
16      Q.   I'm going to show you what has been
17    previously marked as D353.
18                MS. FUNG:  This has been
19           turned over to counsel.  This is a
20           copy of the summary for the
21           incident.
22                Do you remember receiving
23           it?
24                MR. MCCLAM:  Sure.
```

Michael Navedo
September 11, 2018

178

```
 1   BY MS. FUNG:

 2       Q.  Can you state --

 3               MS. LASTOWSKI:  Are you

 4       going to mark this as an exhibit?

 5               MS. FUNG:  Yes.  We can

 6       mark this as 12.

 7               (Whereupon the document

 8       was marked, for identification

 9       purposes, as Exhibit Navedo-12.)

10   BY MS. FUNG:

11       Q.  Officer Navedo, can you state what

12   this document is?

13       A.  It's a complaint of Francisco

14   Ortega.  To Internal Affairs.

15       Q.  Can you briefly just review the

16   allegations against you?

17       A.  Should I read the whole thing?

18       Q.  Just review it briefly.

19       A.  Out loud?

20       Q.  No.  To yourself.

21           After briefly reading that, is this

22   the complaint -- the noise complaint that

23   was referenced earlier?

24       A.  Yes.
```

Michael Navedo
September 11, 2018

179

```
 1      Q.   Now, I want to take you to the last
 2   page, where the findings are.
 3           And do you see the conclusion?
 4   A.   Yes.
 5      Q.   Can you read that sentence?
 6   A.   Do you mean the top?
 7      Q.   Yes.
 8   A.   Officer Stephen Robinson and
 9   Officer Navedo are exonerated of the
10   allegation of lack of professional
11   service.
12      Q.   Thank you.  So that would mean
13   there were no sustaining -- sustained
14   against you regarding that incident?
15   A.   Correct.
16              MR. MCCLAM:  Object to
17        form.  Leading.
18              MS. FUNG:  Thank you.
19        That's all I have.
20              MR. MCCLAM:  I have a
21        couple of clarification questions.
22   BY MR. MCCLAM:
23      Q.   How many custody disputes have you
24   responded to since September 2015?
```

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

1      A.   I don't know.

2      **Q.   Dozen, 50?**

3      A.   I'm going to say -- I don't know.

4   I don't know, 50, hundred.   I don't know.

5      **Q.   Have you ever ordered the transfer**

6   **of custody from one parent to another?**

7      A.   I've asked.   Never ordered.

8   They're not orders.   Whatever it's written

9   in the papers from the judge, I'm telling

10  them or reminding them what the orders

11  are, and what's being said and what's

12  agreed upon.   If not they have to go back

13  to court and take it back up to them.   I'm

14  not going to order anybody to do anything

15  because we can't technically do anything.

16  That's up to a judge.   You have to go back

17  and fight that in court.   That's what I'm

18  saying.

19              MR. MCCLAM:   No further

20          questions.

21              MS. LASTOWSKI:   Nothing

22          for me.

23                   -   -   -

24              (Witness excused.)

**THE MCS GROUP, INC.**

**Michael Navedo**
**September 11, 2018**

1                          -   -   -

2                     (Whereupon, the deposition

3              concluded at 1:44 p.m.)

4                          -   -   -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

C E R T I F I C A T I O N

I, JO-ANNE M. BOSLER, a
Professional Court Reporter and Notary
Public, do hereby certify that the
foregoing is a true and accurate
transcript of the stenographic notes
taken by me in the aforesaid matter.

DATE:     SEP 2 6 2018

*J-anne M. Bosle*

JO-ANNE M. BOSLER

Michael Navedo
September 11, 2018

Page 183

**A**

**a-c (1)**
24:1
**a.m (11)**
1:16 26:1 55:16
76:19 79:8 82:3
122:20 123:20
124:15 139:6 140:3
**abide (1)**
48:7
**ability (2)**
7:17 8:9
**able (4)**
8:13 62:22 136:19
148:16
**Absolutely (2)**
70:22 176:6
**abusive (1)**
60:10
**acad (1)**
114:16
**academy (28)**
21:21,24 22:2,5,9,17
22:23 38:11 45:18
45:21 46:16 47:1,17
114:17,19 115:3,6
144:4,7,10,14
153:11,23 160:12
160:24 161:6,14,15
**accept (1)**
142:24
**accepting (1)**
146:19
**accident (1)**
42:3
**accidental (2)**
30:2,5
**accidentally (1)**
31:1
**accurate (5)**
8:3 12:16 109:13
112:24 182:7
**accurately (5)**
7:18 8:14 119:10
132:22 136:5

**acronym (1)**
84:11
**action (4)**
1:2 29:24 44:3,9
**actions (5)**
27:22 28:2,7 31:6
177:1
**active (1)**
41:23
**activity (4)**
3:17 126:21 129:9,11
**actual (1)**
47:5
**address (4)**
50:16 72:8 81:13
170:7
**addresses (2)**
155:10 171:5
**adult (5)**
35:12,15,17,18,22
**advice (1)**
10:5
**advised (2)**
80:17 120:3
**affairs (12)**
3:15 11:17,21 13:6
31:20 32:20 112:16
113:23 114:6
115:12 173:8
178:14
**affluent (1)**
70:6
**aforesaid (1)**
182:8
**afternoon (2)**
7:14 141:12
**age (1)**
35:18
**agent (5)**
20:8,10,12,16 21:1
**aggressive (1)**
22:14
**ago (6)**
14:23 23:11 31:15
117:23 171:24

176:1
**agree (6)**
87:2 145:4,22 146:21
151:23 152:6
**agreed (4)**
63:4 69:24 87:15
180:12
**agreement (1)**
4:1
**ahead (5)**
10:6 56:7 73:2
132:19 174:17
**air (5)**
72:7 80:1 111:7
124:8,20
**Alex (1)**
140:24
**Alexandra (2)**
2:7 4:21
**allegation (1)**
179:10
**allegations (1)**
178:16
**alleged (1)**
32:7
**allowed (8)**
16:23 31:11 40:2
69:18,20,23 88:6
151:18
**amended (2)**
158:5,13
**amendment (2)**
169:15,17
**amendments (2)**
169:14,21
**and/or (2)**
95:21 133:17
**announce (3)**
92:18 104:5,8
**announced (1)**
104:9
**announcing (1)**
104:12
**annual (3)**
153:14,20 154:16

**answer (35)**
5:23 6:3,18,23,24 9:8
9:13 10:5,7,8,10
14:5 27:8 34:6,22
35:21 39:16,19 40:2
61:7 70:10 75:13
78:1 85:17,24 87:8
103:17,20 118:23
137:1 151:18,21
152:23 156:8
174:18
**answered (3)**
65:4 103:8 105:3
**answering (3)**
9:19,22 80:8
**answers (5)**
3:21 112:17 140:8
141:7 158:4
**anticipate (1)**
7:16
**anybody (5)**
11:12 50:23 65:6
111:8 180:14
**anymore (1)**
101:11
**Anytime (1)**
6:15
**aobut (1)**
112:20
**apartment (1)**
63:22
**apparently (6)**
12:6,8,12 29:1,4
131:16
**appear (1)**
66:24
**appearance (2)**
67:22 68:1
**APPEARING (1)**
2:22
**apply (1)**
141:4
**appointed (1)**
114:15
**appointment (4)**

Michael Navedo
September 11, 2018

114:11,13,18,21
**approximately (1)**
18:24
**Arch (3)**
1:15 2:4,13
**area (5)**
42:9 70:15,17,21
  116:16
**areas (1)**
155:12
**arranged (1)**
64:13
**arrest (6)**
51:21,23 52:1 129:10
  130:16,18
**arrested (2)**
34:16 35:14
**arrests (1)**
130:23
**arrival (1)**
138:2
**arrive (2)**
62:5 87:5
**arrived (2)**
62:7 82:9
**articulate (1)**
8:6
**ascertain (1)**
47:24
**asked (9)**
50:19 67:19 93:1
  140:9 141:19 159:5
  159:23 176:24
  180:7
**asking (12)**
5:22 9:24 24:18
  62:14 66:7 74:21
  96:7,21 97:8 121:16
  137:12 160:4
**assignment (3)**
114:24 115:1,4
**assignments (1)**
155:14
**assist (1)**
119:4

**assistance (4)**
43:16 81:2 106:13
  109:8
**Assistant (1)**
2:12
**assume (2)**
6:11 84:20
**attempted (1)**
119:2
**attend (1)**
15:9
**attended (2)**
47:16 153:10
**attention (6)**
43:21 44:18 105:2
  116:23 118:19
  155:9
**attorney (11)**
6:21,22 8:19,21 9:11
  10:16,20,23 11:13
  116:4 176:24
**attorney's (1)**
10:4
**Attorneys (3)**
2:5,10,15
**audio (5)**
54:15 137:8,14
  138:15 139:7
**audio/visual (2)**
53:20 54:16
**audit (1)**
173:8
**audits (1)**
173:5
**August (13)**
144:19,23 161:9
  166:16,18 167:7,9
  167:15 168:18
  169:2 170:14
  171:19,22
**authorized (2)**
88:2 89:1
**auto (1)**
50:11
**available (6)**

77:11,12 79:1 80:9
  137:19 138:20
**Avenue (2)**
56:19,24
**awake (1)**
7:11
**aware (5)**
33:10 57:13 143:3
  147:1,17
**awhile (1)**
40:4

——————————
**B**
——————————

**B (2)**
3:9 124:8
**back (60)**
34:12,14 48:10 49:2
  55:5 56:5 58:15,17
  58:20 63:2,7 70:1
  72:11 73:10,15,17
  81:21 83:12,17,19
  83:23 86:6,7 88:4
  88:15 90:16,24
  91:14,24 96:14
  97:14 98:10 100:22
  101:22 102:2 103:3
  103:11,13 109:8,17
  109:24 110:2,5,9,13
  114:8 118:24
  119:23 139:18
  148:12 149:5
  150:15 167:2,12
  168:2 173:23
  176:14 180:12,13
  180:16
**background (6)**
15:7 16:13,19 17:8
  34:21 67:11
**backup (2)**
81:15 124:9
**bad (5)**
87:17 129:18 147:7
  152:8,10
**bags (2)**
20:13,19

**based (1)**
35:22
**basic (3)**
16:19 17:8 49:18
**basically (22)**
19:5 22:10,14 30:9
  30:13,23 41:13 48:3
  76:9 77:22 84:11
  88:22 96:23 101:7
  102:22 107:1 122:9
  123:4 127:5 131:15
  134:19 169:23
**basis (3)**
9:17 10:1 150:19
**Bates (7)**
117:1,2 118:20
  119:24 143:15
  146:12 167:24
**beat (1)**
28:15
**bed (1)**
63:20
**began (3)**
76:18 79:7 153:8
**beginning (1)**
140:23
**begins (2)**
82:2 99:18
**behalf (4)**
4:19,22 5:1,8
**believe (36)**
12:12 15:12 19:24
  25:15 53:18 55:14
  58:16,21 59:4,8,13
  60:19 62:21 63:3
  64:19 65:11 67:11
  67:19,20 68:21
  71:11 73:8 82:10
  84:16 93:11,12,13
  93:13 94:10,10,12
  105:5,8 127:2
  135:15 162:3
**believes (1)**
133:16
**Berkeley (10)**

15:10,16 16:2,3,6,8
  16:11 17:18,23 18:2
**best (3)**
6:10 50:7 112:23
**better (1)**
49:16
**bit (3)**
8:4 15:18 84:5
**block (1)**
70:14
**blocks (1)**
83:2
**BO (2)**
124:4,5
**board (9)**
33:12,12 43:22 44:18
  44:19 71:12,14,15
  130:24
**BOCKIUS (1)**
2:7
**body (3)**
54:2,12,14
**born (1)**
37:14
**Bosler (3)**
1:16 182:4,16
**bottom (10)**
79:13 99:16,23
  107:24 116:24
  129:4 131:9 146:12
  166:15 168:5
**box (4)**
52:5 127:8,10,18
**break (5)**
6:15 54:21,23 55:6
  111:18
**brief (5)**
27:10 55:2,6 111:19
  160:20
**briefly (4)**
30:12 178:15,18,21
**brings (1)**
69:24
**broad (1)**
15:2

**brother (3)**
37:6,10,13
**burglary (2)**
50:10 51:3
**business (3)**
15:5 16:7 107:22

---
**C**

**C (3)**
2:1 182:1,1
**C21 (1)**
123:23
**call (83)**
38:18 43:7,12,19
  44:4,10 47:8 49:14
  58:22 72:3,21 73:9
  73:24 74:7,11,20,22
  75:3 76:18,21,24
  77:1 78:5 80:8,13
  81:14,15,22 82:6,12
  82:16 83:8,19 84:21
  90:1,18 91:15,18,22
  91:24 94:5 95:17
  98:6 99:5,9,23
  100:9,21 102:3
  103:4 104:18
  109:21 111:9 117:1
  120:6,10,17,22
  121:2,10 124:2,2,3
  125:22 126:4 129:9
  130:9 131:6 137:6
  139:5 140:2 146:6
  154:13 155:5,6,15
  155:21 170:7 171:4
  171:13,14,19
  172:12
**called (21)**
45:6,7 63:3 69:22
  74:9 84:14 97:14
  101:22 109:8,24
  110:5,9 123:6 138:1
  139:17 147:18,24
  150:7 153:17 155:5
  176:14
**calls (13)**

39:15 42:11,19 78:9
  129:21,22,24 130:2
  130:4,23 131:8
  145:23 172:2
**camera (1)**
54:3
**cameras (1)**
54:12
**captain (1)**
27:17
**captain's (1)**
29:19
**car (28)**
30:10,10,14,15,18,19
  30:21 44:23 54:6
  57:7 63:2 71:20
  76:22 100:22 102:2
  102:7,11,15 126:2
  129:9 130:3,3,5,6
  130:11,12,15,19
**care (3)**
33:24 53:15 90:3
**cars (1)**
53:20
**case (5)**
12:24 31:9 116:13
  137:10 158:16
**cashier (1)**
19:6
**category (1)**
174:12
**causing (1)**
12:11
**center (1)**
77:1
**Centre (2)**
1:15 2:3
**certain (8)**
41:12,14 47:19 49:24
  52:2 58:15 156:7
  165:11
**certification (1)**
4:2
**certify (1)**
182:6

**chance (1)**
112:8
**change (2)**
35:21 140:10
**changed (1)**
160:21
**charge (2)**
27:15 160:20
**charged (2)**
28:21,23
**chart (2)**
129:5,7
**check (4)**
109:5 127:7,9 158:9
**checked (3)**
20:17,19 127:18
**checklist (1)**
172:4
**chemistry (1)**
39:1
**Chestnut (1)**
23:16
**child (49)**
45:17,22 46:5,15
  47:13,15,21 48:16
  49:4,10,19 57:19,20
  57:21 58:13,14,15
  58:17,20 60:3,5,21
  61:2,4 63:5 65:12
  65:18,21 67:17,19
  69:11 77:23 87:13
  133:17,21 134:20
  135:5,10,15 136:1,3
  136:10,19,20
  141:24 142:10,17
  142:19 149:19
**children (12)**
61:12,17 63:20 65:10
  67:5,12,13 132:11
  141:20 142:4,20
  149:11
**Cira (2)**
1:15 2:3
**circumstance (2)**
43:10 88:18

Michael Navedo
September 11, 2018

circumstances (4)
42:23 87:3 118:12
133:15
citizen (16)
85:10 86:21 88:3,7
88:12 89:2,6 145:23
148:18,20 150:18
151:5,24 172:2
174:5 175:4
citizen's (8)
32:11 33:4,6,11
143:1 146:20
173:12,16
citizens (3)
151:12 152:4 155:11
city (4)
1:7 2:11,12 70:16
civil (3)
1:2 2:13 74:5
civilian (1)
31:17
civilians (1)
51:14
civilized (1)
85:5
clarification (4)
6:9,11 158:10 179:21
clarified (2)
69:21 109:7
clarify (4)
6:10 17:19 74:8
176:19
class (1)
47:5
clear (5)
8:2 14:2,3 34:4 158:3
clearly (3)
8:6 35:2 66:4
clerk (2)
19:5,13
client (1)
5:3
close (1)
84:12
co-counsel (2)

141:3 153:6
colleague (1)
36:16
collects (1)
165:3
college (3)
15:8,9,18
colon (1)
76:17
column (3)
162:17,21 165:22
combat (1)
22:12
come (11)
42:11,20 49:15 59:22
66:3 68:11,20 93:3
114:7 150:14 171:8
comes (7)
90:7 130:5,9 131:7
155:20 160:16
171:4
comfortable (2)
17:2,5
coming (8)
86:16 109:17 119:5
119:13,17,20 121:8
139:22
command (7)
80:4 81:3,7 100:15
101:5 139:15,20
commencing (1)
1:16
commission (1)
161:1
commissioner (2)
160:13 173:7
commissioner's (4)
46:13 132:23 161:3,4
common (1)
104:11
communication (6)
73:14 81:20 82:8
100:2,6 101:14
complain (2)
147:24 150:8

complainant (11)
33:18 41:18 43:15
51:4 63:3 81:2
88:14 89:20 119:4,6
150:21
complainant's (2)
50:22 136:2
complainants (1)
110:16
complained (4)
65:13 147:2,3,19
complaining (2)
58:12 136:4
complaint (72)
3:23 11:23 29:2
32:12 33:6,11,14,20
33:22,24 43:3,4,5,8
43:11 50:12 57:9
64:6 71:12,13,15
84:22 85:15 86:5,10
86:16,24 87:1 88:12
89:2,6,12,18 90:3,8
96:18 97:3 98:17,18
98:24 101:12
105:11 111:9
124:12,17 145:15
145:16,24 146:7,20
148:9,19,20 150:14
150:19,20 151:6,9
151:24 172:3
173:12,16 174:5,6
174:20,21 175:5
177:2,4 178:13,22
178:22
complaints (21)
33:4 43:2 85:10
86:20,21 88:3,7
125:15 143:1,17
146:17 148:15
152:5 155:10
166:22,24 168:9,12
169:16 172:23
173:20
complete (4)
90:12 107:20 108:13

128:8
completed (3)
150:1 163:20,22
completes (1)
52:12
completing (1)
115:6
compliance (2)
173:5,17
complicated (1)
42:1
computer (29)
33:13 44:20,22 45:1
45:12 57:7 71:18
72:14,16,19 78:17
78:20 81:12 84:1
108:21 110:3,11
115:17 122:9,11
123:20 124:16,23
125:20 126:1 172:7
172:9,16,22
concerns (2)
60:2 155:11
concluded (1)
181:3
conclusion (1)
179:3
conduct (3)
43:6 85:11,15
conducted (3)
155:4 159:7,24
conducting (2)
30:10,14
conducts (1)
115:13
confirm (1)
162:12
confirmed (1)
167:20
conflict (1)
87:10
confront (3)
85:14 150:21 151:8
confusing (1)
158:16

connection (1)
106:1
consider (2)
37:15 133:21
consulted (1)
172:16
contact (10)
49:7,9 60:15 87:12
93:1,3 105:12
134:15,19 142:5
contacted (4)
51:8 87:11,13 135:2
contemporaneousl...
163:17
context (2)
14:15 15:4
continuation (1)
128:15
contrabands (1)
20:13
control (1)
50:17
conversation (1)
101:8
convicted (2)
34:18 35:11
convinced (1)
69:10
copacetic (1)
74:5
copies (2)
170:24 171:2
copy (4)
171:9 172:4 175:1
177:20
corner (9)
77:5 79:13 95:9
99:16 102:6 117:1
162:15 163:3 168:5
corporal (5)
27:13 165:1,4,15,19
correct (81)
11:7 12:22 28:7
35:19,23,24 40:15
44:23 55:8 64:7

65:19 76:20 79:10
80:1 84:15 86:22
90:14 97:4 101:17
108:7 110:6 113:9
113:10 116:2
117:21 120:7,23
121:4,11 123:16
124:13 127:18,19
127:21,22 135:6,11
136:12,13 142:1,2
142:12 144:20,23
144:24 145:2,3,7,8
146:3,4,8 147:5,15
147:20 148:1,11
149:12,13,16,20,23
150:3 151:3 153:11
153:15 154:7,22
155:3 161:10,14
162:16 167:10,11
168:18,23 174:7
175:8,11 176:1
179:15
correctly (2)
117:11 145:20
cough (1)
125:6
counsel (3)
4:1 141:14 177:19
counseling (3)
29:11,15 177:9
counselling (1)
29:9
count (1)
130:8
counted (1)
129:11
County (1)
15:18
couple (8)
5:21 14:23 83:2
90:22 137:8 170:11
175:20 179:21
course (1)
107:21
courses (2)

22:16,18
court (46)
1:1 4:16 5:24 6:3
7:20 13:5,8,17 14:8
18:4,5,6,8,9,12
19:11,16,19 20:18
20:21 23:19,22 30:4
37:7 52:23 56:20,22
59:14 64:12,20,23
66:10 68:14 75:15
77:15 107:5 111:23
119:19 121:20
125:5 126:7 132:2
165:16 180:13,17
182:5
courtroom (1)
13:24
cover (1)
46:4
CPOL (1)
124:11
create (1)
8:3
creating (1)
49:12
credit (4)
130:17 131:1,5,8
crime (5)
34:19 35:12 70:15,17
70:21
criminal (1)
22:11
cross (1)
165:7
curb (1)
30:16
cursing (2)
95:16 98:14
custody (48)
3:18 45:17,22 46:5
46:15 47:13,15,21
48:1,16 49:4,10,19
57:10,14,17 59:13
61:13 62:16 65:22
67:18 69:11 77:21

80:20 107:2 125:16
132:11 133:1 134:6
134:14,17,21 135:6
135:9,19,23 136:1,9
136:18 141:24
142:11 149:7,10,15
176:8,10 179:23
180:6
cut (2)
47:1 73:3
CVNs (1)
130:22

———————————
**D**

D (1)
3:1
D061 (1)
117:2
D074 (1)
79:13
D076 (2)
99:15,24
D133 (2)
128:9 131:9
D282 (1)
143:15
D284 (1)
146:12
D304 (1)
132:15
D306 (1)
134:1
D353 (1)
177:17
D374 (1)
166:12
D378 (2)
167:24 168:5
D68 (1)
122:18
D69 (2)
123:19 125:9
D74 (1)
120:1
D76 (2)

Michael Navedo
September 11, 2018

102:3 120:17
**dad (1)**
37:15
**danger (1)**
60:6
**Danielle (2)**
116:3,10
**dark (3)**
62:10,12 63:14
**Darus (8)**
1:3 2:10,24 4:23 5:4
12:24 77:1 141:1
**database (1)**
172:16
**date (23)**
21:6 50:18 113:4
114:11,13,14,18,21
115:1,4,5 144:17,22
162:17 164:8
166:15 167:6,10
168:17,21 169:13
170:8 182:13
**dates (1)**
162:18
**daughter (2)**
60:10,17
**Davis (2)**
25:15,16
**day (14)**
55:13,20 57:5 59:3
62:23 63:6 69:21
114:17,19 129:12
164:3,20 165:12
170:5
**days (2)**
38:20 162:18
**DC (3)**
80:3,11 81:6
**de-escalate (1)**
89:11
**Dechert (2)**
1:15 2:2
**decide (3)**
41:21 52:11 82:15
**decided (3)**

29:14 121:1,9
**decides (1)**
141:16
**decision (2)**
41:11 82:11
**decisions (1)**
42:5
**Defendants (2)**
1:9 2:15
**Definitions (1)**
133:11
**delegate (3)**
41:15 42:5,8
**delegating (1)**
48:21
**deliver (1)**
61:5
**delivered (1)**
136:3
**department (32)**
2:11 20:6 21:4,7,11
21:16 26:13 27:23
31:7 53:19,22 54:6
59:23 116:9 132:10
142:22,24 143:4,17
143:19 145:13
146:1,18 153:9
159:8 160:1 167:1
168:13 173:4 174:3
174:11,13
**departments (1)**
19:6
**depends (2)**
43:20 51:20
**deposed (1)**
5:18
**deposition (10)**
1:15 5:14 6:22 10:19
10:24 13:4 140:11
140:23 141:2 181:2
**depositions (1)**
39:24
**depth (6)**
16:21 17:10,11,13
45:4 160:19

**describe (20)**
28:1,3 30:8 31:10
37:2 50:7 51:10,13
58:9 61:15 67:22
70:2 77:9 102:23
106:14 132:22
142:3 159:11 160:9
168:24
**described (2)**
75:5 133:22
**description (8)**
3:11 45:3 52:4 109:3
109:13 160:21
162:22 163:4
**designated (1)**
108:24
**desk (1)**
19:13
**detail (4)**
50:19 51:18,22
168:24
**details (4)**
15:3 50:24 52:3
102:21
**detective (1)**
51:9
**devices (2)**
54:14,17
**different (11)**
25:3 40:18 79:4
88:17 142:6 152:20
153:23 159:22
169:15 173:6 176:8
**direct (1)**
157:13
**directed (2)**
80:13 157:7
**direction (2)**
136:3 172:14
**directive (42)**
3:19 142:23 143:4,16
144:5 145:4,19,23
148:12,22,24
150:17 159:9,13
160:3,6,11 161:8,12

166:24 167:3,6,16
167:19 168:10,12
168:17,22 169:3,16
170:10,15 171:1,2
171:15,19 172:5,17
172:22 173:1,18
174:1
**directives (11)**
46:1,4,12,12 153:24
154:4,4 160:13
161:1 169:15 173:7
**directly (3)**
46:6,7 47:18
**directs (1)**
148:17
**disagrees (1)**
150:19
**Disanto (30)**
27:1,3 41:4,7 73:6,15
73:21,24 74:19
81:14,21 82:8 83:6
87:5 100:7 101:15
102:4,14,18 103:2
103:11,14,19 104:5
104:16,22 105:4
128:17,19 148:4
**discharge (2)**
30:3,5
**disciplinary (6)**
27:22 28:1,6 29:24
31:5 177:1
**disciplines (1)**
28:4
**disclosure (1)**
151:11
**discuss (5)**
16:24 102:17,20
116:19 155:20
**discussed (2)**
146:23 153:5
**Discussion (9)**
18:21 35:8 36:11
42:16 75:22 140:16
156:17 159:18
177:13

Michael Navedo
September 11, 2018

**dispatch (2)**
45:13 76:24
**dispatched (3)**
45:7 124:4 134:7
**dispatcher (1)**
76:8
**dispatcher's (1)**
124:2
**Dispatcher/Radio (...**
3:13
**disposition (1)**
78:23
**dispute (24)**
3:18 45:17,23 47:15
  47:21 49:20 57:10
  57:14,17 61:13
  62:16 65:22 67:18
  80:20 125:16 134:6
  134:14,18,21 135:9
  142:1,11 149:7
  176:11
**disputes (8)**
46:5,15 47:14 132:11
  133:1 176:8,10
  179:23
**distance (3)**
119:5,13 121:8
**distinction (1)**
78:14
**district (18)**
1:1,1 33:22 50:17
  54:9,10 57:16 70:20
  78:24 79:24 114:9
  115:3 125:13
  154:24 155:2
  161:17 174:23
  177:10
**District/Sector (2)**
125:4,10
**districts (1)**
54:2
**disturb (1)**
135:24
**divide (1)**
41:16

**dividing (1)**
129:8
**doctor (1)**
89:19
**document (36)**
12:2 66:12 75:16,17
  107:6,7 112:1
  121:19,22 126:8,9
  132:3,4,14 143:8,13
  143:15,22 144:9,13
  144:18 145:1
  156:22 157:1,19,24
  161:21 162:7,10,13
  163:4 165:9 166:9
  166:13 178:7,12
**documentation (7)**
59:7,9,11 63:24 64:6
  64:15,17
**documents (4)**
10:15,18 153:24
  156:20
**doing (7)**
55:19,22 92:15 165:2
  171:13,14 173:9
**domestic (2)**
78:19 80:20
**door (42)**
12:10 61:17 62:9,13
  62:14 65:3 66:5,6
  67:10,23 75:7,12
  86:8,14 87:23 91:5
  91:8 92:1 93:8,10
  94:15,19 95:20,22
  99:8 103:8,11,15,21
  104:22 109:12
  117:10,15,17,19,20
  118:1,5,8,12,16,17
**double (1)**
158:9
**dove (1)**
30:17
**Dozen (1)**
180:2
**drawn (1)**
30:18

**drive (6)**
53:11,13,14,15 61:23
  102:8
**driven (2)**
82:23 84:18
**driver (2)**
53:9,10
**driver's (1)**
22:14
**driving (5)**
22:15 52:20 83:4
  131:18,21
**drop (6)**
78:16,20 81:7,10
  123:9 125:6
**drove (6)**
53:12,15,18 71:9
  82:24 131:13
**due (3)**
57:19 58:14 109:6
**duly (1)**
4:9
**duty (3)**
55:10 57:5 59:2

---
**E**

**E (5)**
2:1,1 3:1,9 182:1
**earlier (7)**
36:19 135:13,18
  141:20 153:5 167:5
  178:23
**early (4)**
12:20 24:24 26:19
  55:10
**EASTERN (1)**
1:1
**ed (1)**
22:14
**educational (2)**
15:7 16:21
**effect (3)**
48:2 145:5 151:4
**effective (5)**
144:22 161:8 167:6

167:10 168:18
**eight (6)**
22:1,6 26:8,9 46:24
  55:15
**either (5)**
38:9 50:21,22 164:15
  165:3
**employment (1)**
17:22
**en (2)**
45:8 79:2
**encounter (4)**
68:22 69:5 71:8 79:7
**encourage (1)**
152:4
**encourages (1)**
151:10
**enforce (2)**
48:3,5
**enforcing (1)**
49:10
**engineering (1)**
16:6
**enrolled (1)**
15:15
**ensure (1)**
41:11
**enter (3)**
21:24 63:22 109:1
**Entered (1)**
123:23
**enters (1)**
108:21
**entire (2)**
70:16 145:12
**entirety (2)**
12:2 131:1
**entitled (1)**
136:18
**entrance (1)**
61:17
**entries (1)**
126:24
**entry (13)**
12:9 51:7 76:11

Michael Navedo
September 11, 2018

79:21 80:5,10 82:2
99:18,21 166:17
167:13 168:8,8
**environment (1)**
87:20
**equipment (5)**
54:10,11 57:6 127:7
127:9
**especially (1)**
70:21
**ESQUIRE (4)**
2:3,7,8,12
**established (1)**
59:14
**evaluation (1)**
173:15
**evening (4)**
58:23 69:11 113:14
113:20
**event (2)**
42:8 111:11
**events (1)**
176:3
**eventually (1)**
25:7
**everybody (1)**
165:5
**everybody's (1)**
164:4
**everything's (1)**
163:22
**exact (2)**
13:12 28:4
**exactly (1)**
100:11
**exam (1)**
47:9
**EXAMINATION (...**
4:12
**examined (1)**
4:9
**example (4)**
50:9 130:16 169:12
174:19
**exception (1)**

69:19
**exchange (1)**
82:3
**exchanged (3)**
87:18 88:20 101:9
**exclusively (1)**
53:13
**excuse (7)**
13:18 28:10 65:20
74:18 105:6 146:11
157:8
**excused (1)**
180:24
**executive (2)**
159:8 160:2
**exhibit (19)**
66:11,14 75:19 107:9
111:23 112:3 117:3
121:24 126:8,11
132:6 143:7,10
156:24 157:3
161:19,23 178:4,9
**Exhibit-10 (1)**
157:9
**Exhibit-11 (3)**
161:20 167:13,23
**Exhibit-2 (5)**
76:2,7 91:14 99:14
119:24
**Exhibit-3 (3)**
107:11,13,17
**Exhibit-4 (6)**
112:6,9,11,15 113:1
118:22
**Exhibit-5 (2)**
122:2,4
**Exhibit-6 (7)**
126:13,16,20,22
127:4 128:9 131:20
**Exhibit-7 (2)**
132:8,20
**Exhibit-8 (5)**
143:7 160:5 167:2,19
173:24
**Exhibit-9 (5)**

156:20 157:6,17,24
158:19
**exist (2)**
133:15 161:12
**existence (1)**
145:16
**exists (1)**
135:6
**exonerated (1)**
179:9
**experienced (1)**
152:20
**explain (2)**
49:15 88:10
**explained (2)**
99:7 164:5
**explaining (1)**
62:17
**explosives (1)**
20:14
**express (1)**
60:2
**extended (2)**
62:23 69:21

_____

**F**

**F (1)**
182:1
**fact (4)**
61:3 136:18 149:2
150:7
**facts (1)**
133:14
**fading (1)**
14:10
**fail (1)**
22:22
**fair (1)**
69:3
**fall (4)**
28:21,23 88:15
174:12
**familiar (4)**
76:4 107:15 112:13
126:18

**family (1)**
64:12
**far (2)**
83:1 140:9
**father (3)**
58:13 60:16 134:20
**February (4)**
21:8,17 22:3 114:22
**feel (6)**
17:1,4,10,12 98:16
143:12
**feeling (1)**
7:6
**female (9)**
12:6 57:15,18 62:13
137:18,22 138:19
142:7,19
**fifth (1)**
168:8
**fight (1)**
180:17
**figure (1)**
72:23
**figured (1)**
72:6
**file (6)**
33:22 146:6 174:20
174:21,22 175:5
**filed (4)**
32:11 96:18 97:2
148:9
**filing (1)**
4:3
**fill (11)**
49:24 52:17 105:24
106:6 110:16,23
126:22,24 127:1
154:14 175:2
**filled (2)**
105:20 106:3
**filling (1)**
90:8
**final (2)**
161:18 163:13
**find (3)**

Michael Navedo
September 11, 2018

134:14 148:17
174:24
**finding (1)**
96:14
**findings (2)**
177:7 179:2
**fine (5)**
7:19 63:5 69:3 119:2
153:3
**finger (1)**
31:1
**finish (4)**
34:5 140:10 171:16
174:18
**finished (2)**
14:4 45:10
**fire (1)**
42:7
**fired (1)**
30:24
**first (32)**
6:18 18:1 21:9 28:13
28:15 47:24 59:1
66:16 68:22 69:6
71:4,7 75:7 76:11
76:12 77:3,9 79:6
79:23 85:13 114:16
114:18 115:5
118:17 119:1 138:3
144:2,4 145:10
146:1 147:17
149:14
**fit (1)**
52:4
**five (7)**
20:1 33:2,3 91:1
123:12,15 166:15
**flashing (1)**
92:9
**flashlight (1)**
63:10
**flashlights (1)**
92:10
**flip (2)**
146:10 173:23

**flipping (1)**
157:22
**Floor (1)**
2:3
**follow (10)**
47:20 82:20 84:6,10
100:14 101:4
141:18 146:19
149:6 175:10
**following (1)**
173:6
**follows (1)**
4:10
**foot (1)**
28:15
**FOP (3)**
116:5,5,6
**force (2)**
24:22 40:14
**forced (1)**
12:9
**forcefully (1)**
12:10
**foregoing (1)**
182:6
**forgetting (1)**
141:9
**form (15)**
4:4 29:21 39:15
50:15 52:5 61:7
70:10 85:17 87:8
105:14 136:24
151:16 152:23
154:15 179:17
**formal (7)**
145:16 146:2 159:6
159:12,24 160:10
175:9
**forms (5)**
51:19 52:18 107:20
110:17,23
**forward (1)**
30:15
**found (3)**
61:2 101:10 136:17

**founded (4)**
134:5,14,17,21
**four (6)**
20:1 23:10,11 68:5
166:14 168:7
**Francisco (1)**
178:13
**frank (1)**
151:11
**Fraternal (1)**
116:7
**free (1)**
143:12
**frequent (1)**
111:11
**fresh (1)**
176:4
**friends (2)**
36:23 41:6
**friendship (1)**
37:3
**frightened (1)**
93:21
**front (11)**
13:23 63:21 66:6
94:18 95:20,22
128:15 148:13
167:4,19 173:24
**fuck (1)**
117:9
**full (3)**
5:15 151:11 160:15
**Fung (53)**
2:12 3:7 5:7,7 8:24
9:4,12,16,24 10:6
10:10 16:18 17:7,14
17:19 18:18 34:23
35:3,7 36:5 39:14
39:18 42:14 54:22
61:6 66:15 70:9
75:20 85:16,23 87:7
136:23 140:20
147:9 150:23
151:15 152:22
156:14 158:2,8,14

159:15 175:20,23
176:21,23 177:11
177:15,18 178:1,5
178:10 179:18
**further (5)**
81:2 120:8 150:16
174:17 180:19

---

**G**

**general (4)**
40:21 50:6 100:11
110:20
**generally (3)**
88:13 104:23 110:21
**gentleman (1)**
62:15
**getting (4)**
15:3 29:9 122:10
163:23
**give (19)**
11:17 13:12 15:2
27:10 47:1 49:1
50:9 58:17,20
104:12 140:18
151:19 160:17,20
164:23 169:24
170:1,4 175:1
**given (4)**
46:20 57:15,16
155:13
**gives (1)**
46:2
**giving (2)**
116:11,20
**go (51)**
5:20 10:6 18:18
21:17 29:13 32:20
32:22 33:15,16,21
34:23 42:15 43:6
46:18 48:11 52:6
56:7 60:22 64:9,12
71:7 73:2 75:20
78:11,17,21 79:11
83:16,22 90:2,16
102:2 103:10

Michael Navedo
September 11, 2018

111:16 114:8
127:23 130:24
131:2 132:19 134:1
135:4 140:15
141:12 150:20
156:14 159:15
172:7 174:17,23
180:12,16
**goes (6)**
27:9,16 42:5 105:15
132:16 169:19
**going (69)**
5:13,20,22,24 16:20
17:7,9 29:14 42:19
45:24 48:22 49:17
54:8,20 58:17,20
61:20 62:18 63:7
64:9 66:9 75:6,8,14
80:16 81:13 83:12
83:19 85:1,7 86:9
87:15,22 89:10 91:6
96:9 97:10 98:23
99:13 107:4 111:16
111:22,23 117:6
118:24 121:19
126:6 131:22,24
132:1 137:4,6,8,12
139:5 141:12
157:22 159:21
160:22 162:20
164:14 173:21,21
175:6,21 177:16
178:4 180:3,14
**Good (1)**
5:12
**graduate (1)**
16:8
**graduated (1)**
115:2
**grocery (1)**
19:6
**GROUP (1)**
1:21
**guess (13)**
20:7 27:11 28:14

29:17 41:23 58:2
100:17 101:9 116:5
117:17 136:6 138:9
138:24
**guidance (1)**
172:13
**guideline (1)**
46:2
**guidelines (1)**
46:8
**guy (9)**
28:22 30:16 48:18,19
48:21 52:20,21,21
104:4
**guy's (1)**
52:20
**guys (4)**
36:23 38:1 39:7,10

## H

**H (1)**
3:9
**half (2)**
10:13 68:5
**halfway (3)**
79:14,18 99:14
**hand (4)**
29:13 49:4 111:22
121:19
**hand-to-hand (1)**
22:12
**handed (3)**
143:14 157:5 162:3
**handle (10)**
38:3,6 41:14,21
45:20,22 49:13,19
78:18 119:7
**handled (2)**
86:17 97:10
**handling (1)**
86:24
**handwritten (1)**
162:14
**happen (1)**
171:17

**happened (16)**
28:19 51:2 62:7
67:21 71:2,10 72:23
88:23 98:9 99:7
102:21 103:6 105:3
112:17 149:2
152:10
**happens (7)**
32:24 52:19 88:12
108:13,19 111:12
169:7
**hard (2)**
34:9 94:23
**he'll (3)**
130:7 171:6,7
**head (3)**
6:4,5 88:22
**heading (4)**
114:11 145:9 146:15
148:14
**headquarters (2)**
56:16 61:24
**health (1)**
133:16
**healthy (1)**
38:18
**hear (6)**
8:2 43:18 82:3 92:2
94:23 104:21
**heard (15)**
44:3 72:12,20 82:6
84:13,20 90:17,23
91:8,23 92:5 94:16
95:22 96:17 124:19
**held (10)**
1:15 18:21 35:8
36:11 42:16 75:22
140:16 156:17
159:18 177:13
**help (3)**
37:22 53:5 131:24
**helps (1)**
160:8
**hey (1)**
116:13

**high (4)**
15:24 70:15,17,21
**higher (1)**
81:3
**highest (1)**
123:13
**hire (1)**
116:8
**history (2)**
16:22 35:1
**Hmm (1)**
76:23
**Hmm-mm (8)**
25:23 76:13 80:12
108:5 126:15
133:13 142:13
148:6
**hold (4)**
77:13 120:15 137:20
138:21
**holding (1)**
79:3
**holiday (3)**
62:21,23 69:20
**home (17)**
12:9,13 99:4 101:19
141:22 142:6 147:4
147:13,23 148:8,19
149:9,12,22 150:3
151:8 152:2
**honestly (2)**
96:7 117:22
**hostile (2)**
87:19 117:8
**hour (3)**
10:13 54:20 111:16
**house (3)**
58:24 63:23 94:24
**Huh-huh (1)**
127:9
**hundred (1)**
180:4
**Hundreds (1)**
176:12
**Hunter (39)**

1:3 2:10,24 4:23
5:4,4 12:24 58:19
58:22 60:9 64:1,14
65:7 67:23 68:23
69:9 70:3,23 71:3
77:1 93:15,24 94:9
94:23 95:12 96:3,10
97:2,6,12 98:5
136:20 141:1 145:6
147:2,18 149:15,19
152:19
**Hunter's (8)**
65:10 141:22 142:6
147:13,23 148:8
149:9 150:3
**hurt (1)**
31:3

---
**I**
---

**i-a-c (1)**
24:2
**idea (1)**
166:4
**identification (12)**
66:13 75:18 107:8
112:2 121:23
126:10 132:5 143:9
156:23 157:2
161:22 178:8
**identify (4)**
67:17 149:10 159:5
159:23
**ill (1)**
88:20
**illegally (1)**
12:14
**immediate (1)**
133:16
**immediately (1)**
90:16
**impact (1)**
7:17
**impair (1)**
8:9
**important (2)**

171:6,16
**in-district (1)**
29:12
**incident (26)**
11:3,6,10,14 12:18
30:1,8 31:10,14,16
59:1 70:24 89:8
102:17 106:1 111:8
112:20 113:8
116:19 122:13
128:4 175:24 176:5
176:7 177:21
179:14
**incidents (2)**
50:1 129:15
**include (5)**
50:15 51:19 109:19
110:21 158:3
**included (2)**
51:23 109:23
**includes (2)**
53:16 54:12
**independent (1)**
170:13
**individual (2)**
132:15 136:10
**individually (2)**
130:1,10
**inexperienced (2)**
39:13 40:10
**inform (5)**
43:23,24 86:12
145:14 146:1
**informal (4)**
159:6,12,24 160:10
**information (9)**
16:13 45:1,11,14
50:14 110:20 128:8
157:12 175:6
**informed (1)**
174:4
**informing (1)**
136:15
**initial (2)**
149:4 165:24

**initially (2)**
67:14 77:22
**input (1)**
45:14
**inputs (1)**
45:11
**inside (10)**
27:14 62:13 63:16
67:5 92:2 94:16,24
103:17 104:21
108:23
**instance (1)**
138:3
**instructions (2)**
5:21 7:4
**instructs (1)**
6:23
**intended (1)**
83:7
**interaction (15)**
95:4 96:6 97:1 98:12
100:23 101:20
102:9 106:15
110:22 117:14
118:13 120:21
149:14 152:15,21
**interactions (8)**
12:19 51:10,13
102:23 109:14
110:15 111:2 145:5
**internal (12)**
3:15 11:17,20 13:6
31:20 32:20 112:16
113:22 114:5
115:12 173:8
178:14
**interrogatories (7)**
3:20 156:2,4 157:7
157:11,16 158:20
**Interrogatory (2)**
3:21 157:23 159:1
**interview (5)**
3:15 112:16 114:7
115:21 121:12
**Interviewed (1)**

115:8
**interviews (3)**
113:23 115:13
156:12
**introduce (1)**
4:15
**introduced (1)**
140:22
**invest (6)**
77:14 78:1 105:5
123:8 137:21
138:22
**investigate (8)**
77:17,20 78:2 105:7
105:9,14 122:23
148:9
**investigating (1)**
146:20
**investigation (2)**
31:20 177:6
**investigations (1)**
32:5
**involved (2)**
29:10 42:3
**involving (4)**
30:2 31:16 132:11
133:1
**irate (10)**
75:9,9 88:14 92:8
93:19,22 95:8,15
98:13,20
**irrelevant (1)**
14:21
**issue (12)**
49:13 57:14 65:18
74:6 77:22 89:21
107:2 135:15
144:17 149:20
177:2,3
**issued (3)**
144:19 167:9 168:17
**issues (2)**
151:12 155:11
**issuing (1)**
65:1

Michael Navedo
September 11, 2018

**item (1)**
162:21
**items (1)**
51:7
**IVPRM (1)**
122:22

**J**

**jeopardy (1)**
133:18
**Jo-Anne (3)**
1:16 182:4,16
**job (47)**
17:23 18:1 20:4
41:14,15,22,24 42:2
43:6,20,24 44:7,12
44:14 45:4,9,19
48:3 50:20,20,24
51:2,21 52:22,24
57:15,17 69:7 75:5
78:16 81:3 82:21
84:11,12,13 86:18
106:19 107:1,19
110:10 114:15
115:5 123:5,7 131:1
150:6 174:9
**job's (1)**
45:5
**jobs (7)**
38:3,7 41:12 44:21
50:7,12 52:2
**jog (1)**
160:8
**John (3)**
2:3 4:18 5:13
**Joseph (3)**
115:9,11 121:13
**judge (7)**
13:23 48:23 64:22,22
64:24 180:9,16
**judge's (1)**
48:4
**jump (1)**
34:10
**juvenile (1)**

109:5

**K**

**keep (1)**
14:9
**Kenya (4)**
1:3 2:5 4:19 12:24
**kept (1)**
39:2
**kid (2)**
48:7,11
**kind (13)**
22:8 34:8 41:20 43:4
46:1,17 50:14 51:24
64:5 129:5 130:14
131:19 170:3
**Kingsessing (2)**
102:6,12
**knew (1)**
135:10
**knock (6)**
65:3 77:24 86:8
103:7,14 104:1
**knocked (16)**
62:9,13 75:7,12 78:3
86:14 87:23 91:5
92:1 95:21 99:8
103:23 104:2,22
105:10 109:10
**knocking (8)**
12:10 91:7,11 92:7
92:16 93:20 94:15
103:20
**knocks (1)**
103:24
**know (85)**
6:16 15:1 17:11 18:3
24:17,21 25:3,10
28:4 31:23 32:15,17
32:18,19,21 33:5
37:16 38:2 39:3,7,9
40:20 51:16 53:24
54:2 58:2,8 59:18
68:8 69:17 72:19
73:20 75:6 83:2,17

84:3 87:17 88:18
90:21 91:10,16,23
92:6 93:5 96:16
98:18 103:22,23
108:11,11 114:10
118:9 119:14 121:3
121:6,7 123:24
124:5 125:12
137:11 138:9,11,14
139:21 140:2
141:11 142:8,21
148:3 153:5 158:12
158:17 160:12
164:23 165:2,3,7,14
166:5 172:20,21
180:1,3,4,4
**known (2)**
70:15,20
**knows (1)**
81:13

**L**

**lack (1)**
179:10
**large (1)**
117:5
**lasted (1)**
170:21
**Lastowski (32)**
2:7 3:6 4:21,22 5:2
140:18,21,24 143:6
143:11 147:10,12
151:2,17,22 153:2,4
156:16,19 157:4
158:7,12,17,23
159:17,20 161:18
162:1 165:20
175:16 178:3
180:21
**law (4)**
1:15 2:11 22:11,11
**laws (1)**
22:11
**lawsuit (1)**
14:22

**lawyer (1)**
116:5
**lawyers (1)**
116:9
**laying (1)**
63:20
**Leading (1)**
179:17
**learned (1)**
147:23
**leave (3)**
38:9 98:11 102:1
**leaving (1)**
100:22
**left (25)**
16:10 17:17,23 18:2
69:6,6 71:2 74:4
77:4 82:19,22 84:24
85:4 95:8,23 98:15
98:19 99:1,3,9
101:18 131:9
149:22 152:8 163:3
**length (1)**
146:23
**let's (12)**
34:23 89:17 111:16
119:23 130:2 134:1
135:4 144:16,17
167:23 169:9 170:5
**level (1)**
155:2
**levels (1)**
123:11
**LEWIS (1)**
2:7
**lieutenant (47)**
26:22,24 27:3,17
41:4,6 73:6,15,20
73:23 74:19,21 80:7
80:14,16 81:14,21
82:8 83:6 87:5
100:7 101:15 102:4
102:14,18 103:2,10
103:14,19 104:5,16
104:22 105:1,4

Michael Navedo
September 11, 2018

115:8,12,18 118:24
119:5,12,15 121:3,7
121:13 128:17,19
148:4
**lieutenant's (1)**
29:20
**life (2)**
16:16 17:6
**light (3)**
62:10,12 63:18
**lights (1)**
94:13
**liked (2)**
38:24 53:11
**line (2)**
113:5 155:6
**lines (3)**
77:4 127:23 166:15
**lip (1)**
30:24
**list (3)**
44:21 164:3 170:2
**listed (2)**
102:3 145:18
**listening (1)**
137:24
**litigation (1)**
12:5
**little (9)**
8:4 15:18 31:15 40:4
46:8 52:5 79:4 84:5
130:15
**live (1)**
70:4
**LLP (3)**
1:15 2:2,7
**location (26)**
29:3 44:15 57:18
60:14 72:22 78:10
78:22 79:3 80:19
83:10,21,24 88:13
109:4,9 110:1,4,11
123:8 127:24 129:4
134:20 146:6
150:10,11 174:6

**locations (1)**
145:18
**log (5)**
3:16,17 122:7 126:21
129:1
**logs (1)**
128:22
**long (29)**
7:11 8:23 9:10 10:3
23:6 24:9 25:10
38:17 39:9 40:20
43:6 58:6 62:24
65:3 68:22 69:24
90:20 91:7,11,12
95:4,6,7 96:1,2
103:19,22 170:20
171:24
**longer (7)**
89:23 98:23 100:15
101:5,16 120:11
139:15
**look (23)**
72:13 79:18 99:14
107:24 119:23,24
127:7 132:14
133:11 135:22
143:12 144:16,17
145:9 148:12,21
156:21 158:18,24
162:2 166:14 172:9
172:16
**looked (5)**
124:20,22 159:14
167:5 172:21
**looking (11)**
30:20 76:11 91:14
104:24 113:4 125:9
148:14 157:14
161:13 167:14
169:13
**looks (5)**
162:7 166:1 167:12
168:16 169:14
**lost (1)**
50:11

**loud (8)**
103:24,24 104:3
108:16 109:3 171:7
171:20 178:19
**louder (2)**
8:4 104:1
**lowest (3)**
123:4,10,15

_____
**M**

**M (6)**
1:16 2:7 46:21,22
182:4,16
**M.D (2)**
166:3,10
**mad (2)**
92:6 93:23
**magistrate's (1)**
48:4
**main (2)**
48:3 107:1
**major (1)**
42:8
**making (6)**
77:11,11 89:17
105:12 148:20
151:9
**male (19)**
117:7 125:14,16,24
137:17,19 138:18
138:20,23 139:10
139:11,12,13,14,17
139:20,24 142:7,17
**management (1)**
16:7
**manner (1)**
43:16
**manpower (1)**
38:20
**mark (14)**
52:8 66:10 75:15
107:5 111:24
121:20 126:7
129:10 130:10
132:2 143:6 156:19

178:4,6
**marked (13)**
66:13 75:18 107:8
112:2 121:23
126:10 132:5 143:9
156:23 157:2
161:22 177:17
178:8
**Market (2)**
1:22 2:8
**material (5)**
163:2,8,12 164:10
165:8
**materials (5)**
3:22 162:4 163:10
164:12 170:24
**matter (13)**
11:24 28:19 31:12
32:4 73:5 106:11
109:6 141:1 150:5
152:16 156:2,10
182:8
**McClam (78)**
2:3 3:5 4:14,18,18
5:11,13 8:1 9:2,7,9
9:14,20 10:3,14
14:12 17:16,21
18:14,20,23 20:23
24:3 30:7 34:11,15
35:1,5,10 36:9,13
37:11 39:22 40:8
42:18 53:6 54:19,24
55:4 57:1 61:10
65:2 66:9,18,20
68:18 70:13 75:14
76:1 77:19 85:21
86:19 88:1 107:4,10
111:15,21 112:4
119:22 122:1 125:7
125:8 126:6,12
132:1,7 137:7,23
139:2 140:1,13
141:19 177:1,24
179:16,20,22
180:19

**McGarrey (4)**
115:9,11,18 121:13
**MCS (1)**
1:21
**MD (1)**
166:1
**MDT (5)**
3:16 122:7 127:15,20
150:9
**mean (58)**
9:16 19:2 22:18
30:10 33:9 35:18
37:12 38:19 44:5,19
48:5,19 51:1 54:2
56:15 63:6 64:3
70:5 71:13 73:2
75:2 76:5,17 80:6
81:10 89:7,15 94:2
95:7 97:8,15 98:9
103:23 108:17
109:17 111:4,12
112:20 115:15
116:6,13 121:15
123:3 124:19 125:2
131:12 134:13,18
137:4 148:21 151:4
160:17 171:3 172:6
173:8 174:16 179:6
179:12
**meaning (2)**
79:1 177:6
**means (6)**
72:19 78:2 82:20
101:23 123:24
125:12
**meant (1)**
114:10
**meat (1)**
19:7
**mechanical (1)**
16:6
**medications (1)**
8:8
**meet (7)**
8:20 9:10 57:22 58:6

116:10,12,14
**meeting (2)**
10:16 59:16
**MELVIN (1)**
1:8
**memo (7)**
3:18 29:9,11,15 52:1
134:3 177:9
**memorandum (8)**
46:13 132:10,24
133:3,9 161:3,4
173:7
**memorandums (2)**
154:12 160:14
**memory (2)**
8:9 160:9
**mentioned (3)**
29:23 141:23 160:23
**mentor (1)**
37:20
**message (3)**
3:16 101:4 122:7
**met (4)**
58:4 70:23 102:5,14
**Michael (6)**
1:7,8,15 3:4 4:8 5:17
**Michaela (2)**
2:8 4:24
**middle (3)**
48:18,19 117:5
**Middlesex (5)**
15:18,19,22 16:4,5
**midnight (2)**
59:19,22
**Millbridge (1)**
18:10
**mind (2)**
152:9 176:4
**mine (2)**
25:17 140:5
**minor (2)**
132:11 133:17
**minors (1)**
133:2
**minus (1)**

109:16
**minute (10)**
72:10 79:20 107:11
112:5 122:2 126:13
132:8 140:19
156:15 177:12
**minutes (4)**
58:8 69:2 83:4 90:22
**miscarriage (1)**
12:11
**mischaracterizatio...**
150:24
**Mohammed (25)**
58:1,4,7,9 59:5,6,17
59:21 60:2,8,13,22
61:3,5 64:2,5,18
65:13 133:22
134:22 135:8,14,19
136:18,21
**mom (4)**
37:14 48:10,12 69:22
**Monday (6)**
76:15 79:15 99:19
137:15 138:16
139:8
**month (5)**
129:12 169:10,24
170:5 176:4
**months (13)**
19:17 22:1,6 23:8,8,9
23:10,11,14 46:24
68:5 113:8 154:11
**MORGAN (1)**
2:7
**morning (13)**
5:12 12:20 26:3,9,19
55:11,15 66:23 67:2
128:18 146:24
147:4,14
**mother (3)**
49:1 87:12,14
**motor (1)**
22:11
**mouth (1)**
49:17

**move (1)**
153:3
**moving (2)**
30:15 130:21
**MPO (1)**
46:18
**MPT (1)**
78:20
**multiple (2)**
109:11 137:11
**municipal (8)**
18:4,6,8 19:10,15,19
46:22 153:18

———————————
N
———————————

**N (4)**
2:1 3:1 46:21 182:1
**name (9)**
5:13,15 50:18,22
57:24 131:10
140:24 162:14
164:4
**names (2)**
104:13,14
**Navedo (26)**
1:8,15 3:4,24 4:8 5:8
5:9,10,12,17 55:5
66:21 111:22 126:8
131:11 140:22
142:21 143:14
153:6 157:5,8 159:2
159:21 162:2
178:11 179:9
**Navedo-1 (3)**
3:13 66:11,14
**Navedo-10 (2)**
3:21 157:3
**Navedo-11 (2)**
3:22 161:23
**Navedo-12 (2)**
3:23 178:9
**Navedo-2 (3)**
3:13 75:16,19
**Navedo-3 (3)**
3:14 107:6,9

Michael Navedo
September 11, 2018

**Navedo-4 (3)**
3:15 111:24 112:3
**Navedo-5 (3)**
3:16 121:21,24
**Navedo-6 (2)**
3:17 126:11
**Navedo-7 (3)**
3:18 132:3,6
**Navedo-8 (2)**
3:19 143:10
**Navedo-9 (2)**
3:20 156:24
**Navedo/Schutte (1)**
108:3
**necessarily (1)**
33:21
**need (19)**
5:23 6:2,15 35:4
    38:11 41:12 45:19
    54:23 84:1 98:20
    100:15,19 101:6,9
    137:10 139:16
    155:13 172:7,14
**needed (6)**
72:24 74:3 101:16
    106:13 110:20
    120:11
**needing (1)**
81:2
**negative (2)**
78:3 105:11
**neighborhood (2)**
70:3,7
**never (3)**
53:11 54:7 180:7
**new (5)**
28:22 38:1 154:4
    160:21 171:4
**nice (1)**
53:5
**night (11)**
7:9 12:7 26:23 53:4
    128:24 129:1,2
    130:7 131:4,13,17
**nights (2)**

**26:11,16**
**nine (2)**
15:14 19:17
**Nitti (2)**
116:3,10
**nods (1)**
6:4
**noise (4)**
29:2 177:2,3 178:22
**Nope (2)**
5:19 94:20
**normal (2)**
55:17 83:18
**normally (5)**
25:20 44:14 78:8,15
    169:7
**Notary (2)**
1:17 182:5
**note (5)**
66:15 126:1 132:12
    132:17 152:8
**notes (2)**
8:18 182:8
**noticed (1)**
163:1
**notices (1)**
32:1
**notifications (1)**
51:8
**November (2)**
113:3,7
**NPO (1)**
46:21
**number (15)**
3:11 13:12 45:5
    50:18 79:12 116:24
    117:2 118:20 120:1
    132:15 157:23
    159:1,8 166:24
    176:18
**numbers (2)**
117:2 132:16

———————————
**O**

**O (1)**

**182:1**
**o'clock (2)**
7:13,14
**oath (4)**
13:9,16,20 55:8
**object (4)**
6:21 87:7 151:20
    179:16
**objected (1)**
39:18
**objection (14)**
9:3,5,18,21 39:14,15
    61:6 70:9 85:16,20
    136:23 150:23
    151:15 152:22
**objections (3)**
4:4 40:1 85:22
**objects (2)**
40:3 151:19
**obligated (1)**
146:1
**observed (3)**
51:6 173:11,14
**obviously (4)**
92:24 96:20 111:6
    131:23
**occasion (1)**
91:4
**occurred (3)**
11:6 165:13 175:24
**occurrence (2)**
50:16,17
**office (3)**
29:19,21 97:3
**officer (113)**
5:8,9,12 11:2,9,13
    14:18 21:12,15 23:1
    23:16 24:8,21 27:12
    27:13,18 29:3 33:20
    34:2 36:2,15 37:16
    37:20,22 38:6,13,23
    39:3,12 40:9,13,17
    42:3 45:8 46:22
    48:13,15 49:23 53:1
    53:7 54:5 55:5 56:4

**56:8 58:3 62:2**
66:21 74:17 84:23
85:11,15 87:4 88:2
88:6 89:1 90:2
92:12,16 94:4,21
95:13,18,21 97:13
98:3,24 100:20
103:9,10 106:6
108:17 109:20
110:8 111:13,22
115:5 116:20 120:9
120:21 124:15
125:15 126:2 127:1
131:19 133:15
134:4 135:24 136:1
136:8 138:2,10
140:22 142:21
143:14 145:15
147:3,19 148:17
150:18 151:7 153:6
153:18 157:5,8,9,10
157:17 159:2,21
162:2 178:11 179:8
179:9
**officer's (2)**
129:1 176:18
**officers (13)**
28:21 29:5 38:2
    43:12 45:14 47:20
    151:7 152:1,2,5
    154:19 173:6
    176:13
**Offices (1)**
1:15
**official (1)**
90:9
**oh (8)**
11:18 22:13 76:23
    113:6 115:2 117:12
    134:11 176:24
**okay (33)**
8:6 12:15 14:6,11
    18:13 20:5,22 34:6
    44:17 63:7 76:23
    99:17,22 107:12

Michael Navedo
September 11, 2018

109:2 112:7 119:23
122:3 124:4 126:15
129:4 132:19
139:24 140:6,13
141:6,17 142:16
158:1 164:16
166:20 170:8
175:15
**older (1)**
35:19
**omit (1)**
110:15
**omitted (1)**
111:1
**omitting (1)**
111:3
**once (5)**
21:23 30:14 91:23
95:8,15
**ones (2)**
129:18 130:22
**open (7)**
31:9,12 62:11 66:6
67:8 95:2 117:17
**opened (9)**
67:10 93:7,9 117:16
118:2,6,8,12,16
**opening (1)**
34:9
**operated (1)**
131:14
**operations (2)**
27:16 108:23
**operator (2)**
100:4 131:12
**operator's (1)**
131:10
**opinion (1)**
40:10
**opportunity (2)**
141:15 151:20
**Oral (1)**
1:15
**orally (2)**
5:24 115:24

**order (20)**
48:5 49:3,11 59:14
59:15 64:20 69:14
69:15 90:12 116:7
132:13 135:6,20,23
136:9 149:10,16
159:8 160:2 180:14
**ordered (2)**
180:5,7
**orders (7)**
48:1,2,4 155:13
161:1 180:8,10
**ordinary (1)**
107:21
**Ortega (1)**
178:14
**outcome (1)**
177:5
**outlined (1)**
148:24
**outlining (1)**
142:23
**outside (11)**
11:20 35:6 36:23
41:7 66:3 68:11,20
68:20,21 170:24
171:2
**outstanding (1)**
6:17
**overtime (2)**
113:22 114:4

_____

**P**

**P (3)**
2:1,1,3
**p.m (9)**
25:24 26:3 55:15,16
57:2 113:12,17
114:5 181:3
**package (7)**
160:18 164:5,9 169:5
169:8,11 170:1
**packet (2)**
160:24 169:21
**page (29)**

3:3,11 52:6,8 76:12
79:12,14 99:15,15
116:24 117:3
118:20,22 122:17
123:17,19 128:7,9
128:14 132:15
134:3 146:10,11
157:23 158:24
166:13 167:23
168:4 179:2
**pages (1)**
132:13
**paid (2)**
113:22 114:4
**pair (1)**
38:1
**paired (2)**
38:24 39:5
**panel (1)**
31:3
**paper (6)**
48:23 111:6 155:21
164:15,15,17
**papers (1)**
180:9
**paperwork (7)**
62:19 131:16,20,23
134:23 175:1,7
**paragraph (6)**
117:5 134:4,12,13
135:4 145:10
**parent (4)**
48:17 49:3,5 180:6
**parenthesis (2)**
122:22 124:12
**parents (1)**
48:20
**paret (1)**
136:9
**parked (2)**
102:11,15
**parking (1)**
130:21
**part (5)**
38:19 106:13 109:16

109:19 128:16
**partial (1)**
130:17
**particular (2)**
112:18,19
**parties (8)**
48:21 69:7 85:6
87:14 106:12
152:17 156:5,6
**partner (21)**
23:4,7,12,13 24:5,10
24:16 25:4 27:18
36:17,20 38:13,16
50:19 52:10,12,15
52:17 53:8 56:1,8
**partnered (2)**
39:6,10
**partners (9)**
25:7,8,9,11 38:22
39:2,4 106:8 130:4
**parts (1)**
52:1
**party (2)**
49:12 136:4
**pass (1)**
140:14
**passenger (3)**
52:21 53:2 131:15
**passenger's (2)**
30:17 62:3
**Passengers (2)**
20:20,22
**patrol (11)**
3:17 41:10 53:20
57:8 61:23 78:15
126:21 128:21
130:13 131:14
134:4
**paying (3)**
43:21 44:18 105:2
**payroll (1)**
50:19
**ped (1)**
130:19
**pedestrian (1)**

Michael Navedo
September 11, 2018

123:7
**pending (1)**
17:15
**Pennsylvania (6)**
1:1,16,23 2:4,9,14
**people (5)**
25:6 124:7,9 165:10
175:12
**percent (1)**
131:22
**perform (1)**
173:4
**period (2)**
19:21 24:14
**periodically (1)**
32:23
**permitted (1)**
149:11
**person (8)**
108:20,22,24 145:14
146:2,5 171:14,18
**personal (4)**
14:16 15:5 16:15,16
**personally (2)**
136:2 173:10
**personnel (4)**
145:13 174:3,11,13
**persons (1)**
145:17
**Philadelphia (39)**
1:7,16,23 2:4,9,11,14
20:6 21:2,3,7,10,16
26:12 27:22 31:7
40:16 53:19 54:6
70:16 132:9 142:22
143:16,18 145:13
145:24 146:18
153:8 159:7,9 160:1
160:2,6 167:1
168:13 169:17
174:3,10,13
**phone (1)**
89:18
**photo (1)**
66:17

**photograph (2)**
3:13 66:22
**photographs (1)**
169:18
**phrase (1)**
155:5
**physical (3)**
22:12 29:6 135:24
**physically (1)**
71:17
**pick (1)**
171:9
**pilot (1)**
53:24
**place (4)**
28:20 64:10 113:12
113:16
**plaintiff (8)**
2:5,10 4:19,22 5:1,5
141:1 157:16
**plaintiffs (11)**
1:5 12:20,23 79:7
97:17 98:22 102:24
106:15 109:14
117:15 118:14
**plaintiffs' (5)**
98:16 99:4 101:19
131:6 157:6
**play (4)**
137:8,11 138:13
139:5
**PLAYBACK (3)**
137:14 138:15 139:7
**please (6)**
5:15 14:3 18:19 35:7
112:5 174:17
**PO (2)**
3:23 124:10
**point (14)**
65:15 71:11 87:19
92:6,24 99:13
101:24 116:23
118:19 130:18,18
135:1 146:24
175:11

**pointers (1)**
141:3
**police (81)**
14:17 20:6 21:3,7,10
21:16 26:12 27:23
31:7 33:14,20 34:2
38:10 40:22,24 43:5
43:11,15 46:22
53:19 54:6 59:22
71:15 76:22 92:21
100:22 104:10,14
104:15 105:11
109:4,7,8,24 115:5
116:7 124:8,12,18
126:2,21 132:9
136:8 142:22,23
143:17,18 144:6,10
144:13 145:13,15
145:24 146:2,18
151:7,11,13 152:1
153:8,11,18 159:7,9
160:1,3,6,24 161:5
161:14,15 166:22
167:1 168:13
169:17,18 172:23
173:4 174:3,11,13
**policy (2)**
145:10 167:20
**poorly (1)**
152:15
**popped (1)**
30:16
**porch (10)**
63:8 66:2 68:12
92:13 93:17 95:20
98:14 102:2 103:7
117:9
**position (2)**
9:15 85:12
**possible (2)**
8:6 152:19
**posted (1)**
172:10
**practice (1)**
104:11

**precinct (3)**
40:18 70:18 74:7
**pregnant (3)**
12:7 68:5,9
**preliminary (1)**
5:21
**prem (6)**
77:14 78:2 105:5
123:8 137:21
138:22
**premise (6)**
77:18,20 78:2 105:7
105:9,15
**premises (1)**
122:23
**prep (1)**
116:13
**preparation (1)**
10:19
**prepare (1)**
8:16
**prepared (1)**
108:1
**preparing (1)**
10:23
**presence (5)**
88:8 89:3 104:6,12
134:6
**present (3)**
51:14 89:9 90:11
**pretty (4)**
22:13 32:24 96:13
104:9
**previous (1)**
56:6
**previously (1)**
177:17
**primarily (1)**
26:16
**primary (3)**
53:9,10 124:10
**printout (1)**
164:3
**Prior (2)**
111:8 121:5

Michael Navedo
September 11, 2018

**priorities (1)**
123:5
**priority (6)**
123:1,3,10,11,13,15
**prisoner (1)**
41:18
**privileged (1)**
9:15
**probably (9)**
10:12 15:23 25:1
43:17 98:1,8 106:11
111:10 124:20
**problem (3)**
88:9 93:2 155:12
**procedure (7)**
78:5 83:18 87:3
145:17 146:2 174:5
175:9
**procedures (4)**
47:19,23 146:16
148:14
**proceeding (3)**
13:4,6,8
**proceedings (1)**
13:17
**process (3)**
143:1 148:23 175:7
**processing (2)**
146:16 148:15
**produced (1)**
137:9
**professional (3)**
1:17 179:10 182:4
**programs (1)**
54:1
**proper (1)**
87:2
**properly (1)**
149:19
**property (1)**
50:11
**provide (4)**
45:2 116:8 136:9,20
**provides (1)**
45:3

**Public (2)**
1:17 182:5
**punch (1)**
114:5
**purpose (6)**
60:18 101:3 127:3
128:14 148:7 150:2
**purposely (1)**
110:19
**purposes (13)**
66:14 75:19 107:9
112:3 121:24
126:11 132:6
143:10 156:24
157:3 161:23
173:15 178:9
**push (1)**
94:18
**pushed (1)**
12:10
**put (7)**
29:4 51:16 52:2
110:19 111:6
114:16 115:3

**Q**
**quarter (1)**
31:3
**question (40)**
4:5 6:2,8,12,17,18,24
9:6,8,19,22 10:2,5,9
10:11 14:4 17:15,20
34:5,12,14 36:3
39:16,19,21 40:3,6
56:7 61:8 70:12
85:18,24 88:24
129:19 136:24
141:19 147:7
158:21 159:22
171:22
**questionable (1)**
41:24
**questions (18)**
5:22,23 16:19 17:9
112:17 121:15

137:12 140:7,9
141:13,15 156:5,8,9
175:17,21 179:21
180:20
**quick (2)**
54:21 111:17
**quickly (1)**
173:23

**R**
**R (2)**
2:1 182:1
**R/C (1)**
129:5
**radio (53)**
33:12 42:11,20 43:7
43:12,19 44:4,11
45:13 57:6 72:3,5
72:13,21 74:19 76:8
76:10,18,21,22 77:9
78:6,9,16,17 79:23
80:3,10,13,15 81:6
82:4 83:7,9,11 84:8
84:21 100:3,9,14
101:21 119:16
124:6 129:9,21,22
129:24 130:2,4,9,23
131:6,8
**ran (1)**
170:17
**rank (2)**
27:9,11
**re-ask (1)**
147:11
**read (21)**
7:4 11:23 12:1 34:12
34:14 108:16 109:2
117:6,11 119:10
136:5 145:12,20
147:9 160:18 171:7
171:15,19 174:2
178:17 179:5
**reading (3)**
118:1,15 178:21
**reads (2)**

145:11 170:9
**realize (1)**
95:11
**really (8)**
16:15 19:2 84:9
105:1 138:5 171:16
172:7 173:23
**rear (1)**
31:3
**reason (12)**
8:12 60:20 64:8 86:6
86:14 87:22 90:10
98:2,9 149:4,4
150:14
**recall (52)**
15:1 18:24 19:21
20:3 21:6 24:20
26:18,21 28:9 29:19
32:1,3,4,9 55:19,22
59:24 60:4,7,11
62:6 65:5 67:4 69:1
69:4 71:22,24 75:4
92:5,15,17 93:11,15
93:18 94:14 117:18
117:22,24 118:11
133:8 144:2,5 156:1
156:7 157:15
171:18,21,24
172:15,24 173:3
177:8
**receipt (2)**
163:11,14
**receipt/record (2)**
163:2 165:9
**receive (19)**
22:10 45:18,21 47:3
136:14 154:5,20
155:16 161:11
164:4,8,9,12,16,20
169:8,10 170:23
175:6
**received (33)**
43:15 45:16 46:14,17
47:16 57:20 58:13
85:9 132:13 137:22

Michael Navedo
September 11, 2018

138:23 141:14
153:7 154:15
159:13 160:5,11,15
160:24 161:16
162:4,19 163:7,8
164:6 165:11
167:14 168:16,20
169:2,5,20 170:10
**receives (1)**
165:6
**receiving (9)**
73:24 80:7 81:15
155:22 156:7
172:24 173:11,15
177:22
**recert (1)**
46:23
**recertification (3)**
153:14,19,21
**recertifications (1)**
154:10
**recertified (2)**
47:6,10
**recess (2)**
55:2 111:19
**recognize (8)**
11:5 76:2 107:13
112:11 122:4
126:16 132:20
143:22
**recollection (5)**
79:6 117:13 136:7
138:1 170:14
**record (34)**
5:16 14:3 18:19,22
34:5,24 35:9 36:6,6
36:8,10,12 42:17
55:1,6 66:16 75:21
75:23 111:17
115:14 127:5
131:19 132:12
140:15,17 156:15
156:18 159:16,19
162:4 168:1,2
177:11,14

**recorded (3)**
46:9,10 115:22
**reorder (2)**
115:22 131:15
**recording (12)**
52:20 53:20 54:14,16
128:3,4 137:14,24
138:15 139:7
146:16 148:15
**recordings (1)**
137:9
**records (2)**
8:3 172:10
**recovered (1)**
50:11
**ref (1)**
125:15
**refer (3)**
145:17 146:5 174:6
**reference (2)**
62:16 175:12
**referenced (2)**
177:2 178:23
**references (1)**
165:8
**referring (2)**
12:18,19
**reflect (6)**
100:2 162:13,18,22
163:6,8
**reflects (1)**
163:11
**refresh (3)**
79:5 117:13 136:7
**regarding (2)**
11:18 179:14
**regardless (1)**
135:23
**regards (2)**
107:19 160:15
**register (1)**
6:4
**regular (1)**
51:21
**related (4)**

14:17,20 96:13 156:9
**relationship (3)**
36:1,14 41:3
**relayed (1)**
96:20
**relevance (4)**
9:1,5,18,20
**relevant (5)**
16:12 34:20 35:2
106:20,22
**remember (32)**
47:13,14 58:11,18
59:10,11 61:16
64:16 68:17,19 71:1
72:9,18 75:8 92:23
93:19 96:8,19,20
102:5 106:9 118:3,5
118:9,15,16,18
142:20 171:3 177:5
177:9,22
**remind (4)**
141:2,9 153:16 172:1
**reminding (1)**
180:10
**repeat (1)**
39:23
**rephrase (1)**
156:4
**report (25)**
3:14,16 49:24 50:3,6
56:11,13 57:2 82:20
84:6,9 90:5,8,9,12
90:15 100:14 101:4
108:1,7,10,14,19
109:22 122:7
**reported (5)**
33:7,8,9 57:4 135:9
**reporter (33)**
1:17 4:16 5:24 6:4
7:20 14:8 18:5,9,12
20:18,21 23:19,22
30:4 34:13 37:7
52:23 56:20,22
64:23 66:10 68:14
75:15 77:15 107:5

111:24 119:19
121:20 125:5 126:7
132:2 165:16 182:5
**reporting (1)**
59:2
**reports (1)**
53:3
**represent (2)**
66:21 140:24
**representative (1)**
116:5
**represented (1)**
5:5
**representing (1)**
116:17
**request (8)**
72:12,17 79:23 91:15
109:9 110:1,6 134:6
**requested (3)**
97:18,20,24
**requesting (9)**
42:12,21,24 43:2
71:16,24 72:8
125:16,24
**required (6)**
49:7,9 128:21,24
134:15 172:2
**requirement (1)**
49:18
**reserved (1)**
4:5
**residence (27)**
61:12,20 62:8 63:8
67:1,6 68:23 71:3
73:10,16 78:7 81:22
82:13 83:12,20
90:17 91:4,17,21
92:13 95:19 97:14
97:18 100:23 102:1
103:3 138:3
**resident (1)**
97:16
**residents (4)**
84:22 91:9 95:23
131:6

Michael Navedo
September 11, 2018

Page 202

**resolve (1)**
89:21
**resolved (8)**
69:5,7 71:6 89:12
98:17 109:7 119:4
152:16
**respond (14)**
45:17 57:9 74:14,19
82:11 83:8 85:10
88:3,7 89:2 121:2,9
130:24 173:17
**responded (22)**
59:2 67:1 73:8 74:11
74:22 75:3 89:5
104:17 109:4,10
118:17 120:10,22
126:3 129:14,15,16
129:22,23 176:9
177:3 179:24
**responding (9)**
47:20 99:4 105:10
109:20 125:15,21
156:1,9 173:11
**response (4)**
61:13 80:3 91:8
109:11
**responses (5)**
115:19 157:10,11
158:5,13
**responsibility (1)**
86:22
**responsible (4)**
38:5,8 48:15 86:23
**rest (1)**
141:11
**Restate (1)**
70:11
**results (2)**
78:3 105:12
**resume (6)**
89:13,15,22 100:15
101:5 139:15
**retraining (1)**
154:1
**return (7)**

73:24 82:15 91:20
94:4 148:19 151:8
152:2
**returned (10)**
48:11 60:21 61:4
91:3,16,24 95:18
96:12 147:22 148:3
**returning (2)**
82:12 148:7
**review (14)**
10:15,18 79:21 99:21
107:11 108:9 112:5
112:8 116:18 122:2
126:13 132:8
178:15,18
**reviewed (3)**
46:1 149:15 160:12
**reviewing (2)**
8:18 132:17
**right (94)**
15:23 23:2 25:2,22
35:20 36:21 44:7,8
49:6,21,22 52:15,16
59:10 61:17 62:20
63:9,11,20 64:8
66:8 73:18 76:20
80:2,21 84:19 86:1
86:18 90:23 94:7
95:24 97:5 99:11
102:16 106:5 110:7
111:2 113:17 114:1
114:22 115:9
118:14 120:5,13,14
120:24 121:17
122:16,23 123:2
125:1 126:5 128:5,6
128:12,13 129:17
131:3,21 133:20
134:11,12 135:16
135:17,20,21
136:11,12 139:22
141:4 146:9 148:10
148:13 149:7 150:4
153:14 154:18
159:11 161:6

162:15 164:10,18
164:21 166:1 167:7
167:16,21 168:3,19
168:22 170:12
174:8 175:12,17
**right-hand (5)**
79:13 99:16 117:1
162:15 168:5
**rightful (1)**
69:10
**rights (2)**
2:13 109:6
**risk (6)**
133:12,14,23 135:5
135:10,15
**Rite (6)**
18:3,16 19:1,4,9,24
**robbery (1)**
50:10
**ROBERT (1)**
1:7
**Robinson (1)**
179:8
**role (1)**
41:9
**roll (11)**
47:8 154:13 155:5,6
155:15,20 170:7
171:4,13,14,19
**room (2)**
27:16 108:24
**ropes (1)**
38:3
**route (2)**
45:8 79:2
**routed (4)**
125:2,3,11,12
**RTF (3)**
84:10,14 139:14
**RTF'd (1)**
82:19
**rules (2)**
141:3,10
**run (1)**
171:11

**running (1)**
171:18

**S**

**S (2)**
2:1 3:9
**S-k-a-s-a-i-k (1)**
24:1
**safe (1)**
25:18
**safety (3)**
60:3 133:16 176:18
**sat (1)**
116:17
**satisfied (2)**
73:4 149:18
**saw (13)**
61:15 65:18 66:1
67:5,7,10 71:17
87:13 89:13 95:8
141:20,23 144:3
**saying (20)**
12:8,13 57:19 80:8
101:7 110:2,3,10
111:7 114:6 115:17
122:10 128:16
129:14 151:1
154:15 164:6
165:10 175:4
180:18
**says (42)**
48:6,7,23,24 76:14
77:13 79:15 80:10
80:17 81:6,6 100:13
101:21 108:1,3
109:24 114:4 115:8
115:14 118:23
120:3 122:7,22
123:23 124:4,11
125:9,10,14 127:15
127:24 128:11
129:5 131:10,10
133:14 134:4 135:5
135:22 144:19
163:1 166:1

THE MCS GROUP, INC.

Michael Navedo
September 11, 2018

scenario (1)
135:8
scenarios (1)
41:20
scene (8)
78:7 82:9 84:16,18
  87:6 90:12 101:16
  176:15
school (2)
15:24 62:24
Schutte (57)
1:7 11:3,9,13 24:8,9
  24:21 27:18 36:2,15
  37:16,20,22 38:6,14
  38:23 39:3,12 40:9
  40:14,17 53:8 56:8
  58:3 62:2 74:17
  84:23 87:4 92:12,16
  94:21 95:13,18,21
  97:3,13 98:24
  100:21 103:9,10
  106:6 108:9,17
  109:20 110:8
  116:20 120:9,21
  124:16 126:3 127:1
  131:19 138:10
  147:3,19 157:9,17
Schutte's (3)
94:4 138:2 157:10
scratching (1)
88:22
screen (9)
20:13 62:11 67:9
  94:11 123:20
  124:17,24 125:21
  126:1
seafood (1)
19:7
sealing (1)
4:2
searched (1)
12:13
seat (3)
30:17 53:2 62:3
second (42)

18:19 34:24 35:4
  75:7,21 79:11 91:4
  92:3,10 93:8,10,17
  93:20 94:1,2,3,9
  95:13 96:6 97:1
  98:11 99:1,10,11,21
  100:23 101:19
  102:9 106:14
  109:17 117:2,14
  118:13,23 120:20
  122:17 145:11
  146:10 148:5 158:6
  159:16 174:2
seconds (3)
137:16 138:17 139:9
section (3)
109:3 133:12 145:18
see (59)
34:9 60:15,16 61:11
  62:12 63:15,16,19
  65:12,21 66:4 67:15
  74:2 75:8 76:14
  77:23 79:16 80:22
  81:8 85:2 88:9 89:4
  91:6 93:24 94:8
  99:18 100:13 108:3
  111:3 113:11 119:3
  119:8 120:1,18
  125:18,20,24
  127:13,15 128:1
  131:20 132:15
  133:12,19 134:8
  143:20 146:13,15
  148:14 150:13,15
  152:7 159:2 163:3
  166:17 168:14
  173:5,21 179:3
seeing (7)
76:5 117:18,20 123:8
  144:5 157:15
  173:16
seen (12)
66:17 122:13,19
  123:18,19 124:16
  133:3 143:24 144:9

144:13 157:19
  162:10
send (1)
81:12
seniority (1)
29:8
sent (2)
32:1 150:2
sentence (6)
117:7 145:11,12
  174:2,10 179:5
September (46)
1:12 11:4,7 12:21
  24:4 25:11,14 26:5
  26:15,19 27:19 37:3
  37:4,5 39:13 40:10
  40:13 53:16 55:11
  55:17,23 56:2,9,12
  57:10 67:2 73:7
  76:19 79:8 109:15
  122:15,20 123:21
  127:21 133:22
  137:15 138:4,16
  139:8 141:21 145:6
  147:1,5,14 179:24
  182:13
sergeant (20)
23:18,20 25:15,16,17
  25:19 26:23 27:2,9
  27:12,17 29:17 51:9
  155:10 160:19
  165:1,4 170:6 171:5
  171:12
sergeants (1)
154:12
series (1)
146:17
served (2)
157:16 158:20
service (2)
89:19 179:11
services (1)
116:8
set (4)
29:5 42:8 153:23

158:6
settled (3)
69:8 85:5 106:12
seven (4)
15:13,13 25:24 26:3
shakes (1)
6:5
share (3)
15:6 130:3,4
shared (1)
141:4
sharing (2)
17:2,5
sharp (1)
155:7
she'll (1)
78:19
sheet (4)
164:2,20,24 165:10
shift (19)
26:4,7 38:17 55:13
  55:17,20,23 56:2,9
  56:12,17 113:13,19
  113:21 114:1,2,3
  127:6 129:3
shifts (2)
25:20 38:14
shine (1)
63:18
shined (2)
62:10,12
shining (1)
63:13
shooter (1)
41:23
shooting (3)
31:17 42:4 50:11
Shop (6)
18:3,16 19:1,4,9,24
short (2)
38:20 47:1
shorter (1)
170:4
Shorthand (1)
1:17

THE MCS GROUP, INC.

**show (10)**
43:22 59:6 69:9,13
78:6,10 101:16
108:15 148:16
177:16
**showed (9)**
62:18 64:1,15 67:20
69:14 99:7 105:4
134:22 135:19
**showing (1)**
79:1
**shown (2)**
64:2 124:23
**shows (1)**
79:2
**Shujaa (26)**
1:4 2:5 4:20 13:1
60:9 65:4,7 68:2,4,8
68:11 70:4,24 93:16
94:1,9,24 95:12
96:3,11 97:2,7,13
98:4,5 152:20
**Shujaa's (1)**
71:3
**sick (1)**
38:18
**side (1)**
30:20
**sidewalk (4)**
30:22,23 103:13
104:24
**sign (17)**
29:22 57:7 124:2,3
128:19,21,24
155:22 163:16,18
163:24 164:1,6,19
166:9 170:2 171:10
**sign-in (3)**
164:19,24 165:9
**signature (2)**
165:21,22
**signed (4)**
128:17 165:12 166:9
166:11
**signing (1)**

**4:2**
**signs (1)**
165:6
**single (1)**
38:17
**Sinquenna (1)**
57:24
**sir (8)**
6:14 34:4 77:3 80:17
120:3 126:14 127:4
175:3
**sit (2)**
90:6 173:21
**site (1)**
123:7
**situation (13)**
29:10 44:1 63:4
69:22 78:23 82:18
86:13 88:17 97:11
101:10 104:20
112:18,19
**situations (2)**
32:10 45:20
**six (4)**
23:14 77:4 129:23
166:15
**Skasiac (2)**
23:18,21
**skimmed (1)**
12:2
**slammed (2)**
117:9 118:2
**slap (1)**
29:12
**sleeping (5)**
61:18 67:12,13,15,16
**slipped (1)**
31:1
**slow (1)**
34:8
**Solicitor (1)**
2:12
**solo (1)**
38:21
**somebody (5)**

**31:17 41:17 85:14**
89:17 174:19
**soon (1)**
100:21
**sorry (29)**
7:21 14:6 19:23 24:2
26:2,8 29:20 34:7,7
39:17 42:14 43:9
47:14 52:13 56:3
79:17 81:24 91:19
98:4 100:1 113:15
120:16 125:23
135:12 142:15
144:16 151:17
163:1 173:13
**sort (2)**
29:1 176:11
**sound (2)**
93:21 138:5
**South (10)**
60:19 77:13 78:19
80:18 127:24 128:4
128:11,18 137:20
138:21
**sp (1)**
57:24
**speak (7)**
8:4 49:20 61:19 65:6
65:9 89:20 141:7
**speaking (1)**
135:14
**special (3)**
21:18 42:2 155:12
**specifically (5)**
42:12,20 69:16
132:24 172:18
**spelling (1)**
23:23
**split (5)**
130:15,17,20,22,23
**spoke (1)**
60:12
**staging (1)**
42:9
**stamp (1)**

**146:12**
**stamped (2)**
143:15 167:24
**standard (1)**
78:5
**standing (6)**
63:8 65:24 67:5
92:13 93:16 176:3
**stands (1)**
89:1
**start (19)**
5:20 11:4 20:5 21:6
22:3 24:15,16 35:17
42:19 48:14 49:8
56:17 57:8 82:2
85:8 86:20 140:8
171:15 175:10
**started (12)**
21:10,15 24:22 25:4
26:12 28:15 30:15
37:17 56:12 62:17
114:14,15
**starts (1)**
113:21
**state (8)**
5:15 51:3,5,6 150:17
154:20 178:2,11
**stated (6)**
69:16 79:23 119:12
120:12 135:13,18
**statement (9)**
11:17 112:24 113:3
113:11,16,24
115:24 116:11,21
**states (2)**
1:1 117:7
**statewide (2)**
154:9,17
**stating (4)**
58:16 62:19 105:10
121:5
**station (4)**
60:24 61:5 124:10
172:5
**stay (3)**

Michael Navedo
September 11, 2018

60:24 85:19 130:12
**stayed (3)**
101:23 102:10
103:12
**steady (4)**
23:13 25:7,8,9
**stenographic (1)**
182:7
**step (1)**
35:6
**Stephen (1)**
179:8
**steps (2)**
95:9 146:17
**stop (8)**
19:15 30:10,14 94:15
130:5,11,19,19
**stops (5)**
129:9 130:3,3,6,16
**street (23)**
1:16,22 2:4,8,13
27:15 50:23 60:15
60:19 61:21,24 62:8
66:23 67:6 68:24
70:14 80:18 127:24
128:5,12 137:21
138:22 174:20
**streets (1)**
38:4
**strokes (1)**
15:2
**struck (1)**
31:2
**study (2)**
16:4 22:10
**stuff (4)**
13:7 42:10 51:16
54:4
**subject (10)**
27:21 31:19 32:4
65:22 67:18 132:10
133:1 141:24
142:11 143:17
**submitted (2)**
108:10 158:4

**subsequent (1)**
153:13
**substance (1)**
169:1
**sued (1)**
14:13
**suit (1)**
14:20
**Suite (1)**
1:22
**summary (1)**
177:20
**super (2)**
16:20 171:6
**superior (2)**
28:16 41:5
**supervisor (122)**
23:17 25:13 26:18
27:4,7 33:15,16,23
41:9,21 42:12,21,24
43:3,7,13,17,19,23
44:1,2,4,7,11 49:8
49:10,14,20 61:19
71:16 72:1,4,8,13
72:17,21 73:1,7
74:1,3,8,12,15,16
74:18,20 75:11
79:24 80:18,24 81:4
81:23 82:7,12,16
83:8 84:14,21 85:3
86:12,22 88:4,8,16
89:3,9,13,22,24
90:2,4,9,11,17
91:15,17,21 94:5
95:5,10,17 97:23
98:7 99:5,6,12
100:16 101:6,11
103:4 104:17
109:10,21 110:1,5,6
120:4,10,12,22
121:2,9 125:17,21
126:1,3 128:23
134:7,15 135:2
137:3,6 139:16
165:19 166:5,8

173:12,14 174:22
174:24 176:14,20
**supervisor's (2)**
165:24 174:8
**supervisors (2)**
172:13 173:20
**supervisory (4)**
85:12 89:14,16,23
**supposed (5)**
48:8 51:18 110:13
142:24 149:3
**sure (32)**
18:20 24:19 26:22
27:10 28:24 29:16
36:4 46:17 78:13
83:13,13,15,16
88:11 96:13 100:10
104:9 125:7 138:11
138:12,14 139:18
140:20 141:8
142:10 144:12
147:11 156:16
165:5,10 174:20
177:24
**suspect (1)**
169:18
**sustained (2)**
177:7 179:13
**sustaining (1)**
179:13
**sworn (1)**
4:9
**system (2)**
109:1 127:20
**systems (1)**
53:21

---
**T**
---

**T (3)**
3:9 182:1,1
**take (30)**
6:16 22:17,19 38:9
44:9 47:9,12 54:20
79:20 90:3,20 96:1
99:21 107:11 112:5

122:2 126:13 130:6
132:8 136:20
143:12 144:16,17
158:18 162:2
163:18 173:19
175:14 179:1
180:13
**taken (9)**
28:7 50:6 51:7 55:3
66:18,22,23 111:20
182:8
**taker (1)**
124:3
**takes (2)**
33:23 40:4
**talk (13)**
10:22 11:6 32:21
33:16 34:8 54:8
89:20 90:6,6 93:13
94:3 95:13 100:17
**talked (4)**
11:2,9,12 174:4
**talking (14)**
13:5 21:21 44:20
65:16 76:24 77:2,6
80:15 112:20 124:8
141:5 148:4 156:11
169:4
**talks (1)**
171:5
**tape (1)**
115:22
**Tara (3)**
2:12 5:7 175:19
**target (1)**
32:2
**targets (1)**
132:24
**teach (1)**
38:2
**teaching (1)**
38:6
**technically (3)**
82:17 109:23 180:15
**tell (23)**

THE MCS GROUP, INC.

Michael Navedo
September 11, 2018

| | | | |
|---|---|---|---|
| 45:8,9 48:22 68:4 | 46:7 65:17 86:2 | 91:16,20 92:3,10 | 162:22 |
| 83:6 96:10,15,17 | 92:11 93:6,7,9 98:3 | 93:8,10,17,20 94:1 | **totally (1)** |
| 97:6,12,16,22 98:22 | 98:4 106:16,19 | 94:3,9 95:14 98:17 | 38:10 |
| 101:15 103:2 142:3 | 108:8 126:23 | 99:1,10,11 109:17 | **touch (1)** |
| 148:22 154:12 | 135:18 138:6 139:3 | 111:1,12 113:4 | 172:8 |
| 159:10 163:6 | 140:12 151:4,10 | 117:7 119:1,15 | **track (1)** |
| 170:17,20 171:8 | 152:4 158:5,9 175:3 | 121:1 131:22 133:8 | 127:5 |
| **telling (3)** | 176:21 | 138:13 144:2,4 | **train (2)** |
| 80:16 96:21 180:9 | **thinking (1)** | 150:1 161:13 | 37:22 154:13 |
| **tells (1)** | 56:5 | 163:17 172:15 | **trained (5)** |
| 45:5 | **third (4)** | **timeframe (1)** | 133:6,9 153:21,22 |
| **Temple (4)** | 117:6 118:22 146:11 | 24:17 | 161:5 |
| 40:22,23,24 41:1 | 166:13 | **timeframes (1)** | **training (67)** |
| **ten (2)** | **thought (13)** | 24:18 | 3:22 21:18,22 22:8 |
| 58:8 69:2 | 30:20 60:5 64:4,4 | **timely (1)** | 22:13 45:16,19,22 |
| **tend (1)** | 71:5 73:4 74:4 85:4 | 43:16 | 46:14,23 47:7,15 |
| 152:3 | 86:17 97:10 106:18 | **times (6)** | 85:9 136:14 141:13 |
| **tension (2)** | 110:19 158:15 | 13:11 31:22 32:14 | 144:6 153:7 154:5,8 |
| 152:12,14 | **thousands (1)** | 89:11 109:11 | 154:9,15,16,21,24 |
| **terms (1)** | 13:13 | 137:11 | 155:2,17,18,19,23 |
| 17:22 | **threatened (1)** | **tired (1)** | 159:6,12,23 160:5 |
| **testified (3)** | 133:18 | 138:8 | 160:10,15 161:11 |
| 4:9 13:3 36:19 | **three (26)** | **title (3)** | 162:4,19,23 163:2,7 |
| **testify (4)** | 19:3,23 23:8,9,11 | 19:13 21:9,13 | 163:9,12,15,18,24 |
| 7:7,17 8:10,13 | 24:11,12,13 28:12 | **titled (2)** | 164:7,9,13,17,21 |
| **testifying (1)** | 36:20 117:23 | 132:9 160:6 | 165:5,8,11,12 |
| 8:17 | 129:15,16,16,20,20 | **today (19)** | 167:15,24 168:2,16 |
| **testimony (1)** | 129:21,22 130:2 | 5:6,14 7:7,18 8:10,14 | 168:20 169:1 |
| 13:22 | 131:3,4 132:16 | 8:17 10:19,24 11:5 | 170:10,15,18,21,23 |
| **tests (4)** | 166:14 168:7 | 13:16,22 21:13 23:1 | 173:1 |
| 22:20,21,22 47:11 | 175:22,24 | 23:17 36:17 112:21 | **trainings (1)** |
| **Thank (3)** | **tickets (1)** | 140:9 176:3 | 163:20 |
| 26:10 179:12,18 | 130:20 | **told (8)** | **trains (1)** |
| **they'd (1)** | **till (3)** | 29:4 63:3 69:23 98:3 | 38:11 |
| 49:16 | 26:9 55:15,16 | 98:4 104:19 117:8 | **transcript (1)** |
| **thing (7)** | **time (66)** | 147:22 | 182:7 |
| 17:3 26:21 30:11 | 4:6 11:10 13:8 16:5 | **tomorrow (2)** | **transcription (1)** |
| 32:20 86:2 152:7 | 19:22 22:2 24:14 | 63:6 70:1 | 122:12 |
| 178:17 | 25:19 32:2 33:19 | **top (13)** | **transfer (1)** |
| **things (4)** | 45:6,6,8 48:24 49:8 | 30:22 76:12 77:4 | 180:5 |
| 16:22 38:3 39:24 | 50:17,18 54:1 58:15 | 128:11,16 134:10 | **transferring (1)** |
| 153:22 | 59:16,19 62:5 66:16 | 134:11,12 144:18 | 48:16 |
| **think (31)** | 68:6 71:4 73:21 | 162:14 163:3 168:8 | **transmission (2)** |
| 17:16 19:3 37:19 | 75:7,9 81:18 84:15 | 179:6 | 77:10 140:4 |
| 40:21,22 43:10 46:6 | 85:13 87:11 91:11 | **topic (1)** | **transmissions (3)** |

Michael Navedo
September 11, 2018

3:14 76:9 119:17
**transmitted (1)**
122:11
**transporting (1)**
41:17
**treatment (3)**
151:6,13 152:1
**trial (1)**
4:6
**trick (1)**
11:16
**tried (1)**
91:2
**trigger (1)**
31:2
**trip (1)**
60:18
**tripped (1)**
30:24
**true (1)**
182:6
**truthful (1)**
112:23
**truthfully (2)**
7:18 8:13
**try (3)**
38:2 58:22 74:8
**trying (8)**
11:16 101:12,15
   111:5 148:18
   150:18 151:5,24
**TSA (9)**
19:20,22,23 20:2,8
   20:10,12,16 21:1
**TUESDAY (1)**
1:12
**turn (12)**
83:23 108:20 122:17
   123:17 128:7
   140:11 166:10,12
   167:2,12,23 168:4
**turned (2)**
166:11 177:19
**tutorial (1)**
27:11

**TVR (1)**
130:20
**two (22)**
5:6 28:12 31:5,24
   32:16 40:22 52:8,9
   52:9 61:17 76:3
   113:8 124:9 127:23
   130:6,8 132:16
   142:20 156:20
   166:14 168:7 176:5
**type (24)**
41:11 42:2,7 45:5
   48:1 50:10,20 54:16
   74:6 115:16 122:22
   124:11 130:19,20
   153:7,22 154:20
   155:10,12 159:11
   160:9 164:17,19
   167:14
**typed (1)**
115:18
**typically (3)**
52:19 110:15 164:16
**typist (1)**
19:13

---
**U**

**uncommon (2)**
111:14 176:13
**understand (42)**
6:6,7,8,13,19 7:1,3
   12:4,17,23 13:15,19
   16:14,15 28:24
   51:24 55:7 72:9,24
   75:10 78:13 80:5
   84:5 85:1,7 86:4,9
   86:15 87:21 88:21
   88:24 94:6 97:9
   148:5,8 149:1
   150:12 152:14
   153:10 162:13
   175:3,15
**understanding (3)**
35:22 49:16 152:21
**understood (3)**

6:12 79:5 147:8
**unit (3)**
2:13 100:12 139:11
**UNITED (1)**
1:1
**University (1)**
41:1
**unsure (1)**
172:8
**update (2)**
46:18 154:11
**updated (6)**
145:1 155:19 158:4
   167:21 168:22
   172:11
**updates (7)**
46:19 47:2,4,8 154:2
   154:3 160:16
**upgrade (1)**
30:23
**usually (6)**
29:13 78:9,22 88:14
   131:18 169:24

---
**V**

**vaguely (1)**
51:24
**valid (1)**
9:21
**vantage (1)**
65:15
**vehicle (8)**
22:11 31:2 53:9
   61:23 95:19 100:3
   130:13 131:14
**verbal (1)**
141:7
**verification (1)**
134:5
**versa (1)**
48:10
**version (2)**
138:8 170:4
**veteran (1)**
29:3 38:1

**vice (1)**
48:10
**victim's (1)**
42:2
**video (3)**
155:21 164:15,15
**viewed (1)**
142:5
**violations (2)**
130:21,21
**visit (4)**
141:21 147:4,18
   148:5
**visitation (7)**
48:2 59:15 62:20
   69:14,15 77:21
   109:6
**visited (2)**
147:13 149:9
**visits (1)**
142:6
**visually (1)**
94:8
**voice (17)**
14:9 137:17,18,19,22
   138:18,19,20,23
   139:10,11,12,13,14
   139:17,20,24
**voices (1)**
137:13
**vs (1)**
1:6

---
**W**

**wagon (1)**
77:12
**wait (13)**
14:3 44:2,6 72:10
   73:23 74:16 86:11
   87:5 88:15 102:3
   103:20 114:7 119:7
**waited (6)**
59:21 95:9 99:6
   101:23 102:7
   103:22

Michael Navedo
September 11, 2018

**waiting (3)**
44:10,15 116:16
**waived (1)**
4:3
**walked (1)**
95:20
**want (18)**
4:14 7:19 16:24 35:5
  39:22 75:12 79:11
  84:4 89:23 95:12
  101:11 116:23
  118:19 119:6 137:5
  142:8 175:5 179:1
**wanted (8)**
53:14 57:18,19 85:2
  97:11 101:12
  141:18 158:9
**wants (3)**
48:10 49:1 174:19
**wasn't (8)**
27:2 37:14 38:8
  58:17 83:23 87:18
  87:19 105:1
**watch (1)**
166:8
**Wawa (5)**
119:18,21 120:7,13
  139:22
**way (9)**
30:13 37:24 41:14
  50:7 67:21 76:6
  78:4 97:11 99:12
**we'll (7)**
54:20 78:21 83:16
  138:13 140:15
  141:8 155:22
**we're (26)**
8:2 11:5 14:2 55:5
  62:15 77:11 82:20
  83:21 88:13 106:8
  110:3,11,12 112:20
  114:8 118:24
  122:10 123:7 141:4
  141:9 150:10
  157:22 161:13

169:12 172:8
  173:20
**we've (4)**
54:19 66:17 111:15
  146:23
**weapon (2)**
30:18,21
**week (2)**
48:9 129:12
**weekend (4)**
48:8 58:14 69:17,18
**weeks (1)**
170:11
**weird (2)**
39:24 130:15
**welcome (2)**
6:9 148:21
**welfare (1)**
133:17
**well-being (1)**
109:5
**went (37)**
16:1 29:2,3,5 30:21
  56:18 58:24 60:14
  63:2 64:9 72:7,11
  72:22 73:9,15,17
  76:18 77:22,23
  81:21 83:14 86:6,7
  86:12 90:24 103:3,7
  110:2,12 111:7
  114:1 130:11 149:5
  149:6 150:15
  152:15,21
**window (11)**
63:13,17 67:8,8,16
  93:6,7,14 94:11,12
  95:2
**windows (1)**
62:11
**wish (1)**
140:10
**wishes (1)**
145:14
**witness (36)**
3:3 7:22 10:8,12

14:11 17:4,12 18:7
  18:11 20:20 23:21
  23:24 30:6 36:7
  37:9 39:17,20 51:19
  53:1 56:21,23 61:9
  65:1 68:16 70:11
  77:17 85:19 86:1
  87:9 119:21 137:2
  138:24 140:14
  152:24 165:18
  180:24
**witnessed (2)**
51:4,5
**witnesses (3)**
51:11,15 110:22
**woman (1)**
57:22
**Woodbridge (6)**
18:11,13 19:10,12,15
  19:19
**Woodland (2)**
56:18,23
**word (2)**
6:1 121:14
**words (2)**
105:13 159:11
**work (13)**
14:17 17:24 18:15
  20:2 25:20 26:4,7
  36:24 40:17 41:7
  52:14 56:18 172:5
**worked (12)**
18:4 19:1,2,5,8,10,18
  19:20,22 25:6 26:11
  39:1
**working (12)**
7:9 18:3 19:15 25:4
  26:16 37:17 52:10
  53:7 54:9 114:15
  127:16,20
**worries (1)**
14:7
**wouldn't (6)**
27:14 35:21 53:10
  106:21 136:22

137:2
**write (7)**
50:13 51:24 52:7
  78:1 90:5,14 121:13
**writing (3)**
6:1 52:22 53:3
**written (3)**
107:18 135:23 180:8
**wrong (11)**
28:17,18 32:8 70:8
  74:4 86:3 88:19
  96:14 97:8 106:24
  158:11
**wrote (5)**
105:5,7 106:9 108:6
  116:1

**X**

**X (2)**
3:1,9

**Y**

**yeah (114)**
9:16 10:10 11:18,18
  14:14 15:13,20
  17:24 20:9 21:23
  24:13 25:1 31:18,21
  34:1,8 35:3,7 39:6
  46:11 47:11,22
  48:18 53:18 54:24
  59:20 61:9 63:12,14
  63:18 64:16,19 67:3
  67:7,14 69:3 76:3
  76:16 77:8 79:19,22
  81:9 82:5 83:5
  84:24 86:23 90:23
  91:2 94:17 96:7,12
  96:12 99:20 100:5
  100:17,24 102:7,13
  103:1,5,12 104:3,7
  104:7 105:13,21,23
  106:2 107:14,23
  108:2,8,23 109:16
  109:18 110:24
  111:10 112:10

Michael Navedo
September 11, 2018

115:7 117:12,12,17
118:4 119:9,11
120:2,19 122:14
123:22 124:6,14,19
126:23 127:12,14
128:2 133:5 134:16
135:3,7 136:6 138:5
138:9 139:4 140:4
144:1 158:7 159:17
161:15 166:19
168:6 169:6 171:17
172:19
**year (17)**
15:17 31:15 32:22
40:15 46:19 47:6,7
47:10 50:18 129:13
154:5,8,23 163:14
163:15,19,21
**years (18)**
14:23 15:11,15,21
18:15 19:1,3,23
20:2,3 24:11,12,13
25:18 36:20 40:22
117:23 176:1
**yelling (4)**
95:15 98:13 118:3,18
**Yep (1)**
168:11
**yesterday (5)**
7:13,14 8:22 66:19
66:23
**Young (3)**
2:8 4:24,24

—————— **Z** ——————

—————— **0** ——————
**0:14 (2)**
137:15 138:17
**01-09 (1)**
132:10
**01:06 (1)**
139:8
**06 (1)**
134:2

**07 (2)**
20:7,8
**08 (1)**
139:9

—————— **1** ——————
**1 (5)**
134:4 139:10,12,14
176:19
**1:06 (2)**
139:6 140:3
**1:06:08 (1)**
99:19
**1:14 (1)**
128:18
**1:44 (1)**
181:3
**10 (5)**
20:7,8 156:21 157:23
159:1
**10/31/11 (1)**
115:1
**10:45 (3)**
25:24,24 26:3
**107 (1)**
3:14
**11 (2)**
1:12 182:13
**11/5/15 (1)**
3:15
**11:45 (9)**
26:8,9 55:14,16 57:2
113:12,16 114:4
155:7
**112 (1)**
3:15
**12 (11)**
80:3,3,11 81:6,6
125:2,3,11,12
139:20 178:6
**12.18 (14)**
3:19 143:16 148:13
159:9,13 160:7
167:3,6,19 171:20
172:17,22 173:2,18

**12:14 (2)**
76:19 122:20
**12:15 (1)**
79:8
**12:48 (3)**
82:3 123:20 124:15
**1200 (1)**
70:14
**1201 (13)**
76:21 77:12 78:18
80:19 100:13
137:17,18 138:18
138:19 139:10,12
139:13 140:4
**121 (1)**
3:16
**124 (1)**
125:10
**1242 (12)**
60:19 66:23 67:3
77:13 78:19 80:18
127:24 128:4,11,17
137:20 138:21
**126 (1)**
3:17
**127 (3)**
166:24 168:10,12
**12DC (1)**
109:10
**12th (7)**
32:23 54:9,18 70:19
70:20 79:24 125:13
**132 (1)**
3:18
**14 (5)**
76:17 137:15 139:8
145:6 147:5
**140 (1)**
3:6
**143 (1)**
3:19
**14th (24)**
11:7 12:21 26:20
27:19 55:11 56:2,9
56:12 57:10 67:2

73:7 76:19 79:9
109:15 122:15,20
123:21 127:21
133:23 138:4,16
141:21 147:1,14
**15 (3)**
40:13 58:8 69:2
**1515 (1)**
2:13
**156 (1)**
3:20
**157 (1)**
3:21
**15th (8)**
145:2 167:21 168:9
168:21 169:13,21
170:9 171:23
**1601 (1)**
1:22
**161 (1)**
3:22
**17-0889 (1)**
1:2
**1701 (1)**
2:8
**175 (1)**
3:7
**178 (1)**
3:23
**18 (1)**
35:19
**19102 (1)**
2:14
**19103 (2)**
1:23 2:9
**19104 (1)**
2:4

—————— **2** ——————
**2 (7)**
7:13,14 134:3 139:11
139:13,17,24
**2-A (1)**
145:18
**20 (3)**

Michael Navedo
September 11, 2018

Page 210

| | | |
|---|---|---|
| 76:17 137:16 138:17 | **29th (10)** 144:19,23 161:9 166:16,18 167:7,9 167:15 168:18 169:2 | **6448 (2)** 56:21,22 |
| **2005 (1)** 15:23 | | **66 (1)** 3:13 |
| **2007 (1)** 15:12 | | **68 (2)** 56:18,20 |
| **2010 (5)** 21:8,17 22:3 114:22 161:6 | | **686-1776 (1)** 2:14 |

**29th (10)**
144:19,23 161:9
166:16,18 167:7,9
167:15 168:18
169:2

─────── **3** ───────

**3 (4)**
135:4 139:20 146:16
148:14
**3B (1)**
135:22

─────── **4** ───────

**405-8178 (1)**
1:24
**48 (6)**
50:13 52:7,8 105:16
108:20,22
**48:58 (1)**
79:15
**48s (1)**
109:1

─────── **5** ───────

**5 (8)**
3:5 123:1,3 124:4,5
124:10 130:18,19
**50 (2)**
180:2,4
**51 (3)**
77:13 78:19 128:18
**51st (15)**
60:14,19 61:20,24
62:8 66:23 67:6
68:24 70:14 80:18
127:24 128:5,11
137:21 138:22
**5th (3)**
113:4,7 173:1

─────── **6** ───────

**6 (3)**
126:8 157:24 158:24
**62 (1)**
118:20

First column:

76:17 137:16
138:17
**2005 (1)**
15:23
**2007 (1)**
15:12
**2010 (5)**
21:8,17 22:3 114:22
161:6
**2014 (13)**
144:20,23 161:9
162:5 165:8 166:16
167:7,9,15 168:18
169:2 170:14
171:19
**2015 (53)**
11:7 12:21 14:24
24:4,24 25:11,14
26:5,15,20 27:19
37:3,5 39:13 40:11
53:17,21 55:11,17
55:23 56:2,9,12
57:11 67:2 73:7
76:19 109:15 113:4
113:7 122:15
123:21 127:21
133:23 137:15
138:16 139:8
141:21 145:2,6
147:1,5,14 167:21
168:9,21 169:13,22
170:9,15 171:23
173:1 179:24
**2018 (2)**
1:12 182:13
**215 (4)**
1:24 2:5,9,14
**21st (1)**
2:3
**22nd (3)**
21:8 22:3 114:22
**25th (1)**
115:3
**2929 (2)**
1:15 2:4

Third column:

**6448 (2)**
56:21,22
**66 (1)**
3:13
**68 (2)**
56:18,20
**686-1776 (1)**
2:14

─────── **7** ───────

**7 (1)**
25:24
**711 (1)**
159:8
**75 (1)**
3:13
**75-48 (1)**
3:14
**7548 (19)**
50:3,4,15 52:5,12,18
105:17,18,24 106:4
106:7,10,15 107:18
107:20 108:14
109:3,21 110:16

─────── **8** ───────

**8 (1)**
55:16
**800 (1)**
1:22

─────── **9** ───────

**9/14/15 (2)**
79:15 99:19
**9/14/2015 (1)**
76:15
**9:54 (1)**
1:16
**90 (1)**
131:21
**911 (2)**
123:6 124:2
**963-3300 (1)**
2:5
**963-5608 (1)**
2:9